1

2

3

4

5

6  George A. Kimbrell (WSB No. 36050)

7  Amy van Saun (*pro hac vice* pending)
   Center for Food Safety

8  917 SW Oak Street, Suite 300
   Portland, OR 97205

9  T: (971) 271-7372 / F: (971) 271-7374
   Email: gkimbrell@centerforfoodsafety.org

10          avansaun@centerforfoodsafety.org

11  *Counsel for Plaintiffs*

12

13          **THE UNITED STATES DISTRICT COURT**
            **FOR THE WESTERN DISTRICT OF WASHINGTON**

14

15  CENTER FOR FOOD SAFETY, a non-profit      )   Case No.
    corporation,                              )

16                                            )
                                              )

17          *Plaintiffs,*                     )   **COMPLAINT**
                                              )

18              v.                            )
                                              )

19  U.S. ARMY CORPS OF ENGINEERS, an          )
    agency of the United States of America,   )

20  LIEUTENANT GENERAL TODD T.                )
    SEMONITE in his Official Capacity as Chief )

21  of Engineers of the U.S. Army Corps of    )
    Engineers; MAJOR GENERAL SCOTT A.         )

22  SPELLMON, in his Official Capacity as      )
    COMMANDER of the Northwestern Division    )

23  of the U.S. Army Corps of Engineers; and  )
    COLONEL MARK A. GERALDI, in his           )

24  Official Capacity as Commander of the     )
    Seattle District of the U.S. Army Corps of )

25  Engineers,                                )
                                              )

26

COMPLAINT
PAGE 1
CASE NO.

*Defendants.*                          )
                                       )

**INTRODUCTION**

1. Washington State is home to unique and invaluable coastal ecosystems that are threatened by the unchecked expansion of industrial shellfish aquaculture. This lawsuit challenges the United States Army Corps of Engineers (Corps) issuance of Nationwide Permit (NWP) 48 in Washington State without considering or fully disclosing the environmental impacts of its approval, an approval which greenlights a massive expansion of shellfish aquaculture with entirely inadequate protections. The Corps has a duty to protect public waters from cumulatively adverse impacts, but it has violated its environmental protection mission by issuing 2017 NWP 48 in Washington.

2. Pursuant to its authority under Clean Water Act (CWA) Section 404 and Rivers and Harbors Act of 1899 Section 10, the Corps has issued nationwide general permits to cover shellfish aquaculture since 2007. General permits under CWA § 404 must not have more than minimal adverse impacts, individually or cumulatively. The latest iteration of these five-year permits was renewed by Corps Headquarters on January 6, 2017, effective on March 19, 2017, and it covers more operations with less stringent conditions than previous versions. Although Corps regional divisions and districts are responsible for attaching regional conditions to ensure they will have no more than minimal adverse impacts in a particular region, or forgoing these nationwide permits altogether, the Northwest Division and Seattle District (responsible for Washington State) fully adopted the 2017 NWP 48 without adequate regional conditions to avoid the significant impact that shellfish aquaculture has on Washington's shorelines.

3. By adopting a NWP that will have more than minimal adverse impacts, and without disclosing to the public the full scope of impacts or adequately analyzing or explaining how those impacts will not be significant, the Corps has violated the Clean Water Act § 404 (CWA) and its implementing regulations; the National Environmental Policy Act (NEPA) and its implementing regulations; and the Administrative Procedure Act (APA).

COMPLAINT
PAGE 3
CASE NO.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

4.      Plaintiff Center for Food Safety (CFS), on behalf of its adversely affected members, challenges Defendants' adoption of 2017 NWP 48 for Washington State, effective March 19, 2017.  Despite comments from the public (including Plaintiffs), tribes, and other agencies (like the U.S. Environmental Protection Agency), Defendants summarily concluded that the approval of NWP 48 would have no more than minimal adverse cumulative impacts, despite the 2017 permit allowing for greatly increased conversion of tidelands into intensive shellfish operations without protections for crucial aquatic habitats.

5.      Commercial shellfish aquaculture is a large-scale industry in Washington State, and as such has significant impacts on the nearshore marine environments, which provide essential habitat for many species, including invertebrates (such as commercially important Dungeness crab), finfish (including herring and salmon), and birds (migratory and shorebirds). Shellfish aquaculture operations include bed preparation (removal of native species like snails, starfish, and sand dollars, sometimes spreading of gravel), seeding, grow out, and harvest. Harvest, especially by mechanical or hydraulic means, affects water quality and disturbs the benthic community on the tidal bed.  These activities are continuous and last for years.

6.      Two major impacts from shellfish activities are the suppression or removal of eelgrass and the physical barriers imposed to wildlife by aquaculture gear.  Eelgrass is an essential habitat for many species, providing food and shelter, and an important ecosystem engineer.  It can be suppressed and outright removed by shellfish aquaculture, due to physical barriers (shading), mechanical means, and herbicide use in Willapa Bay and Grays Harbor. Shellfish plastic gear can exclude native species from their habitat, especially the anti-predator netting used with clam culture.  Another significant impact from dense shellfish aquaculture is a reduction in shoreline biodiversity: the intensive culture of introduced species can fundamentally alter native ecosystems by consuming nutrients previously relied on by native species, depositing waste on the seabed, and changing the physical dynamics of an environment.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

7.      NWP 48 has already been overused in Washington, with far greater impacts than previously analyzed.  Yet the 2017 approval allows significantly *expanded* shellfish aquaculture acreage, increasing the already-large footprint (roughly a quarter of all Washington tidelands) while allowing nearly all shellfish aquaculture operations to forgo compliance with stricter protections for expansion to previously fallow or undisturbed acres.  It does this by using an arbitrarily-revised definition of "new" operations.  The revised definition of "new" makes all operations "existing" so long as any commercial shellfish aquaculture took place in the area in the last 100 years.  This would allow an operation in 2018 to be considered "existing" and thus avoid restrictions on "new" operations if, for example, oyster culture was conducted in 1919, with nothing in between.

8.      While the Corps Seattle District completed a supplemental environmental assessment (EA), within its "Decision Document," it failed to complete an environmental impact statement (EIS), despite the significant impacts that industrial commercial shellfish aquaculture operations have on the environment.  The failure to complete an EIS and reliance on an inadequate EA and Finding of No Significant Impact (FONSI) violates NEPA.

9.      The Corps Seattle District violated the CWA by adopting a NWP that will have more than minimal adverse cumulative impacts, and failed to articulate or document how it will avoid cumulative impacts based on unspecified and unsupported mitigation measures.

10.      Accordingly, Plaintiff respectfully requests the Court, *inter alia*: (1) declare the Corps' decision to adopt 2017 NWP 48 in Washington State is unlawful under the CWA, NEPA, and arbitrary and capricious, in violation of the APA; (2) set aside or vacate the Corps' March 17, 2017 decision to adopt 2017 NWP 48 in Washington (effective March 19, 2017); (3) declare that the Corps, prior to adopting any new NWP for commercial shellfish aquaculture, must comply with NEPA, including the preparation of an EIS, and the CWA, including the requirement that any general permit not cause more than minimal adverse individual or cumulative impacts to Washington's aquatic environment.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1

## JURISDICTION AND VENUE

2      11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

3  question), 28 U.S.C. § 1346 (United States as a defendant), 28 U.S.C. §§ 2201-02 (declaratory

4  and injunctive relief) and 5 U.S.C. §§ 701-706 (APA).  An actual controversy exists between the

5  parties within the meaning of 28 U.S.C. § 2201.

6      12.      Venue is properly vested in this judicial district under 28 U.S.C. § 1391(e)(1)(B)

7  because a substantial part of the events or omissions giving rise to the claims occurred within this

8  district.  The U.S. Army Corps' office that is responsible for substantial portions of the actions or

9  omissions giving rise to this case is also located in this judicial district, in Seattle, King County,

10  Washington.  In addition, a number of Plaintiff's members reside in this judicial district.

11

## PARTIES

12      13.      Plaintiff **Center for Food Safety (CFS)** is a public interest, nonprofit

13  organization whose mission is to empower people, support farmers, and protect the earth from

14  the adverse impacts of industrial food production.  CFS has more than 900,000 members across

15  the country, including tens of thousands in Washington State, and offices in Portland, Oregon,

16  San Francisco, California, and Washington, D.C.  CFS is a recognized national leader on the

17  issue of industrial agriculture and its impacts to public health and the environment, utilizing

18  regulatory actions, citizen engagement, legislation, and, when necessary, litigation, to protect

19  transparency and accountability in food production.  CFS also acts as a watchdog by ensuring

20  that federal agencies with regulatory authority over aspects of food production, such as the Corps

21  here, comply with their statutory mandates as well as other federal laws.

22      14.      CFS has long had a specific aquaculture program, dedicated to addressing the

23  adverse environmental and public health impacts of industrial aquaculture, including numerous

24  policy, scientific, and legal staff.  In its program, CFS strives to ensure and improve aquaculture

25  oversight, furthering policy and cultural dialogue with regulatory agencies, consumers, chefs,

26  landowners, and legislators on the critical need to protect public health and the environment from

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1  industrial aquaculture, including specifically shellfish aquaculture, and to promote and protect

2  more sustainable alternatives.

3     15.     Specifically with regard to the challenged action, CFS actively engaged with the

4  Corps on the proposed reissuance of NWP 48, including the submission of several comments

5  urging the Corps to forgo adopting NWP 48, at least in its current form, and to protect the unique

6  and essential aquatic ecosystems and shorelines in Washington.  CFS members live and work in

7  areas affected by commercial shellfish aquaculture, including Willapa Bay, and are harmed by

8  the unchecked expansion of industrial shellfish aquaculture, including the use of pesticides.

9     16.     Defendant **United Sates Army Corps of Engineers** is an agency of the U.S.

10  Department of Defense.  The Corps has a District Office in Seattle, Washington.  The Corps and

11  its officers are responsible for the lawful execution of the CWA, NEPA, and the APA, as they

12  pertain to dredge and fill activities of commercial shellfish aquaculture in public waters.

13     17.     Defendant **Lieutenant General Todd T. Semonite** is the Commanding General

14  and Chief of Engineers of the Corps.  Lieutenant General Todd T. Semonite is named as a

15  defendant solely in his official capacity.  The Commanding General and Chief of Engineers is

16  charged with the supervision and management of all Corps' decisions and actions, including the

17  evaluation of Corps' decisions and actions under NEPA and § 404 of the CWA.  The Chief of

18  Engineers is authorized to issue NWPs, and is charged with reviewing NWPs and proposing

19  modifications, revocations, and reissuance, as well as preparing NEPA documents and Section

20  404(b)(1) Guidelines compliance analyses for proposed NWPs.

21     18.     Defendant **Major General Scott A. Spellmon** is the Commander and Division

22  Engineer of the Northwestern Division of the Corps.  Major General Scott A. Spellmon is named

23  as a defendant solely in his official capacity.  The Northwestern Division includes the Seattle

24  District.  Division Engineers are responsible for imposing regional conditions on NWPs at their

25  discretion, and to prepare supplemental documentation for modifications or revocations made as

26

COMPLAINT
PAGE 7
CASE NO.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1  a result of their authority.  The Northwestern Division is responsible for a substantial portion of

2  the actions or omissions at issue in this lawsuit.

3        19.     Defendant **Colonel Mark A. Geraldi** is the Commander and District Engineer of

4  the Seattle, Washington District of the Corps. Colonel Mark A. Geraldi is named as a defendant

5  solely in his official capacity.  Under Corps regulations, a District Commander is responsible for

6  compliance with NEPA for actions within district boundaries, and CWA § 404 permitting.  The

7  Seattle District is responsible for a substantial portion of the actions or omissions at issue in this

8  lawsuit, including, but not limited to, the issuance of regional conditions for NWP 48 and

9  supplemental analysis and findings in support of those conditions.  The Seattle District Engineer

10  is authorized to add, modify, or delete special conditions in permits, and to modify, suspend and

11  revoke permits, such as regional permits or authorizations under a NWP. Colonel John G. Buck

12  was Commander and District Engineer during a substantial portion of the actions or omissions at

13  issue in this lawsuit. Colonel Geraldi replaced Colonel Buck prior to the filing of this lawsuit.

14  **STATUTORY AND REGULATORY BACKGROUND**

15  **I.     CLEAN WATER ACT.**

16        20.     The Corps has authority under the CWA § 404 to regulate dredge and fill

17  activities in the waters of the U.S., including shellfish aquaculture. 33 U.S.C. § 1344.

18        21.     The stated objective of the CWA is "to restore and maintain the chemical,

19  physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  Congressional

20  intent was that the discharge of pollutants into the Nation's waters be eliminated by 1985. *Id.*

21  Discharges of pollutants into the Nation's waters is unlawful unless conducted pursuant to a

22  permit, including a dredge and fill permit under 33 U.S.C. § 1344. *Id.* § 1311.

23        22.     In carrying out its functions relating to the discharge of dredged or fill materials,

24  the Army Corps:

25            may, after notice and opportunity for public hearing, issue general permits on a

26            State, regional, or nationwide basis for any category of activities involving

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, *will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment.*

33 U.S.C. § 1344(e)(1) (emphasis added).

23.     Thus, nationwide permits may only be granted if activities (1) are "similar in nature" and (2) will only cause minimal adverse effects to the environment, either separately or cumulatively. *Id.; see also* 33 C.F.R. Part 330.

24.     In issuing a general permit, either regional or nationwide, the Corps must consider and disclose the separate and cumulative impacts from the permit on the environment, and make a finding that the permit will not have more than minimal adverse impacts before granting any general permits under CWA § 1344(e)(1).

25.     The Corps is prohibited from issuing a nationwide permit that causes or contributes to significant degradation of the waters of the United States, and when it reviews a permit application it must follow the binding 404(b) Guidelines, codified at 40 C.F.R. Part 230. *Id.* § 1344(b).

26.     The Corps must set forth in writing an evaluation of the potential individual and cumulative impacts of the category of activities to be regulated under a nationwide permit, and provide documentation to support each factual determination, including cumulative impacts. 40 C.F.R. §§ 230.7(b); 230.11.

27.     Under the CWA, cumulative impacts are defined as:

the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material.  Although the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems.

40 C.F.R. § 230.11(g)(1).

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

28.     If the Corps relies on mitigation measures to meet the CWA standard of no more than minimal adverse cumulative impacts, it must adequately document those mitigation measures and support their efficacy. *Id.* §§ 230.7(b); 230.11.

## II.     NATIONAL ENVIRONMENTAL POLICY ACT.

29.     The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. 40 C.F.R. § 1500.1.  NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  NEPA "ensures that the agency . . . will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).

30.     If the federal action *may* significantly affect the environment, the agency *must* prepare an EIS. *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998).  Whether an action is significant requires consideration of the "context" and "intensity" factors, and an action may be "significant" if even one of the factors is present. 40 C.F.R. § 1508.27; *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).

31.     To determine if an action may significantly affect the environment, an agency may prepare an environmental assessment (EA). 40 C.F.R. § 1508.9.  If the agency determines that the action will not have a significant impact, the agency must supply a "convincing statement of reasons" to explain the action's impacts are insignificant. *Save the Yaak v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).  The EA must provide sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact. 40 C.F.R. § 1508.9(a)(1).

32.     NEPA regulations require the agency to analyze (take a hard look at) all direct, indirect, and cumulative impacts. *See* 40 C.F.R. §§ 1508.8, 1508.9, 1508.13, 1508.18, 1508.27.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   Cumulative impacts include the incremental impact of the proposed action when added to all

2   past, present, and reasonably foreseeable actions, taken not just by the agency, but by any entity.

3   *Id.* § 1508.7.

4          33.   NEPA also requires agencies to evaluate economic or social and natural or

5   physical environmental effects that are interrelated. 40 C.F.R. § 1508.14.

6          34.   Public participation is vital to NEPA. 40 C.F.R. §§ 1500.1(b), 1501.  When

7   preparing an EA, an agency must provide the public with sufficient environmental information to

8   allow the public to weigh in with their views and thus inform the agency decision-making

9   process.

10         35.   Environmental assessments must include a purpose and need statement. 40 C.F.R.

11   § 1508.9 (EA shall include "brief discussions of the need for the proposal").  The purpose cannot

12   be defined in unreasonably narrow terms.

13         36.   EAs must also include a "no action" alternative in addition to the preferred

14   alternative, as well as a range of appropriate alternatives. 40 C.F.R. § 1508.9(b) (citing Section

15   102(2)(E).  NEPA Section 102(2)(E) requires agencies to "study, develop, and describe

16   appropriate alternatives to recommended courses of action in any proposal which involves

17   unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

18   Section 102(2)(E) applies to both EAs and EISs, so an EA must include "appropriate

19   alternatives" when a proposal involves unresolved conflicts concerning alternatives uses of

20   available resources.

21         37.   A finding of no significant impact must be supported, and if mitigation measures

22   are relied upon to avoid significance, they must be developed to a reasonable degree: a

23   "perfunctory description, or mere listing of mitigation measures, without supporting analytical

24   data, is insufficient to support a finding of no significant impact." *Natl. Parks & Conservation*

25   *Ass'n v. Babbitt*, 241 F.3d 722, 733–34 (9th Cir. 2001) (internal citations omitted).  Particularly

26   in situations where the agency is relying upon mitigation to support a decision to rely upon an

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   EA and a FONSI—and therefore not to prepare an EIS—the agency must carefully evaluate any

2   proposed mitigation, and engage in on-going monitoring in order to ensure that mitigation

3   measures are being followed.  Mitigation measures used to support a FONSI must be enforceable

4   and the agency must have sufficient resources to perform or ensure performance of mitigation

5   measures.

6   38.   NEPA requires that an agency incorporate its environmental analysis into its

7   decision making process.  "NEPA's purpose is not to generate paperwork—even excellent

8   paperwork—but to foster excellent action." 40 C.F.R. § 1500.1(c); *see also id*. ("Ultimately … it

9   is not better documents but better decisions that count."); 40 C.F.R.§ 1502.1 (explaining that the

10  "primary purpose" of an EIS is to "serve as an action-forcing device to insure that the policies

11  and goals defined in the Act are infused into the ongoing programs and actions of the Federal

12  Government….  An environmental impact statement is more than a disclosure document.  It shall

13  be used by Federal officials in conjunction with other relevant material to plan actions and make

14  decisions.").

15  **III.   THE ENDANGERED SPECIES ACT.**

16  39.   When a species is listed as threatened or endangered under the ESA,

17  Section 7(a)(2) of the Act requires that all federal agencies "insure" that their actions "are not

18  likely to jeopardize the continued existence of any endangered species or threatened species or

19  result in the destruction or adverse modification of" their critical habitat. 16 U.S.C. § 1536(a)(2).

20  40.   The Act establishes an interagency consultation process to assist federal agencies

21  in complying with their substantive Section 7(a)(2) duty to guard against jeopardy to listed

22  species or destruction or adverse modification of critical habitat.  Under ESA Section 7(a)(2),

23  federal agencies must consult with the appropriate expert fish and wildlife agency to determine

24  whether their actions will jeopardize any listed species' survival or adversely modify designated

25  critical habitat and, if so, to identify ways to modify the action to avoid that result. *See* 50 C.F.R.

26  § 402.14.  The National Marine Fisheries Service (NMFS) is the expert fish and wildlife agency

1   with respect to most anadromous and marine species, and Fish and Wildlife Service (FWS) is the

2   expert agency with respect to many terrestrial and freshwater species.

3       41.     The Services have adopted joint regulations governing the ESA Section 7(a)(2)

4   consultation process.  Under the joint regulations, a federal agency must initiate Section 7(a)(2)

5   consultation with NMFS or FWS whenever it undertakes an "action" that "may affect" a listed

6   species or critical habitat. 50 C.F.R. § 402.14(a).  The threshold for a "may affect" determination

7   and the required ESA section 7(a)(2) consultation is low. *See* 51 Fed. Reg. 19,926, 19,949 (June

8   3, 1986) ("Any possible effect, whether beneficial, benign, adverse, or of an undetermined

9   character, triggers the formal consultation requirement."); *see also* FWS, *Endangered Species*

10  *Consultation Handbook* at 3-13, 4-26 (1998).

11      42.     To complete formal consultation, NMFS and/or FWS must provide the Corps

12  with a "biological opinion" explaining how the proposed action will affect the listed species or

13  habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.  In insuring that any action is not likely to

14  jeopardize a listed species or result in the adverse modification of critical habitat, the ESA

15  requires every agency to use only the best scientific and commercial data available at every step

16  of the process. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).  Until consultation is complete,

17  agencies may not commence the action or make any irreversible or irretrievable commitment of

18  resources which may foreclose the formulation or implementation of any reasonable and prudent

19  alternative measures. 16 U.S.C. § 1536(d).

20      43.     If either of the Services concludes that the proposed action "will jeopardize the

21  continued existence" of a listed species, the biological opinion must outline "reasonable and

22  prudent alternatives." 16 U.S.C. § 1536(b)(3)(A).  If the biological opinion concludes that the

23  action is not likely to jeopardize the continued existence of a listed species, and will not result in

24  the destruction or adverse modification of critical habitat, the Services must provide an

25  "incidental take statement" (ITS) specifying the amount or extent of such incidental taking on the

26  listed species and any "reasonable and prudent measures" that they consider necessary or

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   appropriate to minimize such impact, and also setting forth the "terms and conditions" that must

2   be complied with by the Corps to implement those measures. *Id.* at § 1536(b)(4); 50 C.F.R. §

3   402.14(i).

4          44.    Formal consultation must be reinitiated by the Corps or the Services if

5   discretionary federal involvement or control over the action has been retained or is authorized by

6   law, and:

7           a.   the amount or extent of taking specified in the incidental take statement is
             exceeded;

8

9           b.   new information reveals effects of the action that may affect listed species or
             critical habitat in a manner or to an extent not previously considered;

10          c.   the action is modified in a manner that causes an effect to the listed species or
             critical habitat that was not considered in the biological opinion; or

11

12          d.   a new species is listed or critical habitat designated that may be affected by
             the identified action.

13

14  50 C.F.R. § 402.16.

15  **IV.    THE ADMINISTRATIVE PROCEDURE ACT.**

16         45.    The APA grants a right of judicial review to "[a] person suffering legal wrong

17  because of agency action, or adversely affected or aggrieved by agency action…."  5 U.S.C.

18  § 702.  "[F]inal agency action for which there is no other adequate remedy in a court [is] subject

19  to judicial review." *Id.* § 704.

20         46.    Under the APA, a court must "hold unlawful and set aside agency action … found

21  to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law…."

22  *Id.* § 706(2)(A).

23  ///

24  ///

25  ///

26  ///

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**FACTUAL BACKGROUND**

**I.      INDUSTRIAL SHELLFISH AQUACULTURE IN WASHINGTON.**

47.      Shellfish, including oysters, clams (including geoducks), and mussels, have been harvested and grown in Washington for over 150 years, but cultivation has greatly expanded in recent years.  Today, modern industrial shellfish aquaculture exists in Willapa Bay, Grays Harbor, Hood Canal, and Puget Sound, covering between 38,700 and 50,000 acres of tidelands (or about a quarter of all tidelands) in Washington.



**Figure 1: Washington tidelands, coastal bays, and inland marine waters. Corps PBA (2015)**

48.      The bulk of this acreage (26,000-36,000 acres) is found in Willapa Bay, a large shallow bay in Pacific County, Washington.  It is Washington's largest outer coast estuary,

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    covering 88,000 acres at high tide, and 45,000 acres of tidelands.  Additional acreage (around

2    3,800 acres) is found in nearby Grays Harbor, a shallow, bar-built estuary north of Willapa Bay.

3          49.    Puget Sound and Hood Canal account for the rest, and is slated for much of the

4    expansion of this industry in the future.  The south Puget Sound area is a basin drained by many

5    small streams, and these sheltered, nutrient rich waterways are highly conducive to shellfish

6    aquaculture.  North Puget Sound includes Whidbey Basin, Admiralty Inlet, Strait of Juan de

7    Fuca, and the San Juan Archipelago.  Hood Canal is a diverse network of mudflats, dendritic

8    tidal channels, lagoons, salt marches, eelgrass beds, and sandy beaches.  Together these areas are

9    already host to between 8,000 and 9,400 acres of shellfish aquaculture.

10         50.    While oysters and clams are primarily grown in the southwestern water bodies

11   (Willapa Bay/Grays Harbor), geoducks (raised almost exclusively for export to the Asian luxury

12   foods market) are also grown mostly in Puget Sound/Hood Canal, along with oysters and other

13   bivalves.

14         51.    Shellfish are raised either directly on the tidal bed ("bottom culture"), or with

15   some kind of support ("off-bottom culture"), often using plastic gear like polyvinyl chloride

16   (PVC) and high-density polyethylene (HDPE).  Oysters may be grown using: bottom culture;

17   long lines (oysters suspended on nylon ropes strung on stakes in rows in tidal bed); rack and bag

18   culture (plastic net bags hold oysters, rack suspends off ground, including emerging "flip bag"

19   technique); or stake culture (oyster attached to stakes in tidal bed).  Clams are also grown with

20   bottom culture, often with anti-predator netting, and geoducks are grown inside PCV tubes

21   inserted into the tidal bed (at a rate of 42,000 tubes per acre), which are then covered with the

22   anti-predator netting.

23   ///

24   ///

25   ///

26   ///

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**Figure 2: Oyster long lines, Willapa Bay**



**Figure 4: Oyster bags & geoduck tubes, Totten Inlet, 2009**



**Figure 3: Geoduck tubes, Totten Inlet 2008**



**Figure 5: New geoduck installation, Eld Inlet 2013**

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    52.    The same intertidal areas and inland bays that support shellfish aquaculture are

2    also home to numerous wildlife species, including threatened and endangered species.  This

3    shoreline habitat is essential for many species, including: invertebrates (such as benthic

4    invertebrates that are the backbone of the food chain and larger, commercially important

5    Dungeness crab); finfish (including forage fish like herring and many varieties of salmon); and

6    birds (migratory and shorebirds).  These areas serve as nurseries, feeding grounds, and have

7    important roles in cycling nutrients.

8    53.    Shellfish aquaculture impacts this environment through physical barriers; impacts

9    to water quality through the deposition of wastes, disruption of sediments, and intentional

10   addition of chemical pesticides; and the removal of important and native species and a reduction

11   in biodiversity.  Because the Corps now estimates that shellfish aquaculture already covers a

12   *quarter* of all tidal acreage in Washington, the potential for cumulative impacts from this

13   industry is significant.

14   54.    Shellfish aquaculture activities fall into the general categories of bed preparation,

15   seeding, grow out, and harvest.  Bed preparation and harvest activities can temporarily increase

16   turbidity and total suspended solids.  Bed preparation also involves the removal and destruction

17   of species like snails, starfish, and sand dollars.  Some activities, *e.g.* tilling, harrowing, dredge

18   harvest and geoduck harvest, can remove submerged aquatic grass, like eelgrass.  The use of

19   chemicals (*i.e.* imazamox herbicide to kill non-native eelgrass) also affects water quality and

20   removes eelgrass.  During grow out, plastic gear remains on the beach continuously.  Finally,

21   shellfish aquaculture activities can cause benthic disturbance.

22   55.    Despite the unfounded claims of the industry, there is no evidence that intensively

23   concentrated shellfish aquaculture in Washington has a positive impact on water quality.  In fact,

24   these concentrated shellfish operations are consuming nutrients previously relied on by wild

25   species, while depositing waste on the seabed, and changing the physical dynamics of an

26   environment.

COMPLAINT
PAGE 18
CASE NO.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

56.     Geoduck aquaculture involves the use of a massive number of PVC tubes inserted into the substrate, then covered in anti-predator netting.  At a rate of 42,000 tubes per acre, the shore is *covered* with plastic.  This gear can and does become dislodged during storms and other weather events, spreading plastics pollution into other areas of the marine environment.  Once the geoducks are ready for harvest, they are removed from the substrate via high-pressure water hoses, which liquefy the sediments, disrupting and harming benthic organisms and spreading suspended sediment in the water column.

57.     Clam culture, including geoduck, involves acres and acres of anti-predator netting, typically plastic, to exclude predators (i.e. wildlife) like crabs and birds.  Although evidence suggests that ironically these nets are not highly effective at deterring predators, they do, however, change the intertidal coastline resulting in lower species richness, accumulation of fine silt and organic matter, and trapping wildlife (crabs, fish, birds).  Nets pose a particular threat to forage fish like herring that use the intertidal regions for spawning.  The accumulation of silt and reduction of eelgrass provides perfect habitat for, and correlates with an increase in, native burrowing and ghost shrimp, which at high enough numbers cause the substrate to loosen and clams to sink and suffocate.  Anti-predator nets can also become dislodged and wash up on the shore providing hazards to humans and wildlife alike.  The expert wildlife agencies NMFS and FWS both recognized the harm these nets pose to wildlife from trapping, entanglement, and blocking movement/migration.

58.     Commercial shellfish aquaculture operations also impact forage fish, like Pacific herring (a keystone forage fish species in the area), surf smelt, and sand lance.  Forage fish are an important prey resource for many species including Chinook salmon, steelhead, bull trout, and marbled murrelet.  Many types of shellfish aquaculture equipment result in loss of spawning habitat for these crucial fish, netting can entangle fish, and harvesting can destroy forage fish eggs.  Active aquaculture, including fallow acreage, is co-located with herring, surf smelt, and sand lance in Puget Sound and Hood Canal, and with herring in Willapa Bay/Grays Harbor.  The

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   Corps estimates that in Willapa Bay, shellfish aquaculture currently overlaps with over 50% of

2   the total herring spawning area mapped by the Washington Department of Fish and Wildlife. *See*

3   Corps, Programmatic Biological Assessment, 97 (2015) (Corps PBA).



**Figure 6: Anti-predator nets in South Puget Sound, 2016.  (Coalition to Protect Puget Sound Habitat)**

15       59.     Shellfish aquaculture also has negative aesthetic impacts, as well as impacts to

16   public beach access and recreation.  Shellfish operations, particularly those using a lot of plastic

17   gear, mar views of the beaches, inlets, and bays along Washington shorelines, to the detriment of

18   residents and visitors.  These operations often involve heavy machinery, and some activities

19   involve significant noise and light pollution.  Shellfish aquaculture's presence and gear prevents

20   residents and visitors from walking and other recreational activities on beaches. The harm to

21   wildlife, including endangered species, impacts residents' and visitors' ability to view these

22   species, and recreationally fish or harvest wild shellfish.

23       A.      **Impacts to Highly Valuable Eelgrass.**

24       60.     One major impact from shellfish aquaculture is the reduction and removal of

25   eelgrass and other submerged aquatic vegetation.

26

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

61.     Much of the intertidal area in Washington still supports eelgrass (*zostera marina* and other varieties) and other submerged aquatic vegetation, although it is declining there and in the rest of the world.  Eelgrass is a highly valued and protected native habitat for many species of fish, invertebrates, and birds.  Eelgrass is known as an "ecosystem engineer" because it can partially create its own habitat by slowing down water flow, while its roots and rhizomes bind and stabilize sediments.  Eelgrass is a direct food source for many organisms, and also serves as nurseries and juvenile habitat for various fauna, including herring, Dungeness crab, and several species of juvenile salmon.  Further, eelgrass provides organic material, aids in sediment/substrate nutrient cycling and release, and improves water quality through production of oxygen and adsorption of nutrients.  Because eelgrass absorbs carbon dioxide and produces oxygen, it provides mitigation against ocean acidification (a decrease in ocean pH caused by increasing atmospheric $CO2$ levels).

62.     The vegetated shallows that support eelgrass are considered "special aquatic sites" under the CWA 404(b) Guidelines. 40 C.F.R. § 230.43.

63.     The Puget Sound Partnership, the Washington state agency leading the region's collective effort to restore and protect Puget Sound, has identified eelgrass as a prime indicator of estuarine ecosystem health and has established a goal of increasing eelgrass area in Puget Sound by 20% by the year 2020.

64.     Japanese eelgrass (*zostera japonica*) was introduced to the Pacific Northwest nearly a century ago and now grows along the entire Pacific coast from Humboldt, California to British Columbia.  Like the native *z. marina,* Japanese eelgrass provides many of the same food, shelter, and habitat functions in Washington and was long protected and highly valued.  Its regulatory status only changed after shellfish growers lobbied the State Noxious Weed Control Board to list Japanese eelgrass as a Class C noxious weed to commercial shellfish beds.

65.     Shellfish aquaculture significantly overlaps with eelgrass.  The Corps estimates that 66% of the active aquaculture acreage overlaps with eelgrass, not including the authorized

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1  acreage currently fallow, which is even more likely to support eelgrass.  Aquaculture exists in

2  about 50% of the eelgrass in Willapa Bay, as shown by Figure 8 below. Corps PBA at 94-95.

3



**Figure 7: Eelgrass and shellfish aquaculture in
Willapa Bay, Corps PBA (2015).**

18     66.     Studies find negative correlations between shellfish aquaculture and eelgrass

19  density and extent. (Dumbauld and McCoy 2015; Wilson and Atkinson 1995).  This is no

20  surprise given that industrial shellfish aquaculture often involves the intentional removal of

21  eelgrass, either through mechanical or chemical means.  Many shellfish operations use heavy

22  machinery like tractors on the tidal bed, outfitted with city street sweepers (to remove aquatic

23  vegetation), plows, and pesticide injectors.  In addition to intentional/actual removal of

24  submerged aquatic vegetation, nets and other equipment used in commercial shellfish

25  aquaculture can reduce or eliminate eelgrass and other vegetation due to shading.

26

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

67.     The Corps has recognized that these impacts are *continuous* for the permit period authorizing aquaculture activities, because there is often no return to the prior substrate and habitat conditions; new equipment is placed shortly after harvest of the prior crop, and equipment use occurs in all regions of Washington. Corps, PBA (2015).  Thus, while eelgrass may recover or re-colonize areas after shellfish aquaculture has ceased (recovery estimated to take about five years in Washington), the continuous nature of production makes this impossible.



**Figure 8: Tractor with street sweeper, Willapa Bay**

**B.     Pesticide Use in Shellfish Aquaculture.**

68.     Another harmful consequence of industrial shellfish operations in Washington is the introduction pesticides into the marine environment.  Pesticides are biocides meant to kill living things, and as such have an enormous potential to harm non-target organisms, especially when used in aquatic areas where it is assured they will move and disperse into the environment.

69.     Washington is the only state which allows pesticide use on shellfish beds. Currently, one herbicide is allowed in Willapa Bay/Grays Harbor and another application for insecticide use is pending.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1          70.      Once the shellfish industry succeeded in having Japanese eelgrass designated a

2    noxious weed, they were able to secure a permit to remove it through chemical means.  In 2014

3    the Washington Department of Ecology, the agency responsible for administering water

4    pollution discharge permitting under CWA § 402, granted commercial clam growers a permit to

5    spray the herbicide imazamox on clam beds in Willapa Bay and Grays Harbor. *Zostera Japonica*

6    Mgmt. on Commercial Clam Beds in Willapa Bay General Permit, National Pollutant Discharge

7    Elimination System (Issued Apr. 2, 2014, Exp. May 2, 2019) ("Imazamox NPDES Permit").

8          71.      The Imazamox NPDES Permit was opposed by numerous groups and agencies,

9    including the United States Fish and Wildlife Service (FWS), based on potential impacts to

10   native eelgrass both in mixed beds and off-site and the ecological benefits of Japanese eelgrass.

11   Imazamox is an ALS-inhibiting systemic herbicide that kills all types of eelgrass. While

12   Japanese eelgrass grows at slightly higher elevations than *z. marina* eelgrass, Willapa Bay is very

13   shallow and many mixed beds of both eelgrasses exist.  The Permit did not prohibit the spraying

14   native eelgrass on clam beds, nor did the permit include requirements to monitor impacts to

15   native and off-site eelgrasses.  No monitoring is required if spraying does not occur up to a 10

16   meter property line buffer. Imazamox NPDES Permit at 12.  In the three years between 2014 and

17   2017, only one grower has ever been required to monitor impacts in the 10m buffer (on 2.5% of

18   the total acreage sprayed).  The Washington Department of Ecology modified the permit in 2017

19   to allow continued spraying for the remaining two years of the permit, despite a failure to

20   adequately verify that 10m buffers are sufficient to prevent off-site impacts to eelgrass (either

21   through the Buffer Validation study or monitoring by permittees).

22   ///

23   ///

24   ///

25   ///

26   ///

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372



**Figure 9: Tractor with pesticide injector in Willapa Bay**

72.     In addition to the ongoing use of herbicide to kill eelgrass in Willapa Bay/Grays Harbor, oyster growers are currently seeking a NPDES permit from the Washington Department of Ecology for imidacloprid, a systemic neurotoxin, to kill burrowing and ghost shrimp.  As a neonicotinoid, imidacloprid is especially toxic to invertebrates, highly effective in small doses, persistent in the environment, and moves easily in water.  Imidacloprid was selected as a replacement to the phased-out carbaryl, a likely carcinogen harmful to ESA-listed species like green sturgeon and salmon.

73.     In 2015, the Department of Ecology initially granted a NPDES permit that would have allowed aerial spraying of thousands of acres of shellfish beds.  Numerous conservation groups, residents, and other agencies objected to the permit.  NMFS objected that burrowing shrimp are native to the area and play an important role in the ecosystem, including as prey for species like Dungeness crab, green sturgeon, and salmon.  NMFS Letter to Derek Rockett, WA Dept. of Ecology (Dec. 8, 2014).  In addition to reducing prey, NMFS stated that imidacloprid would "kill nearly all benthic organisms on the acreage directly treated."  Indeed, imidacloprid product labels expressly prohibit use in water because of its high toxicity to aquatic

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    invertebrates.  The permit was cancelled after major shellfish companies like Taylor Shellfish

2    pulled out, due to customer pressure, including from major restaurant chefs in Seattle citing food

3    safety concerns with serving shellfish directly sprayed with neurotoxin and refusing to serve it.

4    However, Willapa Bay/Grays Harbor growers have subsequently renewed their pesticide

5    application, and Dept. of Ecology is currently considering a new permit for imidacloprid use on

6    shellfish beds.

7                **C.    Plastic Use in Shellfish Aquaculture.**

8            74.    Another consequence of industrial shellfish aquaculture is the introduction of

9    plastic pollution to the intertidal waters and beaches, with grave impacts to wildlife, aesthetics,

10   and food safety.

11           75.    The Corps estimates that 23,409 acres of shellfish production currently use plastic

12   gear, or roughly half of all acres the Corps says it authorized under the previous iteration of

13   NWP 48.

14           76.    As noted above, plastic PVC tubes and anti-predator netting (HDPE) are heavily

15   used in clam and geoduck culture, and other types of plastics like racks and bags and PVC stakes

16   and polyolefin ropes are used for oyster culture.  Shellfish plastic gear can exclude native species

17   from their habitat, especially the anti-predator netting used with clam culture.  Anti-predator

18   netting traps wildlife, excludes wildlife from its habitat, and may become dislodged and

19   transported.  This netting actually provides little benefit to the industry despite its cost in terms

20   of nearshore impacts and plastics pollution.

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1



2

3

4

5

6



7
**Figure 11: Crab caught in net, Case Inlet 2006**

**Figure 10: Juvenile bald eagle caught in net, Harstine Is. 2006**

8   77.    This plastic gear also breaks down or fragments into microplastics, which act as

9  an additional source of plastic contamination in the ocean.  Microplastics adsorb toxic pollutants

10  already present in the water, and are being ingested by the very bivalves being cultivated (and

11  then ingested by consumers).  Other species also ingest these microplastics, including fish and

12  birds.  In addition to microplastics showing up in mussels and oysters, oysters have grown

13  around the polyolefin ropes used in oyster long lines, resulting in strands of this plastic within

14  the oyster.

15   78.    These microplastics act like a poison pill to aquatic life that consume them, and

16  have been shown to reduce oyster's reproductive ability.  Hence, not only is the shellfish

17  industry contributing to the global issue of marine plastic pollution, but also contaminating the

18  very product they are producing.

19

20



21

22

23

24

25

26
**Figure 13: Geoduck PVC tube (C. Moore)**


**Figure 12: Oyster shell grown around polyolefin rope (C. Moore)**

COMPLAINT
PAGE 27
CASE NO.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    **II.    CORPS COMMERCIAL SHELLFISH AQUACULTURE PERMITTING.**

2        **A.    Corps Permitting Prior to 2017 NWP 48.**

3        79.    In 2007, the Corps issued the first nationwide permit for commercial shellfish

4 aquaculture, which included only existing operations as of 2007 (and operation "that has been

5 granted a permit, license, or lease from a state or local agency specifically authorizing

6 commercial aquaculture activities and which has undertaken such activities"). 72 Fed. Reg.

7 11,092, 11,145 (Mar. 17, 2007). Like the later iterations, it authorized the installation of buoys,

8 floats, racks, trays, nets, lines, tubes, containers, and other structures necessary for commercial

9 aquaculture activity, and discharges of dredged or fill material necessary for shellfish seeding,

10 rearing, cultivating, transplanting, and harvesting activities. The Seattle District adopted this

11 NWP and consulted with NMFS regarding impacts to listed species, including as part of the

12 action several conservation measures to be attached to authorizations under nationwide permit.

13 NMFS, *ESA – Section 7 Programmatic Consultation Biological and Conference Opinion* (April

14 28, 2009).

15        80.    In 2012, the Corps reissued NWP 48, this time extended the permit to cover new

16 shellfish aquaculture operations, although any new activity could not directly affect more than

17 1/2-acre of submerged aquatic vegetation beds (eelgrass). 77 Fed. Reg. 10.184, 10,228-10,232

18 (Feb. 21, 2012). An activity was considered "existing" if it was within "the area in which the

19 operator is currently authorized to conduct commercial shellfish aquaculture activities, as

20 identified through a lease or permit issued by an appropriate state or local government agency, a

21 treaty, or any other easement, lease, deed, or contract which establishes an enforceable property

22 interest for the operator." Corps, *Decision Document NWP 48* (2012).

23        81.    The Seattle District adopted the renewed 2012 NWP 48 for Washington, with ten

24 general conditions and one regional condition specifically for NWP 48: "The commercial harvest

25 of clams by means of hydraulic escalator harvester equipment is not authorized by this NWP."

26 Seattle District, *Supplement to National Decision Document for 2012 Nationwide Permit 48 and*

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

*Regional General Conditions*, 42-45 (March 19, 2012). In its Supplemental Decision Document (including its supplemental environmental assessment under NEPA), the Seattle District stated that it already completed a programmatic ESA consultation for existing commercial shellfish aquaculture in 2009, and attached the set of 16 special conditions to be added to all activities authorized under the 2012 NWP 48.

82.     Although the Seattle District predicted that 2012 NWP 48 would only be used 50 times a year, or 250 times over its five-year life, *id.* at 31, it was actually used *over 1,000 times*, from 2012 to 2016. The Seattle District issued 92% of all NWP 48 authorizations in the nation, so the industrialized shellfish aquaculture production challenged here is particularly centralized and unique to Washington State.

83.     Despite the significant overuse of the 2012 permit, far beyond what was considered and analyzed during its adoption, the Corps never completed any supplemental impacts analysis to determine whether the massive expansion of operations under the 2012 permit had adverse cumulative impacts that are more than minimal (CWA) or significant impacts the environment (NEPA). Instead, the overuse of this permit has allowed significant expansion of commercial shellfish aquaculture, onto thousands of never-before cultivated acres, or acres that had been fallow since (at least) before 2007, with no analysis of their environmental impacts.

**B.      Programmatic Consultation with Services on Shellfish Permitting.**

84.     In 2014, the Seattle District initiated a programmatic ESA Section 7 consultation with NMFS and FWS on all shellfish permitting (commercial, recreational, and restoration) for the next 20 years, with commercial shellfish aquaculture being the bulk. Although the Corps began issuing verifications under the 2012 permit, assuming it was covered by its previous 2009 ESA consultation, NMFS informed the Seattle District that the 2009 biological opinion in fact *did not* cover 2012 permit activities, because the new permit covered broader activities than the 2007 version (including new operations). Rather than having to consult on a new NWP 48 every

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    five years, the Seattle District decided to take a broader programmatic approach to shellfish

2    permitting.

3         85.    The Seattle District completed programmatic biological assessments in 2014 and

4    2015, and the biological opinions were finalized in fall 2016, finding no jeopardy but likely

5    adverse impacts to several listed fish species.  Importantly, these programmatic consultations did

6    *not* include certain activities with significant or unpredictable effects, including the use of

7    pesticides.  The consultation covered shellfish activities that: 1) fall within the scope of activities

8    described in the programmatic biological assessment (various commercial shellfish activities on

9    38,700 acres); 2) incorporate the 28 conservation measures outlined in the assessment; and 3)

10   occur within the geographic area considered by that assessment.  That ESA consultation

11   considered both "continuing" shellfish activities (a defined footprint of authorized aquaculture as

12   of March 18, 2007) and new cultivation since 2007, including the fallow areas that were not in

13   cultivation since at least 2007.  The Corps estimated that the total acreage of commercial

14   aquaculture during the 20 year period covered by the programmatic consultation is 38,400 acres,

15   of which nearly 40% is "continuing fallow" meaning that the acreage was already leased or

16   authorized for commercial shellfish production but was not being actively used since at least

17   2007. Corps PBA at 6-7, 42, 49.

18        86.    In its Biological Opinion, NMFS concluded that the industrial shellfish

19   aquaculture operations in Washington State were likely to "adversely affect" four ESA-protected

20   species over which it has purview: threatened canary rockfish (Puget Sound), threatened Hood

21   Canal summer-run chum salmon, threatened Puget Sound Chinook salmon, and the threatened

22   Southern DPS green sturgeon (Willapa Bay). NMFS, *Endangered Species Act Section 7 Formal*

23   *Biological Programmatic Opinion and Magnuson-Stevens Fishery Conservation and*

24   *Management Act Essential Fish Habitat Consultation for Shellfish Aquaculture Activities in*

25   *Washington State*, 63-93 (September 2, 2016) (NMFS BIOP).  NMFS included an Incidental

26   Take Statement for: (1) take of canary rockfish and green sturgeon from mechanical oyster

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1  harvest and harrowing; (2) take of all four fish from entanglement in shellfish anti-predator nets;

2  (3) take of Puget Sound Chinook from suppression of eelgrass in Puget Sound and Hood Canal;

3  and (4) take of HCSR chum salmon from nearshore disturbance during juvenile migration. *Id.* at

4  94-96.  The non-discretionary ITS terms and conditions include: 1) a prohibition on mechanical

5  dredge harvest and harrowing in North Puget Sound from April 1 to August 31 to avoid canary

6  rockfish; 2) a limit on mechanical dredge harvest and harrowing to 18,367 acres/year in Willapa

7  Bay and 2,763 in Grays Harbor to minimize take of green sturgeon; 3) a requirement to secure all

8  anti-predator nets and report any entanglements to minimize take of all species; 4) only oyster

9  long lines spaced 10 feet apart are allowed in fallow areas colonized by eelgrass, with any

10  mechanical work prohibited, in Puget Sound and Hood Canal, to minimize take of Puget Sound

11  Chinook; 5) no planting or harvesting of shellfish within 15 feet waterward of tideline in HCSR

12  chum critical habitat from Feb. 1 to April 30, including any shellfish activities that increase

13  turbidity in the nearshore water (i.e. geoduck harvest); 6) annual implementation reporting

14  requirements for Corps. NMFS, *Revised ITS and Biological Opinion Errata* (Sept. 30, 2016).

15      87.  FWS issued its own Biological Opinion, finding adverse impacts, but no jeopardy

16  to bull trout or marbled murrelet. FWS, *Biological Opinion: Programmatic Consultation for*

17  *Shellfish Activities in Washington State Inland Marine Waters* (Aug. 26, 2016).  FWS included

18  an ITS for six bull trout in North Puget Sound and a total of eight in the rest of the sub-areas,

19  including the term/condition that permit language require growers to inspect for salmonids

20  tangled in cover nets or stranded by shellfish culturing equipment. *Id*. at 205-07.

21      88.  Both FWS and NMFS Biological Opinions are premised on and anticipated the

22  use of the 28 conservation measures to reduce the effects of shellfish aquaculture on listed

23  species. NMFS BIOP at 4, 11, 15, 28-9, 73-4, 81, 112; FWS BIOP at 5, 6-7, 33, 119-20, 141-42,

24  156, 176, 186, 188, 192, 199, 202, 206.

25

26

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    **C.    The 2017 Permit Approval.**

2        89.    On June 1, 2016, the Corps announced its proposal to renew numerous nationwide

3    general permits, including NWP 48 for aquaculture. Notice of Proposed Rule, 81 Fed. Reg.

4    35,186 (June 1, 2016).  Like previous versions of the permit, NWP 48 authorizes "the installation

5    of buoys, floats, racks, trays, nets, lines, tubes, containers, and other structures into navigable

6    waters of the United States….NWP [48] also authorizes discharges of dredged or fill material

7    into waters of the United States necessary for shellfish seeding, rearing, cultivating,

8    transplanting, and harvesting activities." Issuance and Reissuance of Nationwide Permits, 82

9    Fed. Reg. 1,860, 1,995 (Jan. 1, 2017).

10        90.    The 2017 permit included several significant changes, the biggest of which is a

11    revised definition of "new" commercial aquaculture, to "an operation in a project area where

12    commercial shellfish aquaculture activities have not been conducted during the *last 100 years*."

13    82 Fed. Reg. at 1,995 (emphasis added).  This definition of "new" was not in the 2012 permit.

14    Instead, a new project area was one not "currently authorized," and new operations were

15    prohibited from directly affecting more than 1/2-acre of submerged aquatic vegetation beds.

16        91.    The 2017 revised definition of "new" means that any operation is considered

17    "existing" rather than "new" so long as some manner of commercial shellfish activity was

18    conducted there *in the last 100 years*.  This is a significant departure from the previous

19    definitions of existing operations: the 2007 permit included as "existing" only operations were

20    actually authorized and operating at the time the permit was adopted, in 2007, and the 2012

21    permit defined "existing" as the "area in which the operator is currently authorized to conduct

22    commercial shellfish aquaculture activities, as identified through a lease or permit issued by an

23    appropriate state or local government agency, a treaty, or any other easement, lease, deed, or

24    contract which establishes an enforceable property interest for the operator."

25        92.    Being considered an "existing" operation, rather than "new," allows a commercial

26    shellfish operation to avoid specific protections, including the prohibition on affecting more than

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   1/2 acre of submerged aquatic vegetation (i.e. eelgrass), and to avoid having to submit a Pre-

2   Construction Notice (PCN) to the Corps (including various information about the proposed

3   operation). 82 Fed. Reg. at 1,995-1,996.  The Corps also removed the Pre-Construction Notice

4   requirement for dredge harvesting, tilling, or harrowing in eelgrass, and for changing from

5   bottom culture to floating/suspended culture. 81 Fed. Reg. at 35,202; 82 Fed. Reg. at 1,995.

6       93.    In its environmental assessment, the Corps predicted that approximately 1,625

7   activities could be authorized over a five-year period under the 2017 permit, resulting in impacts

8   to approximately 56,250 acres of waters of the United States, including jurisdictional wetlands.

9   Corps, *Decision Document NWP 48*, 65 (Dec. 21, 2016) (National EA).

10      94.    Plaintiff and others commented to the Corps that the permit approval would cause

11  cumulatively adverse impacts, especially with the new 100-year loophole definition for "new"

12  operations.  Plaintiff urged the Corps not to re-issue NWP 48 as written, to allow regional and

13  district engineers to utilize regional general or individual permits, or if the Corps did decide to

14  move forward with NWP 48, to complete a full EIS rather than an EA and to undertake ESA

15  consultation with the Services. CFS, Comments on Proposal to Reissue and Modify Nationwide

16  Permits; Docket Number COE-2015-0017/RIN 0710-AA73 (August 1, 2016).

17      95.    The Corps stated in the National EA that while individual authorizations or

18  verifications under NWP 48 would not require any additional NEPA, regional Corps divisions

19  and districts are required to prepare supplemental decision documents to provide regional

20  analyses of environmental effects of a NWP, including a regional cumulative effects analysis.

21  Corps, *Decision Doc. NWP 48* at 6.

22      96.    The Corps' National EA for NWP 48 did not address pesticide or plastic gear use

23  on shellfish beds: "The Corps does not have the authority to regulate discharges of pesticides.

24  Discharges of pesticides may require authorization by states or the U.S. EPA under section 402

25  of the Clean Water Act. Division engineers can impose regional conditions to address the use of

26

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1  plastics, if plastic materials are used for the activities regulated under the Corps' authorities." *Id.*

2  at 9.

3  97.    The Corps did not complete any ESA Section 7 consultation with the Services

4  regarding the renewal of NWP 48, instead relying on a general condition requiring all non-

5  federal permitees to submit a Pre-Construction Notice "if any listed species or designated critical

6  habitat might be affected or is in the vicinity of the activity, or if the activity is located in

7  designated critical habitat." General Condition 18, 82 Fed. Reg. at 1,999.

8  98.    On June 20, 2016, the Seattle District issued a special public notice with regional

9  general conditions for all NWPs in Washington, although no NWP 48-specific conditions were

10  proposed at that time (the programmatic consultation with NMFS and FWS was still ongoing).

11  99.    Seattle District solicited comment on its general regional conditions and Plaintiff

12  and others provided comments urging the Seattle District to forgo NWP 48, and instead use

13  individual or regional general permits that focused on specific water bodies (Willapa Bay is

14  different from Puget Sound), because NWP 48 as written would cause more than minimal

15  adverse cumulative impacts.  Plaintiff further detailed the environmental impacts of shellfish

16  aquaculture in Washington, including pesticide and plastic use, pointed to the requirement under

17  NEPA to complete an environmental impact statement if an action may have a significant

18  impact.  Plaintiff commented that because the Corps acknowledged there are possible negative

19  impacts on the human environment, some of which are highly uncertain or involve unique or

20  unknown risks, and because the permit would affect tens of thousands of acres of marine and

21  estuarine aquatic environments, an EIS is required prior to adopting 2017 NWP 48. CFS,

22  Comments on June 20, 2016 Special Public Notice of NWP Regional Conditions (Aug. 19,

23  2016).

24  100.    On November 23, 2016 the Seattle District announced its proposed regional

25  conditions for NWP 48, including two regional general conditions (RGC): RGC 10, which

26  required avoidance and minimization of impacts to submerged aquatic vegetation and forage

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

fish, and RGC 14, requiring revegetation after temporary impacts and monitoring for more than minimal impacts to submerged aquatic vegetation. Seattle District, *Special Public Notice, NWP 48 Reissuance Request for Comments* (Nov. 23, 2016).  However, several days later on November 30, 2016 the District clarified that RGCs 10 and 14 would *not* apply to shellfish aquaculture, and proposing only two NWP 48-specific conditions (one outlining the information required in a PCN, and the other prohibiting clam harvest by hydraulic escalator). Seattle District, *Special Public Notice: Clarification to November 23, 2016 Notice* (Nov. 30, 2016).

101.    Plaintiff and others, including the EPA, commented urging the Seattle District to retain RGCs 10 and 14 for commercial shellfish, because protections for aquatic vegetation and forage fish are especially needed in commercial shellfish permitting, and particularly to avoid cumulatively adverse impacts in violation of the CWA. EPA Comments on NWP 48 Reissuance and Proposed Regional Conditions (Jan. 6, 2017). Plaintiff also urged the Seattle District to forgo NWP 48, based on the cumulative adverse impacts from unchecked industrial shellfish aquaculture, and notified the Corps of its failure to comply with NEPA and prepare an EIS or to comply with the ESA.  Like other commenters, Plaintiff commented that Seattle District should include the 28 conservation measures identified in the programmatic consultation with the Services, and all Incidental Take Statement terms and conditions, as conditions to NWP 48. CFS, Comments on NWP 48 Reissuance and Proposed Regional Conditions (Jan. 6, 2017).

102.    Several tribes also requested that the Corps reinstate RGCs 10 and 14 for shellfish production, given the impacts shellfish aquaculture has on species like salmon, and the lack of any scientific justification for exempting NWP 48 from these requirements. *See* Swinomish Indian Tribal Community, Comments on NWP 48 Reissuance and Proposed Regional Conditions (Jan. 8, 2017); Stillaguamish Tribe of Indians, Nat. Res. Dept., Comments on NWP 48 Reissuance and Proposed Regional Conditions (Jan. 6, 2017).

103.    Despite serious public concern that 2017 NWP 48 would unlawfully result in more than minimal cumulative adverse impacts, on March 17, 2017, the Seattle District

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   announced it was adopting NWP 48 with only one specific regional condition (no clam harvest

2   by hydraulic escalator), effective March 19, 2017. Seattle District, *Special Public Notice: Final*

3   *Seattle District 2017 Nationwide Permit Regional Conditions* (March 17, 2017).

4        104.   Because the Seattle District adopted 2017 NWP 48 as written, with the single

5   regional condition regarding clam harvest, it did not reduce or restrict the use of plastic gear

6   under the NWP, nor did it prohibit pesticide use.

7        105.   Seattle District's Supplemental Decision Document for NWP 48 (containing its

8   environmental assessment with regional analysis as contemplated in the national decision

9   document), was dated March 17, 2017 and delivered pursuant to a FOIA request to Plaintiff on

10   March 30, 2017. Seattle District, *Supplement to the National Decision Document for 2017*

11   *Nationwide Permit 48 and Regional Conditions* (March 19, 2017) ("Seattle EA").

12        106.   That is, the Corps did not make Seattle District's EA public prior to making its

13   decision to adopt 2017 NWP 48, including the 100-year "new" definition, with only one regional

14   condition.  The Corps did not provide the public with any opportunity to comment on this EA or

15   the additional information contained therein or the agency's NEPA compliance.

16        107.   The Seattle EA did not include any statement on the purpose and need of the

17   action and analyzed only one alternative, the preferred alternative of adopting 2017 NWP 48.

18   The EA included a brief cumulative effects analysis for NWP 48, which discounted the

19   possibility of significant or adverse cumulative impacts by relying entirely on future unspecified

20   mitigation measures to be attached to individual verifications under NWP 48 at the discretion of

21   the district engineer. *Id.* at 104-05, 108-09.  The EA failed to consider and analyze the

22   foreseeable impacts of pesticide use on shellfish beds. *Id.* at 71, 75.

23            1.   Adverse Cumulative Impacts of 2017 NWP 48.

24        108.   Commercial shellfish aquaculture as currently practiced in Washington State is

25   already having cumulative effects on the environment and nearshore aquatic wildlife.  The full

26

COMPLAINT
PAGE 36
CASE NO.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   impact of all the expanded aquaculture allowed under the 2012 approval has never been properly

2   analyzed and disclosed through any public NEPA or CWA permitting process.

3        109.    The new 2017 permit is even more lax, and will allow a massive increase in

4   acreage: from 49,575 acres the Corps says was authorized under 2012 NWP 48 to **72,300** acres

5   (more than a third of all tideland acres in Washington). Seattle EA at 107-08 & Table 4.  This

6   acreage expansion may be even greater given the discrepancy in acreage between the 38,700

7   acres of commercial aquaculture the Corps identified in its programmatic consultation and the

8   49,575 acres it says it authorized under 2012 NWP 48. *Compare* NMFS BIOP at 29 (proposed

9   Corps permitting over 20 years to include 38,715 acres of commercial shellfish) *with* Seattle EA

10   at 107-108 (49,575 acres authorized under 2012 NWP 48).

11        110.    Not only does the new permit allow a massive increase in acreage, but the vast

12   majority of that acreage would be considered "existing"—only 332 acres out of 72,300 would be

13   considered "new" under the 100-year definition. Seattle EA at 108.  "Existing" operations do not

14   have to abide by the prohibition on affecting more than 1/2 acre of submerged aquatic

15   vegetation, and are unrestricted from disturbing or removing eelgrass and harming species from

16   the area.  Despite potentially authorizing 22,725 to 33,600 new acres not previously permitted (in

17   addition to the unanalyzed acreage authorized under 2012 NWP 48), the Corps' NWP 48 would

18   consider all but a tiny fraction of that acreage to be "existing," merely because some commercial

19   shellfish activity happened in that area within the last 100 years in some form, and regardless of

20   whether the specific site has returned to a more natural state or serves as habitat for wildlife.

21        111.    Given the research suggesting that eelgrass might recover in as little as five years

22   in Washington after aquaculture is ceased (cited favorably by Corps), this new permit will allow

23   unrestricted aquaculture on thousands of acres of eelgrass habitat undisturbed by prior shellfish

24   aquaculture, not to mention other types of habitat suitable/used by wild species, like mudflats.

25   The permit language is contrary to the requirement to protect salmon imposed by NMFS in its

26   Biological Opinion and ITS that aquaculture expanding into areas with eelgrass must either

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   completely avoid it (new operations) or use only long-lines spaced 10 feet apart (previously

2   authorized but expanding into fallow area). *See* NMFS BIOP at 66, 97-98.

3        112.    The Seattle District did not, as commenters urged, attach the 28 conservation

4   measures from its programmatic biological assessments, which defined the action analyzed in the

5   programmatic consultation, nor did it include any of the non-discretionary conditions from its

6   Incidental Take Statements.  The conservation measures address seeding, grow out, and harvest

7   activities and are meant lessen the impact of shellfish aquaculture, including by restricting work

8   in fish spawning windows and regulating equipment use and maintenance. Corps PBA at 49-53.

9   Of the 28 conservation measures, five are solely for "new" operations, and these include strict

10   protections for native eelgrass and forage fish spawning, including prohibiting any new activities

11   (including equipment or on-bottom culture) within 16 horizontal feet of native eelgrass or any

12   activities within forage fish spawning areas until eggs are hatched and spawn is no longer

13   present. Corps PBA at 49-50 (Measures 3, 6-8, and 10 apply to "new" operations only).

14        113.    In addition to not including any of the 28 conservation measures as regional

15   conditions to NWP 48, the Seattle District *exempted* shellfish aquaculture from Regional General

16   Conditions 10 and 14 (protection for submerged aquatic vegetation and forage fish and site

17   restoration after temporary impacts).  EPA commented to the Corps:

18   
19          This change, along with the proposed national changes to NWP48 opens the door
       to the potential for *significant cumulative adverse effects* to eelgrass beds and
20          forage fish from aquaculture activities.  We are very concerned that the
       cumulative effects from NWP48 as proposed will be *incompatible with*
21          *conservation of these resources*, unless the content of any specific regional
       conditions for NWP48 are far more prescriptive.

22   
23   EPA, Comments on June 20, 2016 Special Public Notice of NWP Regional Conditions, Encl. 1

24   (Aug. 19, 2016) (emphases added).

25        114.    In response to the Seattle District's announcement that it proposed to adopt NWP

26   48 without RGCs 10 and 14, and with only one NWP 48-specific condition (no hydraulic

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

escalator clam harvest), EPA stated that "without protective regional conditions, the revised language proposed for the 2017 NWP 48 *will lead to cumulative adverse impacts to the aquatic environment in Washington State*." EPA Jan. 6, 2017 Comments. As to RGCs 10 and 14, EPA stated:

> By removing the protective and specific language of RGCs I 0 and 14 from NWP 48 there are no clear or consistent requirements to avoid and minimize impacts to eelgrass, kelp, or forage fish and no guarantees that these critical resources will be adequately protected. Removing these protections appears inconsistent with the Corps' renewed commitment in the recently signed 2016 Memorandum of Understanding to protect and restore Puget Sound and address tribal treaty rights.

*Id.* EPA expressed specific concern over the 100-year definition and the "expanded geographic extent of areas that will now be considered 'continuing'" and that in combination with the other language of NWP 48, it "will allow *significant cumulative adverse impacts* to submerged aquatic vegetation and other special aquatic sites and critical resources in Washington State." *Id.* at 2. EPA confirmed its continuing support for a regional general permit rather than a NWP, as requested by Plaintiffs in their comments to the Corps. *Id.*

115.    Like EPA, Washington Department Fish and Wildlife expressed serious concern that removing RGCs 10 and 14 would weaken protection for critical fish habitat, contrary to CWA § 404. WDFW, Comments on NWP 48 Reissuance and Proposed Regional Conditions (Dec. 30, 2016). Washington Department Fish and Wildlife also noted research showing that "standard aquaculture practices may have profound effects on the benthic ecology of Washington State's tidelands and conservation of eelgrass and forage fish spawning beds." These effects are due to the overlap of shellfish culture areas and herring spawning, particularly in native eelgrass, and the intentional or incidental destruction of eelgrass beds prior to the start of culture activities and dredging activities that "routinely take place on or near tide flat areas containing herring spawn." *Id.* at 2. Protection of herring spawn areas is critical, because as the Washington Department Fish and Wildlife pointed out, these habitats are being degraded and destroyed by the "cumulative impacts of shoreline development in Puget Sound."  The Washington

COMPLAINT
PAGE 39
CASE NO.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    Department Fish and Wildlife urged protection for eelgrass beds at the outset, because mitigation

2    is difficult and expensive, and eelgrass is extremely important wildlife habitat and can play a role

3    in remediating ocean acidification.

4         116.    The adopted 2017 permit allows for a large increase in acreage (to over a third of

5    all tidelands in Washington) but fails to provide any adequate protections for submerged aquatic

6    vegetation, forage fish, and other wildlife (including threatened and endangered species).  The

7    Corps refused to attach any regional conditions to this permit to mitigate the cumulative adverse

8    impacts, including RGC 10 and 14, the 28 conservation measures, or the terms and conditions of

9    its Incidental Take Statements.  Nor does the 2017 permit restrict any of the more disruptive and

10   damaging practices, including pesticide use on shellfish beds and the massive amount of plastic

11   gear introduced into Washington's marine environment.

12

13              2.    Corps' Failure to Adequately Analyze and Disclose Environmental
                      Impacts of 2017 NWP 48.

14

15        117.    In the Corps' approval it failed to adequately explain or provide any scientific

16   justification for how the permit and the expansion of shellfish aquaculture with no protections

17   will avoid significant environmental impacts (NEPA) or cumulative adverse effects (CWA).

18   This major failure renders the 2017 permit unlawful.

19              i.    Corps failed to comply with NEPA in adopting the permit.

20        118.    The Corps did not complete an EIS for the adoption of 2017 NWP 48 in

21   Washington, despite the substantial possibility that the industrial shellfish aquaculture operations

22   authorized under it may have significant effects to the environment.  Plaintiff and others'

23   comments to the Corps raised substantial questions as to 2017 NWP 48's potential to cause

24   significant impacts to Washington's tidelands, including eelgrass habitat, forage fish, and

25   commercially important and ESA-protected species like salmon.  However, rather than prepare

26   an EIS, the Corps summarily discounted significant impacts through conclusory statements.

1    119.    The Seattle District's EA lacks any analysis of the significance factors at 40

2    C.F.R. § 1508.27 (context of project and intensity), and provided no statement of reasons for

3    finding no significant impact and forgoing an EIS.  While admitting there are impacts to the

4    environment from shellfish aquaculture (using eelgrass as indicator species), the Corps

5    summarily concluded that these impacts were already happening under the 2012 permit, and that

6    they will be minimalized by individual authorization review.

7    120.    The Corps admits that eelgrass is a unique and valuable habitat for many species,

8    EA at 100, and the potential for commercial shellfish aquaculture to cause cumulative adverse

9    impacts the environment and to listed species. EA at 100-104. *See also* Corps PBA.

10    121.    There is uncertainty both as to the amount of aquaculture allowed under 2017

11    NWP 48, and the impacts therefrom, as well as the effectiveness of any mitigation measures that

12    may or may not be attached to individual authorizations at the discretion of the district engineer.

13    The Corps has not been clear on the amount of aquaculture previously authorized or which

14    would likely be authorized under 2017 NWP 48: in its programmatic consultation the Seattle

15    District identified 38,700 acres for permitting other the next 20 years (including current and new

16    acres), the Corps' National EA stated that about 56,250 acres would be affected nationwide

17    (National EA at 65), and then the Seattle District estimated 72,300 acres could be authorized

18    under 2017 NWP 48, increasing from 49,575 acres previously authorized from 2012-2017

19    (Seattle EA at 107-08).  These numbers simply do not add up, and because the impacts increase

20    with the acreage converted to shellfish aquaculture, the cumulative impact of all aquaculture

21    authorized under NWP 48 are entirely unclear.

22    122.    The Seattle District improperly ignored the cumulative impacts of NWP 48,

23    because it concludes that the impacts are already happening under the 2012 NWP 48, ignoring

24    that these impacts were never assessed, and that the change in the definition of "new" in 2017

25    NWP 48 will allow a huge increase in acres cultivated (at least 32% more according to District's

26    estimate) without any of the restrictions for new acreage. Seattle EA at 107-08.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

123. Because the Corps failed to include and analyze any potential mitigation measures to counteract these impacts, it is also highly uncertain whether any restrictions applied on a per-applicant basis will be effective.

124. Finally, there are impacts to endangered species, as indicated by the Corps' programmatic biological assessments and the Services' Biological Opinions. NMFS found that commercial shellfish aquaculture on just 38,700 acres, including the conservation measures and no use of pesticides, is *likely to adversely affect* four species and critical habitat, so the impacts from greatly expanded acreage (overwhelmingly considered "existing" under the 100-year definition) raises substantial questions.

125. Given the context (the unique and invaluable public waters of Washington's shorelines), and the various significance factors implicated by this permit, (i.e. unique characteristics of the location, controversial and uncertain effects, cumulative effects, and impacts to listed species, § 1508.27(b)(4), (5), (7), (9)), the Corps' failure to complete an EIS violates NEPA.

126. The Seattle District's EA is inadequate to support its finding of no significant impact and decision to forgo an EIS.

127. Although Plaintiff requested that the Corps include the public in its NEPA process, the Seattle District released its EA for public viewing only *after* the District had already adopted the permit. The Corps did take comment on its proposed regional general conditions and its proposed condition specific to NWP 48 (hydraulic clam harvest prohibition), but in so doing failed to provide the public with the information contained in the EA, especially the estimate that the 2017 permit would authorize 72,300 acres of aquaculture and consider only 332 acres "new" under the 100-year definition. The first time the public was provided this estimate of the impact of NWP 48 was after the decision to adopt NWP 48. Nor was the public given the Seattle District's regional cumulative impact analysis prior to the decision, with no explanation from the District as to why provision of this crucial information was impossible or even

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   impracticable.  The Seattle District's failure to provide the public with its draft EA for comment

2   prior to adopting NWP 48 violates NEPA.

3       128.    The Seattle EA failed to include a purpose and need statement, a "no action"

4   alternative, or to analyze any reasonable alternatives other than the Corps' preferred one (adopt

5   NWP 48 with only one regional condition).  Given that the Seattle EA was required to analyze

6   impacts to the specific region, Washington State, the Corps was required to consider a "no

7   action" (i.e. no NWP) and any additional reasonable and feasible alternatives for Washington.

8   The Seattle District did not provide any explanation as to why it rejected a "no action"

9   alternative from consideration.

10      129.    The Corps failed to consider or rejected without adequate explanation numerous

11  feasible alternatives, failing to give full and meaningful consideration to all reasonable

12  alternatives in its EA.  The Seattle EA did not consider an alternative to 2017 NWP 48 of

13  regional general permits for regions like Willapa Bay/Grays Harbor, Hood Canal, South Puget

14  Sound, and North Puget Sound, despite commenters (including U.S. EPA) suggesting this

15  alternative and the Corps' apparent willingness at one time to consider or adopt this alternative.

16      130.    Several feasible alternatives rejected without further consideration despite many

17  of these alternatives potentially allowing the Corps to use a NWP in compliance with the CWA.

18  Seattle EA at 73-75. These include a list of nine suggestions/alternatives which would involve

19  different regional conditions on NWP 48.  For example, reducing the 100-year definition for

20  "new" operations (and thus limiting impacts to eelgrass) was rejected based on the explanation in

21  the National EA, but the National EA did not at all address impacts specific to Washington and

22  in fact relies on local modifications to avoid impacts. *Id.* at 73.  An alternative that would

23  incorporate the conservation measures and ITS terms from the programmatic consultation was

24  also rejected, despite the acknowledgement that it would standardize NWP 48 and the Biological

25  Opinions. *Id.* at 74.

26

COMPLAINT
PAGE 43
CASE NO.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

131.    Alternatives to restrict the use of plastic gear and pesticides were rejected based on a lack of available alternatives to plastics (without explanation or data to back up this conclusion) and lack of "authority" to regulate pesticide use. *Id.* at 74.

132.    Other alternatives rejected from consideration, without adequate explanation, include: a requirement to formally demonstrate that a project area was used for commercial aquaculture within the past 100 years; protection of forage fish; and prohibiting new activities from encroaching on eelgrass and increasing protection for eelgrass. *Id.* at 74-75.

133.    The Seattle District's EA fails to adequately consider, or take a "hard look" at direct, indirect, and cumulative impacts from 2017 NWP 48. 40 C.F.R. § 1508.9(b); 40 C.F.R. § 1508.8; 40 C.F.R. § 1508.25(c)(3).

134.    The Seattle EA (as well as the National EA) expressly refused to discuss impacts from pesticide use on shellfish beds.  The assessment also fails to provide any detail about various negative direct/indirect impacts from shellfish aquaculture, merely listing these general impacts, including: "conversion of substrates (e.g. mudflats to gravel bars), impacts to submerged aquatic vegetation, alteration in aquatic communities from native to non-native shellfish species, and water quality impacts from harvest activities," as well as "increased competition for native species [from introduced non-native shellfish species] affecting their viability." *Id.* at 100.  Although these impacts are acknowledged, the consequences from allowing shellfish aquaculture on 72,300 acres (or more than a third of all tideland acres in Washington) are not discussed at all, despite this being a significant increase in the acreage the Corps states was authorized under the 2012 NWP 48, almost all of which would be considered "existing" under the revised 100-year definition of "new."

135.    Although the Seattle District concluded that 2017 NWP 48 (and its massive expansion of "existing" aquaculture) would not have a significant impact on the environment in Washington, even when added to all past, present, and reasonably foreseeable impacts, this conclusion was not well supported by any quantified or detailed information.  The Corps

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   assumes impacts from the 2012 permit are the baseline, despite the *five-fold* increase in use of

2   2012 NWP 48 from its original assessment, with no cumulative impacts analysis ever performed.

3        136.   The Seattle EA admits that shellfish aquaculture is pervasive (covering a quarter

4   of all tidelands in Washington according to the EA's estimate), co-located with eelgrass habitat,

5   likely to continue expanding, and that it negatively impacts to important indicator species—

6   eelgrass and forage fish—but then summarily concludes that these impacts, even when added to

7   the past/ongoing impacts to these water bodies from human development and climate, will be

8   minimal. Seattle EA at 101-103.

9        137.   For Willapa Bay/Grays Harbor, the Seattle EA does not provide any detail about

10  the past, present, or reasonably foreseeable impacts of activities *other* than shellfish aquaculture.

11  *Id.* at 99-100 (stating that Willapa Bay and Grays Harbor have been "substantially altered" by

12  human activities but with only cursory listing of these changes).

13       138.   For Puget Sound and Hood Canal, the Corps refers to the regional cumulative

14  impacts analysis for bank armoring, the subject of several regional general conditions proposed.

15  *Id.* at 100; 86-95 (bank armoring discussion).  However, this discussion focuses *only* on bank

16  armoring, just one of many current and historical stressors on the Puget Sound ecosystem.

17       139.   The Corps' failure to explain the effects of other actions on the same resources

18  affected by shellfish aquaculture renders the EA's cumulative impacts analysis inadequate.

19       140.   Additionally, the Corps failed to address much of the information and studies

20  regarding the impacts of shellfish aquaculture provided by commenters.

21       141.    Although the Corps failed to include a "no action" alternative in its Seattle EA,

22  which would have served as the baseline against which to evaluate cumulative effects, it did

23  indicate that the baseline for its analysis was all shellfish operations authorized under the 2012

24  NWP 48. *Id.* at 105 ("The presence of structures from aquaculture activities authorized under

25  NWP 2012 represent the existing environment; such effects may continue if verification under

26  NWP 48 2017 is requested."); 108 ("Impacts from previously authorized existing activities

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   would not change the current existing environmental baseline within the NWP 2017

2   authorization period.").  However, this baseline grandfathers in never-assessed impacts and while

3   also inflating the previous impact by assuming impacts to the full number of acres authorized,

4   even though many of these acres are actually fallow. *See* Corps PBA at 6-7, 42 (table 3-5

5   indicates that of the 38,185 acres of commercial shellfish aquaculture, 14,771 are authorized but

6   did not have active cultivation since at least since 2007).  The Corps uses its improper baseline to

7   minimize the impacts from the increased acreage that will be allowed under the 2017 permit.

8       142.    Finally, the Corps' FONSI and EA rely on inadequately described mitigation

9   measures to discount significance.  Because 2017 NWP 48 will allow a significant increase in

10   commercial shellfish aquaculture without any defined, detailed, or analyzed mitigation measures,

11   there is the potential for a significant impact.

12       143.    In its Seattle EA, the Corps' finding of no cumulative impacts relied entirely on

13   unspecified future mitigation measures to be attached to individual verifications under NWP 48,

14   which would be up to the discretion of the district engineer. *Id.* at 104 ("Special conditions may

15   be applied on a project specific basis to ensure impacts are minimal.  The district engineer may

16   exercise his discretionary authority as discussed below to ensure impacts are minimal both

17   individually and cumulatively."); 105 (similar); 108-09 (similar).  These conditions were not

18   listed, nor did the Corps provide any explanation as to how they would be enforceable and

19   effective to mitigate the significant cumulative impacts of commercial shellfish aquaculture.  The

20   Corps expressly did not include various protections suggested by commenters (including

21   Plaintiff), including the conservation measures and ITS terms and conditions from the Corps'

22   programmatic consultation and NWP regional general conditions 10 and 14. Seattle EA at 49,

23   54-56.

24

25

26

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1        ii.        Failure to Comply with Clean Water Act.

2        144.    The Corps can only issue a nationwide general permit if the activities are similar

3  in nature and will cause only minimal adverse environmental effects both individually and

4  cumulatively. 33 U.S.C. § 1344.

5        145.    As detailed above, the NWP 48 as issued will result in more than minimal adverse

6  cumulative impacts to Washington's aquatic ecosystems.  These impacts, although more than

7  minimal, were not adequately documented.

8        146.    As with significant impacts under NEPA, the Corps relied on mitigation measures

9  to meet the CWA "minimal adverse cumulative effects" standard, but failed to adequately

10  document how those measures will work. Seattle EA at 104-05,108.

11        147.    The mitigation measures that might be applied by the district engineer to any

12  individual authorization under 2017 NWP 48 were not even listed, much less supported by

13  substantial evidence as to their success.  The Corps provided no documented information or data

14  to support its conclusion that cumulative adverse impacts would be avoided or mitigated.

15        148.    Despite the estimate that the acreage authorized under 2017 NWP 48 could swell

16  to 72,300 acres, over a third of all marine tideland acres in Washington State, the Corps does not

17  adequately explain or provide any documentation as to how these future mitigation measures

18  (special conditions on individual authorizations) would mitigate impacts from this massive

19  increase.

20        3.        Harm to Plaintiffs from Defendants' Unlawful Approval.

21        149.    Plaintiff and its members are injured by the challenged action because Defendants

22  negated their procedural rights, as stakeholders, consumers of shellfish, and residents and visitors

23  of the impacted areas, to meaningfully participate in an important permit approval process.  The

24  2017 permit was approved before the public was even provided the environmental assessment or

25  the crucial information therein, including the scope of the permit itself.  The Corps failed to

26  adequately evaluate the significant impacts likely from its 2017 permit, and to ensure that its

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   permit approval complied with NEPA, and thus caused procedural injury to Plaintiff and its

2   members.

3        150.    Plaintiff's members live, work, and recreate on and near Washington's shorelines,

4   where shellfish aquaculture is or will be approved under the 2017 permit.  These members enjoy

5   recreation along Washington's shorelines, including observing wildlife, walking along the beach,

6   recreational shellfish harvest, and other activities.  Some members have businesses that rely on

7   the natural beauty and ecological health of Washington's marine aquatic ecosystems.  Many of

8   these members also consume shellfish, including commercially produced shellfish in

9   Washington.  These interests are harmed by the impacts of industrial shellfish aquaculture,

10  including pesticide use and drift, physical barriers to beach access, impairment of aesthetics,

11  light and sound pollution, and reduction in biodiversity.  Some members are afraid to consume

12  shellfish on their own property due to pesticide use in adjacent areas, while other members are

13  concerned about health impacts from consuming commercial shellfish grown using industrial

14  methods or near these operations.

15       151.    Plaintiff's members include people who have aesthetic, recreational, cultural,

16  scientific, and economic interests in the health of Washington's aquatic ecosystems and the

17  wildlife they support, including endangered species like salmon.  These members' interest in the

18  species, including listed species, that require tidal waters for spawning, rearing, and/or feeding, is

19  injured by the Corps' 2017 approval.

20       152.    Plaintiff and its members are injured by the Corps' approval of a permit that will

21  have more than minimal adverse cumulative impacts to Washington's shorelines and bays,

22  without adequate analysis of these impacts or mitigation to avoid cumulative impacts.

23  ///

24  ///

25  ///

26  ///

COMPLAINT
PAGE 48
CASE NO.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

**FIRST CLAIM FOR RELIEF**
VIOLATION OF NEPA AND APA:
FAILURE TO PREPARE AN ENVIRONMENTAL IMPACT STATEMENT

153.    Plaintiffs re-allege, as if fully set forth, each and every allegation set forth in paragraphs 1 through 152 of this Complaint.

154.    NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  Under certain circumstances, the agency can prepare an EA that provides "sufficient evidence and analysis for determining whether to prepare" an EIS and that contributes to the agency's compliance with NEPA. 40 C.F.R. §§ 1508.9; 1501.4.

155.    Determining the significance of an action in an EA or elsewhere requires the agency to consider the intensity of the impact by evaluating factors enumerated at 40 C.F.R. § 1508.27(b), including, *inter alia*, the unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; the degree to which the effects are likely to be highly controversial; the degree to which effects are highly uncertain or involve unique or unknown risks; whether the action establishes a precedent for future actions or represents a decision in principle about a future consideration; the degree to which the action may affect endangered or threatened species; and whether the action is related to actions with individually insignificant but cumulatively significant impacts.

156.    As detailed above, the Corps' decision to adopt 2017 NWP 48 in Washington implicates unique ecosystems and ecologically critical areas (such as eelgrass habitat); is highly controversial; it involves uncertain, unique, and unknown risks (the Corps has not even been clear on the acreage at issue); it involves significant cumulative impacts (conversion of more than a third of Washington tidelands to industrial aquaculture); it poses risks to species protected under the Endangered Species Act (as confirmed by the recent programmatic consultation); and

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    it will impact all or nearly all of the Corps' commercial shellfish permitting in Washington until

2    2022.

3        157.    For these reasons, the plain language of NEPA, the CEQ regulations

4    implementing NEPA, and well-established precedent all require the Corps to prepare an EIS

5    before deciding whether to adopt 2017 NWP 48 for Washington.  42 U.S.C. § 4332(2)(C); 40

6    C.F.R. §§ 1508.27; 1502.3

7        158.    Plaintiff urged the Corps to complete an EIS in several comments to the agency

8    and the Seattle District, but the Corps refused.  By issuing an inadequate EA and FONSI instead

9    of preparing an EIS, the Corps has acted in a manner that is arbitrary, capricious, an abuse of

10   discretion, not in accordance with law, and without observance of procedures required by law, in

11   violation of NEPA, 42 U.S.C. § 4332, and the APA. 5 U.S.C. §§ 701-706.

12       159.    The actions and inactions of the Defendants described in this Claim for Relief are

13   causing injuries to the Plaintiffs, for which they have no adequate remedy at law.

14

15                       **SECOND CLAIM FOR RELIEF**
                          VIOLATION OF NEPA AND APA:
16          FAILURE TO COMPLY WITH ALTERNATIVES REQUIREMENTS

17       160.    Plaintiffs re-allege, as if fully set forth, each and every allegation set forth in

18   paragraphs 1 through 159 of this Complaint.

19       161.    EAs must include a purpose and need statement, to define the scope of reasonable

20   alternatives that would satisfy the purpose. 40 C.F.R. § 1508.9. An EA must also include a "no

21   action" alternative.  Finally, an EA must include a range of appropriate alternatives. 40 C.F.R. §

22   1508.9(b) (citing Section 102(2)(E)).  NEPA Section 102(2)(E) apples to EAs and EISs, and

23   requires agencies to "study, develop, and describe appropriate alternatives to recommended

24   courses of action in any proposal which involves unresolved conflicts concerning alternative uses

25   of available resources." 42 U.S.C. § 4332(2)(E).

26

COMPLAINT
PAGE 50
CASE NO.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

162.    The Seattle EA lacks a purpose and need statement and as such violates the CEQ regulations implementing NEPA and established precedent.

163.    The Seattle EA does not consider a "no action" alternative at all, despite a "no action" alternative (i.e. not adopting 2017 NWP 48) being both reasonable and feasible.  Indeed it is contemplated in the Corps' national decision document that each Corps region will evaluate whether nationwide permits are appropriate for that region, and whether use of a nationwide permit in that region that would result in more than minimal adverse cumulative impacts (prohibited under CWA).  A no-action alternative means not using 2017 NWP 48 as written, but the Corps had other options, such as a conditioned NWP, regional general permits, or individual permits.  These other options were made clear to the Corps by the public and other agencies.

164.    By failing to include a discussion of the purpose and need for the action or a "no action" alternative in its Seattle EA, the Corps has acted in a manner that is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedures required by law, in violation of NEPA, 42 U.S.C. § 4332, and the APA. 5 U.S.C. §§ 701-706.

165.    As detailed above, despite conflicting uses of Washington's tidal waters (e.g., wildlife habitat, recreation, and aquaculture) the Corps failed to include a reasonable range of alternatives in the Seattle EA, rejecting many feasible alternatives without explanation.  The Seattle EA did not consider an alternative to 2017 NWP 48 of regional general permits for regions like Willapa Bay/Grays Harbor, Hood Canal, South Puget Sound, and North Puget Sound, although the Corps entertained this idea at one time.  Nor did the EA consider any alternative to the language of 2017 NWP 48 as proposed by Corps headquarters, including, as suggested by commenters: a different definition of "new operation" (as opposed to the 100-year definition); a prohibition on the use of pesticides; reduction or elimination of plastic gear; protection for submerged aquatic vegetation (e.g. no new activities in eelgrass and increased protections); protections for forage fish; or the incorporation of the conservation measures and ITS terms and conditions from the programmatic consultation.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

166.    The Corps ignored numerous reasonable and feasible alternatives or rejected them from further consideration.  By considering only one alternative—adoption of 2017 NWP 48 as written by Corps headquarters—the agency failed to adequately consider other reasonable alternatives to the proposed action, in violation of NEPA.  The Corps has acted in a manner that is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without observance of procedures required by law in violation of NEPA, 42 U.S.C. § 4332,  its implementing regulations, and the APA. 5 U.S.C. §§ 701-706.

167.    The actions and inactions of the Defendants described in this Claim for Relief are causing injuries to the Plaintiffs, for which they have no adequate remedy at law.

**THIRD CLAIM FOR RELIEF**
VIOLATION OF NEPA AND APA:
FAILURE TO IDENTIFY A REASONABLE BASELINE

168.    Plaintiffs re-allege, as if fully set forth, each and every allegation set forth in paragraphs 1 through 167 of this Complaint.

169.    An appropriate baseline is critical to NEPA analyses and a "no action" alternative (which should describe the baseline) that assumes the same impacts as the action alternatives is arbitrary and capricious.

170.    To comply with NEPA's requirements, the Corps was required to analyze a "no action" alternative and describe and utilize a proper baseline from which to analyze the impact of its proposed action.  Not only did the Corps fail to include any "no action" alternative, the subject of Plaintiffs' Second Claim for Relief, the Corps indicated that it was using an improper baseline for its analysis.  The Corps repeatedly stated that it was considering all acres authorized under the 2012 NWP 48 to be the baseline. Seattle EA at 105 ("The presence of structures from aquaculture activities authorized under NWP 2012 represent the existing environment; such effects may continue if verification under NWP 48 2017 is requested."); 108 ("Impacts from

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    previously authorized existing activities would not change the current existing environmental

2    baseline within the NWP 2017 authorization period.").

3        171.    By using an improper and poorly described baseline, the Corps has violated its

4    duty under NEPA, its implementing regulations, and established precedent, to ground its analysis

5    on a proper baseline, to use high quality, accurate scientific information, and to ensure the

6    scientific integrity of this analysis (40 C.F.R. §§ 1500.1(b); 1502.24).  The Corps' reliance on an

7    improper baseline in its Seattle EA was arbitrary, capricious, an abuse of discretion, not in

8    accordance with law, and without observance of procedures required by law, in violation of

9    NEPA, 42 U.S.C. § 4332, its implementing regulations, and the APA. 5 U.S.C. §§ 701-706.

10       172.    The actions and inactions of the Defendants described in this Claim for Relief are

11    causing injuries to the Plaintiffs, for which they have no adequate remedy at law.

12

13                          **FOURTH CLAIM FOR RELIEF**
                          VIOLATION OF NEPA AND APA:

14    FAILURE TO TAKE A HARD LOOK AT DIRECT, INDIRECT, AND CUMULATIVE
                               IMPACTS

15       173.    Plaintiffs re-allege, as if fully set forth, each and every allegation set forth in

16    paragraphs 1 through 172 of this Complaint.

17       174.    NEPA requires that federal agencies take a "hard look" at the environmental

18    consequences of their actions, before action is taken.  NEPA's implementing regulations require

19    the Corps to assess the environmental impacts of the proposed action, including direct and

20    indirect effects, which are reasonably foreseeable but removed in time or space. 42 U.S.C.

21    § 4332(C); 40 C.F.R. §§ 1502; 1508.7.  NEPA and its implementing regulations also require the

22    Corps to analyze the cumulative effects of its actions. 40 C.F.R. §§ 1508.25 (a)(2), (c); 1508.7;

23    1508.8.  A cumulative impact is the "incremental impact of the action when added to other past,

24    present, and reasonably foreseeable future actions regardless of what agency (Federal or non-

25    Federal) or person undertakes such other actions.  Cumulative impacts can result from

26

COMPLAINT                                           Center for Food Safety
PAGE 53                                             917 SW Oak Street, Suite 300
CASE NO.                                            Portland, OR 97205
                                                    (971) 271-7372

1  individually minor but collectively significant actions taking place over a period of time." 40

2  C.F.R. § 1508.7. NEPA further requires FDA to use high quality, accurate scientific information

3  and to ensure the scientific integrity of this analysis. 40 C.F.R. §§ 1500.1(b); 1502.24.

4        175.   To satisfy NEPA's direct/indirect impacts requirement, the Corps was required to

5  take a hard look at all foreseeable direct and indirect impacts of the commercial shellfish

6  aquaculture that would be permitted under 2017 NWP 48, and to seek or develop evidence to

7  determine whether there is likely to be a significant impact from the proposed action.

8        176.   As detailed above, and despite the detailed information provided to the agency by

9  commenters, the Seattle EA fails to evaluate impacts from various shellfish aquaculture

10  activities, including but not limited to pesticide and plastic use, harm to submerged aquatic

11  vegetation, impacts to wildlife that depend on the essential marine habitats (including from food

12  competition and habitat conversion), impacts to water quality, and recreational, aesthetic, and

13  economic impacts.

14        177.   To satisfy NEPA's cumulative impacts mandates, the Corps was required to

15  consider the cumulative impacts of its approval of 2017 NWP 48 in combination with other

16  actions, including but not limited to, the approval of new pesticides for use on shellfish beds (e.g.

17  imidacloprid); and any other actions that could affect the marine environment impacted by the

18  Corps' adopting of NWP 48, regardless of what agency or entity is responsible for those actions.

19        178.   The Seattle EA fails to adequately discuss and evaluate the cumulative impact of

20  permitting commercial shellfish aquaculture on 72,300 acres. The EA did not fully assess the

21  incremental impact of expanding commercial shellfish aquaculture to more than a third of all

22  Washington tidelands combined with the existing impacts from other human activities in

23  Washington waters, including climate change. While admitting the possibility of impacts from

24  commercial shellfish to the environment, the EA dismisses these impacts based entirely on the

25  discretion of the district engineer to attach unknown "special conditions" to mitigate any

26  impacts. This ignores the evidence before the agency that commercial shellfish aquaculture on

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   the currently authorized acreage is already having significant impacts to the environment,

2   including eelgrass, forage fish, protected species, and recreational and aesthetic interests.

3   Moreover, nowhere does the Corps take a hard look at the impact of its proposed increase from

4   the existing acreage to 72,300 acres, where almost all is considered "existing," combined with

5   past, present, or reasonably foreseeable impacts of activities *other* than shellfish aquaculture.

6       179.    For the above reasons, the Corps violated NEPA, and the EA and FONSI are

7   invalid because they fail to take a hard look at the direct, indirect, and cumulative effects arising

8   from the commercial shellfish aquaculture that will be authorized under 2017 NWP 48.

9       180.    By issuing an EA and FONSI that fail to meet the standards laid out in NEPA, its

10   implementing regulations, and governing precedent, the Corps has acted in a manner that is

11   arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without

12   observance of procedures required by law, in violation of NEPA, 42 U.S.C. § 4332, its

13   implementing regulations, and the APA. 5 U.S.C. §§ 701-706.

14       181.    The actions and inactions of the Defendants described in this Claim for Relief are

15   causing injuries to the Plaintiffs, for which they have no adequate remedy at law.

16

17                            **FIFTH CLAIM FOR RELIEF**
                              VIOLATION OF NEPA AND APA:

18       FAILURE TO PROVIDE PUBLIC PARTICIPATION ON NEPA PROCESS

19       182.    Plaintiffs re-allege, as if fully set forth, each and every allegation set forth in

20   paragraphs 1 through 181 of this Complaint.

21       183.    When preparing an EA, agencies must provide enough information to allow the

22   public to weigh in and inform the decision-making process.  Public participation is key to NEPA,

23   and agencies must involve the public in the preparation of EAs. 40 C.F.R. § 1501.

24       184.    The Corps did not make the Seattle EA available for public comment prior to

25   making its decision to adopt 2017 NWP 48.  The public was not provided with crucial

26   information, such as the scope of the permit (72,300 acres), the alternatives being considered,

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1 and the cumulative impacts assessment, prior to comment or the Corps' decision.  The Seattle

2 EA contained the Corps supplemental regional cumulative impacts assessment, and this

3 information is essential for public information and participation in the decision of whether to

4 adopt NWP 48 again in Washington.  Had the public been provided this information, especially

5 the number of acres affected and the regional cumulative impacts analysis, it could have more

6 effectively participated and informed the decision making.

7    185.    By issuing an EA without first providing it to the public or providing the public

8 with sufficient environmental information to permit members of the public to weigh in with their

9 views and thus inform the agency decision-making process, the Corps has acted in a manner that

10 is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without

11 observance of procedures required by law, in violation of NEPA, 42 U.S.C. § 4332, its

12 implementing regulations and governing precedent, and the APA. 5 U.S.C. §§ 701-706.

13    186.    The actions and inactions of the Defendants described in this Claim for Relief are

14 causing injuries to the Plaintiffs, for which they have no adequate remedy at law.

15
                                **SIXTH CLAIM FOR RELIEF**
16                              VIOLATION OF NEPA AND APA:
                              IMPROPER RELIANCE ON MITIGATION

17    187.    Plaintiffs re-allege, as if fully set forth, each and every allegation set forth in

18 paragraphs 1 through 186 of this Complaint.

19    188.    Mitigation measures may be used to forego issuing an EIS, however proposed

20 mitigation measures must be developed to a reasonable degree, and a perfunctory description, or

21 mere listing of mitigation measures, without supporting analytical data, is insufficient to support

22 a finding of no significant impact.  Courts examine mitigation measures to see whether such

23 measures keep impacts below the EIS threshold, which sets a low standard for whether a project

24 may have a significant effect.  The Corps cannot use uncertain, unanalyzed, and unenforceable

25 mitigation to evade meeting the low EIS threshold and preparing an EIS.

26

COMPLAINT
PAGE 56
CASE NO.

189.     As described above, the Corps' finding of no significant impact relied entirely on unspecified future mitigation measures to be attached to individual verifications under NWP 48, which would be up to the discretion of the district engineer.  The Seattle District never discussed potential measures (including those resulting from its programmatic consultation) in the Seattle EA or how they might be used to mitigate impacts from 72,300 acres of shellfish aquaculture to ensure cumulative effects are not significant.  Even the mitigation measures from the programmatic consultation are limited to an analysis of impact from nearly half the acreage proposed under 2017 NWP 48, and the Services still found likely adverse impacts to listed species.  Thus, even if the Corps fully attached all measures from the programmatic consultation to 2017 NWP 48, it would still have to document and support how those measures alone would suffice to avoid significant impact from nearly twice the acreage of shellfish aquaculture.  Not only did the Corps entirely fail to provide any support for the effectiveness of mitigation measures, it failed to describe mitigation measures *at all*.

190.     By concluding that 2017 NWP 48 would not meet the low threshold for "significance" and relying on uncertain, unanalyzed mitigation measures, the Corps violated NEPA, its implementing regulations, and established precedent.  The Corps' improper reliance on mitigation measures to forgo preparation of an EIS was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedures required by law, in violation of NEPA, 42 U.S.C. § 4332, its implementing regulations, and the APA. 5 U.S.C. §§ 701-706.

191.     The actions and inactions of the Defendants described in this Claim for Relief are causing injuries to the Plaintiffs, for which they have no adequate remedy at law.

///

///

///

///

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

## SEVENTH CLAIM FOR RELIEF
### VIOLATION OF CWA AND APA:
ADOPTION OF NWP WITH ADVERSE CUMULATIVE IMPACTS

192.   Plaintiffs re-allege, as if fully set forth, each and every allegation set forth in paragraphs 1 through 191 of this Complaint.

193.   The Corps may issue nationwide permits only for activities that are "similar in nature" and that will cause no more than minimal adverse effects to the environment, either separately or cumulatively. 33 U.S.C. § 1344(e)(1); 33 C.F.R. Part 330.  In issuing a nationwide permit, the Corps must consider the separate and cumulative impacts from the permit on the environment, and make a finding that the permit will not have more than minimal adverse cumulative impacts. *Id.*

194.   As detailed above, the Corps has violated the CWA, its implementing regulations, and established precedent by issuing a nationwide permit that will have more than minimal adverse cumulative effects on the environment and cause or contribute to significant degradation of the aquatic ecosystem, due to the nature and extent of commercial shellfish aquaculture activities that will be authorized under 2017 NWP 48 and the lack of protections for impacted habitats and species.

195.   The Corps violated the CWA 404(b) Guidelines by issuing a permit that would cause or contribute to significant degradation of waters of the U.S., including significant adverse effects to fish, wildlife, special aquatic sites, ecosystems, recreational, aesthetic, and economic values. 40 C.F.R. § 230.10(c).

196.   Although the individual authorizations for several acres at a time may be individually minor (although not always), the cumulative impact of tens of thousands of acres of commercial shellfish production is more than minimal, with adverse impacts to eelgrass and aquatic wildlife, including forage fish, benthic species, invertebrates, ESA-protected species like salmon and green sturgeon, and birds.  As detailed above, the conversion of habitat to intensive shellfish production, along with the activities and gear associated with shellfish aquaculture,

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    reduces or eliminates eelgrass habitat, kills or harms wildlife and their food sources, impacts

2    water quality, and overall has more than minimal impacts.  The NWP will allow commercial

3    shellfish aquaculture in special aquatic sites (i.e. submerged aquatic vegetation) and essential fish

4    habitat, as well as critical habitat for ESA-protected species.  Indeed the Corps states that its

5    2017 NWP 48 will allow an expansion of commercial shellfish aquaculture to over a third of all

6    Washington tidelands (72,300 acres), with no restrictions on new or expanded activities on land

7    not previously actively used.  This adverse cumulative impact renders the use of nationwide

8    permit unlawful under the CWA.

9            197.    By adopting a NWP with more than minimal adverse cumulative impacts, which

10   may cause or contribute to significant degradation, and which is contrary to the public interest,

11   the Corps has violated its duty under the CWA, its implementing regulations, and established

12   precedent, and the adopting of 2017 NWP 48 for Washington was arbitrary, capricious, an abuse

13   of discretion, not in accordance with law, and without observance of procedures required by law,

14   in violation of CWA, 33 U.S.C. § 1344, its implementing regulations, and the APA. 5 U.S.C. §§

15   701-706.

16           198.    The actions and inactions of the Defendants described in this Claim for Relief are

17   causing injuries to the Plaintiffs, for which they have no adequate remedy at law.

18

19                           **EIGHTH CLAIM FOR RELIEF**
                              VIOLATION OF CWA AND APA:
20        FAILURE TO DOCUMENT IMPACTS AND MITIGATION MEASURES

21           199.    Plaintiffs re-allege, as if fully set forth, each and every allegation set forth in

22   paragraphs 1 through 198 of this Complaint.

23           200.    The Corps must set forth in writing an evaluation of the potential individual and

24   cumulative impacts of the category of activities to be regulated under a NWP permit, and provide

25   documentation to support each factual determination, including cumulative impacts. 40 C.F.R.

26   §§ 230.7(b); 230.11(a)-(g).  If the Corps relies on mitigation measures to meet the CWA standard

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1  for general permits (no more than minimal adverse cumulative impacts), it must adequately

2  document those mitigation measures and their efficacy. *Id.*

3        201.    As detailed above, the Corps failed to adequately support its determinations as to

4  the impacts, including cumulative impact, of shellfish aquaculture under 2017 NWP 48,

5  including to special aquatic sites, wildlife, and other aspects of the environment as listed in Part

6  230, Subparts C through F.

7        202.    In its Decision Document, the Seattle District acknowledged some adverse

8  impacts of shellfish aquaculture activities, but then entirely discounted them through the use of

9  unspecified conditions (or mitigation measures) to be determined by the district engineer for

10  each authorization.  The Corps' determination that commercial shellfish activities (such as beach

11  clearing, eelgrass elimination, use of plastic gear and pesticides, and benthic-disrupting harvest)

12  on 72,300 acres would not have a cumulative adverse impact to aquatic resources is unsupported.

13        203.    The Corps relied on mitigation measures to meet the CWA requirement that

14  NWPs have no more than minimal cumulative impacts, but failed to adequately document those

15  mitigation measures and their efficacy.  The Corps based its determination on mitigation

16  measures to be attached at the discretion of the district engineer, but then failed to document

17  what those mitigation measures will be, or support their presumed success.

18        204.    By failing to adequately document and support the Corps' factual determinations

19  as to the impacts of 2017 NWP 48, including cumulative impacts, or effectiveness of the Corps'

20  mitigation measures, the Corps' adoption of 2017 NWP 48 for Washington was arbitrary,

21  capricious, an abuse of discretion, not in accordance with law, and without observance of

22  procedures required by law, in violation of CWA, 33 U.S.C. § 1344, its implementing

23  regulations, and the APA. 5 U.S.C. §§ 701-706.

24        205.    The actions and inactions of the Defendants described in this Claim for Relief are

25  causing injuries to the Plaintiffs, for which they have no adequate remedy at law.

26

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1

**PRAYERS FOR RELIEF**

2

WHEREFORE, the Plaintiffs respectfully request that the Court:

3

4

5

      1.      Adjudge and declare that the Corps' decision to adopt 2017 NWP 48 in Washington, as well as the Decision Document, EA and FONSI issued by the Corps in connection with that approval, are in violation of the CWA, NEPA, and the APA;

6

7

      2.      Adjudge and declare that the Corps violated NEPA and the APA by failing to prepare an EIS prior to adopting 2017 NWP 48 in Washington;

8

9

10

      3.      Adjudge and declare that the Corps violated the CWA and its implementing regulations when it adopted 2017 NWP 48 in Washington without adequately supporting its determination that it would not cause more than minimal cumulative adverse impacts or the effectiveness of its mitigation measures;

11

12

13

      4.      Vacate, set aside, and/or enjoin the Corps' decision to adopt 2017 NWP 48 in Washington, and declare that the Corps must comply with all requirements of NEPA, the CWA, and the APA, including preparing an EIS, in the event that the agency proposes to adopt a new general permit for commercial shellfish aquaculture in Washington;

14

15

      5.      Award the Plaintiffs their fees, costs, expenses, and disbursements, including reasonable attorneys' fees, associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

16

      6.      Grant such further and additional relief as this Court deems just and proper.

17

18

Respectfully submitted this 10th day of August, 2017 in Portland, Oregon.

19

20

/s/

George A. Kimbrell (WSB No. 36050)

21

Amy van Saun (*pro hac vice* pending)

Center for Food Safety

22

917 SW Oak Street, Suite 300

Portland, OR 97205

23

T: (971) 271-7372 / F: (971) 271-7374

Email: gkimbrell@centerforfoodsafety.org

24

            avansaun@centerforfoodsafety.org

25

*Counsel for Plaintiffs*

26

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372