1
                                          The Honorable Robert S. Lasnik

2  George A. Kimbrell (WSBA No. 36050)
   Amy van Saun (*pro hac vice*)
3  Center for Food Safety
   917 SW Oak Street, Suite 300
4  Portland, OR 97205
   T: (971) 271-7372 / F: (971) 271-7374
5  Email: gkimbrell@centerforfoodsafety.org
           avansaun@centerforfoodsafety.org
6

7  *Counsel for Plaintiffs*

8

              **THE UNITED STATES DISTRICT COURT**
9        **FOR THE WESTERN DISTRICT OF WASHINGTON**

10

| | |
|---|---|
| 11 CENTER FOR FOOD SAFETY, a non-profit corporation, | ) Case No. 2:17-cv-01209-RSL |
| 12       *Plaintiff*, | ) **MOTION FOR SUMMARY JUDGMENT** |
| 13 | ) **AND MEMORANDUM IN SUPPORT** |
|       v. | ) **AND [PROPOSED] ORDER** |
| 14 | ) |
| 15 U.S. ARMY CORPS OF ENGINEERS, *ET AL.*, | ) **NOTE ON MOTION** |
| 16 | ) **CALENDAR: Court will schedule** |
|       *Defendants*, | ) **once briefs filed.** |
| 17 | ) |
|       and | ) |
| 18 | ) |
| 19 PACIFIC COAST SHELLFISH GROWERS ASSOCIATION, | ) |
| 20 | ) |
|       *Intervenor-Defendant* | ) |
| 21 | ) |
| 22 THE COALITION TO PROTECT PUGET SOUND HABITAT, a non-profit Corporation, | ) Case No. 2:16-cv-00950-RSL |
| 23 | ) |
| 24       *Plaintiff*, | ) |
| 25       v. | ) |
| 26 | ) |
| U.S. ARMY CORPS OF ENGINEERS, *ET* | ) |

MOTION FOR SUMMARY JUDGMENT
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    *AL.*,                              )
                                         )
2              *Defendants*,             )
                                         )
3              and                       )
                                         )
4    TAYLOR SHELLFISH COMPANY, INC.,     )
                                         )
5              *Intervenor-Defendant*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND .............................................................................. 2

    I. THE IMPACTS OF COMMERCIAL SHELLFISH AQUACULTURE ..................... 2

    II. DEFENDANTS' SHELLFISH PERMITTING ............................................. 6

STANDARD OF REVIEW ................................................................................ 11

ARGUMENT ...................................................................................................... 12

    I. 2017 NWP 48 VIOLATES THE CLEAN WATER ACT .......................................... 12

        A. The Corps Violated The CWA By Adopting A NWP With
            More Than Minimal Adverse Cumulative Impacts. ................................. 13

        B. The Corps Violated The CWA By Failing to Adequately
            Support Its Determination That 2017 NWP 48 Is
            Appropriate. ............................................................................................ 16

    II. 2017 NWP 48 VIOLATES THE NATIONAL ENVIRONMENTAL
        POLICY ACT ........................................................................................ 18

        A. The Corps Violated NEPA By Failing to Prepare An EIS for
            2017 NWP 48 ......................................................................................... 19

        B. The Corps' EA Was Inadequate in Scope and Lacked Public
            Participation ........................................................................................... 22

        C. The Corps Failed to Take A Hard Look At Impacts ..................................... 24

            1. Failure to Assess Reasonable Baseline ................................................. 25

            2. Failure to Adequately Assess Direct, Indirect, and
               Cumulative Impacts ................................................................... 26

    III. 2017 NWP 48 VIOLATES THE ENDANGERED SPECIES ACT ......................... 29

        A.     ESA Standards and the Section 7 Consultation Process .......................... 30

        B.     Reinitiation of Section 7 Consultation ..................................................... 32

        C.     The Corps Violated the ESA By Failing to Reinitiate
            Consultation For the  Challenged Action .................................................. 33

MOTION FOR SUMMARY JUDGMENT
PAGE i
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1. 2017 NWP 48 Doubled the Size of Analyzed Shellfish
Acreage. ...................................................................... 33

2. 2017 NWP 48 Does Not Include the Conservation
Measures Upon Which the Expert Agencies
Predicated their ESA Conclusions. .............................. 34

3. 2017 NWP 48 Does not Include the Incidental Take
Restrictions Upon Which the Expert Agencies
Predicated their Conclusions....................................... 35

4. 2017 NWP 48 Modified the Terms of the Action by
Redefining New and Existing Operations, Reducing
Protections................................................................. 37

5. The 2016 Consultation Failed to include Pesticide
Impacts of Industrial Shellfish Production ................. 38

6. Attempting to Pass the Buck to Future Individual Permits
Does Not Satisfy the Corps' ESA Duties .................... 39

CONCLUSION............................................................................ 40

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

*Alaska Ctr. for Env't v. West*,
  31 F. Supp. 2d 714 (D. Alaska 1998) ...................................................................23

*All. for the Wild Rockies v. Krueger*,
  950 F. Supp. 2d 1196 (D. Mont. 2013)...............................................................39

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
  524 F.3d 938 (9th Cir. 2008) .........................................................................19, 24

*California ex rel. Lockyer v. U.S. Dep't of Agric.*,
  575 F.3d 999 (9th Cir. 2009) ...............................................................................31

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) ........................................................................32, 34

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
  538 F.3d 1172 (9th Cir. 2008) .......................................................................18, 19

*Ctr. for Biological Diversity v. Salazar*,
  695 F.3d 893 (9th Cir. 2012) ...............................................................................24

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
  698 F.3d 1101 (9th Cir. 2012) .............................................................................36

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  623 F.3d 633 (9th Cir. 2010) .....................................................................22, 25, 26

*Earth Island Inst. v. U.S. Forest Serv.*,
  697 F.3d 1010 (9th Cir. 2012) .......................................................................19, 22

*Friends of the Earth v. Hall*,
  693 F. Supp. 904 (W.D. Wash. 1988)...................................................................14

*Friends of Yosemite Valley v. Kempthorne*,
  520 F.3d 1024 (9th Cir. 2008) .......................................................................25, 26

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
  844 F.3d 1095 (9th Cir. 2016) .............................................................................25

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

**Page(s)**

**Federal Cases**

*Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.,*
    230 F. Supp. 3d 1106 (N.D. Cal. 2017) ..................................................................33

*Karuk Tribe of California v. U.S. Forest Serv.,*
    681 F.3d 1006 (9th Cir. 2012) (en banc) ..............................................................31

*Kentucky Riverkeeper, Inc. v. Rowlette,*
    714 F.3d 402 (6th Cir. 2013) ................................................................16, 17, 28

*Kern v. U.S. Bureau of Land Mgmt.,*
    284 F.3d 1062 (9th Cir. 2002) ............................................................19, 28, 29

*Klamath Siskiyou Wildlands Ctr. v. Grantham,*
    642 F. App'x 742 (9th Cir. 2016) ..........................................................................24

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................................12, 22

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
    241 F.3d 722 (9th Cir. 2001) ..........................................................19, 20, 21

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.,*
    606 F.3d 1058 (9th Cir. 2010) ..............................................................................22

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs,*
    2013 WL 1294647 (D. Or. Mar. 27, 2013) ....................................................15, 39

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
    402 F.3d 846 (9th Cir. 2005) ..........................................................................18, 20

*Ohio Valley Envtl. Coal. v. Hurst,*
    604 F. Supp. 2d 860 (S.D.W. Va. 2009) ..................................................13, 14, 15, 28

*Oregon Envtl. Council v. Kunzman,*
    714 F.2d 901 (9th Cir. 1983) ................................................................................27

*Oregon Nat. Desert Ass'n v. Singleton,*
    47 F. Supp. 2d 1182 (D. Or. 1998) ......................................................................21

*Pac. Rivers Council v. Thomas,*
    30 F.3d 1050 (9th Cir. 1994) ................................................................................32

MOTION FOR SUMMARY JUDGMENT
PAGE iv
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1

2

**Page(s)**

**Federal Cases**

*Pacificans for a Scenic Coast v. California Dep't of Transp.*,
   204 F. Supp. 3d 1075 (N.D. Cal. 2016) ................................................................32, 36

*Pit River Tribe v. U.S. Forest Serv.*,
   469 F.3d 768 (9th Cir. 2006) ............................................................................25, 26

*Pres. Our Island v. U.S. Army Corps of Eng'rs*,
   2009 WL 2511953 (W.D. Wash. Aug. 13, 2009)....................................22, 23, 29

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989)..................................................................................................18

*Salmon Spawning & Recovery All. v. Gutierrez*,
   545 F.3d 1220 (9th Cir. 2008) ........................................................................1, 25

*Save Our Ecosystems v. Clark*,
   747 F.2d 1240 (9th Cir. 1984) ................................................................................27

*Sierra Club v. Marsh*,
   816 F.2d 1376 (9th Cir. 1987) ......................................................................31, 35

*Sierra Nevada Forest Prot. Campaign v. Weingardt*,
   376 F. Supp. 2d 984 (E.D. Cal. 2005)....................................................................24

*Tennessee Valley Auth. v. Hill (TVA)*,
   437 U.S. 153 (1978)..........................................................................................30, 31

*Thomas v. Peterson*,
   753 F.2d 754 (9th Cir. 1985) ..................................................................................31

*W. Watersheds Project v. Abbey*,
   719 F.3d 1035 (9th Cir. 2013) ..........................................................19, 22, 23

*W. Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011) ..................................................................................31

*Wild Fish Conservancy v. Salazar*,
   628 F.3d 513 (9th Cir. 2010) ..................................................................................32

*Wildlands v. Woodruff*,
   151 F. Supp. 3d 1153 (W.D. Wash. 2015)......................................................24, 27

MOTION FOR SUMMARY JUDGMENT
PAGE v
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

**Page(s)**

**Federal Cases**

*Wyoming Outdoor Council, Powder River Basin Res. Council v. U.S. Army Corps
of Eng'rs,*
351 F. Supp. 2d 1232 (D. Wyo. 2005)............................................................ *passim*

**Federal Statutes**

5 U.S.C. §§ 702, 704, 706(2) .............................................................................12, 40

16 U.S.C. § 1531(b) ................................................................................................30

16 U.S.C. § 1536(a)(2)........................................................................................31, 32

16 U.S.C. § 1536(b)(4)(C)(ii) ................................................................................32

16 U.S.C. § 1536(b)(4), (o)(2) ...............................................................................32

33 U.S.C. § 1251(a) ................................................................................................12

33 U.S.C. § 1344(e)(1).........................................................................................13, 15

42 U.S.C. § 4332(2)(C)...........................................................................................18

42 U.S.C. § 4332(2)(E)...........................................................................................19

**Rules**

Fed. R. Civ. P. 56...................................................................................................11

**Regulations**

33 C.F.R. § 323.2(h) ...........................................................................................13, 15

40 C.F.R. § 230.7(a)...............................................................................................13

40 C.F.R. § 230.7(a)(1)...........................................................................................15

40 C.F.R. §§ 230.7(b) .........................................................................................13, 16

40 C.F.R. § 230.10(c)..............................................................................................14

40 C.F.R. § 230.43 ..................................................................................................4

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

**Regulations**

40 C.F.R. § 1500.1(a) ..................................................................................................18

40 C.F.R. § 1501 ........................................................................................................24

40 C.F.R. § 1502.14 .............................................................................................19, 23

40 C.F.R. §§ 1508.8 ............................................................................................19, 24

40 C.F.R. § 1508.9 ..............................................................................................22, 24

40 C.F.R. § 1508.9(b) ................................................................................................19

40 C.F.R. § 1508.13 ....................................................................................................24

40 C.F.R. § 1508.18 ....................................................................................................24

40 C.F.R. § 1508.27 ......................................................................................18, 21, 24

40 C.F.R. § 1508.27(b)(3) ..........................................................................................19

50 C.F.R. § 402.13(a) ..................................................................................................32

50 C.F.R. § 402.14(a) ...........................................................................................31, 39

50 C.F.R. § 402.14(b)(1) .............................................................................................32

50 C.F.R § 402.14(i)(1)(ii), (i)(3) ...............................................................................32

50 C.F.R. § 402.14(i)(5) ..............................................................................................32

50 C.F.R. § 402.14(h)(3) .............................................................................................31

50 C.F.R. § 402.16(a)-(d) ............................................................................................32

50 C.F.R. § 402.16(b)-(c) ......................................................................................*passim*

50 C.F.R. § 402.16(c) ..................................................................................................33

82 Fed. Reg. 1860, at 1995 (Jan. 6, 2017) ...................................................................8

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

**MOTION**

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Center for Food Safety (CFS), moves for an Order entering Summary Judgment in its favor, finding that the U.S. Army Corps of Engineers' 2017 approval of Nationwide Permit 48 in Washington violates the Clean Water Act (CWA), the National Environmental Policy Act (NEPA), the Endangered Species Act (ESA), and the Administrative Procedure Act (APA), and issuing appropriate relief.

**MEMORANDUM IN SUPPORT OF PLAINTIFF CFS'S
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

When the U.S. Army Corps of Engineers (Corps or Defendants) adopted the Nationwide Permit 48 in March, 2017 (2017 NWP 48 or the permit), it allowed an industrialized activity on a significant amount of Washington shoreline and aquatic habitat, while simultaneously providing a massive loophole for shellfish operations to avoid necessary environmental protections. The Corps adopted 2017 NWP 48 for use in Washington State without considering the cumulative impact of between 50,000 and 72,300 acres of industrial commercial shellfish aquaculture (covering between a quarter and a third of *all* Washington tidelands), without supporting its determination that such an expansive activity would be appropriate for a general permit, without adequately considering alternatives to the permit and its impacts, and without protecting threatened and endangered species, including iconic species like salmon. As such, the Corps violated the Clean Water Act (CWA), the National Environmental Policy Act (NEPA), the Endangered Species Act (ESA), and the Administrative Procedure Act (APA).

The Corps lacks CWA authority to use a nationwide permit here because, according to the Corps' own staff and other expert agencies, the regulated shellfish aquaculture activities have more than minimal adverse cumulative impacts. Moreover, the Corps failed to document and support its determination to the contrary. Further, despite NEPA's requirement to complete an environmental impact statement analyzing 2017 NWP 48's significant environmental impacts,

1   the Corps instead released an inadequate and unsupported Environmental Assessment, without

2   public participation. Finally, the Corps failed to ensure that its action would not jeopardize the

3   continued existence of ESA-protected species through Section 7 consultation with the expert

4   federal agencies, despite the significant mismatch between the proposed action consulted on in

5   2016 and the final permit adopted in 2017. For any of these reasons alone, the Corps' issuance of

6   2017 NWP 48 was unlawful and must be vacated. Taken together they show a serious dereliction

7   of duty by the Corps in its mission to protect the aquatic environment in Washington. The Court

8   should grant Plaintiffs' motion for summary judgment, vacate and remand for lawful compliance

9   with these core environmental mandates.

10                          **FACTUAL BACKGROUND**

11   **I.    THE IMPACTS OF COMMERCIAL SHELLFISH AQUACULTURE.**

12          Shellfish aquaculture is not benign, particularly when undertaken at an industrial scale,

13   such as in Washington, where it covers such a significant percentage of tide lands and shoreline

14   habitat. The areas where shellfish are grown, in Willapa Bay/Grays Harbor, North and South

15   Puget Sound, and Hood Canal, are home to many species across the food web, from tiny

16   invertebrates in the substrate all the way to Southern Resident Killer Whales. Commercial

17   shellfish operations clear the beach of native species—replaced by a monoculture of non-native

18   shellfish, including in many cases massive amounts of plastic equipment—resulting in

19   competition with wildlife for habitat and destructive impacts to eelgrass, forage fish, and other

20   prey species. COE125583-125700; COE134134-340; COE134755-928; COE134516-754.

21          The commercial production of oysters, clams, including geoducks, and mussels typically

22   involves clearing the beach of unwanted native species, like sand dollars and sea stars. The area

23   is then prepared by "frosting" the ground with inches of gravel in the case of clams; seeding

24   oysters on the substrate; or the placement of plastic oyster racks, bags, rafts, long-lines, or stakes.

25   COE125591-610. These structures are left in place for years while the shellfish grow to market

26   size, during which time maintenance includes the removal of aquatic vegetation and wildlife,

MOTION FOR SUMMARY JUDGMENT
PAGE 2
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

including predators. *Id.* In the case of geoduck, operators use thousands of 9-inch long PVC plastic tubes stuck in the substrate, at a rate of 42,000 per acre. COE125611-2. After seed clams are implanted, these tens of thousands of PVC tubes are covered with plastic netting, often covering multiple acres, in an attempt to stop predators. COE125611-14. Geoduck harvest involves high-pressure water jets that liquefy the substrate, dislodging benthic invertebrates and causing plumes of suspended sediment to wash into the bay or harbor. COE125615; COE125620, 125630-1. Clam and oyster harvest can be by mechanical equipment, including dredge or excavating the substrate to extract the shellfish. COE125597-8, 125601, 125606-07. All of these activities can also involve heavy equipment, lights, and noise. COE125616-18, 125634-5; COE134788-9, 134833-5.

These activities are not without consequences. Water quality is impacted by the disturbance of the substrate, and wastes from the cultivated shellfish are excreted into the water column and settle on sediments. COE125630; COE118096 (and citations). That same sediment and substrate disturbance—through tilling, harrowing, leveling, installation of nets, raking, dredging, and hydraulic harvesting—can change the composition of native substrate and the species living there. COE125630-33; COE128680-6; 128739-45. These operations also impede recreational activities by residents and visitors of Washington beaches. COE131586; *infra* n.8.

One of commercial shellfish aquaculture's most significant impacts is harm to aquatic vegetation, including eelgrass. Eelgrass is declining in Puget Sound and worldwide. COE118148. The Corps' own analysis explains that there is a net loss of eelgrass when shellfish activities are co-located with it, either through intentional removal or reduced density through space competition, and it takes years to recover. *Id.*; COE125639-640. These impacts are essentially continuous because once the multi-year shellfish growing process is over, the process often re-starts almost immediately. COE127587-8. Eelgrass provides vital ecosystem services, including foraging habitat for juvenile salmonids, shelter for fish in early life stages, spawning habitat for Pacific herring and other forage fish, habitat for Dungeness crab, white and green

MOTION FOR SUMMARY JUDGMENT
PAGE 3
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   sturgeon, and the prey for these larger fish and invertebrates. COE118146-48. Both the native *z.*

2   *marina* eelgrass and the introduced *z. Japonica* (Japanese eelgrass) are food sources for

3   migratory birds. *Id.* Eelgrass provides detrital food chain support from decaying shoots,

4   stabilizes sediment and enhances water quality, and is a carbon sink, meaning it sequesters and

5   stores $CO_2$, and as such can help reverse the effects of ocean acidification locally. *Id.* This is

6   why eelgrass is called "one of Earth's most valuable" ecosystems, and given its ongoing pressure

7   from development and climate change, even the Corps (like many other bodies) has concluded

8   there is an immediate "need to protect, maintain, and even enhance eelgrass habitat where

9   feasible." COE118148; COE118210-213. As aquatic vegetated shallows, eelgrass beds are

10  considered special aquatic sites under the CWA's 404(b)(1) guidelines (40 C.F.R. § 230.43), and

11  the Puget Sound Partnership has a goal of increasing Puget Sound eelgrass by 20% by 2020.

12  COE118148-9.

13      Damage to eelgrass harms the species that rely on it for shelter, food, and spawning

14  habitat. Forage fish are particularly harmed, and are a crucial part of the food chain for bigger

15  fish like salmon, which in turn are the primary prey for Southern Resident Killer Whales.

16  COE125633, COE135268 (and citations). Commercial shellfish also affects forage fish through

17  work in spawning areas and the aquaculture equipment used, which can remove spawning

18  habitat, smother eggs by trampling, and kill fish entangled in cover nets. COE125691. Fish and

19  birds are also harmed or killed by aquaculture beyond eelgrass reduction, through decreases in

20  their prey species, in-water activity, noise, increases in suspended sediment, and net

21  entanglement. COE125633-34; COE1180103 (and citations).

22      Water contamination also results from the use of pesticides and plastics. COE125629,

23  125634, 125672. Pesticides have historically been used to kill native burrowing shrimp in

24  Willapa Bay and Grays Harbor, recently changing from carcinogenic carbaryl to experiments

25

26

MOTION FOR SUMMARY JUDGMENT
PAGE 4
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

with the neonicotinoid imidacloprid.[1] Further, producers in Willapa Bay and Grays Harbor are permitted to spray the herbicide imazamox on oyster and clam beds to kill introduced Japanese eelgrass, but which is acknowledged to also kill native eelgrass (and other aquatic vegetation).[2] Shellfish operations in Willapa Bay have sprayed hundreds of acres of eelgrass with the herbicide in the last four years.[3] As to plastics, not only does the aquaculture equipment become dislodged by currents and weather events and move onto beaches or deeper into bays, it also breaks down into microplastics, which are ingested by organisms and accumulate up the food web. COE125634; COE118097. Microplastics accumulate toxins in the water and deliver these to the organisms that ingest them, like a poison pill, including the oysters being cultivated. COE128610-60; 130200-9; COE131714-800; COE134648-52; *see also* van Saun Decl., Ex. A. Plastic netting excludes wildlife from habitat and causes entanglements of fish, birds, and crabs. COE128654-60; COE131714-800; COE134854-62; COE134615, 134642-8; COE129030-7.

Finally, these same activities and impacts described above are occurring in habitat utilized by ESA-protected species and harm them, altering their shelter and feeding habitat and reducing their prey-base, with likely adverse effects to at least five: the canary rockfish, Hood Canal summer-run chum salmon, Puget Sound Chinook salmon, green sturgeon, and bull trout.

---

[1] After successfully securing a CWA §402 NPDES permit to spray imidacloprid on shellfish beds in 2015, the Washington Department of Ecology withdrew the permit at the industry's request, following public outcry over the plan to spray neurotoxins on oysters. The Growers Association resubmitted its application in 2016, and after completing a Supplemental Environmental Impact Statement finding significant impacts, the Dept. of Ecology has tentatively denied the permit. Wash. Dept. of Ecology, *Burrowing shrimp control (Imidacloprid)*, https://www.ecology.wa.gov/Regulations-Permits/Permits-certifications/Aquatic-pesticide-permits/Burrowing-shrimp-control-Imidacloprid (last visited Apr. 30, 2018).

[2] Wash. Dept. of Ecology, *Final Environmental Impact Statement: Management of* Zostera Japonica *on Commercial Clam Beds in Willapa Bay, Washington* (Mar. 2014), https://fortress.wa.gov/ecy/publications/SummaryPages/1410050.html. The NPDES permit is in its fourth year, and is set to be renewed in 2019. Wash. Dept. of Ecology, *Zostera japonica management on commercial clam beds in Willapa Bay General Permit,* https://www.ecology.wa.gov/Regulations-Permits/Permits-certifications/Aquatic-pesticide-permits/Zostera-japonica-eelgrass-management (last visited Apr. 30, 2018).

[3] *Id.* (Annual reports and pre-treatment plans available on Department of Ecology website).

MOTION FOR SUMMARY JUDGMENT
PAGE 5
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   COE134755-928; COE134516-754; COE134200-2. Other ESA-protected species utilize the

2   habitats impacted, including Puget Sound steelhead, the Snowy plover, marbled murrelet, and

3   Southern Resident Killer Whale. COE134200-2. Willapa Bay in particular is designated Critical

4   Habitat for the Southern DPS green sturgeon, where the sturgeon comes to feed and grow, and

5   where netting, impacts to water quality, and pesticide use from commercial shellfish aquaculture

6   are "likely to adversely affect" the sturgeon and its critical habitat. COE134803-4, 134808-10,

7   134813, 134825, 134833, 134841-47.

8   **II.       DEFENDANTS' SHELLFISH PERMITTING.**

9         The Corps initially brought shellfish aquaculture under the Nationwide Permit (NWP)

10   system in 2007, permitting only the then-existing footprint of active production as of March,

11   2007 under NWP 48. COE127618. In 2012, the Corps renewed NWP 48 and expanded it to

12   include new project areas, so long as they did not directly affect more than 1/2-acre of

13   submerged aquatic vegetation beds (*i.e.* eelgrass). COE127619-20; COE119090. Although the

14   Corps predicted 2012 NWP 48 would only be used 50 times per year (250 times total over the

15   five-year life of the permit), and evaluated its impacts on that basis, in reality 2012 NWP 48 was

16   used at least *1,129 times* from 2012 to 2016, with impacts to anywhere from 37,000 to 50,000

17   acres. COE118193; COE118085. No additional cumulative impact analysis was completed for

18   this vastly larger-than-predicted use of 2012 NWP 48. *See* Coalition to Protect Puget Sound

19   Habitat, Mot. Summ. J., No. 16-cv-00950-RSL (filed concurrently).

20         Throughout the 2017 renewal process for NWP 48, the exact acreage currently affected

21   has been elusive. Depending on the record document, the number goes from 37,000 to nearly

22   50,000 acres. COE121461; COE134768; COE118085; COE127592. This represents roughly a

23   *quarter* (25%) of all Washington tidelands, but depending on the region is as much as 81% of

24   tidelands, like in Willapa Bay. COE125638.

25         Prior to renewing NWP 48, the Corps engaged in programmatic ESA consultation with

26   the expert wildlife agencies, Fish and Wildlife Service (FWS) and the National Marine Fisheries

MOTION FOR SUMMARY JUDGMENT
PAGE 6
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   Service (NMFS). Because authorizations under 2012 NWP 48 were not covered by a previous

2   2009 ESA Section 7 consultation and Biological Opinion (BiOp), the Corps reinitiated

3   consultation with the Services to assess all its permitting for the next 20 years. COE134134-340.

4   This programmatic consultation resulted in a 2015 programmatic biological assessment (PBA)

5   by the Corps, *id.*, and Biological Opinions (BiOps) by each agency. COE134755-928;

6   COE134516-754. The Services evaluated the Corps' permitting of 38,400 acres of commercial

7   aquaculture over the next 20 years, including 22,196 acres of active aquaculture, 1,401 acres of

8   new aquaculture, and 14,803 acres of aquaculture expanded into previously approved by unused

9   acres (aka "fallow"). COE134768. The programmatic consultation specifically included all

10  shellfish permitting, not only commercial (although the majority is commercial), and not

11  necessarily under NWP 48, but limited to 38,715 acres total. COE134147; COE134768. The

12  proposed action evaluated was specifically limited to operations that "incorporate the relevant

13  Conservation Measures," *id.*, listed in the PBA. COE134191-95 (listing 28 measures that "are

14  included as elements of the proposed action."). These conservation measures include protections

15  for habitat, water quality, benthic life, eelgrass, and forage fish; several measures are focused

16  specifically on "new" operations, providing stricter protections for native eelgrass and forage

17  fish spawning areas. *Id.* The consultation did not include the use of pesticides by shellfish

18  operations. COE134196.[4]

19      NMFS found that shellfish aquaculture would likely adversely affect four ESA-protected

20  fish species: Puget Sound Chinook salmon, Hood Canal summer-run chum salmon, canary

21  rockfish, and the Southern Distinct Population Segment (DPS) green sturgeon and their

22  designated critical habitat. COE134755-928. Concluding there would be harm to individuals

23  from these species and their critical habitat (i.e. "take") resulting variously from mechanical

24

25  [4] Despite not included pesticide use as part of the proposed action, NMFS still considered the use

26  of imazamox to kill eelgrass as an "interrelated activity." COE134769-70. FWS did not include
    pesticide use at all. COE134555-56.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

oyster harvest and harrowing, entanglement in anti-predator nets, suppression of eelgrass, and

nearshore disturbance, NMFS included an incidental take statement. COE134854-59. This

statement included several mandatory terms and conditions, limiting these activities in various

regions by date and acreage. *Id.*; COE134929-37. FWS similarly found adverse impacts to bull

trout and marbled murrelet, including an incidental take statement for six bull trout in North

Puget Sound and eight in the rest of Washington, and including the term/condition that permits

require growers to inspect for salmonids entangled in cover nets or stranded by shellfish

equipment. In support of their "likely adverse effects but no overall jeopardy to the species"

conclusions, both BiOps were premised on and anticipated the use of these conservation

measures to reduce the effects of shellfish aquaculture on listed species.[5]

Simultaneously, the Corps Headquarters renewed the suite of NWPs, including NWP 48.

Notice of Proposed Rule, 81 Fed. Reg. 35,186 (June 1, 2016). However, the Corps HQ made

some significant changes from the prior version of NWP 48, including most importantly a

revised definition of "new" operation, to "an operation in a project area where commercial

shellfish aquaculture activities have not been conducted during the *past 100 years*." 82 Fed. Reg.

1860, at 1995 (Jan. 6, 2017) (emphasis added). Thus, restrictions on "new" operations, such as

the prohibition on new operations affecting more than 1/2-acre of submerged aquatic vegetation,

would *only* apply if that operation was in an area where no commercial shellfish activity took

place over the last 100 years. NWP3034-35. (In other words, if 99 years ago someone gathered

wild native oysters to sell in a part of the coast that developers now wanted to use for

commercial production for the first time, that project area would now nonetheless be considered

"continuing" not "new" and be exempt from the eelgrass impact prohibition.) 2017 NWP 48 also

had reduced requirements for a Pre-Construction Notice (PCN) to inform the Corps of what an

individual operation would be doing under the NWP. COE127618-22. The Corps HQ did not

---

[5] COE134764, 134771, 134775, 134788-9, 134833-4, 134841, 134872; COE134528-30, 134556, 134642-3, 134664-5, 134679, 134699, 134709, 134711, 134715, 134722, 134725, 134729.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

engage in ESA Section 7 consultation for the renewed NWPs, despite doing so in the past, (even resulting in a jeopardy opinion in 2012, COE133303-588).

Individual Corps regions and districts are not bound to adopt NWPs—indeed, if they find that cumulative impacts from NWP activities are more than minimal for their area, they may restrict NWPs with regional conditions, or prohibit their use entirely. NWP3037, 3057. When deciding whether to adopt a NWP and whether regional conditions are required to mitigate impacts, the Corps Districts issue Supplemental Decision Documents, which contain both the determination of whether a NWP will cause more than cumulative impacts (CWA) and NEPA documentation. In its Supplemental Decision Document, the Corps Seattle District (which covers Washington State) acknowledged that the changes to NWP 48—specifically that the 100-year "new" definition—would mean there are no limits to impacts to eelgrass under NWP 48 as adopted, COE127549-50, and indeed would expand impacts from operations "exponentially," COE121695; COE125663.

Many agencies, including the Environmental Protection Agency (EPA), and commenters expressed grave concern over the changes. COE119327; COE120776-826; COE124960-4; COE125542-50; NWP46264-78; NWP041619-63; NWP043593-739; NWP048473-86. In fact the Corps Seattle District initially considered forgoing NWP 48 because of its adverse impacts and issuing its own Regional General Permit (regional permit) for shellfish aquaculture instead. COE118939; COE119017-19; COE119073; COE119601; COE120466-476 (draft of regional permit). The Corps stressed that a regional permit would have many benefits over NWP 48, including: being designed for Washington (where over 90% of the NWP 48 authorizations are issued); clearing up the confusion caused by NWP 48's definition of "project area" to include the entire leased parcel and not just the actively cultivated acres; and clarifying the definition of "new" and "continuing" aquaculture, including when "fallow" acres would be considered new. COE119073. A regional permit would have let the Corps use definitions of "new" and "continuing" to match the ESA programmatic consultation, and to include the conservation

MOTION FOR SUMMARY JUDGMENT
PAGE 9
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    measures and terms as permit requirements. COE119017-19. The EPA, among other agencies,

2    Tribes, and other commenting organizations, were in favor of a regional permit over the now

3    less-protective NWP 48. COE119487; 129080; COE121433. For the same reason the industry

4    applied pressure against adopting a regional permit. COE121441; COE120492.

5         Despite acknowledging that a regional permit would be more appropriate, the Corps

6    ultimately scrapped its draft and simply went with 2017 NWP 48, but stressed that it would add

7    regional conditions to ensure no more than minimal cumulative impacts. COE121527-34;

8    COE121697; COE121716. EPA told the Corps that it must attach regional conditions to NWP 48

9    to make it lawful, suggesting several, and underscoring that it was be "irresponsible not the

10   ensure that commercial shellfish aquaculture activities are held to the same or similar standards

11   as all other applicants in terms of not causing or contributing to impacts to eelgrass and kelp beds

12   or forage fish in Washington State." COE124961-64.

13        However, even after multiple agencies and the public urged the Corps to adopt regional

14   conditions that would protect eelgrass, forage fish, and imperiled species,[6] the Corps adopted *no*

15   additional regional conditions[7] and even revoked two of its regional general conditions that apply

16   to all nationwide permits, meaning they would not be applied to commercial shellfish

17   aquaculture. COE127598. Regional general conditions 10 and 14 would have required avoidance

18   and minimization of impacts to eelgrass and documentation of forage fish spawning areas,

19   revegetation of temporarily disturbed areas, and monitoring plans for impacts to submerged

20   aquatic vegetation. COE125042. After informing the public it would apply these conditions to

21   NWP 48 on November 23, 2016, COE125040-42, the Corps received an email on November 28

22

23   ───────────────
     [6] *See* Corps' Summary of Comments (COE127404-8); EPA (COE120776-826; COE124960-4;
     COE125542-50); FWS (COE120890-903; COE121689); Wash. Dept. of Ecology (COE125242-
24   3); Wash. Dept. of Fish & Wildlife (COE125124-6); Plaintiffs (COE125160-241; COE120906-
     23); Tribes (COE125151-2; COE121379-83; COE121321-74; COE120884-9); and Additional
25   organizations and individuals (COE125522-3; COE125526-32; COE125127-39; COE120572).
     [7] The single regional condition applicable to NWP 48 specifically is a prohibition on clam
26   harvest by hydraulic escalator harvester, a condition applied since 2007. COE127618-20.

MOTION FOR SUMMARY JUDGMENT
PAGE 10
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   from the Pacific Coast Shellfish Growers Association (PCSGA) (Intervenor-Defendant in this

2   case) railing against these specific conditions and accusing the Corps of "attempting to

3   undermine the industry," COE125052-57. On November 30, the Corps informed the public and

4   PCSGA that it had revoked regional general conditions 10 and 14. COE125058-9.

5         On March 17, 2017 the Corps announced it was adopting NWP 48 with no additional

6   regional conditions, such as regional general conditions 10 and 14 or the ESA conservation

7   measures. COE126119-36. Although the Corps took comment on proposed regional conditions

8   for NWP 48, the agency did not release or take comments on its Supplemental Decision

9   Document for NWP 48, dated March 19, 2017, including its Environmental Assessment under

10  NEPA. COE127485-86. Finally, despite an internal, never-made-public 112-page cumulative

11  impacts assessment from February 2017—finding *significant cumulative impacts* to eelgrass and

12  forage fish from commercial shellfish aquaculture under 2017 NWP 48 as adopted,COE125583-

13  125700—the Corps still did not undertake an environmental impact statement under NEPA. The

14  Corps nonetheless concluded there would be no more than minimal cumulative impacts from

15  72,300 acres of commercial shellfish aquaculture on the basis of a 10-page cumulative impacts

16  assessment in its Supplemental Decision Document. COE127582-93. Plaintiffs filed suit on

17  August 10, 2017. ECF No. 1.

18                          **STANDARD OF REVIEW**

19        Summary judgment is appropriate where the pleadings and record show "no genuine

20  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

21  Civ. P. 56. Issuance of a NWP is a final agency action under the APA, which provides the basic

22  framework for judicial review of agency action and requires the court to "hold unlawful and set

23  aside" any agency action that it concludes is "arbitrary, capricious, an abuse of discretion, or

24  otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or

25  limitations, or short of statutory right," or adopted "without observance of procedure required by

26

MOTION FOR SUMMARY JUDGMENT
PAGE 11
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   law." 5 U.S.C. §§ 702, 704, 706(2).[8] For substantive APA violations, a court evaluates whether

2   the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its

3   action including a rational connection between the facts found and the choice made." *Motor*

4   *Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal

5   quotation marks omitted). An action is arbitrary and capricious if the agency "has relied on

6   factors which Congress has not intended it to consider, entirely failed to consider an important

7   aspect of the problem, offered an explanation for its decision that runs counter to the evidence

8   before the agency, or is so implausible that it could not be ascribed to a difference in view or the

9   product of agency expertise." *Id.*

10                                     **ARGUMENT**

11   **I.      2017 NWP 48 VIOLATES THE CLEAN WATER ACT.**

12          The CWA prohibits adoption of 2017 NWP 48 in Washington State because it will have

13   more than minimal cumulative impacts, and because the Defendants failed to support its

14   determination to the contrary. The CWA's goal is "to restore and maintain the chemical,

15   physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Corps has

16   authority under CWA § 404 to regulate dredge and fill activities, including shellfish aquaculture.

17   *Id.* § 1344. CWA § 404 authorizes the use of general permits, in lieu of individual permits, on a

18   state, regional, or national (NWP) basis, but *only* if the Corps determines that (1) the activities

19

20   [8] Plaintiff CFS has standing. Plaintiff's members include local residents whose recreational,
     aesthetic, economic, and personal interests in Washington's shoreline and tide land aquatic and
21   wildlife resources, including federally-protected species, are injured and will continue to be
     injured, by the Corps' failure to lawfully regulate the commercial shellfish industry. *See*
22   Barkhurst Decl., Buchele Decl., Cohen Decl., Corbett Decl., Townsend Decl. (filed
     concurrently). Additionally, Plaintiff's organizational mission is to protect people and the
23   environment from the harms of industrial agriculture, including aquaculture, and as such has
     devoted organizational resources to addressing the environmental impacts of industrial
24   commercial shellfish aquaculture in Washington, thus Plaintiff is injured and will continue to be
     injured by the improper regulation of the Washington shellfish industry and lack of public
25   participation in the Corps' environmental and public interest assessments of the same. *See*
     Kimbrell Decl. (filed concurrently).
26

MOTION FOR SUMMARY JUDGMENT
PAGE 12
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

and their environmental impacts are similar in nature, and (2) individually or *cumulatively* will not cause more than minimal adverse impacts. *Id.* § 1344(e)(1); 33 C.F.R. § 323.2(h); 40 C.F.R. § 230.7(a). The Corps may not legally adopt a NWP if the activities covered will cumulatively cause more than minimal adverse impacts to the environment. This determination for general permits must be supported, in accordance with the § 404(b) Guidelines, which require the Corps to provide documentation to support each factual determination, including cumulative impacts and secondary effects. 40 C.F.R. §§ 230.7(b); 230.11. If the Corps relies on mitigation measures to meet the CWA standard of no more than minimal adverse cumulative impacts, it must adequately document those mitigation measures and support their efficacy. *Id.*

A.    **The Corps Violated The CWA By Adopting A NWP With More Than Minimal Adverse Cumulative Impacts.**

Because commercial shellfish aquaculture's combined adverse impacts, over tens of thousands of Washington acres, are more than "minimal," *see supra* pp. 3-5, the CWA does not authorize the Corps to use a NWP to cover these activities. The CWA is not merely procedural, but imposes "substantive restrictions on agency action," and is "clear that when the effect of a general permit will be more than minimal, either individually or cumulatively, the Corps cannot issue the permit." *Wyoming Outdoor Council, Powder River Basin Res. Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1254 (D. Wyo. 2005) (citations omitted). Where the Corps fails to adequately consider cumulative impacts, or its finding of minimal cumulative impact is not supported by substantial evidence in the record, courts strike NWPs. *Id.* at 1255-57. Courts have also set aside NWPs when the Corps relies on mitigation measures to avoid adverse cumulative impacts, but fails to document and support those mitigation measures and their efficacy. *Id.* at 1256; *Ohio Valley Envtl. Coal. v. Hurst*, 604 F. Supp. 2d 860, 884 (S.D.W. Va. 2009) (vacating and remanding NWP 21 for failure to provide rational explanation of mitigation

MOTION FOR SUMMARY JUDGMENT
PAGE 13
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   measures).[9]

2       In *Wyoming Outdoor Council*, the Corps' adopted a NWP for discharge of dredge and fill

3   materials associated with coalbed methane gas production, finding its cumulative effects

4   minimal. The court rejected this determination as unsupported by the record and arbitrary and

5   capricious, because the Corps failed to consider cumulative impacts beyond wetlands impacts

6   and relied on mitigation measures that were unsupported or unmonitored. *Wyoming Outdoor*

7   *Council*, 351 F. Supp. 2d at 1256-57. Similarly, the *Ohio Valley Envtl. Coalition* court vacated

8   NWP 21 (surface coal mining activities) because the Corps failed to provide information about

9   the cumulative impact of all authorizations and based its cumulative impacts analysis on the

10  success of a mitigation process with no support. 604 F. Supp. 2d at 901-02 (holding "[t]he Corps

11  may not use the nationwide permit process to circumvent its statutory obligations to thoroughly

12  examine the environmental impacts of permitted activities.").

13      Like these prior cases, Defendants here failed to adequately evaluate the cumulative

14  impact of permitting commercial shellfish aquaculture on potentially 72,300 acres, or a third of

15  all Washington tide lands, COE127582-593, despite evidence in the record of significant

16  negative impacts to eelgrass, forage fish and other wildlife, and federally-protected species. *See*

17  *supra* pp. 2-5. This evidence contrary to the Corps' decision included the Corps' *own* cumulative

18  impacts analysis, finding *significant cumulative impacts* to eelgrass and forage fish from 2017

19  NWP 48. COE125583-700. In the cumulative effects analysis in the Decision Document (the

20  cumulative impact section serving for both CWA and NEPA), Defendants admitted impacts to

21  eelgrass, forage fish, and some issues with plastic,[10] but went on to merely name the acreage that

---

22  [9] The Corps must also satisfy the CWA requirement to avoid significant degradation, 40 C.F.R. §
23  230.10(c); a failure to adequately support this finding will render a permit fatally flawed. *Friends*
    *of the Earth v. Hall*, 693 F. Supp. 904, 945 (W.D. Wash. 1988) (arbitrary and capricious to rely
24  on insufficient significant degradation analysis). Here the Corps' Supplemental Decision
    Document for NWP 48 also does not make or support this "no significant degradation" finding.
25  COE127485-611.

26  [10] The Corps admits plastics cause serious impacts, but refused to put regional conditions on their
    use under NWP 48. COE127559 ("The Seattle District recognizes marine debris is a serious

1    may be affected and conclude that there will not be cumulative impacts because there may be

2    discretionary mitigation by the district engineer. COE127582-593 (providing no details on what

3    these measures or special conditions might be or how they will be effective). Mitigation

4    measures that are not described, much less supported with documentation and data, cannot

5    support a conclusion that a NWP will have only minimal cumulative impacts. *Wyoming Outdoor*

6    *Council*, 351 F. Supp. 2d at 1256-57; *Ohio Valley Envtl. Coal.*, 604 F. Supp. 2d at 901. The

7    Corps also refused to consider the cumulative impacts of aquaculture pesticide use, despite not

8    restricting the use of pesticides under the NWP (and requiring those operations to secure

9    individual permits). COE127555.

10       Defendants' "no more than minimal cumulative impacts" conclusion cannot be squared

11    with the Defendants' own internal cumulative impacts analysis and the other evidence in the

12    record, including the conclusion by the expert wildlife agencies that commercial shellfish

13    aquaculture on fewer acres and with more protections would nonetheless still adversely affect

14    several ESA-protected species. COE134755-928; COE134516-754. The plain text of the CWA

15    does not allow the Corps to adopt a NWP unless it will have no more than minimal cumulative

16    adverse impacts. 33 U.S.C. § 1344(e)(1).[11] The Corps' conclusion that 2017 NWP 48 is

---

18    impact on the marine environment, but believes it would not be a practicable solution to
19    regionally condition NWP 48 to not allow the use of PVC and HDPE gear as there are no current
    practicable alternatives to use of these materials."). Without restricting this impact, the Corps
20    must consider it as part of the cumulative impacts of NWP 48 for purposes of the CWA, *supra*
    p.12, because plastics impact the aquatic environment, *supra* p.5, but it failed to do so.
21    [11] Further, it is unclear how the Corps' supported its determination that the activities authorized
    under 2017 NWP 48 are "similar in nature" as required by 33 U.S.C. § 1344(e)(1), and similar in
22    "impact upon water quality and the aquatic environment" by 40 C.F.R. § 230.7(a)(1). *See, e.g.,*
    *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 2013 WL 1294647, at *4 (D. Or. Mar. 27,
23    2013) (Corps violated CWA by failing to explain why general permit for gravel mining on river
    was appropriate, including how activities and impacts were similar in nature). When commenters
24    questioned how the various shellfish production activities were "similar in nature" the Corps
    pointed to the HQ explanation in its Federal Register notice, that the Corps interprets "similar in
25    nature" requirement broadly. COE127495 (citing 82 Fed. Reg. 1860, 1868 (Jan. 6, 2017)); *but
    see* 33 C.F.R. § 323.2(h) (Corps' regulation defining "general permit" as covering category of
26    activities that "are *substantially* similar in nature"). This citation does not explain how all

appropriate for use in Washington is arbitrary and capricious, and must be set aside.

**B.    The Corps Violated The CWA By Failing to Adequately Support Its Determination That 2017 NWP 48 Is Appropriate.**

Even if all commercial shellfish aquaculture in Washington was appropriately covered by a NWP (it is not), 2017 NWP 48's adoption in Washington was deficient because the Corps failed to provide documentation to support its determination, including a disclosure of mitigation measures. The CWA and its regulations require Defendants make and support a written finding that the permit will have only minimal effects on the environment. 40 C.F.R. §230.7(b). The Corps must (1) evaluate the potential cumulative impacts of the category of activities to be regulated by the permit, *id.* § 230.7(b), and (2) provide *documented information* supporting each factual determination required by § 230.11, including a determination of cumulative impacts, *id.* §§ 230.7(b)(1); 230.11(g). *Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 412 (6th Cir. 2013) (finding NWP 21 deficient for lack of compliance with documentation requirement). In *Kentucky Riverkeeper*, another challenge to NWP 21, the court found the Corps' discussion of mitigation measures to avoid cumulative impacts to be devoid of "*any*…factual underpinnings for this determination," *id.* at 412 (emphasis in original). The court held that the Corps could not rely on its procedures to oversee individual projects without explaining how its compensatory mitigation would ensure minimal cumulative effects. *Id.* at 412-13 (holding the Corps' conclusory mere-listing of "post-issuance mechanisms do not explain how the Corps arrived at its *preissuance* minimal cumulative-impact findings."). Failure to document support for CWA determinations is fatal to a NWP:

> After opting for streamlined nationwide permitting, the Corps took the easier path of preparing an environmental assessment instead of an environmental impact statement. Having done so, it needed to follow the applicable CWA and NEPA

---

shellfish aquaculture in Washington is similar in nature or in impact, when some operations use 42,000 PCV tubes per acre plus plastic netting, while others use pesticides to kill eelgrass, while still others are less detrimental. The Corps' implicit determination that all commercial shellfish aquaculture is similar in nature is unsupported.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   regulations by documenting its assessment of environmental impacts and
2   examining past impacts, respectively. Failing these regulatory prerequisites, the
    Corps leaves us with nothing more than its say-so that it meets CWA and NEPA
    standards.

3   *Id.* at 413.

4       Here, the Corps makes the same fatal error. As noted above, the Corps acknowledges

5   some impacts but then concludes, without support, that they will not be more than minimal

6   cumulatively. *See supra* p. 14. The Corps relies on mitigation to ensure impacts will be

7   minimized, but does not tell the public what that mitigation will look like or how it will be

8   effective. For example, after acknowledging harm to eelgrass from shellfish aquaculture

9   equipment, the Corps merely states that "[i]mpacts to eelgrass from all operations will be

10  reviewed by the district engineer…[s]pecial conditions may be applied on a project specific basis

11  to ensure impacts are minimal." COE127588. *See also* COE127589 ("the district engineer may

12  add activity specific conditions, or require project modifications to ensure impacts are

13  minimal"); COE127592-93 (similar). In its section entitled "Measures to Ensure No More than

14  Minimal Adverse Environmental Effects" the Corps provides no additional details, stating that

15  the district engineer will review authorizations on a "case-by-case basis to ensure those activities

16  result in no more than minimal adverse environmental effects, individually or cumulatively."

17  COE127599. If this level of individual review is necessary, a nationwide permit cannot be

18  appropriate. Nor is it clear when the level of "concern" will be triggered for the district engineer

19  to modify or revoke NWP 48 from a given operation, or what "special conditions" may be added

20  to authorization letters to minimize impacts. COE127599-600.

21      Nor does the Corps support through documentation its conclusions as to the §404(b)

22  Guidelines, particularly for special aquatic sites (including vegetated shallows, *i.e.* eelgrass),

23  COE127569. The Corps merely states that a PCN will be required for all aquaculture affecting

24  submerged aquatic vegetation (under general condition 18), and this general condition will

25  "ensure impacts to vegetated shallows are minimized." *Id.* Not only is this bald statement

26

1  unsupported by any documentation, it is impossible to square with the record, where the Corps'

2  own internal cumulative impacts analysis states that 2017 NWP 48 will cause *significant*

3  cumulative impacts to eelgrass, COE125589; 125684-6. Accordingly, the NWP must be set aside

4  because the Corps failed to provide documentation to support its determination that 2017 NWP

5  48 would not cause more than minimal cumulative effects, as required by the CWA.

6  **II.      2017 NWP 48 VIOLATES THE NATIONAL ENVIRONMENTAL POLICY ACT.**

7         NEPA "is our basic national charter for protection of the environment." 40 C.F.R. §

8  1500.1(a). It requires a detailed environmental impact statement (EIS) for all "major Federal

9  actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

10  NEPA "ensures that the agency . . . will have available, and will carefully consider, detailed

11  information concerning significant environmental impacts; it also guarantees that the relevant

12  information will be made available to the larger [public] audience." *Robertson v. Methow Valley*

13  *Citizens Council*, 490 U.S. 332, 349 (1989).

14         If the federal action *may* significantly affect the environment, the Corps must prepare an

15  EIS. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172, 1219-

16  20 (9th Cir. 2008). If the agency finds instead that the action will not have a significant impact

17  (FONSI), the agency must supply a "convincing statement of reasons" to explain how the

18  action's impacts are insignificant. *Id.* at 1220 (quoting *Blue Mountains Biodiversity Project v.*

19  *Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) ("The statement of reasons is crucial to

20  determining whether the agency took a 'hard look' at the potential environmental impact…")).

21  Whether an action is significant requires consideration of the "context" and "intensity" factors,

22  and an action may be "significant," requiring an EIS, if even one of the factors is present. 40

23  C.F.R. § 1508.27; *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th

24  Cir. 2005). A FONSI and a decision to forgo an EIS may be justified by adoption of mitigation

25  measures; however measures "must be developed to a reasonable degree," and a "perfunctory

26  description, or mere listing of mitigation measures, without supporting analytical data, is

MOTION FOR SUMMARY JUDGMENT
PAGE 18
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   insufficient to support a finding of no significant impact." *Nat'l Parks & Conservation Ass'n v.*

2   *Babbitt*, 241 F.3d 722, 733-34 (9th Cir. 2001) (citations omitted).

3        NEPA regulations require the agency analyze (take a hard look at) all direct, indirect, and

4   cumulative impacts. *See* 40 C.F.R. §§ 1508.8; 1508.9; 1508.13; 1508.18; 1508.27. Cumulative

5   impacts include the incremental impact of the proposed action when added to all past, present,

6   and reasonably foreseeable actions, taken not just by the agency, but by any entity. *Id*. § 1508.7.

7   A thorough consideration of cumulative impacts is required in an EA. *Kern v. U.S. Bureau of*

8   *Land Mgmt*., 284 F.3d 1062, 1075-77 (9th Cir. 2002).

9        Alternatives to the proposed action are the "heart" of NEPA. 40 C.F.R. § 1502.14. EAs

10   must assess a "no action" alternative, *i.e.* the status quo without the action, and a reasonable

11   range of alternatives to the proposed action. *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d

12   1010, 1022 (9th Cir. 2012); *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir.

13   2013); 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b).

14        Finally because public disclosure is one of the pillars of NEPA, agencies are required to

15   provide enough information to allow the public to weigh in and inform the decision-making

16   process. *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d

17   938, 952 (9th Cir. 2008).

18        **A.      The Corps Violated NEPA By Failing to Prepare An EIS for 2017 NWP 48.**

19        "[I]f substantial questions are raised as to whether a project ... *may* cause significant

20   degradation of some human environmental factor," an EIS must be undertaken. *Ctr. for*

21   *Biological Diversity,* 538 F.3d at 1219-20 (emphasis in original) (to trigger this requirement

22   Plaintiff "need not show that significant effects *will in fact occur*," but only that there are

23   substantial questions ).[12]

24   _____

25   [12] In considering whether an action is significant, agencies must consider both context and
     intensity factors, including: the unique characteristics of the location, 40 C.F.R. § 1508.27(b)(3),
26   the degree to the which the impacts are highly controversial or highly uncertain, *id.* §
     1508.27(b)(4)-(5), whether the action is cumulatively significant, *id.* § 1508.27(b)(7), and the

MOTION FOR SUMMARY JUDGMENT
PAGE 19
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    In *Ocean Advocates*, the Ninth Circuit held that the Corps violated NEPA when it failed

2    to consider increased ship traffic in Puget Sound from a dock expansion project, and failed to

3    provide the required statement of reasons as to why the project would have only a negligible

4    impact on the environment. 402 F.3d at 864-65 ("conclusory assertions that an activity will have

5    only an insignificant impact on the environment" are insufficient). Because the plaintiffs raised

6    "substantial questions" as to whether impacts would be significant, an EIS was required. *Id.* at

7    865. *See also Nat'l Parks & Conservation Ass'n*, 241 F.3d at 731-37 (EIS required due to unique

8    characteristics of park and uncertainty about impacts of increased traffic and effectiveness of

9    mitigation measures).

10    Here, the record shows that the industrial shellfish activities approved by the challenged

11    permit may have significant impacts and should have required an EIS. *Supra* pp. 2-5. The Corps

12    *itself* concluded that cumulative impacts would be significant for impacts to eelgrass and forage

13    fish. COE125583-125700. In its internal cumulative impacts analysis, the Corps found that

14    aquaculture is one of the primary adverse impacts to eelgrass habitat, but it is not mitigated.

15    COE125654-686. Looking at the NEPA context and intensity factors, the Corps itself found

16    many of those EIS-triggering factors to be present: eelgrass is an ecologically critical area;

17    impacts to eelgrass are controversial; there was some uncertainty about impacts, but there is

18    "little debate among the scientific community about the stressors on eelgrass and effects of

19    aquaculture in particular;" that NWP 48 would establish precedent for the future, with significant

20    cumulative impacts and likely adverse effects to ESA-protected species and their critical habitat;

21    and threatens a violation of state requirements and the ESA. COE125682-4. Given the

22    importance of eelgrass and losses already incurred, "additional losses…would therefore be

23    considered significant," including losses to Puget Sound eelgrass and the "loss and/or

24    degradation of 1,000s of acres of eelgrass in Willapa Bay and Grays Harbor." COE125685. The

25    _____

26    degree to which the action may adversely affect an endangered or threatened species or critical
     habitat, *id.* § 1508.27(b)(9).

analysis concluded the same for forage fish. COE125686-95. This analysis considered 55,000

total acres of shellfish aquaculture, including new acreage, and did not include pesticide use, thus

finding significance despite *analyzing an even lesser action than ultimately adopted*, which

could impact 72,300 acres, and did not exempt operations using pesticides. COE125620, 125627;

COE127592, 127598.

The Corps' public EA ignores the impacts and conclusions of this cumulative impacts

analysis, instead concluding without explanation that impacts from 2017 NWP 48, even without

regional conditions and its 100-year loophole, would only have insignificant impacts.

COE127592-3. The Corps' EA does not consider the context and intensity factors in 40 C.F.R. §

1508.27. Despite admitting impacts to eelgrass and forage fish, including the "substantial overlap

between eelgrass and much of the project area," the EA provides no reasoned explanation of how

those impacts will not rise to the level of significance, instead summarily concluding that these

impacts are already happening and will be minimized by individual review.

Indeed, the EA relies on unspecified future mitigation measures that may be required at

the discretion of the district engineer when each (of 1000s) application is reviewed. COE127592-

3, 127599. But the Corps cannot mitigate its way out of an EIS without developing mitigation

measures to a reasonable degree, disclosing those measures, and analyzing their efficacy at the

time the permit is issued. *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 733-34; *Wyoming

Outdoor Council*, 351 F. Supp. 2d at 1250; *Oregon Nat. Desert Ass'n v. Singleton*, 47 F. Supp.

2d 1182, 1193 (D. Or. 1998) (agency acknowledged harms from grazing but failed to mitigate

those harms or support them with analytical data, could not avoid EIS). Despite commenters like

the EPA and Plaintiff urging the Corps to adopt regional conditions to mitigate the harms from

NWP 48,[13] the Corps never discussed any mitigation measures, or whether and how they would

be sufficient to reduce the impacts below significance. While there are some national and

regional general conditions on NWPs, the Corps acknowledged that it is "uncertain whether any

---

[13] *Supra* note 6.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   of the general conditions would minimize effects of the action" and "[h]istorically, these

2   conditions have not been invoked to restrict activities under NWP 48." COE125589. Just like the

3   agencies in *National Parks* and *Wyoming Outdoor Council*, the Corps cannot rely on mitigation

4   to avoid preparation of an EIS without detailing and analyzing how those measures will work to

5   mitigate significant impacts. Defendants' conclusion that an EIS was not required is contrary to

6   evidence and thus arbitrary and capricious. *State Farm*, 463 U.S. at 43.

7         **B.**     **The Corps' EA Was Inadequate in Scope and Lacked Public Participation.**

8         The EA was improperly cabined to its single proposal (to adopt the HQ version of NWP

9   48), and the Corps did not allow for sufficient public participation in its development. "It is black

10   letter law that NEPA requires a comparative analysis of the environmental consequences of the

11   alternatives before the agency." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d

12   633, 645 (9th Cir. 2010).

13         First, an EA must have a purpose and need statement, defining the scope of reasonable

14   alternatives that would satisfy the purpose. 40 C.F.R. § 1508.9. This purpose cannot be defined

15   so narrowly that only one alternative would accomplish the goals. *Nat'l Parks & Conservation*

16   *Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010). The Corps' EA here

17   appears to lack a purpose and need statement. COE127485-611.

18         Second, the EA fails to analyze a "no action" alternative or any reasonable range of

19   alternatives beyond the proposed action. An EA must include a "no action" alternative. *Earth*

20   *Island Inst.*, 697 F.3d at 1022; *W. Watersheds Project*, 719 F.3d 1035. *See also Pres. Our Island*

21   *v. U.S. Army Corps of Eng'rs*, 2009 WL 2511953, at *16-17 (W.D. Wash. Aug. 13, 2009)

22   (failure to assess "no action" alternative based on erroneous assumption that baseline would

23   remain the same). The EA does not consider a "no action" alternative, *i.e.* not adopting NWP 48

24   in Washington, which is especially problematic given that the "no action" alternative is meant to

25   "provide a baseline against which the action alternative" is evaluated. *Ctr. for Biological*

26   *Diversity*, 623 F.3d at 642. NWPs adopted at the national level may not be appropriate for all

MOTION FOR SUMMARY JUDGMENT
PAGE 22
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

districts, so the Seattle District must consider whether to forgo NWP 48 under both NEPA and the CWA.

The Corps considered only one alternative, and failed to adequately explain its rejection of other, feasible alternatives previously considered or suggested by commenters, including a Regional General Permit or regional conditions to reduce impacts from NWP 48. *Supra* at pp.8-10; *see W. Watersheds Project*, 719 F.3d 1035; *Alaska Ctr. for Env't v. West*, 31 F. Supp. 2d 714, 722 (D. Alaska 1998) (failure to consider two more environmentally-benign alternatives to a NWP rendered EA insufficient); *Pres. Our Island*, 2009 WL 2511953, at *16-17 (failure to consider reasonable range of alternatives when they were feasible violates NEPA). The EA's alternatives section briefly describes several alternatives proposed by commenters and gives conclusory statements as to why they are not needed. COE127556-59. Nowhere does the Corps evaluate the alternative of a Regional General Permit, despite evidence in the record of both a draft of this permit and the Corps' own favorable comparison of this permit to NWP 48. *See, e.g.*, COE118939; COE119017-19; COE119073; COE120466-476. The Corps' failure to consider this viable and more environmentally-benign alternative to NWP 48 violated NEPA. The Corps' conclusory rejection of other alternatives (like more protective regional conditions or not using the 100-year definition of "new") was arbitrary and capricious, with no reasoned explanation. Merely stating that these additional conditions are "not necessary" does not satisfy NEPA's requirement to take a "hard look" at impacts and ignores the "heart" of the NEPA analysis. *Pres. Our Island*, 2009 WL 2511953, at *16; 40 C.F.R. § 1502.14.

Third, commenters suggested many feasible alternatives to the national NWP 48 and the Seattle District's proposed adoption of the same;[14] however these commenters were never able to see or comment *on the EA itself*, or the information contained therein. The Corps did not release the EA until after it made its decision to adopt NWP 48 with no additional regional conditions, thus depriving the public of enough information to allow the public to weigh in and inform the

---

[14] *Supra* note 6.

MOTION FOR SUMMARY JUDGMENT
PAGE 23
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    decision-making process. 40 C.F.R. § 1501; *Bering Strait Citizens for Responsible Res. Dev.*,

2    524 F.3d at 952; *Sierra Nevada Forest Prot. Campaign v. Weingardt*, 376 F. Supp. 2d 984, 991

3    (E.D. Cal. 2005) (agency's failure to give public adequate pre-decisional opportunity for

4    informed comment violated NEPA). While a draft EA itself is not strictly required, the failure to

5    provide as much environmental information as possible, *prior to completion* of the EA, violates

6    NEPA. *Sierra Nevada Forest Prot. Campaign*, 376 F. Supp. 2d at 991-92 (minimal scoping

7    notices did not provide enough information for informed comment). Here, the EA included the

8    information that NWP 48 might apply to 72,300 acres, and that the total acreage approved under

9    the 2012 NWP 48 was nearly 50,000 acres, COE127591-92, information which was not

10   previously available but is highly relevant to whether NWP 48 is appropriate for Washington, its

11   cumulative impacts, and alternatives. Nor did the Corps ever provide the public with its internal

12   cumulative impact analysis from February 2017, COE125583-125700. Without this crucial

13   information, the public was left in the dark as to the scope and impacts of the only alternative

14   considered, 2017 NWP 48 without additional regional conditions.

15       **C.    The Corps Failed to Take A Hard Look At Impacts.**

16       Agencies must evaluate all foreseeable direct, indirect, and cumulative impacts from a

17   proposed action in order to satisfy NEPA's "hard look" requirement. *Ctr. for Biological*

18   *Diversity v. Salazar*, 695 F.3d 893, 916-17 (9th Cir. 2012); 40 C.F.R. §§ 1508.8, 1508.9,

19   1508.13, 1508.18, 1508.27. Where an agency's EA fails to provide information on the

20   foreseeable environmental impacts of the proposed action, courts have found that the agency

21   failed to take a "hard look" at potential environmental consequences. *See, e.g., Klamath Siskiyou*

22   *Wildlands Ctr. v. Grantham,* 642 F. App'x 742, 744 (9th Cir. 2016) (although admitting impact

23   possible, agency failed to describe environmental consequences of cattle drift from grazing

24   areas); *Wildlands v. Woodruff*, 151 F. Supp. 3d 1153, 1163 (W.D. Wash. 2015) (finding Wildlife

25   Services failed to take a hard look at the ecological effects of lethal wolf removal). Here, the

26   Corps first failed to establish a reasonable baseline, then failed to assess the impact of past

MOTION FOR SUMMARY JUDGMENT
PAGE 24
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    actions, *i.e.* the approval of nearly 50,000 acres of commercial shellfish aquaculture under 2012

2    NWP 48, and finally failed to assess direct, indirect, (including pesticide use) and cumulative

3    impacts of the expanded 2017 NWP 48 to Washington's tideland ecosystems.

### 1.    Failure to Assess Reasonable Baseline.

5    A proper baseline is crucial to analyze the true impacts of an action, especially its

6    cumulative impact when added to other past, present, and reasonably foreseeable future actions,

7    and should have been evaluated in a no-action alternative. *Great Basin Res. Watch v. Bureau of*

8    *Land Mgmt.,* 844 F.3d 1095, 1101 (9th Cir. 2016) (baseline is "critical" and "must be based on

9    accurate information and defensible reasoning") (quoting *Oregon Nat. Desert Ass'n v. Jewell*,

10    840 F.3d 562, 570 (9th Cir. 2016)). The Ninth Circuit has held arbitrary and capricious agency

11    actions with no-action alternatives that assume the same impacts as the proposed action. *Id. See*

12    *also Ctr. for Biological Diversity*, 623 F.3d at 636 (BLM arbitrary and capricious for assuming

13    same impacts from "no action," where government would retain land and could condition

14    mining, and preferred alternatives where land would be transferred to private ownership);

15    *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024 (9th Cir. 2008) (no action alternative

16    is meaningless if it assumes the existence of the very plan being proposed); *Pit River Tribe v.*

17    *U.S. Forest Serv.*, 469 F.3d 768, 784 (9th Cir. 2006) (lease extension for geothermal plant was

18    not preservation of status quo or "continued use" and EIS required).

19    Here, the Corps failed to describe or evaluate a "no action" alternative, *supra* p. 22*,* but

20    did indicate that the baseline for its analysis was *all* shellfish operations/acreage authorized

21    under the 2012 NWP 48. COE127589; 127592. This assumption is unreasonable and not

22    supported by the record—without NWP 48, shellfish growers are not authorized to conduct

23    dredge and fill activities unless they are covered under a different CWA § 404 permit. Assuming

24    the level of impacts authorized under 2012 NWP 48 is the baseline ignores the true extent of

25    environmental consequences. Not only has the Corps never assessed the impacts from the

26    overuse of 2012 NWP 48 beyond what it predicted, *see infra*, the Corps ignores that much of this

MOTION FOR SUMMARY JUDGMENT
PAGE 25
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

acreage may be fallow,[15] and is thus grandfathering in impacts to essentially undisturbed tide

lands. Moreover, while these operations are continuous, they are not necessarily permanent, but

restart the cultivation process every few years (if permitted). COE125591-618. Thus it is not

reasonable to assume the environmental baseline is all the shellfish aquaculture permitted under

2012 NWP 48 (nearly 50,000 acres); rather, it is classic arbitrary and capricious decision-

making. *Ctr. for Biological Diversity,* 623 F.3d at 639-40, 642-43 (agency conclusion that

consequences of proposed land exchange and no action alternative would be the same held

arbitrary and capricious because mining would not necessarily occur in same manner if the land

exchange did not happen); *Friends of Yosemite Valley*, 520 F.3d at 1037-38 (no true baseline

because agency "assume[d] the existence of the very plan being proposed" and predetermined

the "user capacity" of the national park without any analysis); *Pit River Tribe*, 469 F.3d at 784

(where an action requires renewal of permit or lease, agency cannot assume ongoing impacts

because permit or lease may not be renewed). While a baseline without NWP 48 may not be *no*

shellfish aquaculture, the mechanism of CWA § 404 permitting might change the acreage

authorized and the restrictions on the same.[16]

### 2.  Failure to Adequately Assess Direct, Indirect, and Cumulative Impacts.

The Corps' EA expressly refused to consider the impacts of pesticide use on shellfish

beds as a consequence of commercial shellfish aquaculture, giving the rationale that the Corps

does not issue NPDES permits for the discharge of pesticides into water. COE127555. However,

pesticide use on shellfish beds, in particular to kill eelgrass, is a direct (or at least indirect)

impact of commercial shellfish aquaculture in Washington. *Supra* pp. 4-5. Whether the Corps

---

[15] COE134768; COE134149 (describing fallow acreage to mean areas without active cultivation since at least 2007 or longer); COE134184 (14,771 fallow acres total in all geographic areas).

[16] Elsewhere the Corps identified the existing active footprint as of March 2007 (when the first NWP 48 was adopted) as a more reasonable definition of "existing" shellfish aquaculture, and this definition of "existing" that may have been adopted in a different CWA permit (i.e. Regional General or individual permits). COE134149.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

has the authority to issue CWA §402 NPDES permits is irrelevant to the NEPA analysis—impacts that must be discussed are not limited to those the action agency is in charge of approving, including in the case of pesticides. *See Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1247 (9th Cir. 1984) (holding NEPA requires consideration of impacts of herbicides in National Forest, reliance on EPA registration inadequate); *Oregon Envtl. Council v. Kunzman*, 714 F.2d 901, 905 (9th Cir. 1983) (same); *see also Wildlands*, 151 F. Supp. 3d at 1163 (rejecting agency refusal to consider impact because another agency is responsible); *Wyoming Outdoor Council*, 351 F. Supp. 2d at 1244 (even though water discharges controlled by state agencies, "[i]mpacts to water quality are impacts to the human environment and, if significant, could necessitate the preparation of an EIS"). Moreover, the Corps can only adopt a NWP that will have no more than minimal cumulative impacts to the environment, and thus must consider whether under the CWA operations that use pesticides should be permitted under NWP 48 (as opposed to another CWA § 404 permit). *Supra* pp. 12-17. Thus, the Corps' failure to discuss the impacts of pesticide use violated NEPA.[17]

The Corps failed to analyze cumulative impacts adequately for two reasons: it never assessed the impacts from all the acreage authorized under 2012 NWP 48, and then failed to acknowledge evidence in the record of cumulatively significant impacts from adopting the even less-protective 2017 NWP 48. Consideration of cumulative impacts requires "some quantified or detailed information" and "general statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could

---

[17] In addition to pesticide use, the EA fails to provide any detail about various negative direct/indirect impacts, including the massive plastic use, although they are briefly listed, including "conversion of substrates (e.g. mudflats to gravel bars), impacts to submerged aquatic vegetation, alteration in aquatic communities from native to non-native shellfish species, and water quality impacts from harvest activities," as well as "increased competition for native species [from introduced non-native shellfish species] affecting their viability." COE127584. Although these impacts are acknowledged, and supported by the record, the direct and indirect consequences from allowing shellfish aquaculture on 72,300 acres (or a third of all tideland acres in Washington) are not discussed in any detail.

1  not be provided." *Kern*, 284 F.3d at 1075 (quoting *Neighbors of Cuddy Mountain v. U.S. Forest*

2  *Serv.,* 137 F.3d 1372, 1379-80 (9th Cir. 1998)). An EA must "provide a 'useful analysis of the

3  cumulative impacts of past, present, and future projects.'" *Id.* (quoting *Muckleshoot Indian Tribe*

4  *v. U.S. Forest Serv*., 177 F.3d 800, 810 (9th Cir. 1999)).

5      First, the Corps failed to analyze the cumulative effects of all the aquaculture authorized

6  under 2012 NWP 48. *See* COE135243-263; Coalition Mot. Summ. J. (filed concurrently). *See*

7  *Ohio Valley Envtl. Coal.*, 604 F. Supp. 2d at 885-87 (Corps' NWP approval violated NEPA

8  where Corps failed to discuss the past loss of thousands of miles of streams in Appalachia from

9  mountaintop mining under prior CWA § 404 permits, losses "not corrected or cured every five

10  years with the renewal of new nationwide permit."). The court in *Ohio Valley* held that prior to

11  authorizing "future activities with such tremendous impacts, the Corps must at least consider the

12  present effects of past activities" which were unlikely to have been "successfully mitigated to

13  insignificance." *Id.* at 887. In its review of the same NWP, the Sixth Circuit found the failure to

14  assess the impacts of past actions was arbitrary and capricious. *Kentucky Riverkeeper*, 714 F.3d

15  at 410 ("An environmental assessment that omits consideration of past impacts, followed by a

16  conclusory suggestion that past impacts did not matter, cannot be in conformance. This is

17  especially true where the reviewing agency *reauthorizes* a nationwide permit involving the same

18  type of mining activities that cause the same type of environmental impacts."). There, the Corps

19  failed to use data on past impacts to gauge the cumulative impact of reauthorizing the NWP. *Id.*

20      The same is true here: the Corps authorized NWP 48 in 2012 predicting it would only be

21  used a total of 250 times, but used it *1,129 times* on tens of thousands of acres in Washington and

22  never conducted a cumulative impacts analysis to evaluate this increased use. Then the Corps

23  reauthorized NWP 48 in 2017 to cover tens of thousands of *new* acres, *with fewer protections* for

24  eelgrass, forage fish, other wildlife and imperiled species, and *still failed to evaluate* the impacts

25  of the past 2012 NWP 48 to gauge the cumulative impact of reauthorizing NWP 48. *Supra* pp. 5-

26  11. The Corps cannot ignore the impacts of its own past actions, as well as all other past actions,

MOTION FOR SUMMARY JUDGMENT
PAGE 28
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   when evaluating how its proposed action will cumulatively effect the environment. *Pres. Our*

2   *Island*, 2009 WL 2511953, at *17 ("[T]he [Corps'] conclusion that the proposed project would

3   not contribute to cumulative effects because the shoreline in the area was already disturbed is an

4   improper application of the cumulative effects standard.").

5        Second, the cumulative impacts analysis in the EA is significantly different from the

6   internal cumulative impact analysis undertaken by Corps staff. COE125583-700. This 112-page

7   document detailed the *significant* cumulative impacts of unmitigated commercial shellfish

8   aquaculture (as authorized under 2017 NWP 48) on eelgrass and forage fish, but its analysis is

9   not repeated in the public EA, which merely concludes that cumulative impacts will not happen

10  because of the discretionary unspecified mitigation that district engineers may or may not take

11  for each individual authorization under NWP 48. *Compare* COE125583-700 *with* COE127582-

12  593. Unlike the internal analysis, the EA's cumulative impact section fails to detail any past,

13  present, or reasonably foreseeable impacts of activities beyond shellfish aquaculture, as required

14  by NEPA. *Kern,* 284 F.3d at 1075; *Pres. Our Island*, 2009 WL 2511953, at *17 (failure to

15  consider impacts from other operations beyond proposals undercut cumulative effects analysis

16  was a "serious deficiency"). The Corps' limited analysis cannot be squared with the evidence in

17  the record, including the Corps' own analysis, and the sheer number of acres potentially

18  impacted under 2017 NWP 48. The EA violates NEPA.

19  **III.**    **2017 NWP 48 VIOLATES THE ENDANGERED SPECIES ACT.**

20       The Corps violated the ESA by adopting the 2017 NWP 48 without insuring, through

21  consultation with the expert wildlife agencies, that its approval action does not jeopardize ESA-

22  protected species and/or their critical habitat. The Corps acknowledged that the industrial

23  shellfish production activities are "likely to adversely affect" multiple ESA-protected species,

24  and in 2016 completed an ESA consultation. However, that consultation was for a significantly

25  different action than the one subsequently adopted. The ESA places on the Corps a *continuing*

26  duty to insure no jeopardy, and the Corps violated it by not re-initiating consultation before

MOTION FOR SUMMARY JUDGMENT
PAGE 29
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    issuing the current 2017 NWP 48 approval. The permit ultimately adopted differs in substantial

2    ways from the assumptions of the 2016 ESA determinations. First, 2017 NWP 48 doubled the

3    total amount of industrial shellfish production acreage allowed by Defendants; 90% more of

4    Washington coastline now open to industrial shellfish production, acreage and concomitant

5    impacts not contemplated or analyzed by the prior consultation. Second, the 2016 ESA

6    consultation, and its conclusions of no jeopardy were predicated on, among other things, dozens

7    of conservation measures and Incidental Take conditions focused on protecting those species and

8    their habitat. Yet 2017 NWP 48 omitted those conservation measures. Third, the 2016

9    consultation was based on well-established prior definitions of what is "existing," or in-

10   production shellfish production acreage, compared to "new" production acreage, with the latter

11   requiring more stringent conservation protection measures. Yet after the 2016 ESA consultation,

12   2017 NWP 48 fundamentally changed the definition of "new," narrowing it to only areas where

13   no commercial shellfish activity has taken place at any time for the last 100 years, meaning that

14   the definition of "new" activities is significantly cabined. *Supra* p. 8. Finally, the 2016

15   consultation's analysis did not include the impacts of pesticides used in shellfish production on

16   ESA-species; yet 2017 NWP 48 does not exclude such uses. These are all substantial

17   modifications to the permit and new information regarding its ambit; as such, they belie the basic

18   assumptions and conclusions of the 2016 ESA consultation, risking jeopardy to endangered

19   species, in contravention of the ESA. The Corps must reinitiate consultation.

20      **A.      ESA Standards and the Section 7 Consultation Process.**

21      When Congress passed the ESA in 1973 it "represented the most comprehensive

22   legislation for the preservation of endangered species ever enacted by any nation." *Tennessee*

23   *Valley Auth. v. Hill (TVA)*, 437 U.S. 153, 180 (1978). The statute's purpose is to conserve

24   threatened and endangered species and to protect the ecosystems upon which those species

25   depend. 16 U.S.C. § 1531(b). Congress spoke "in the plainest of words, making it abundantly

26   clear that the balance has been struck in favor of affording endangered species the highest of

MOTION FOR SUMMARY JUDGMENT
PAGE 30
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

priorities, thereby adopting a policy which it described as 'institutionalized caution.'" *TVA*, 437 U.S. at 194.

Section 7 is the "heart" of the ESA, and one of the statute's most important protections. *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009). It mandates that "[e]ach federal agency" "insure" its actions are not likely to either jeopardize any species or adversely modify any designated "critical" habitat. 16 U.S.C. § 1536(a)(2). The Corps' duty to insure against jeopardy and adverse modification is "rigorous." *Sierra Club v. Marsh*, 816 F.2d 1376, 1385 (9th Cir. 1987). Section 7 imposes procedural requirements to facilitate compliance with those substantive mandates. *See Thomas v. Peterson*, 753 F.2d 754, 763-65 (9th Cir. 1985), *abrogated on other grounds*, *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091-92 (9th Cir. 2015). This consultation process to assess the registration's effects is integral to "insuring" EPA implements the ESA's substantive protections, and as such should be enforced stringently. *Id.* at 764.

Section 7(a)(2) requires the Corps, as the "action agency," to determine if a proposed action like the challenged permit approval here "may affect" any listed species or designated critical habitat. If so, then Defendants then must enter consultation with the expert wildlife agencies, FWS (for terrestrial and freshwater species) and NMFS (for marine species) 50 C.F.R. § 402.14(a); *id.* § 17.11; *id.* § 223.102; *id.* § 224.101. Importantly, the "may affect" standard is extremely low: "[A]ctions that have any chance of affecting listed species or critical habitat— even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA." *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (en banc); *see also W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011).

Formal consultation results in the expert consulting agency's BiOp determining whether the action is likely to jeopardize listed species. 50 C.F.R. § 402.14(h)(3). If the consulting agency determines that jeopardy is not likely, it issues an Incidental Take Statement (ITS) with the BiOp

authorizing a defined amount of take that may result from the action. 16 U.S.C. § 1536(b)(4),

(o)(2); 50 C.F.R. § 402.14(i)(5). The ITS includes other important components, including

requirements to minimize impacts to species and to monitor and report take of protected species

to ensure that the amount authorized is not exceeded. 16 U.S.C. § 1536(b)(4)(C)(ii); 50 C.F.R §

402.14(i)(1)(ii), (i)(3); *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531-32 (9th Cir.

2010).[18] In all of ESA analyses and decisions, agencies must "give the benefit of the doubt to the

species," *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988), and use the best scientific and

commercial data available, 16 U.S.C. § 1536(a)(2).

### B.    Reinitiation of Section 7 Consultation.

Agencies remain under a continuing duty under Section 7 of the ESA after consultation to

insure that the action will not jeopardize species. *Wild Fish Conservancy*, 628 F.3d at 525.

Accordingly, agencies *must* reinitiate formal consultation if any one of four scenarios are

presented by a new action:

> (a) If the amount or extent of taking specified in the incidental take statement is
> exceeded;
> (b) If new information reveals effects of the action that may affect listed species
> or critical habitat in a manner or to an extent not previously considered;
> (c) If the identified action is subsequently modified in a manner that causes an
> effect to the listed species or critical habitat that was not considered in the
> biological opinion; or
> (d) If a new species is listed or critical habitat designated that may be affected by
> the identified action.

50 C.F.R. § 402.16(a)-(d). *See also Pacificans for a Scenic Coast v. California Dep't of Transp.*,

204 F. Supp. 3d 1075, 1093 (N.D. Cal. 2016) (Reiniating consultation is required if any one of

the four triggering conditions are satisfied) (*citing Cottonwood*, 789 F.3d at 1088). "The duty to

---

[18] If an action "may affect" endangered species and/or its critical habitat, there is one exception
to formal consultation: informal consultation. Agencies must still consult with the expert agency,
but may avoid formal if during informal consultation the expert agency concurs in writing that,
while the agency action in question "may affect" a species or habitat, that action is nonetheless
"not likely to adversely affect" them. 50 C.F.R. §§ 402.13(a), 402.14(b)(1); *Pac. Rivers Council
v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994).

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

reinitiate consultation lies with both the action agency and the consulting agency." *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106, 1122 (N.D. Cal. 2017) (quoting *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008)). Here, as discussed below, multiple such triggers for reinitiating are present.

### C.   The Corps Violated the ESA By Failing to Reinitiate Consultation For the Challenged Action.

Defendants violated the ESA by failing to re-initiate ESA consultation before approving 2017 NWP 48, despite the fact that multiple triggers requiring reinitiation are present. Defendants "modified" their approval action in several ways "that causes an effect to the listed species or critical habitat that was not considered" in the prior consultation. 50 C.F.R. § 402.16(c). Moreover 2017 NWP 48 and this record include "new information" that "may affect listed species or critical habitat in a manner or to an extent not previously considered." *Id.* § 402.16(b). Finally, the Corps disregarded the ITS measures of the 2016 ESA consultation, failing to require them in 2017 NWP 48. *Id.* § 402.16(a).

### 1.   2017 NWP 48 Doubled the Size of Analyzed Shellfish Acreage.

First, 2017 NWP 48 doubles the size of allowed shellfish aquaculture acreage, far beyond that previously considered. The prior ESA consultation only covered 38,400 acres of allowed "continuing and new" commercial shellfish production in Washington. *See* COE134767; COE134789. However 2017 NWP 48 now approves *72,300 acres*, or expanding to more than 1/3 of all Washington tidelands. COE127591-98. The action covers approximately 90% more of Washington's coastal environment than contemplated by the 2016 consultation. By any commonsense definition, this massive expansion of the tidal acreage affected by the proposed action qualifies as significant new information as well as a substantial modification the agency's previous action in a manner or to an extent not previously considered. 50 C.F.R. § 402.16(b)-(c). Doubling the geographic spread of shellfish production allows means likely exposures to ESA-protected species in new areas and in new ways not previously considered or analyzed by the

1  expert agencies, in addition to potentially doubling the cumulative stress on these species, *supra*

2  pp. 3-5, 14, 20, 27-28. "[T]he scope of the agency action is crucial because the ESA requires the

3  [BiOp] to analyze the effect of the *entire* agency action." *Conner*, 848 F.2d at 1453 (emphasis in

4  original).

      **2.**      **2017 NWP 48 Does Not Include the Conservation Measures Upon Which the Expert Agencies Predicated their ESA Conclusions.**

7        Second, the 2016 ESA consultation included 28 detailed conservation measures, designed

8  to protect ESA-listed species and their habitat. COE134771-134775. The conservation measures

9  address things such as shellfish seeding, grow out, and harvest activities, and are intended to

10  lessen their impacts, such as protecting fish spawning habitat from industrial activities and

11  requiring routine equipment inspections and immediate notice for fish, bird, or mammal

12  entanglement. *Id.* (*e.g.*, measures #7, 8, 9, 10, 24). Increased turbidity from suspended sediment

13  caused by aquaculture activities is well documented to effect salmonids, COE134825; as such,

14  several mitigation measures are intended to address turbidity. COE134771 (e.g., measures # 2,

15  4). The main threat to Chinook salmon is through impacts to eelgrass, which provides cover for

16  juvenile salmonids, and structure for the spawning of species upon which juvenile salmonids

17  prey. COE134826-30. As such several measures focus on protecting eelgrass COE134771

18  (measures # 3, 6, 26). Finally, the BiOp concluded that shellfish aquaculture adversely affects

19  forage fish species, including surf smelt, sand lance, and herring, to the detriment of ESA-listed

20  salmonids. COE134840. Thus numerous mitigation measures were focused on protecting those

21  forage species from aquaculture activities. COE134772 (measures # 8, 9, 10); COE134841. In

22  part predicated on the use of these measures, the 2016 consultation concluded the Corps'

23  shellfish permitting was "likely to adversely affect," but not jeopardize the existence of, several

24  species, including several Pacific salmon, canary rockfish, and green sturgeon. COE134755.

25  That is, the BiOps' "no jeopardy" conclusions for the general permit were predicated upon all

26  operations being required by the permit to conform to those measures. *Supra* note 5.

MOTION FOR SUMMARY JUDGMENT
PAGE 34
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    However 2017 NWP 48 does *not* include or require these measures. COE127591-98.[19]

2    This failure is a substantial modification and new information triggered reinitiation. 50 C.F.R. §

3    402.16(b)-(c). In *Sierra Club*, at issue was the Corps' approval of a highway through endangered

4    bird habitat. 816 F.2d 1376. As here, there FWS made its "not likely to adversely affect" BiOp

5    decision contingent upon the adoption of a mitigation plan to acquire adjacent replacement

6    marshland. *Id.* at 1379-80. The Ninth Circuit held that the Corps' violated the ESA and had to

7    reinitiate consultation when it attempted to approve the highway without securing that mitigation

8    marshland the expert agency previously concluded necessary. *Id.* at 1388. Likewise, in *Forest*

9    *Guardians v. Johanns*, the Ninth Circuit held the defendant agency violated the ESA's Section 7

10   reinitiation mandates when re-approving cattle grazing on national forest land. 450 F.3d 455, 457

11   (9th Cir. 2006). Prior ESA consultation was predicated on the Forest Service's conducting

12   mitigation, such as restricting utilization and annual monitoring of the grazing parcels, which the

13   agency failed to do. *Id.* at 459-60. This failing "constituted modifications to the allotment's land

14   management plan that affected listed species in a manner and to an extent not previously

15   considered," and thus reinitiation was therefore required. *Id.* at 465-66. The same is true here.

### 3.    2017 NWP 48 Does not Include the Incidental Take Restrictions Upon Which the Expert Agencies Predicated their Conclusions.

18   The 2017 NWP 48 also fails to require the prior ESA Incidental Take Statement's

19   conditions, mandatory terms designed to lessen the adverse impacts to ESA-protected species.

20   COE134755 (BiOp explaining that the ITS "describes reasonable and prudent measures NMFS

21   considers necessary or appropriate to minimize the impact of incidental take associated with

22   COE's proposed action.").The take statement sets forth "nondiscretionary terms and conditions,

23   including reporting requirements, that the Federal action agency must comply with" to comply

24   [19] This was contrary to the guidance of the expert agency to include these measures. *See*
25   COE121689 (email from FWS to Corps, 2016: "The Corps should build-in/adopt a set of
     regional NWP 48 conditions that are broadly consistent with, or more protective than, the 28
     Conservation Measures included in the Shellfish Programmatic ESA consultation."). *See also*
26   *supra* note 6.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    with the ESA. COE134756.

2          Specifically, in the 2016 BiOp, NMFS found take of ESA-protected species reasonably

3    certain to occur from mechanical oyster harvesting (canary rockfish and green sturgeon);

4    entanglement (Chinook salmon, Chum salmon, and rockfish); loss of cover due to suppression of

5    eelgrass (salmon); and shellfish-related disturbances nearshore during juvenile migration

6    (salmon). COE134854-6. As such the ITS puts threshold acre limits on these activities, to limit

7    incidental take. COE134855 (limiting annual mechanical harvest acres); 134856 (limiting the

8    amount of fallow area to be developed for overlap with eelgrass); 134856 (limiting the number

9    of reported entanglements). From these NFMS developed reasonable and prudent measures and

10   terms and conditions to avoid incidental take. COE134856-8; *see also* COE134933-37 (NMFS'

11   minor ITS revisions); COE134728-32 (FWS ITS).

12         The Corps' subsequent failure to include these protective measures or require them in

13   2017 NWP 48 is new information and significant modification that requires reinitiation of

14   consultation. 50 C.F.R. § 402.16(b)-(c).[20] Further, because these measures are not included in or

15   mandated by the general permit's requirements, the Corps cannot show that the incidental take

16   provisions are not being exceeded by the shellfish activities, an independent trigger requiring

17   reinitiation. *See Id.* § 402.16(a). *See also Pacificans for a Scenic Coast*, 204 F. Supp. 3d at 1092

18   (ordering reinitiation because "[t]he loss of this benefit necessarily implies that the project's net

19   effect on listed species and their habitat will be greater than previously thought."); *Ctr. for*

20   *Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1115 (9th Cir. 2012)

21   ("[W]here mitigation measures are not carried out, any risk to listed species thereby created must

22   be borne by the project, not by the endangered species.").

23

24

25

---

[20] Again, the Corps decision was contrary to the guidance of the expert agency to include these measures. *See* COE121689 (email from FWS to Corps, 2016).

26

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

**4.**     **2017 NWP 48 Modified the Terms of the Action by Redefining New and Existing Operations, Reducing Protections.**

2017 NWP 48 also substantially modified basic assumptions and protections from the 2016 ESA consultation by drastically altering the definition of a "new" shellfish operation for purposes of NWP 48. Namely, the revised definition instantly transforms all shellfish production into "existing," rather than "new," so long as any commercial shellfish activity took place in an area in the last 100 years. *Supra* p.8. Whatever the Corps Seattle District's intention as to matching the definition in the adopted permit to the consultation definition of "new," the Corps HQ appears to have ordered the Seattle District to adopt the 100-year definition of new, without consideration of the unique impacts in Washington. COE125708-12 (February 2017 email from Corps Headquarters to Seattle District attaching memo declaring the changed definition of "new" and instructing that the same memo "provides clarity on what constitutes a 'new commercial shellfish aquaculture operation'"); COE134955-56. This allows a shellfish operation to be considered "existing" and thus avoid protections placed only on "new" facilities, if, for example, oysters were farmed in a spot in 1919, but not a single year since. In sharp contrast, in the 2016 consultation, NMFS considered as "existing" production just those areas that were *actively occurring* in March 2007. COE13764-5. "New" activities were all those undertaken after 2007 and "essentially include all activities that do not qualify as continuing." *Id.* As a result, under 2017 NWP 48, only 332 acres out of a total of 72,300 would be considered "new," COE127592, whereas, under the prior ESA consultation, 1,401 of the 38,715 acres were classified as "new." COE134765-66.

This definitional loosening has significant consequences because numerous of the conservation measures differentiated between "new" and "existing" and created more protections only for the former. COE134771-75. For example, new shellfish permits cannot use gravel or shells to build substrate for their production where eelgrass or kelp is present. COE13771 (measure #3). Further, only new activities are prevented from occurring with 16 horizontal feet of eelgrass or kelp (measure #6), and only new activities cannot occur above certain tidal

elevations where there is forage fish spawning habitat (measures #7 & 8, *see also* 10). COE134771-72. The definitional alteration effectively eliminates all of these protections except for a tiny percentage of acres, and thus increases risks to ESA-species. The 2016 ESA consultation predicated its analysis, conclusions, and ITS on these restrictions on "new" operations being in place, and now they are not. This again easily qualifies as significant modification and new information that should have lawfully required reinitiation of consultation. 50 C.F.R. § 402.16(b)-(c).

### 5.     The 2016 Consultation Failed to include Pesticide Impacts of Industrial Shellfish Production.

The 2017 NWP 48 allows the use of pesticides in shellfish production. However the prior ESA consultation did not include pesticide use in shellfish production within its scope of action. COE134769 (Corps "did not propose to include activities involving the application of any pesticides or herbicides for any purpose regardless of when the activity commenced under this programmatic consultation."). While imazomox use was nonetheless analyzed by NFMS as an "interrelated" activity, it was not considered part of the action *itself*, and any other pesticidial activities were not covered at all. COE134770. Pesticide use is another damaging aspect of industrial shellfish production, creating its own suite of risks and adverse impacts. COE133093, 133112-8, 133143-7; COE125629; COE128671-2.[21] Imazomox is already used by growers in Willapa Bay to kill non-native eelgrass and the permit allows thousands of acres to be sprayed annually. *Supra* note 2. Among other pesticides, growers have again applied for a permit to use imidacloprid, a nerurotoxin to kill native shrimp, which would be an unprecedented water use of

---

[21] Wash. Dept. of Ecology, *Final Supplemental Environmental Impact Statement for Control of Burrowing Shrimp using Imidacloprid on Commercial Oyster and Clam Beds in Willapa Bay and Grays Harbor, Washington* (Jan. 2018), https://fortress.wa.gov/ecy/publications/ SummaryPages/1810002.html; *see also* van Saun Decl. Ex. A (recent study on microplastics and how they accumulate toxins from the water, constituting new information relevant to Corps' shellfish permitting under 2017 NWP 48, which does not prohibit the use of plastics in shellfish aquaculture, COE127559).

MOTION FOR SUMMARY JUDGMENT
PAGE 38
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

this neonicotinoid. *Supra* note 22. While the Washington Department of Ecology has proposed to deny the permit application, the result is still unclear. Regardless, contrary to the boundaries of the 2016 consultation, the 2017 permit approved does not restrict pesticide use, *i.e.*, it is part of the action approved. This is yet another substantial modification and new information that lawfully required consultation reinitiation. 50 C.F.R. § 402.16(b)-(c).

### 6. Attempting to Pass the Buck to Future Individual Permits Does Not Satisfy the Corps' ESA Duties.

Finally, Defendants' likely argument that its current failings are permissible because it will address any ESA risks created by its 2017 general permit's substantial alterations from what was consulted on in 2016, on a case-by-case level for individual permits, is contrary to law. This is not how the ESA works. First, whatever Defendants' ESA duties may be for *future* actions, such as individual permits, is irrelevant to their legal duties for this programmatic action, *now*. *Cottonwood Envtl. Law Ctr.*, 789 F.3d at 1082 (warning that "project-specific consultations do not include a unit-wide analysis comparable in scope and scale to consultation at the programmatic level"); *All. for the Wild Rockies v. Krueger*, 950 F. Supp. 2d 1196, 1200 (D. Mont. 2013) ("The agencies cannot shift this analysis to the project level."); *aff'd sub nom. All. for the Wild Rockies v. Christensen*, 663 F. App'x 515 (9th Cir. 2016). Moreover, as many of the above examples show, any such piecemeal assessment of individual permits in isolation fails to account for the cumulative impacts. The ESA requires this analysis be done "at the earliest possible time," 50 C.F.R. § 402.14(a). Further, later, individual-permit decisions will not be equivalent in scope, and will create impermissible piecemeal decision-making, a danger of death by a thousand cuts; they are no substitute for the Corps' programmatic duties here.[22]

---

[22] Another substantial change made in 2017 was to eliminate the Seattle region's collecting of information for future permits using "Specific Project Information Forms" or SPIFs, which previously had been how the agency undertook ESA Section 7 compliance for individual permits. COE134954 & 134956. Without those forms, the agency will have even less information and data on the potential ESA ramifications of an individual permit. This was yet another modification requiring reinitiation.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   Despite the significant change in the geographic scope and type of activities allowed

2   under 2017 NWP 48, the Corps failed to reinitiate consultation, in violation of the ESA. The

3   Court should vacate 2017 NWP 48 until and unless the Corps reinitiates and completes

4   consultation.

5   **CONCLUSION**

6   The Corps has a duty under the CWA, NEPA, and the ESA to evaluate the foreseeable

7   environmental impacts of commercial shellfish aquaculture and to forgo NWP 48 if it will cause

8   more than minimal cumulative impacts. Instead, the Corps adopted 2017 NWP 48, with its

9   revised 100-year definition of "new," allowing commercial shellfish aquaculture on expanded

10  acreage of potentially 72,300 acres, without additional regional conditions to protect eelgrass,

11  forage fish, other wildlife and ESA-protected species. Because Defendants failed to support its

12  approval of 2017 NWP 48 in Washington, despite the record showing significant adverse

13  cumulative impacts from 2017 NWP 48, and failed to reinitiate ESA Section 7 consultation, the

14  Corps violated these foundational environmental laws and the APA. For the foregoing reasons,

15  the Court should grant Plaintiffs' motion for summary judgment, issue declaratory relief

16  establishing that Defendants violated the CWA, NEPA, the ESA, and the APA, and vacate the

17  challenged permit and remand it to Defendants for further proceedings consistent with the

18  Court's rulings. *See* 5 U.S.C. § 706(2) (explaining that a "reviewing court shall … hold unlawful

19  and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or

20  otherwise not in accordance with law; [or] without observance of procedure required by law.").

21

22  Respectfully submitted this 30th day of April, 2018 in Portland, Oregon.

23

24  CENTER FOR FOOD SAFETY

25  /s/ Amy Van Saun
    Amy Van Saun (*pro hac vice*)

26  avansaun@centerforfoodsafety.org

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1

917 SW Oak Street, Suite 300
Portland, OR 97205
T: (971) 271-7372 / F: (971) 271-7374

2

3

/s/ George A. Kimbrell
George A. Kimbrell (WSB No. 36050)
gkimbrell@centerforfoodsafety.org

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MOTION FOR SUMMARY JUDGMENT
PAGE 41
CASE NOS. 2:17-CV-01209 AND 2:16-CV-00950

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372