U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

KENT E. HANSON
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
(206) 639-5544; kent.hanson@usdoj.gov

PETER KRYN DYKEMA
DEDRA S. CURTEMAN
Natural Resources Section
P.O. Box 7611
Washington, DC 20044
(202) 305-0436; peter.dykema@usdoj.gov
(202) 305-0446; dedra.curteman@usdoj.gov

MARK ARTHUR BROWN
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, DC 20044
(202) 305-0204; mark.brown@usdoj.gov
*Attorneys for Federal Defendants*

The Honorable Richard S. Lasnik

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

CENTER FOR FOOD SAFETY,

 *Plaintiff,*

  v.

U.S. ARMY CORPS OF ENGINEERS, *et al.,*

 *Defendants,* and

PACIFIC COAST SHELLFISH GROWERS
ASSOCIATION,

 *Intervenor – Defendant.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:17-cv-01209-RSL

**FEDERAL DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:**
Court will schedule once briefs are filed.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
P.O. Box 7611, Washington, DC 20044
(202) 305-0446

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF THE CASE ........................................................................................ 2

    I.    STATUTORY AND REGULATORY BACKGROUND ............................ 2

        A.    The Clean Water Act and Nationwide Permits ....................................... 2

            1.    CWA Section 404 .................................................................. 2

            2.    The Corps' Nationwide Permit Decision-Making Structure ............... 3

        B.    The National Environmental Policy Act ................................................. 5

        C.    The Endangered Species Act ................................................................. 6

    II.    The Current Nationwide Permits, Including 48 for Shellfish Aquaculture ................. 7

    III.    Programmatic ESA Consultation on Shellfish Activities in Washington State Inland Marine Waters ........................................................................................... 9

    IV.    The Division Engineer's Review of NWP 48 ...................................................... 10

    V.    Plaintiff's Complaint ....................................................................................... 11

STANDARD OF REVIEW .......................................................................................... 11

ARGUMENT ............................................................................................................... 12

    I.    Plaintiff Has Not Met Its Burden to Demonstrate Article III Standing. .................. 12

    II.    NWP 48 Complies with the National Environmental Policy Act. ........................... 15

        A.    The Corps Took the Requisite Hard Look at Potential Environmental Effects. .......................................................................................... 15

            1.    The Corps' Purpose and Need for NWP 48 ....................................... 16

            2.    The Corps' Consideration of Alternatives ............................................ 17

        B.    The Corps Complied with NEPA's Public Participation Requirements. ....... 19

        C.    The Corps Reasonably Concluded that NWP 48 Would Not Result in Significant Impacts. ......................................................................... 20

            1.    The Corps Considered Potential Impacts of Pesticides. .................... 20

2.     The Corps Adequately Assessed Direct, Indirect, and Cumulative ................................................................. 21

III.    The Corps Complied With Section 7(a)(2) of the Endangered Species Act. ............. 22

    A.    ESA Consultation on the Corps' Decision to Approve NWP 48 for Use in Washington State Is Unnecessary Because the Issuance of NWP 48 Has No Effect on Listed Species or Designated Critical Habitat. ................................................................. 22

    B.    Reinitiation of Consultation on the Programmatic Biological Opinion is Unnecessary. ................................................................. 25

        1.    Claims Concerning the Corps' Alleged Failure to Reinitiate Consultation on the Programmatic Biological Opinion Are Unripe. ................................................................. 26

        2.    Assuming Plaintiff's Reinitiation Claims Are Ripe, They Lack Merit. ................................................................. 27

            a.    The Number of Acres Potentially Subject to Aquaculture Does Not Constitute "New Information Requiring Reinitiation of Consultation. ................................................................. 29

            b.    The Corps' Decision Not To Incorporate the Conservation Measures of the Programmatic Biological Opinion Does Not Require Reinitiation of Consultation. ................................................................. 30

            c.    NWP 48's Revised Definition of New Versus Existing Aquaculture Operations Does Not Require Reinitiation of Consultation. ................................................................. 31

            d.    Reinitiation of Consultation Is Unnecessary Based on the ................................................................. 32

            e.    General Condition 18 Ensures That Issuance of NWP 48 Will Result In "No Effect" on ESA-Listed Species and Designated Critical Habitat. ................................................................. 33

IV.    The Corps' "Minimal Effects" Determination Complies With CWA Section 404(e). ................................................................. 35

    A.    The Corps Minimal Effects Finding Reasonably Took into Consideration the Pre-Construction Notification Process, General and Regional Conditions, and Conservation Measures Applicable to Shellfish Activities. ................................................................. 35

      B.      The Corps Reasonably Concluded That NWP 48 Would Have No
More Than Minimal Cumulative Effects on the Aquatic Environment........ 38

  V.     Should the Court Grant Summary Judgment in Plaintiff's Favor, Vacatur of
Nationwide Permit 48 Would Not Be the Appropriate Remedy.................................. 40

CONCLUSION.................................................................................................................... 40

# **TABLE OF AUTHORITIES**

**Cases**

*Akiak Native Cmty. v. U.S. Postal Serv.,*
213 F.3d 1140 (9th Cir. 2000) ................................................................. 19

*Alaska Ctr. for the Env't v. West,*
157 F.3d 680 (9th Cir. 1998) ............................................................. 34, 35

*All. for the Wild Rockies v. Krueger,*
950 F. Supp. 2d 1196 (D. Mont. 2013) ............................................... 33, 34

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
988 F.2d 146 (D.C. Cir. 1993) ................................................................. 40

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs,*
524 F.3d 938 (9th Cir. 2008) ............................................................. 19, 20

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs,*
833 F.3d 1274 (11th Cir. 2016) ......................................................... 35, 40

*Cabinet Mountains Wilderness v. Peterson,*
685 F.2d 678 (D.C. Cir. 1982) ................................................................. 33

*Cal. Cmtys. Against Toxics v. EPA,*
688 F.3d 989 (9th Cir. 2012) ................................................................... 40

*Citizens to Pres. Overton Park v. Volpe,*
401 U.S. 402 (1971) ................................................................... 12, 23, 24

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ............................................................................... 13

*Cooling Water Intake Structure Coal. v. EPA,*
No. 14-4645, 2018 WL 3520398, __F.3d__ (2d Cir. July 23, 2018) ........ 33

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*
789 F.3d 1075 (9th Cir. 2015) ........................................................... 14, 33

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
698 F.3d 1101 (9th Cir. 2012) ................................................................. 31

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
563 F.3d 466 (D.C. Cir. 2009) ................................................................. 33

*Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation,*
655 F.3d 1000 (9th Cir. 2011) ................................................................. 21

*Davis v. Fed. Election Comm'n.,*
554 U.S. 724 (2008) ............................................................................... 14

*Defs. of Wildlife v. Flowers Defs. of Wildlife,*
414 F.3d 1066 (9th Cir. 2005) ................................................................. 23

*Defs. of Wildlife v. U.S. Dept. of Navy,*
733 F.3d 1106 (11th Cir. 2013) ............................................................... 33

*Fair v. Kohler Die & Specialty Co.,*
228 U.S. 22 (1913) ................................................................................. 25

*Friends of River v. Nat'l Marine Fisheries Serv.,*
293 F. Supp.3d 1151 (E.D. Cal. 2018) ..................................................... 27

*Friends of Southeast's Future v. Morrison,*
153 F.3d 1059 (9th Cir. 1998) ........................................................... 16, 17

*Friends of the Earth v. Hintz,*
   800 F.2d 822 (9th Cir. 1986) ................................................................. 40

*Friends of the Earth v. Laidlaw,*
   528 U.S. 167 (2000) ........................................................................... 12

*Greater Yellowstone Coal. v. Flowers,*
   359 F.3d 1257 (10th Cir. 2004) .......................................................... 19

*Habitat Educ. Ctr. v. Bosworth,*
   363 F. Supp. 2d 1090 (E.D. Wis. 2005) ............................................. 23

*Healy v. Sea Gull Specialty Co.,*
   237 U.S. 479 (1915) ........................................................................... 25

*Hells Canyon Pres. Council v. U.S. Forest Serv.,*
   593 F.3d 923 (9th Cir. 2010) .............................................................. 26

*Karuk Tribe of Cal. v. U.S. Forest Serv.,*
   681 F.3d 1006 (9th Cir. 2012) ............................................................ 23

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ................................................................12, 13, 15

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) ........................................................................... 25

*Marsh v. Or. Nat. Res. Council,*
   490 U.S. 360 (1989) ........................................................................ 5, 32

*Merrell Dow Pharms. v. Thompson,*
   478 U.S. 804 (1986) ........................................................................... 25

*Miccosukee Tribe of Indians of Fla. v. United States,*
   566 F.3d 1257 (11th Cir. 2009) .......................................................... 34

*Morongo Band of Mission Indians v. FAA,*
   161 F.3d 569 (9th Cir. 1998) ................................................................ 6

*Mt. Graham Red Squirrel v. Espy,*
   986 F.2d 1568 (9th Cir. 1993) ............................................................ 32

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior,*
   538 U.S. 803 (2003) ........................................................................... 26

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs,*
   170 F.Supp.3d 6 (D.D.C. 2016) ......................................................... 14

*Native Ecosystems Council v. U.S. Forest Serv.,*
   428 F.3d 1233 (9th Cir. 2005) ............................................................ 18

*North Slope Borough v. Andrus,*
   642 F.2d 589 (D.C. Cir. 1980) ........................................................... 33

*Northern Alaska Envtl. Ctr. v. Kempthorne,*
   457 F.3d 959 (9th Cir. 2006) .............................................................. 30

*Northern Spotted Owl v. Hodel,*
   716 F. Supp. 479 (W.D. Wash. 1988) ................................................ 11

*Nw. Res. Info. Ctr. v. NMFS,*
   56 F.3d 1060 (9th Cir. 1995) ................................................................ 6

*Ohio Valley Envtl. Coal. v. Bulen,*
   429 F.3d 493 (4th Cir. 2005) ...................................... 3, 35, 36, 37, 38, 39, 40

*Ohio Valley Envtl. Coal. v. Hurst,*
   604 F. Supp. 2d 860 (S.D. W. Va. 2009) ........................................... 40

*Or. Envtl. Council v. Kunzman,*
   714 F.2d 901 (9th Cir. 1983) ........................................................................ 20

*Or. Nat. Desert Ass'n v. Singleton,*
   47 F. Supp. 2d 1182 (D. Or. 1998) ............................................................. 19

*Pac. Rivers Council v. Thomas,*
   30 F.3d 1050 (9th Cir.1994) ......................................................................... 23

*Pacificans for a Scenic Coast v. Cal. Dep't of Transp.,*
   204 F. Supp. 3d 1075 (N.D. Cal. 2016) ..................................................... 31

*Protect Our Water v. Flowers,*
   377 F. Supp. 2d 844 (E.D. Cal. 2004) ........................................................ 28

*Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy,*
   898 F.2d 1410 (9th Cir. 1990) ............................................................ 12, 32

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) .................................................................................. 5, 19

*Salmon River Concerned Citizens v. Robertson,*
   798 F. Supp. 1434 (E.D. Cal. 1992) ........................................................... 19

*Salmon Spawning & Recovery All. v. Gutierrez,*
   545 F.3d 1220 (9th Cir. 2008) ..................................................................... 14

*San Luis & Delta-Mendota Water Auth. v. Salazar,*
   638 F.3d 1163 (9th Cir. 2011) ..................................................................... 13

*Save Our Ecosystems v. Clark,*
   747 F.2d 1240 (9th Cir. 1984) ..................................................................... 20

*Sierra Club v. Bostick,*
   787 F.3d 1043 (10th Cir. 2015) ......................................................... 5, 15, 35, 39

*Sierra Club v. Marsh,*
   816 F.2d 1376 (9th Cir. 1987) ..................................................................... 28

*Sierra Club v. Morton,*
   405 U.S. 727 (1972) ...................................................................................... 14

*Sierra Club v. U.S. Army Corps of Eng'rs,*
   803 F.3d 31 (D.C. Cir. 2015) ....................................................................... 15

*Sierra Club v. U.S. Army Corps of Eng'rs,*
   990 F. Supp. 2d 9 (D.D.C. 2013) .................................................................. 3

*Snoqualmie Indian Tribe v. FERC,*
   545 F.3d 1207 (9th Cir. 2008) ..................................................................... 38

*Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs,*
   683 F.3d 1155 (9th Cir. 2012) ..................................................................... 15

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ...................................................................................... 13

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,*
   100 F.3d 1443 (9th Cir.1996) ..................................................................... 23

*Tribal Village of Akutan v. Hodel,*
   869 F.2d 1185 (9th Cir. 1988) ..................................................................... 28

*Tri-Valley CAREs v. U.S. Dep't of Energy,*
   671 F.3d 1113 (9th Cir. 2012) ..................................................................... 21

*United States v. Riverside Bayview Homes, Inc.,*
   474 U.S. 121 (1985) ...................................................................................... 34

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
 435 U.S. 519 (1978) .................................................................................. 5

*Warth v. Seldin*,
 422 U.S. 490 (1975) ................................................................................ 13

*Westlands Water Dist. v. U.S. Dep't of the Interior*,
 376 F.3d 853 (9th Cir. 2004) ................................................................... 18

*Wyoming Outdoor Council, Powder River Basin Res. Council v. U.S. Army Corps of Eng'rs*,
 351 F. Supp. 2d 1232 (D. Wyo. 2005) ...................................................... 39

**Statutes**

5 U.S.C. § 706 ............................................................................................ 12
5 U.S.C. § 706(2)(A) ............................................................................. 12, 23
16 U.S.C. § 1532(15) ................................................................................... 6
16 U.S.C. § 1532(20) ................................................................................... 6
16 U.S.C. § 1533(a) ..................................................................................... 6
16 U.S.C. § 1536(b) ..................................................................................... 6
16 U.S.C. § 1536(o)(2) ............................................................................... 10
33 U.S.C. § 1251(a) ..................................................................................... 2
33 U.S.C. § 1342 (2012) ............................................................................. 20
33 U.S.C. § 1344 ......................................................................................... 1
33 U.S.C. § 1344(e) .................................................................................. 2, 3
42 U.S.C. §§ 4321-4370m-12 .................................................................... 15
42 U.S.C. § 4332(2)(C) ................................................................................ 5

**Regulations**

33 C.F.R. § 320.1(a)(2) ................................................................................ 3
33 C.F.R. Pts. 323 & 325 ............................................................................. 2
33 C.F.R. § 325.4(a)(1) ............................................................................... 10
33 C.F.R. Part 326 ....................................................................................... 8
33 C.F.R. Part 330 ....................................................................................... 3
33 C.F.R. § 330.1(c) .................................................................................. 3, 8
33 C.F.R. § 330.1(d) .............................................................................. 3, 4, 5
33 C.F.R. § 330.1(e)(1) ................................................................................ 5
33 C.F.R. § 330.1(e)(2) ................................................................................ 5
33 C.F.R. § 330.1(e)(3) ................................................................................ 5
33 C.F.R. § 330.2(b) .................................................................................... 2
33 C.F.R. § 330.4(f) .......................................................................... 8, 9, 23
33 C.F.R. § 330.4(f)(2) ................................................................................. 9
33 C.F.R. § 330.5(a)(2)(i) ........................................................................... 19
33 C.F.R. § 330.5(b)(2) ................................................................................ 3
33 C.F.R. § 330.5(b)(2)(ii) ........................................................................... 4
33 C.F.R. § 330.5(b)(3) ................................................................................ 4
33 C.F.R. § 330.5(c)(1) ................................................................................. 4
33 C.F.R. § 330.6(a) ..................................................................................... 5
33 C.F.R. § 330.6(a)(3)(i) ........................................................................... 10
33 C.F.R. § 332.2 ....................................................................................... 35
40 C.F.R. § 230.7(b) .................................................................................... 3

40 C.F.R. §§ 1500–1508 ..................................................................................................5

40 C.F.R. § 1501.4(b) .....................................................................................................5

40 C.F.R. § 1502.14 ..................................................................................................17, 18

50 C.F.R. Part 402 ..........................................................................................................6

50 C.F.R. § 402 ...............................................................................................................9

50 C.F.R. § 402.14 ..........................................................................................................6

50 C.F.R. § 402.14(a) ......................................................................................................6

50 C.F.R. § 402.14(c) ......................................................................................................7

50 C.F.R. § 402.14(h)(3) ..................................................................................................7

50 C.F.R. § 402.16 .....................................................................................................7, 28

50 C.F.R. § 402.16(a)-(d) ....................................................................................22, 26, 34

50 C.F.R. § 402.16(b) ....................................................................................................29

50 C.F.R. § 402.16(b)-(c) ....................................................................................26, 28, 30

50 C.F.R. § 402.16(c) ................................................................................................31, 32

51 Fed. Reg. 19,926 (June 3, 1986) .................................................................................34

61 Fed. Reg. 65,874 (Dec. 13, 1996)..................................................................................9

81 Fed. Reg. 35,186 (June 1, 2016) ..........................................................................4, 7, 19

82 Fed. Reg. 1,860 (Jan. 6, 2017) ......................................................4, 5, 7, 8, 9, 22, 34

**Legislative History**

H.R. Rep. No. 95-830 (1977) (Conf. Rep.),

  *reprinted in* 1977 U.S.C.C.A.N. 4424 ..........................................................................2

**Other Authorities**

Endangered Species Act Section 7 Consultation Handbook,

  *available at* http://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf

  (last visited July 24, 2018) ....................................................................................... 7, 9

**<u>ACRONYMS</u>**

Administrative Procedure Act, "APA"

Clean Water Act, "CWA"

Endangered Species Act, "ESA"

Environmental Protection Agency, "EPA"

Magnuson-Stevens Fishery Conservation and Management Act, "MSA"

National Environmental Policy Act, "NEPA"

National Marine Fisheries Service, "NMFS"

Nationwide Permit, "NWP"

Preconstruction Notice, "PCN"

Regional General Conditions, "RGC"

# <u>INTRODUCTION</u>

This case involves the United States Army Corps of Engineers' compliance with several laws in its most-recent implementation of its Nationwide Permit ("NWP") Program: a program streamlining certain regulatory processes for obtaining a Corps permit under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344. At dispute is the Corps' reissuance of Nationwide Permit 48 ("NWP 48") which authorizes certain shellfish aquaculture activities in waters of the United States. Plaintiff, the Center for Food Safety, pursues a "facial" challenge to NWP 48 as reissued and adopted by the Corps' Seattle District in 2017 for use in Washington State, arguing the Corps failed to comply with the Clean Water Act ("CWA"), the National Environmental Policy Act ("NEPA"), and the Endangered Species Act ("ESA").

Plaintiff's claims cannot succeed. Plaintiff has not identified a member whose particularized interests are actually (rather than hypothetically) affected by any NWP 48-authorized activity. Ignoring Supreme Court precedent, it instead relies upon general concerns about potential environmental harm. Those general concerns are insufficient to establish Article III standing.

In any event, the Corps complied with the applicable statutory requirements. Plaintiff's claims inappropriately ignore the structure of the Corps' Nationwide Permit program and NWP 48 specifically. Each aquaculture operation in Washington State undergoes project specific review. An activity can only receive authorization under NWP 48 through the satisfaction of terms and conditions designed to ensure impacts will be minimal both individually and cumulatively, and after the District Engineer determines that the specific proposal does not present potential effects requiring review under the individual permit process.

The Corps' review procedures and conclusions were not arbitrary and capricious and, instead, were wholly consistent with the Corps' statutory obligations. The Corps properly analyzed the cumulative adverse effects at the national level under the CWA prior to reissuing Nationwide Permit 48. The Corps fully complied with NEPA by taking a hard look at potential environmental effects, including cumulative effects, and, relying on its regionalized review structure, reasonably determined that the Permit would not result in significant environmental impacts. And the Corps reasonably relied on the Permit's general conditions to ensure that ESA consultation would occur,

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 1
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

when necessary, on an activity-specific basis.  The record confirms that the Corps' Seattle District provided a reasoned explanation for its decision to implement NWP 48 in Washington State, subject to appropriate regional terms and conditions.  As such, the Court should enter summary judgment for the Federal Defendants.

## STATEMENT OF THE CASE

### I.    STATUTORY AND REGULATORY BACKGROUND

#### A.  The Clean Water Act and Nationwide Permits

##### 1.   CWA Section 404

The CWA is designed to "restor[e] and main[tain] [the] chemical, physical and biological integrity of [the] Nation's waters." 33 U.S.C. § 1251(a).  It prohibits, among other things, the discharge of dredged or fill material into "waters of the United States" without a permit from the Corps.  *See id.* § 1344(a) ("Section 404").  Section 404 originally authorized the Corps to issue only individual permits, which require a resource-intensive, case-by-case review, including extensive site-specific documentation, public comment, and a formal determination on the permit.  *Id.* § 1344(a); *see* 33 C.F.R. Pts. 323 and 325 (policies and procedures for permit issuance).

In 1977, Congress concluded that requiring individual permits for routine activities imposes unnecessary delay and administrative burdens on the public and the Corps.  *See* H.R. Rep. No. 95-830, at 38, 98, 100 (1977) (Conf. Rep.), *reprinted in* 1977 U.S.C.C.A.N. 4424.  Those concerns led Congress to create the general permit program.  *See* 33 U.S.C. § 1344(e).  Specifically, Section 404(e) authorizes the Corps to issue a general permit "for any category of activities involving discharges of dredged or fill material if the [Corps] determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." *Id.* § 1344(e)(1).  General permits are valid for no more than five years.  *Id.* § 1344(e)(2).  They also must comply with guidelines promulgated by the U.S. Environmental Protection Agency ("EPA") under CWA Section 404(b)(1) (called the "404(b)(1) Guidelines").  Nationwide Permits, including NWP 48, are general permits, 33 C.F.R. § 330.2(b), and advance Congress's goal "to regulate with little, if any, delay or paperwork certain activities having minimal impacts." *Id.* § 330.1(b).  They strike a congressionally-directed

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 2
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

balance between environmental protection and administrative efficiency.

Corps regulations set out policies and procedures used to issue, condition, modify, suspend, or revoke general permits, including NWPs. 33 C.F.R. p 330. Accordingly, the NWPs are subject to certain terms and conditions that apply on a nationwide basis. *See id.* As explained below, Corps district and division engineers also have discretionary authority to (among other things) condition or restrict a NWP based on concerns for the aquatic environment or other public interest factors. 33 C.F.R. § 330.1(d).

## 2. The Corps' Nationwide Permit Decision-Making Structure

The Corps is divided into eight geographic divisions across the country, each of which contains any number of district offices.[1] *See* 33 C.F.R. § 320.1(a)(2); http://www.usace.army.mil/Locations.aspx (map, last visited July 11, 2018). "Most of the authority for administering the [Corps'] regulatory program has been delegated to the [district and division] engineers." 33 C.F.R. § 320.1(a)(2). Consistent with that organizational structure, the Corps addresses NWP activities at three levels. *See id.* § 330.5; *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 19–22 (D.D.C. 2013).

<u>First Level: National Review</u>. Before issuing NWPs, the Corps' Chief of Engineers conducts a predictive environmental analysis at the national level to determine whether the individual and cumulative adverse environmental impacts of the category of activities authorized by each proposed NWP are no more than "minimal." *See* 33 U.S.C. § 1344(e). At this level, analysis of potential adverse effects necessarily consists of "reasoned predictions." *Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493, 501 (4th Cir. 2005). The Corps ensures minimal impact, in part, through "General Conditions," with which all authorized NWP activities must comply. *See* 33 C.F.R. § 330.1(c).

The Chief of Engineers seeks public comment on the proposed NWPs and conditions (33 C.F.R. § 330.5(b)(2)), prepares appropriate NEPA documentation, and analyzes a number of factors relevant under the 404(b)(1) Guidelines. *Id.* § 330.5(b)(3); *see* 40 C.F.R. § 230.7(b). The Corps

---

[1] After several reorganizations since 1986, there are currently eight divisions and 38 districts. Each division is headed by a "division engineer" and each district is headed by the "district engineer."

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 3
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

ultimately memorializes its 404(b)(1), NEPA, and other national-level environmental analyses in a decision document for each NWP. 33 C.F.R. § 330.5(b)(3). Only after complying with these and other statutory and regulatory requirements does the Corps issue NWPs.

Second Level: Division Engineer Review. The Corps recognizes that there are "regional differences in aquatic resource functions and services across the country." Proposal to Reissue and Modify Nationwide Permits, 81 Fed. Reg. 35,186, 35,188 (June 1, 2016); NWP18360.[2] Thus, each division engineer has "discretionary authority to modify, suspend, or revoke NWP authorizations for any specific geographic area, class of activities, or class of waters within his division . . . ." 33 C.F.R. § 330.5(c)(1). The division engineer may exercise this authority "whenever he determines sufficient concerns for the environment under the section 404(b)(1) Guidelines or any other factor of the public interest so requires, or if he otherwise determines that the NWP would result in more than minimal adverse environmental effects either individually or cumulatively." *Id.* § 330.4(e)(1); *see id.* § 330.1(d). For example, division engineers may impose regional conditions on NWPs to facilitate compliance with the ESA. Reissuance of Nationwide Permits, 82 Fed. Reg. 1,860, 1,864 (Jan. 6, 2017); NWP000006.

Before a division engineer can modify, suspend, or revoke NWPs within a specific geographical boundary, the proposed changes must undergo public notice and comment. *See* 33 C.F.R. § 330.5(b)(2)(ii), (c)(1). This comment process is conducted concurrently with the notice and comment process for the proposed NWPs. *See id.* § 330.5(b)(2)(ii). The division engineers' consideration and conclusions are documented separately from the NWP National Decision Document prepared by the Chief of Engineers, in Supplemental Decision Documents that are approved by the division engineer, which impose regional conditions for specific authorized activities within the Corps districts. *Id.* §§ 330.5(c)(1)(i), 330.1(d).

Third Level: Project-Specific Review by District Engineers. In some cases, permittees may proceed with NWP-authorized activities without notifying the Corps. *Id.* § 330.1(e)(1); *id.* § 330.2(c). Other circumstances require a prospective permittee to submit to the Corps a pre-construction

---

[2] Where applicable, we cite to the pages of the Corps' administrative record for the Nationwide Permits by their Bates numbers (*e.g.*, NWPxxxxxx or COExxxxxx).

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 4
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

notice (called a "PCN") seeking verification that the activity complies with the general permit's terms and conditions. *Id.* §§ 330.1(e)(1), 330.6(a). In those situations, the district engineer evaluates the proposed activities on a case-by-case basis. 82 Fed. Reg. at 1870; NWP000011. The district engineer "may add activity-specific conditions," such as compensatory mitigation requirements, "to ensure that the activity complies with the terms and conditions of the NWP" and that adverse impacts are no more than minimal individually and cumulatively. 33 C.F.R. § 330.1(e)(2), (3); *id.* § 330.6(a)(3)(i); *see* 82 Fed. Reg. at 1880. If the district engineer determines that "the adverse effects are more than minimal," he or she "will notify the prospective permittee that an individual permit is required . . . ." 33 C.F.R. § 330.1(e)(3). Following verification, the district engineer retains discretion to suspend, modify, or revoke the verification based on later arising "concerns for the aquatic environment under the . . . 404(b)(1) Guidelines or for any factor of the public interest." *Id.* § 330.1(d). No additional public comment or NEPA analysis is required for NWP verifications. *See id.* § 330.6(a); *Sierra Club v. Bostick*, 787 F.3d 1043, 1053 (10th Cir. 2015) ("At that point, the Corps' only function is to verify that the project is covered by the nationwide permit.").

**B. The National Environmental Policy Act**

Congress passed NEPA to focus governmental and public attention on the potential environmental effects of any proposed "major Federal action." *See* 42 U.S.C. § 4332(2)(C); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). But NEPA is "essentially procedural[.]" *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). The statute does not mandate particular results, instead prescribing a process to ensure that federal decision-makers consider, and that the public is informed about, a proposed action's potential environmental consequences. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). To achieve these twin aims, NEPA requires the preparation of an Environmental Impact Statement for any major federal action "significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(2)(C). If the significance of a given action's effects are not evident on their face, an agency may prepare an Environmental Assessment to determine if the proposal's effects would be

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 5
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

significant. *See* 40 C.F.R. § 1501.4(b), (c), (d).[3] An Environmental Assessment is a concise public document that *briefly* describes the proposal, examines alternatives, and considers environmental impacts. *Id.* § 1508.9. An Environmental Impact Statement is not required where an Environmental Assessment leads to a Finding of No Significant Impact, or "FONSI." *Id.* § 1501.4(d); *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 575 (9th Cir. 1998).

## C. The Endangered Species Act

The ESA provides for the listing of species as "threatened" or "endangered,"[4] if warranted, as well as for the designation of their "critical habitat." 16 U.S.C. § 1533(a). The ESA provides various protections for listed species. As relevant here, ESA Section 7(a)(2) requires that federal agencies must ensure that any action authorized, funded, or carried out by such agency is not likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical . . . ." *Id.* § 1536(a)(2).[5] To this end, the ESA requires the action agency to consult with the National Marine Fisheries Service ("NMFS") or the U.S. Fish and Wildlife Service ("FWS") whenever a federal action "may affect" an endangered or threatened species. 50 C.F.R. § 402.14(a). Conversely, however, where a proposed action has no effect on listed species or designated critical habitat, the consultation requirements are not triggered. *See id.* It is the action agency's responsibility to determine whether its proposed action may affect listed species or critical habitat. 50 C.F.R. § 402.14(a).

Section 7 of the ESA and its implementing regulations set out detailed consultation procedures designed to provide action agencies with expert advice to determine the biological impacts of their proposed activities. 16 U.S.C. § 1536(b); 50 C.F.R. Part 402. The ESA formal consultation process is described at length at 50 C.F.R. § 402.14. As referenced there, action

---

[3] The Council on Environmental Quality has implemented NEPA regulations. 40 C.F.R. §§ 1500–1508.

[4] A "threatened species" is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). An "endangered species" is one "which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6).

[5] The ESA defines "Secretary" to mean the Secretary of the Interior or the Secretary of Commerce, who in turn have delegated their responsibilities to FWS and NMFS, respectively. *See* 16 U.S.C. § 1532(15). In general, FWS has authority over terrestrial species and NMFS has authority over marine species. *See, e.g., Nw. Res. Info. Ctr. v. NMFS*, 56 F.3d 1060, 1065 (9th Cir. 1995). Plaintiff in this action challenges the Corps' Section 7 compliance only as to consultation with NMFS.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 6
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

1  agencies may encompass in their consultation requests a number of similar individual actions within

2  a given geographic area, 50 C.F.R. § 402.14(c).  As further explained in the Endangered Species Act

3  Section 7 Consultation Handbook at E-13, *available at* http://www.fws.gov/endangered/esa-

4  library/pdf/esa_section7_handbook.pdf (last visited July 24, 2018), a "programmatic consultation"

5  may address multiple actions on a program, regional, or other basis.  "Formal" ESA consultation

6  culminates in the issuance of a "biological opinion" by NMFS or FWS, which advises the action

7  agency whether jeopardy is likely to occur for any listed species, whether critical habitat is likely to be

8  destroyed or adversely modified, and, if so, whether "reasonable and prudent alternatives" exist to

9  avoid a jeopardy or adverse modification situation.  50 C.F.R. § 402.14(h)(3).[6]

10  ## II.    The Current Nationwide Permits, Including 48 for Shellfish Aquaculture

11      The Corps' Chief of Engineers proposed to reissue or modify the currently applicable set of

12  NWPs and General Conditions in June 2016.  *See* 81 Fed. Reg. 35,186 (June 1, 2016); NWP018360.

13  After completing national-level review and public comment, the Corps reissued the NWPs on

14  January 6, 2017, with an effective period of March 19, 2017, to March 18, 2022.  82 Fed. Reg. at

15  1860; NWP000001.  As part of its decision-making for each NWP, the Corps undertook an

16  Environmental Assessment to consider each proposed permit's potential effects, and for each NWP

17  that authorizes § 404 activities, analyzed the proposed permit under the § 404(b)(1) Guidelines.  *See,*

18  *e.g.,* NWP003034-3115 (National Decision Document).

19      NWP 48 authorizes new and continuing commercial shellfish aquaculture operations in

20  authorized project areas.  82 Fed. Reg. at 1922; NWP000064.  Typical commercial shellfish

21  aquaculture activities, including those described in NWP 48, may involve discharges of dredged or

22

23  ─────────────────────────

24  [6] After consultation on a proposed action has been completed, reinitiation of formal consultation is required "where
   discretionary Federal involvement or control over the action has been retained or is authorized by law" and one of four
   conditions is met, including:

25          (a) If the amount or extent of taking specified in the incidental take statement is exceeded; (b) If new
           information reveals effects of the action that may affect listed species or critical habitat in a manner
26          or to an extent not previously considered; (c) If the identified action is subsequently modified in a
           manner that causes an effect to the listed species or critical habitat that was not considered in the
27          biological opinion; or (d) If a new species is listed or critical habitat designated that may be affected
           by the identified action.

28  50 C.F.R. § 402.16.

DEFENDANTS' MOTION FOR SUMMARY                    U.S. Department of Justice
JUDGMENT ("MSJ") AND OPP. TO                     Dedra S. Curteman, Trial Attorney
PLAINTIFF'S MSJ – Page 7                              (202) 305-0446
2:17-cv-01209-RSL

fill material into waters of the United States. *Id.* at 1923; NWPW000064. "For example, mechanized

harvesting activities typically involve a discharge of dredged or fill material . . . ." *Id.* As with all

NWPs, the activities authorized by NWP 48 are subject to the Corps' General Conditions. *See* 33

C.F.R. § 330.1(c). The Corps determined that the terms and conditions of NWP 48, including its

PCN requirements, "will ensure that commercial shellfish aquaculture activities will result in no

more than minimal individual and cumulative adverse environmental effects." 82 Fed. Reg. at 1923;

NWP000065. Accordingly, the Corps concluded in the NWP 48 National Decision Document that

"the issuance of NWP 48 will not have a significant impact on the quality of the human

environment. Therefore, the preparation of an Environmental Impact Statement is not required."

NWP003106.

Of relevance to this case, the Corps has ensured ESA compliance through General

Condition 18. General Condition 18 requires that:

> No activity is authorized under any NWP which is likely to directly or indirectly
> jeopardize the continued existence of a threatened or endangered species or a
> species proposed for such designation as identified under the [EA], or which will
> directly or indirectly destroy or adversely modify the critical habitat of such species.
> No activity is authorized under any NWP which 'may affect' a listed species or
> critical habitat, unless ESA section 7 consultation addressing the effects of the
> proposed activity has been completed.

82 Fed. Reg. at 1999. *See also* 33 C.F.R. § 330.4(f). General Condition 18 requires a PCN if any listed

species or designated critical habitat might be affected or is in the vicinity of the proposed NWP

activity. 82 Fed. Reg. at 1957 . In the Seattle District, all shellfish aquaculture occurs in marine

waters with ESA-listed species and/or critical habitat in the vicinity. COE127534. "Therefore,

under NWP general condition 18, a PCN is required in all cases in the Seattle District." *Id.* Based

on the information provided in the PCN, "Corps districts will conduct ESA section 7 consultation

for any activity proposed by a non-federal applicant that may affect listed species or designated

critical habitat." *Id.* at 1930.[7] Prospective permittees may not begin work under authority of the

---

[7] "If a non-federal project proponent conducts an activity and does not comply with general condition 18 or any other applicable general condition, then the activity is not authorized by NWP." *Id.* at 1955. The Corps considers activities that do not comply with a NWP's terms and conditions as unauthorized, and will evaluate them for enforcement actions under 33 C.F.R. part 326. *See* 33 C.F.R. § 330.1(c). *See also* 82 Fed. Reg. at 1954 ("That activity is an unauthorized activity and the Corps will take appropriate action to respond to the unauthorized activity.").

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 8
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

NWP until notified by the district engineer that the requirements of the ESA have been satisfied and that the activity is authorized. 82 Fed. Reg. at 1999; 33 C.F.R. § 330.4(f)(2). Because no activities authorized by any NWPs "may affect" listed species or critical habitat without first completing activity-specific ESA Section 7 consultations with the Services, as required by General Condition 18 and 33 C.F.R. § 330.4(f), the Corps concluded that the issuance or reissuance of NWPs does not require ESA Section 7 consultation. 81 Fed. Reg. at 35,193; NWP018368.

## III. Programmatic ESA Consultation on Shellfish Activities in Washington State Inland Marine Waters

In light of the applicable General Conditions, which mandate case-by-case ESA consultation for any project that may affect threatened or endangered species or designated critical habitat, the Corps has consistently maintained that a programmatic, national ESA consultation is unnecessary as a matter of law. *See, e.g.*, 61 Fed. Reg. 65,874, 65,880 (Dec. 13, 1996). However, some Corps districts have developed optional procedures that provide effective working relationships at a local level. *See* Section 7 Consultation Handbook, *supra*, at 2-14 – 2-15 ("[F]ield stations may consider entering into optional procedures that provide better working relationships with other agencies at a local level consistent with 50 C.F.R. § 402. Other agencies may wish to consult on all or a subset of their activities on a local or regional programmatic basis."). Consistent with the procedures described in the Section 7 Consultation Handbook, the Corps Seattle District voluntarily initiated a programmatic ESA consultation with the FWS and NMFS concerning "Shellfish Activities in Washington State Inland Marine Waters." COE134134. The consultation was not limited to the activities covered by NWP 48 or the short (5 year) duration of NWP 48. COE134762. Rather, the consultation covered "a number of additional shellfish related permitting actions the [Corps] may take" over a period of at least 20 years, some of which may be authorized by NWP 48. COE134762, 134767.

The Corps obtained biological opinions from both agencies in 2016. COE134755-928 (NMFS biological opinion, also referenced herein as "Programmatic Biological Opinion"); COE134134-340 (FWS biological opinion). NMFS issued an errata to its biological opinion on September 30, 2016. COE134929. As explained below, when a NWP 48 applicant seeks to use the Programmatic Biological Opinions to comply with General Condition 18, the applicant's compliance

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 9
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

with the terms and conditions of the incidental take statements become a special condition of the

NWP 48 verification, pursuant to 33 C.F.R. § 325.4(a)(1). COE127561. *See also* 33 C.F.R. §

330.6(a)(3)(i) ("The [District Engineer] may add conditions on a case-by-case basis to clarify

compliance with the terms and conditions of an NWP or to ensure that the activity will have only

minimal individual and cumulative adverse effects on the environment, and will not be contrary to

the public interest."). *See also* NWS-2017-38-B, COE117789-854. Under Section 7(o) of the ESA,

"any taking that is in compliance with the terms and conditions specified in a written statement

provided under subsection (b)(4)(iv) of this section [an incidental take statement] shall not be

considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2).

## IV.  The Division Engineer's Review of NWP 48

As part of the second-level review discussed above, on November 23, 2016, the Seattle

District issued a special public notice seeking additional comments on proposed regional conditions

for NWP 48. COE125040. As a NWP 48-specific regional condition, the Corps proposed that

"[t]he pre-construction notification (PCN) must include a complete description of the NWP 48

activities anticipated to occur over the duration of the permit authorization within the applicant's

project area." COE125041. As an additional regional condition, the Corps proposed that the

harvest of clams by means of hydraulic escalator harvester equipment would not be authorized. *Id.*

The special public notice specifically sought comments "on the need for additional regional

conditions for NWP 48 to help ensure that the adverse environmental effects of activities

authorized by NWP 48 will be no more than minimal, both individually and cumulatively." *Id.*

On March 17, 2017, the Corps Seattle District approved NWP 48 with regional conditions

requiring pre-construction notification, including a complete description of the NWP 48 activities

anticipated to occur over the duration of the permit authorization within the applicant's project area

and prohibiting commercial harvest of clams by means of hydraulic escalator harvester equipment

for use in Washington State. COE126109, 127547. The Seattle District concluded that it would be

unnecessarily duplicative to make the proposed regional general conditions ("RGC") 10 (protection

for submerged aquatic vegetation) and 14 (protection for forage fish spawning areas) applicable to

NWP 48. COE127534 (RGC 10); COE127540 (RGC 14). Consistent with the Corps' "finding of

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 10
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

no significant impact" for NWP 48, NWP003106, the Seattle District determined that the NWPs, including the national terms and conditions and the proposed regional conditions "will authorize only activities with minimal individual and cumulative adverse effect on the aquatic environment." COE126109 (Memorandum for Record); COE127485 (Supplemental Decision Document).

The Seattle District considered and rejected the proposal by some commenters to incorporate the terms and conditions of the NMFS Programmatic Biological opinion as regional conditions for NWP 48. COE127550. The Seattle District reasoned that "[t]he terms and conditions of the programmatic ESA and MSA[8] biological opinions cover more activities than those included in NWP 48, such as shellfish research, restoration and recreational activities. In addition, the programmatic was not developed for any one type of Corps authorization and can be used for standard individual permits as well as for NWPs." COE127550-51. The Corps concluded that "it is reasonable to allow project proponents the opportunity to individually consult under the ESA by not including in the current programmatic consultation as a regional condition." COE127550.

V.      **Plaintiff's Complaint**

Plaintiff Center for Food Safety filed suit on August 10, 2017. ECF No. 1. The Amended Complaint filed September 28, 2017 includes nine counts. ECF No. 9. Plaintiff alleges that, in adopting NWP 48 for use in Washington State, the Corps violated NEPA (First-Sixth Claims for Relief). ECF No. 9, ¶¶ 165-203. In addition, Plaintiff alleges that the Corps violated the CWA, (Seventh-Eighth Claims for Relief). *Id.* ¶¶ 204-217. Plaintiff also alleges that the Corps violated the ESA (Ninth Claim for Relief). *Id.* ¶¶ 218-230. Plaintiff seeks declaratory and injunctive relief including vacatur of the Corps' decision to adopt NWP 48 in Washington. *Id.* at Prayer for Relief ¶¶ 1-7.

<strong>STANDARD OF REVIEW</strong>

In a case seeking review of agency action, such as this one, a summary judgment motion is the appropriate vehicle to bring legal claims before the Court. *N. Spotted Owl v. Hodel*, 716 F. Supp. 479 (W.D. Wash. 1988). Judicial review of administrative actions, including those involving the ESA,

---

[8] Sections of the NMFS Programmatic Biological Opinion also address the essential fish habitat provisions of the Magnuson-Stevens Act.

NEPA, and the CWA, is governed by section 706 of the Administrative Procedure Act ("APA"), 5

U.S.C. § 706. *Pyramid Lake Paiute Tribe v. United States Dep't of Navy*, 898 F.2d 1410, 1413 (9th Cir.

1990). Under the APA, a court may set aside agency action only where it finds the action "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

"[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its

judgment for that of the agency." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)

*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Instead, the reviewing court's task is

to determine, based on the administrative record, "whether the [agency's] decision was based on a

consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at

416.

## **ARGUMENT**

The Court should grant summary judgment in favor of the Corps. Plaintiff has not

presented any factual evidence of an injury-in-fact that would demonstrate Article III standing.

Even if the Court were to find Plaintiff has met its burden to demonstrate standing (which it has

not), Plaintiff has not presented any valid basis on which the Corps' decision-making can be deemed

arbitrary and capricious, or contrary to law.

## I.     Plaintiff Has Not Met Its Burden to Demonstrate Article III Standing.

Plaintiff has failed to prove constitutional standing under Article III. Plaintiff's five

standing-related declarations fail to identify an injury-in-fact derived from a specific site on which an

NWP 48-authorized activity has taken place, or is reasonably certain to take place. Instead, the

declarations state only non-particularized concerns that shellfish aquaculture operations will

adversely affect the marine environment near Washington's coast. Such non-specified injuries are

insufficient for Article III purposes. This is particularly true for Plaintiff's ESA claim—the

declarations do not identify any site where a specific NWP 48-authorized project has impacted or is

imminently likely to potentially impact a listed species.

Article III standing is an "irreducible constitutional minimum" for federal court jurisdiction.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To meet the Constitution's standing

requirements, Plaintiff must demonstrate that one or more of its members would have standing to

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 12
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

sue in their own right.  *See Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000).  To satisfy this

burden, plaintiff must demonstrate that: (1) it has suffered an injury in fact that is concrete and

particularized, and actual and imminent – not conjectural or hypothetical; (2) there is a causal

connection between the injury and the conduct complained of, directly traceable to the defendant's

actions; and (3) it must be likely, as opposed to merely speculative, that a favorable decision will

redress the injury.  *San Luis & Delta-Mendota Water Auth. v. Salazar,* 638 F.3d 1163, 1169 (9th Cir.

2011) (quotation marks omitted).

 A party must be able to demonstrate each element of standing because the "judicial Power"

conferred by Article III "exists only to redress or otherwise to protect against injury to the

complaining party. . . ."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  Therefore, a plaintiff must have a

"personal stake in the outcome of the controversy" that would "justify exercise of the court's

remedial power on his behalf."  *Id.* at 498–99.  The plaintiff "bears the burden of showing that he

has standing for each type of relief sought."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

At the summary judgment stage, satisfying that burden requires proving specific facts via affidavits

or other means.  *Lujan*, 504 U.S. at 561.

 The Supreme Court recently emphasized the importance of the injury-in-fact requirement.

*Summers v. Earth Island Institute* involved a challenge to U.S. Forest Service regulations exempting

certain timber salvage projects from public comment procedures.  *See* 555 U.S. at 490.  The Court

concluded that the plaintiffs lacked standing because their declarant, despite showing a general use

and enjoyment of the National Forests, had not identified any specific site or forest that would be

subject to the allegedly unlawful regulations.  *Id.* at 494–97.  In those circumstances, the Court

concluded that the plaintiffs had failed to meet their burden to demonstrate standing.  *See id.* at 494–

95; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409-414 (2013) (any future harm must be

"certainly impending").

 Plaintiff submits five declarations in an effort to meet its burden under Article III.  *See* ECF

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 13
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

Nos. 33-36.  These declarations state only an abstract concerns.[9]  None of these declarants references NWP 48 or any specific project authorized by the Corps under NWP 48 or any other Corps permit.  Fritzi Cohen, another Center for Food Safety member and proprietor of the Moby Dick Inn expresses concerns about the use of pesticides in aquaculture generally and does not even reference the Corps, much less assert that the Corps is causing her alleged injuries.  *See* ECF No. 35.  Similarly, Patrick Townsend does not reference the Corps or any specific project authorized pursuant to NWP 48.  ECF No. 38.

In *National Wildlife Federation v. U.S. Army Corps of Engineers*, 170 F.Supp.3d 6 (D.D.C. 2016), a D.C. district court rejected a challenge to the Corps' issuance of NWP 13 for lack of standing based on *Summers*.  The court noted that declarants in that case "do not even identify a pending NWP 13 project in the area—or anywhere."  *Id.* at 14.  Here, too, the declarants fail to identify any particular NWP 48-authorized shellfish operation that is allegedly harming their interests.  The declarants' general concerns about shellfish aquaculture, standing alone, are not a substitute for Article III's injury-in-fact requirement.[10]  *See Sierra Club v. Morton*, 405 U.S. 727, 738–40 (1972).  Thus, just as in *Summers* and *National Wildlife Federation*, the declarations here are insufficient for purposes of demonstrating an injury-in-fact.

---

[9] For example, Ross. P. Bankhurst, a member of the Center for Food Safety, states that "[t]he Army Corps' failure to protect wildlife and to prevent the loss of ecological function in Willapa Bay and Grays Harbor is harming my recreational, aesthetic, economic, and other interests."  ECF No. 33, ¶ 11.  Another member, Thomas Buchelle, states that judicial intervention "would lead to far less pesticide/herbicide use and little or no expansion of shellfish aquaculture in Willapa Bay, and stricter protections for wildlife habitat, and thus avoid the actual injuries to my use and enjoyment of the area that would otherwise occur."  ECF No. 34, ¶ 12.  Center for Food Safety member Susan Corbett states that "[t]he lack of government oversight of industrial shellfish aquaculture operations is allowing this harm to our water quality and wildlife habitat to continue, and this directly and negatively impacts my recreational, aesthetic, and other interests, in my own home, community, Squamish Harbor and Hood Canal, and Washington more generally."  ECF No. 36, ¶ 8.

[10] It is also not enough for Plaintiff to allege that its members' interests are harmed as a result of allegedly insufficient ESA and/or NEPA analyses conducted by the Corps prior to issuing NWP 48.  *See, e.g.*, ECF No. 34, ¶ 11 ("I believe that the Army Corps should have thoroughly disclosed and evaluated the use of pesticides by shellfish aquaculture businesses in its public NEPA analysis and had to consider and disclose the cumulative impacts of any increased shellfish aquaculture that its permit allowed."  Procedural injuries based on alleged violations of environmental statutes such as the ESA and/or NEPA were sufficient to demonstrate a threatened concrete interest for purposes of establishing standing in *Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075, 1083 (9th Cir. 2015) and *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008).  However, the redressability requirement "is not toothless in procedural injury cases." *Salmon Spawning & Recovery All.*, 545 F.3d at 1227.  Plaintiff's failure in this case to identify even a single NWP 48-authorized project that allegedly affects its members' interests calls into question whether any alleged procedural injury may be redressed by an order requiring further environmental reviews.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 14
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

1      Plaintiff lacks standing for their ESA claim for an additional reason.  A plaintiff must

2  establish standing for each claim and form of relief.  *Davis v. Fed. Election Comm'n.*, 554 U.S. 724, 734

3  (2008).  An injury-in-fact for a claim under the ESA requires showing "not only that listed species

4  [are] being threatened by the [agency action], but also that one or more of [Plaintiff's] members

5  would thereby be 'directly' affected apart from their 'special interest' in th[e] subject.'"  *Lujan*, 504

6  U.S. at 563 (citation omitted; third alteration in original).  Plaintiff here has done neither.  None of

7  the declarants' asserted injuries involving threatened or endangered species is linked to any actual or

8  certainly impending NWP 48-authorized project.  Plaintiff has failed to demonstrate standing.

9  **II.     NWP 48 Complies with the National Environmental Policy Act.[11]**

10     **A. The Corps Took the Requisite Hard Look at Potential Environmental Effects.**

11     The Corps complied with NEPA, 42 U.S.C. §§ 4321-4370m-12, in all respects when it

12  prepared its National Decision Document for the reissuance of NWP 48.  Nationwide Permits "are

13  a type of general permit designed to authorize certain activities that have no more than minimal

14  individual and cumulative adverse effects . . ."  NWP003036.  Here, the Corps prepared a National

15  Decision Document, NWP003034-116, which included responses to the public comments received

16  regarding the Corps' reissuance of NWP 48 (Section 1.4, NWP003037-54), a presentation of

17  alternatives (Section 2.0, NWP003055-57), a description of the affected environment (Section 3.0,

18  NWP003058-72), and an analysis of the environmental consequences (Section 4.0, NWP003072-

19  3085).  Based on the assessment in the National Decision Document, the Corps ultimately

20  determined that the issuance of the NWP "will not have a significant impact on the quality of the

21  human environment."  NWP003106.[12]  Because the Corps applied the requisite examination of

22  environmental impacts and reasonably concluded that issuance of NWP 48 would not significantly

---

[11] Although Plaintiff's brief leads with arguments under the CWA, we address those arguments last, both because the Corps' decision to issue NWP 48 is predicated, in part, on a determination made pursuant to NEPA and the ESA, and to minimize redundancy.

[12] Courts have routinely upheld the Corps' decision to prepare an EA and FONSI in cases involving issuance of nationwide permits.  *See Sierra Club v. Bostick*, 787 F.3d 1043, 1052-53 (10th Cir. 2015) (concluding that the Corps' issuance of a NWP for utility lines complied with NEPA when the Corps issued an EA and concluded that the environmental impact would be insignificant); *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 39-40 (D.C. Cir. 2015) (upholding the NEPA analysis applied to a NWP for an oil pipeline); *Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1165 (9th Cir. 2012) (upholding the Corps' practice of performing NEPA analysis in advance of their promulgation, and not to conduct additional NEPA analysis when it verifies specific activities under the general permits).

affect the environment, the Corps properly prepared an Environmental Assessment and a Finding

of No Significant Impact. *Id.* In all aspects, the Corps concluded that the impacts would not be

significant, and thoroughly explained the rationale for the decision. NWP003072-85. NEPA

requires no more.

### 1. The Corps' Purpose and Need for NWP 48

The Corps' National Decision Document properly identified the purpose and need for NWP

48. While Plaintiff lodges a number of attacks on the Corps' decision, Plaintiff's arguments

incorrectly challenge the Seattle District's Supplemental Decision Document, and not the applicable

NEPA document, the Corps' National Decision Document. Pl. Mem. 21-22 (citing COE127592-3,

127599), 23-24 (citing COE127556-59, 127591-92), 25-26 (citing COE127589, 592, 125591-618), 26-

29 (citing COE127555). Plaintiff does not cite the National Decision Document, but rather the

Seattle District's Supplemental Decision Document. Thus, when Plaintiff claims the Environmental

Assessment lacks a purpose and need statement, it is actually noting that the Supplemental Decision

Document lacks a purpose and need statement. *See id.* 22, 17 (citing COE127485–611). Similarly,

when Plaintiff claims the Environmental Assessment lacks a no action alternative, it is actually

noting that the Supplemental Decision Document lacks a no action alternative. *See id.* 22, 18. Thus,

Plaintiff's claims entirely fail to challenge—or even consider—the Corps' actual Environmental

Assessment, which is the National Decision Document. On this point alone, Plaintiff's Motion for

Summary Judgment should be denied.[13]

When agencies establish a purpose and need statement, it is subject to review on a

reasonableness standard. *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066-67 (9th Cir.

1998). Here, Plaintiff falsely asserts that the Environmental Assessment lacks a purpose and need

---

[13] Plaintiff also incorrectly cites and relies upon an internal draft document, and not the National Decision Document, which is the relevant NEPA document. Pl. Mem. 20 (citing COE125583-700, 684-86, 685), 21 (citing COE125620, 627), 22 (citing COE125589), 29 (citing COE125583-700). The document is an internal draft cumulative impacts analysis that the author designated as a draft. COE125583 ("Attached is the draft CIA . . ."). Furthermore, the draft document assumes that no general conditions or regional conditions are in place. COE125589-90. Thus, the draft document notes that "[i]n all cases but one, the cumulative effects analysis assumes no additional requirements placed on the work . . . This results in a worst-case environmental effects analysis." COE125589. Plaintiff's reliance on a draft analysis that does not account for the actual operation of the Nationwide Permitting Program, is therefore, misplaced. *See also* Pl. Mem. 29 (suggesting that the agency overlooked the internal cumulative impact analysis undertaken by Corps staff).

statement—contrary to the plain text of the document. The National Decision Document explicitly states, "*the purpose of the NWP is* to authorize discharges of dredged or fill material for commercial shellfish aquaculture activities." NWP003097 (emphasis added). The National Decision Document also plainly states the need for NWP 48. Section 5.2.1 of the National Decision Document is titled, "Relative extent of the *public and private need* for the proposed structure or work," and it explains that the permit is necessary to facilitate satisfaction of society's food demands. NWP003091 (emphasis added). The document also clarifies that NWP 48 is needed for consistency and efficiency in shellfish aquaculture permitting. NWP003056, 3059. With regional or individual permits, aquaculture regulation would be fragmented, requiring additional time and resources from government agencies and private entities. *Id.* With a nationwide permit, on the other hand, regulation is predictable and consistent across the country. Thus, the Corps concluded that the nationwide permit was necessary and adequately explained its reasoning. NWP003039. The Corps fully complied with NEPA when it established the purpose and need of the proposed permit. *See Friends of Southeast's Future*, 153 F.3d at 1066 (holding that agencies have "considerable discretion to define the purpose and need of a project.").

### 2. The Corps' Consideration of Alternatives

In compliance with 40 C.F.R. § 1502.14, the National Decision Document appropriately considered four alternatives—a no action alternative, national modification alternatives, regional modification alternatives, and case-specific on-site alternatives. NWP003055-58. Specifically, Section 2.1 of the National Decision Document is labeled "No Action Alternative (No Nationwide Permit)." NWP003055–56. This section includes a general analysis of the no action alternative and whether it would meet the purpose and need for the NWP. *Id.* The analysis considered what would occur in the absence of a nationwide permit, looking at impacts to the environment, the Corps, other agencies, and the regulated public. *Id.* Based on this assessment, the Corps ultimately found that the no action alternative would not achieve the goals of NWP 48 and rejected it. *Id.* This

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 17
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

section of the EA accordingly meets the NEPA requirements for a no action alternative.[14]

The Corps also considered other alternatives— a national modification, a regional modification, and case-specific on-site alternatives. NWP003055–58. NEPA regulations, 40 C.F.R. § 1502.14, require that an Environmental Assessment "evaluate all reasonable alternatives." The analysis does not need to be exhaustive, and the "agency's obligation to consider alternatives under an [Environmental Assessment] is a lesser one than under an [Environmental Impact Statement]." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005). Additionally, the agency is not required to consider any alternatives that would fail to meet the purpose and need for a project. *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 865 (9th Cir. 2004). Instead, the agency must merely consider reasonable alternatives and explain why they will not suffice. *Native Ecosystems Council*, 428 F.3d at 1246.

Here, the Corps explained that the nationwide permit was the best approach, but it did not foreclose regional and case-specific alternatives. NWP3055–58. Among the alternatives considered, the Corps "Regional Modification Alternatives," which placed a responsibility upon all Corps divisions and district to add regional conditions to the NWPs to enhance the protection of the aquatic environment and address local concerns. NWP003057. Under this alternative, Corps divisions and districts are also required to monitor and analyze the cumulative adverse effects of the NWPs, and if warranted, further restrict or prohibit the use of the NWPs "to ensure that the NWPs do not authorize activities that result in more than minimal individual and cumulative adverse environmental effects." *Id.* And, the Corps considered "Case-specific On-site Alternatives." NWP003058. This alternative recognizes that "[i]f the proposed activity will result in more than minimal adverse environmental effects, the district engineer will exercise discretionary authority and require an individual permit." NWP003058. The Corps accordingly complied with NEPA, as it

---

[14] Plaintiff's argument that the Corps incorrectly applied a baseline to the no action alternative should also be rejected. Plaintiff premises its argument on the basis that the Corps applied the baseline of "all shellfish operations/acreage authorized under the 2012 NWP 48" and that such a baseline ignores the true extent of environmental consequences. Pl. Mem. 25-26. Plaintiff has cherry-picked portions of the administrative record by citing the Supplemental Decision Document's cumulative effects analysis and ignored the Corps' appropriate use of a baseline under NEPA for its "no action" alternative. NWP003055-56. In its analysis of the no action alternative, *id.*, the Corps acknowledged that "in the absence of this NWP . . . authorization in the form of a general permit or individual permits would be required . . . . Not all districts would develop these regional general permits for a variety of reasons." NWP3055. The Corps did not unreasonably utilize an incorrect baseline for its no action alternative.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 18
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

1   considered alternatives and satisfactorily explained how each alternative would fit into the permitting

2   scheme. *Id.*

3       Plaintiff's attacks on the Environmental Assessment's scope are misdirected. Pl. Mem. 22-24.

4   The Supplemental Decision Document is not a standalone document; it does not need to duplicate

5   the National Decision Document. COE127485; 33 CFR § 330.5(c)(1)(iii). Instead, the purpose of

6   the Supplemental Decision Document is to identify and address regional issues. COE127485; 33

7   CFR § 330.5(c)(1)(iii). This structured review is encouraged by the courts "to eliminate repetitive

8   discussions of the same issues and to focus on the actual issues ripe for decision at each level of

9   environmental review." *Salmon River Concerned Citizens v. Robertson*, 798 F. Supp. 1434, 1439 (E.D.

10   Cal. 1992), *aff'd*, 32 F.3d 1346 (9th Cir. 1994). Plaintiff's claims are therefore misdirected and this

11   Court should find that the EA was appropriate in scope.[15]

12      **B. The Corps Complied with NEPA's Public Participation Requirements.**

13       The Corps also complied with the public participation requirements of NEPA. *See*

14   NWP003038-55, at Section 1.4, "Public Comment and Response." Agencies have discretion to

15   promulgate their own regulations outlining when public comment is necessary. The Corps applies

16   its discretion as to how to involve the public. *See Bering Strait Citizens for Responsible Res. Dev. v. U.S.*

17   *Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008) (circulation of a draft environmental

18   assessment of a gold mining project was not required under NEPA because the regulations did not

19   compel such formality); *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1279 (10th Cir. 2004)

20   (court declined to require public comment period for draft EA). The Corps' regulations do not

---

[15] Plaintiff also attacks the Corps' use of unspecified future mitigation measures. Pl. Mem. 21. However, the Corps is not required to develop mitigation to the extent that Plaintiff claims. "NEPA does not require a fully developed plan detailing what steps will be taken to mitigate adverse environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989). The Ninth Circuit has held that the mitigation "requirements" Plaintiff alleges are specific to Environmental Impact Statements, but that an Environmental Assessment need not consider mitigation measures. *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1147 (9th Cir. 2000) ("NEPA does not require that Environmental Assessments include a discussion of mitigation strategies."). Here, the Corps concluded that the action would result in no significant impacts and this finding was independent from the application of any mitigation measures. NWP003052. Plaintiff's citation to *Oregon Natural Desert Ass'n v. Singleton*, 47 F. Supp. 2d 1182, 1193 (D. Or. 1998) is inapposite. There, the court considered a mitigated FONSI, which is a document that determines there are no significant impacts *with* mitigation in place. *Id.* at 1194. (emphasis added). The Corps' finding of no significant impact here was not contingent upon mitigation. *See* NWP3052 (the activities authorized by NWP 48 are "unlikely to . . . result in more than minimal adverse environmental effects."). Thus, the Corps was not required to develop mitigation to completely compensate for adverse impacts *Singleton*, 47 F. Supp. 2d at 1194.

DEFENDANTS' MOTION FOR SUMMARY        U.S. Department of Justice
JUDGMENT ("MSJ") AND OPP. TO        Dedra S. Curteman, Trial Attorney
PLAINTIFF'S MSJ – Page 19        (202) 305-0446
2:17-cv-01209-RSL

require the circulation of a draft Environmental Assessment for public comment. *See* 33 C.F.R. §
330.5(a)(2)(i) (requiring the Chief of Engineers to publish a document seeking public comments,
including the opportunity to request a public hearing). Still, the Corps solicited public comment
concurrent with the June 1, 2016 proposal to reissue NWP 48, and on June 20, 2016, the Seattle
District sought public comment on proposed regional conditions. *See* 81 Fed. Reg. 35,189;
COE127485. Following the initial solicitation for public comments, the Seattle District issued a
third public notice on November 30, 2016 for proposed regional conditions. COE127485. And,
the Corps addressed comments from the three solicitations in the National Decision Document and
the Supplemental Decision Document. NWP003038-55; COE127485-556. The public comments
received from the June 1, 2016 notice were used to improve the NWP "by changing NWP terms
and limits, notification requirements, and/or NWP general conditions, as necessary." NWP003038.
Consistent with its NEPA obligations, the Corps provided multiple opportunities for the public to
weigh in with their views. *See Bering Strait Citizens*, 524 F.3d at 953.

**C. The Corps Reasonably Concluded that NWP 48 Would Not Result in Significant Impacts.**

**1. The Corps Considered Potential Impacts of Pesticides.**

The Corps considered the cumulative effects of pesticide use in Section 4.3.1 of the National
Decision Document when it recognized, "[a] variety of pollutants, including pesticides, might be
released into the environment during the operation and maintenance of these activities."
NWP003074, 3077. Taking into consideration the potential use of pesticides, the Corps reasonably
concluded, "[i]n areas where a Corps district determines that NWP 48 activities may have more than
minimal adverse effects . . . the district can request that the division engineer add a regional
condition to this NWP . . . ." NWP003051. In any event, the Corps does not have the authority to
permit discharges of pesticides into navigable waters—EPA (or an authorized state) does. 33 U.S.C.
§ 1342 (2012); NWP003042. Even if the Corps had the requisite authority over pesticide discharges,
the Corps reasonably concluded, based on its nationwide permitting authority, that where there are
more than minimal cumulative adverse environmental effects, including those resulting from
pesticide use, the Corps will undertake further analysis, and will require individual permits, or will

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 20
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

add conditions to the NWP either on a case-by-case or regional basis to require mitigation to ensure

that the cumulative adverse environmental effects are no more than minimal.  NWP3077.  *See also*

NWP003042, 3051-52.  The present case is distinct from those upon which Plaintiff relies.  Pl. Mem.

27.  *See Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1242–43 (9th Cir. 1984) (noting the Forest

Service's concrete plans to spray pesticides); *Or. Envtl. Council v. Kunzman*, 714 F.2d 901, 902 (9th Cir.

1983) (noting the federal action at issue was pesticide spraying).  Nonetheless, the Corps considered

potential impacts of pesticide use, consistent with its NEPA obligations.

### 2. The Corps Adequately Assessed Direct, Indirect, and Cumulative Impacts.

The Corps considered the increase in acreage affected by the reissuance of the 2017 NWP

48, and considered the impacts resulting from previously issued nationwide permits.  *See generally*

Section 3.0, Affected Environment and 4.0, Environmental Impacts, NWP003058-72, 3072-85.  *See*

*also* COE127591-92 (noting the new estimated project area acreage to be approximately 72,300 acres,

49,575 of which was authorized under 2012 NWP 48).  The Corps specifically recognized that the

"affected environment described in Section 3.0 also includes present effects of past actions,

including activities authorized by NWPs issued from 1977 to 2012 and constructed by permittees,

which are captured in national information on the quantity and quality of wetlands, streams, and

other aquatic resources."  *Id.* 3075.  While NEPA requires an agency to consider the cumulative

effects of a proposed action, *Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000,

1007 (9th Cir. 2011), the purpose of an EA "is not to compile an exhaustive examination of each

and every tangential event that potentially could impact the local environment."  *Tri-Valley CAREs v.*

*U.S. Dep't of Energy*, 671 F.3d 1113, 1129 (9th Cir. 2012).  Plaintiff argues that the Corps' cumulative

impacts analysis was faulty because it did not assess impacts from the acreage impacted by the

previously issued 2012 NWP 48, Pl. Mem. 27-29, and that the Corps adopted fewer protections for

eelgrass, forage fish, other wildlife, and imperiled species.  *Id.*  Plaintiff misconstrues the record.

First, the Corps considered the past impacts of previously issued NWPs from 1977-2012.

NWP3075.  Second, the Corps imposed conditions to provide individual-level review to ensure no

more than minimal impacts would result to resources.  These protections include the Corps'

imposition of general condition 18, which requires non-federal permittees to submit PCNs "if any

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 21
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

listed species or designated critical habitat might be affected or is in the vicinity of the activity, or if the activity is located in designated critical habitat." COE127487, 127534 (noting that in the Seattle District, due to the presence of endangered species and/or critical habitat in the marine waters where shellfish aquaculture occurs, every project will require a PCN). In addition, the District Engineer will evaluate impacts to forage fish for each PCN by reviewing documented spawning locations, as well as evaluating site specific conditions such as substrate appropriate to support spawning. COE127534-55. As a result, greater protections to resources will occur because District Engineers will review each individual project to ensure that no more than minimal adverse impacts will occur.

## III. The Corps Complied With Section 7(a)(2) of the Endangered Species Act.

The Corps also complied with the ESA in reissuing NWP 48 and adopting it subject to General Condition 18 and appropriate regional conditions for use in Washington State. However, Plaintiff asserts that the Corps violated the ESA because the Seattle District did not incorporate the terms and conditions of the Programmatic Biological Opinion as part of its Supplemental Decision Document for NWP 48 and failed to reinitiate ESA consultation with NMFS pursuant to the ESA consultation regulations, 50 C.F.R. § 402.16(a)-(d). As explained in detail below, Plaintiff misunderstands the scope of the NMFS Programmatic Biological Opinion pertaining to various aquaculture activities in Washington State. The Corps Seattle District allows aquaculture operators to follow the terms and conditions described in the Programmatic Biological Opinion as an option to demonstrate ESA compliance for purposes of verifying the applicability of NWP 48 for their aquaculture operations. Reinitiation of consultation on the Programmatic Biological Opinion has not been triggered.

### A. ESA Consultation on the Corps' Decision to Approve NWP 48 for Use in Washington State Is Unnecessary Because the Issuance of NWP 48 Has No Effect on Listed Species or Designated Critical Habitat.

As explained in detail above, General Condition 18 specifies that "[n]o activity is authorized under any NWP which 'may affect' a listed species or critical habitat, unless ESA section 7 consultation addressing the effects of the proposed activity has been completed." 82 Fed. Reg. at 1999; NWP000141. Therefore, the Corps reasonably concluded that issuance of NWP 48 at the

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 22
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

national level has "no effect" on threatened or endangered species or critical habitat. 82 Fed. Reg. at 1874; NWP000016. Plaintiff does not allege any ESA violation in connection with the Corps' decision to issue NWP 48 at a national level. Rather, Plaintiff asserts that the Corps violated the ESA in approving NWP 48 for use in Washington State. *See* Pl. Mem. 10. However, in its Supplement to the National Decision Document for NWP 48, the Corps Seattle District reiterated that "the reissuance/issuance of the NWPs has no effect on listed species or their critical habitat and thus requires no ESA section 7 consultation . . . ." COE127560.[16] The terms and conditions of the NWPs, including General Condition 18, 33 C.F.R. § 330.4(f), ensure that ESA consultation will take place on an activity-specific basis wherever appropriate. *Id.*

Through the adoption of General Condition 18, the Corps ensured that the issuance of NWP 48—at both the national and regional levels, respectively—results in "no effect" on threatened or endangered species and designated critical habitat. COE127560.[17] As a result, ESA consultation on the agency action challenged by Plaintiff (*i.e.*, the issuance of NWP 48 in Washington State, *see* ECF No. 9, ¶ 3) is unnecessary as a matter of law. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1026 (9th Cir. 2012) ("An agency may avoid the consultation requirement only if it determines that its action will have 'no effect' on a listed species or critical habitat."); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447 (9th Cir.1996) ("That [no effect] finding obviates the need for formal consultation under the ESA."); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir.1994) ("[I]f the agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered."). To prove an ESA violation, Plaintiff in this case is required to demonstrate, based on the administrative record, that the Corps was arbitrary and capricious in making this "no effect" determination. *See* 5 U.S.C. §

---

[16] It is of no moment that the Corps acknowledged in its correspondence initiating consultation with NMFS prior to obtaining the Programmatic Biological Opinion that its issuance of *both* individual permits and the issuance of verification letters under general permits "may affect" ESA-listed species. *See* COE134147 (Programmatic Biological Assessment description of "Proposed Action"); COE134263 Table 8-1 (summary of effect determinations). Again, the consultation process leading to the Programmatic Biological Opinion addressed a broader group of Corps actions than NWP 48 and is subject to a much longer timeframe (*i.e.*, 20 years for the programmatic biological opinion) than the five-year term of NWP 48. *See* COE134145.

[17] The "no effect" determination is the Corps' to make; there is no corresponding requirement for NMFS to concur in, or otherwise opine on, the Corps' "no effect" determination. *Defenders of Wildlife v. Flowers Defenders of Wildlife*, 414 F.3d 1066, 1070 (9th Cir. 2005). *See also Habitat Educ. Ctr. v. Bosworth*, 363 F. Supp. 2d 1090, 1111 (E.D. Wis. 2005) (deferring to action agency's determination that the project will not affect listed species).

706(2)(A); *Citizens to Pres. Overton Park*, 401 U.S. at 416. Plaintiff has failed to carry its burden of demonstrating that the Corps erred in concluding that the reissuance of NWP 48 has no effect on listed species or their critical habitat and thus requires no ESA Section 7 consultation at the programmatic level. COE126560.

To streamline the process for consultations on an activity-specific basis, the Seattle District has completed various programmatic consultations with FWS and NMFS for pre-identified categories of activities that are similar in nature and are located in pre-defined geographic areas. COE127561. A project proponent seeking authorization under a NWP has the option to demonstrate ESA compliance by meeting the terms and conditions of an existing programmatic biological opinion or instead have an individual ESA consultation for his or her project. COE127550.

Because the NMFS Programmatic Biological Opinion pre-dated the Seattle District's approval of NWP 48 for use in Washington, Plaintiff suggests that the Corps was obligated to limit and otherwise condition the use of NWP 48 according to the terms of the Programmatic Biological Opinion. Pl. Mem. 39 ("The permit ultimately adopted differs in substantial ways from the assumptions of the 2016 ESA determinations."). Plaintiff also asserts that the Corps is obligated to reinitiate ESA consultation because NWP 48 does not incorporate the terms and conditions of the Programmatic Biological Opinion. *Id.* Plaintiff misunderstands the scope of the Programmatic Biological Opinion and, in any event, reinitiation of consultation is unnecessary.

The Programmatic Biological Opinion covers more activities than those included in NWP 48, such as shellfish research, restoration and recreational activities. COE127550. Thus, on its face, the Programmatic Biological Opinion pertains to a "broader programmatic proposed action" than merely the reissuance of NWP 48. COE134762 ("In contrast to the previous consultations on NWP 48, this consultation covers a number of additional shellfish related permitting actions the COE may take; it is not limited to activities covered by NWP 48."). Furthermore, neither the Corps nor NMFS intended for the Programmatic Biological Opinion to cover all projects to be authorized under NWP 48.

As explained in the Seattle District's Supplemental Decision Document, if a project

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 24
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

proponent would like coverage under an existing programmatic consultation, they must ensure their project meets the design criteria and conservation measures described in the Programmatic Biological Opinion. COE127561. Alternatively, if a project proponent elects to pursue an individual consultation, the Corps and NMFS will determine appropriate project-specific avoidance or reduction measures. *Id.*[18] The Seattle District reasonably decided against included the terms of the Programmatic Biological Opinion as regional conditions for NWP 48, to ensure flexibility for applicants wishing to individually consult. COE217558. *See also* COE135242 ("The Corps reviewed but did not incorporate all [conservation recommendations] as special conditions because they were either duplicative, programmatic in nature, unenforceable, or would be unnecessarily restrictive . . . .").

**B. Reinitiation of Consultation on the Programmatic Biological Opinion is Unnecessary.**

The Court should reject Plaintiff's ESA-related arguments to the extent that Plaintiff is attempting to frame the relevant Corps action at issue in this case as some sort of ongoing implementation of the procedures described in the Programmatic Biological Opinion. *See* Pl. Mem. 38-39. As a threshold matter, claims concerning the Corps' implementation of procedures described in the Programmatic Biological Opinion are not properly before the Court.[19] In any event, to the extent that Plaintiff's ESA claims are reviewable at all[20], Plaintiff fails to demonstrate

---

[18] The NMFS Programmatic Biological Opinion similarly recognizes that some projects not conforming to the terms and conditions of the programmatic biological opinion would achieve ESA compliance through individual ESA consultations. COE134770 ("Activities involving the use of herbicides or pesticides other than imazamox for treatment of Japanese eelgrass on clam culture beds is not covered by this programmatic and will require individual consultation.").

[19] Other than raising a facial challenge to the Corps' issuance of NWP 48 in Washington State based on an alleged failure to reinitiate ESA consultation with NMFS, Plaintiff's Amended Complaint does not raise any claims concerning the sufficiency of the Corps' actions to comply with the mandatory terms and conditions of the Programmatic Biological Opinion. ECF No. 9, ¶¶ 218-223. Likewise, the Prayer for Relief in Plaintiff's Amended Complaint, ECF No. 9 at 67-68, omits any request for specific remedies concerning the Corps' implementation of the mandatory terms and conditions of the Programmatic Biological Opinion. "Jurisdiction may not be sustained on a theory that the plaintiff has not advanced." *Merrell Dow Pharms. v. Thompson*, 478 U.S. 804, 809 n.6 (1986), *see Healy v. Sea Gull Specialty Co.*, 237 U.S. 479, 480 (1915) ("[T]he Plaintiff is absolute master of what jurisdiction he will appeal to."), and *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) ("[T]he party who brings a suit is master to decide what law he will rely upon. . . .").

[20] In *Lujan v. National Wildlife Federation*, 497 U.S. 871, 890 (1990), the Supreme Court held that a plaintiff lacks standing to challenge the implementation of an agency program. The Supreme Court stated that, even if "rampant" violation of the law is occurring within the program, that in and of itself does not confer upon plaintiff the right to "seek wholesale improvement of [the] program by court decree, rather than in the offices of the Department or the halls of Congress,

---

JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 25
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

any ESA violation resulting from the Corps' alleged failure to reinitiate ESA consultation with NMFS concerning the activities described in the Programmatic Biological Opinion.

As explained in detail below, the Programmatic Biological Opinion is not tied to the issuance of NWP 48, but rather describes a programmatic, 20-year federal action. This 20-year action includes a broad range of aquaculture activities including but not limited to some of the activities authorized by NWP 48 over the next five years. The NWP 48 Supplemental Decision Document clearly explains that ESA compliance on NWP 48 activities occurs either through compliance with the terms of the Programmatic Biological Opinion or through individual consultation with the services. COE127560. Thus, even though some of the terms and conditions of NWP 48 as re-authorized by the Corps in 2017 differ from the 2012 version of NWP 48, the Programmatic Biological Opinion continues to apply to many of the activities that will be authorized under NWP 48. None of the cited triggers for reinitiating consultation pursuant to 50 C.F.R. § 402.16(b)-(c) has occurred here.

### 1. Claims Concerning the Corps' Alleged Failure to Reinitiate Consultation on the Programmatic Biological Opinion Are Unripe.

To the extent that Plaintiff's Amended Complaint may be construed to state a claim concerning the Corps' alleged failure to reinitiate consultation on the Programmatic Biological Opinion—notwithstanding the fact that the Corps' decision to reissue NWP 48 plainly was not conditioned or premised upon the Programmatic Biological Opinion—the Court lacks jurisdiction because such a claim is unripe. Determining whether a claim is ripe for review requires an evaluation of (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration. *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003). Applying these factors here, Plaintiff's re-initiation claim is clearly unripe.

As to the fitness of the issues for judicial decision, further factual development would "significantly advance [the Court's] ability to deal with the legal issues presented." *Id.* at 812. The

---

where programmatic improvements are normally made." *Id.* at 891. "Under the terms of the APA," the Court continued, plaintiff "must direct its attack against some particular 'agency action' that causes it harm." *Id.* (emphasis supplied). As described in detail above, Plaintiff's Amended Complaint fails to attack a particular agency action that causes it harm. Based on the reasoning in *Lujan,* Plaintiff here is simply not entitled to a "wholesale" review of the Corps' administration of NWP 48 in Washington State.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 26
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

general and regional conditions on the use of NWP 48 set up a case-by-case framework for determining whether a particular proposed discharge of dredged or fill material will be allowed. Thus, without concrete site-specific examples of how the Corps' Seattle District is verifying projects as authorized under NWP 48, it is impossible to evaluate whether any of the regulatory criteria for reinitiating ESA consultation have been triggered. *See* 50 C.F.R. § 402.16(a)-(d). *Hells Canyon Preservation Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010) (holding that plaintiffs lacked standing where the "precise injury" could not be identified).

As to whether deferring review will result in any hardship to Plaintiff, Plaintiff has not identified any specific NWP 48-authorized project, much less any specific NWP 48-authorized project that harms or threatens to harm it or its members. If the Corps authorizes a project under NWP 48 that affects Plaintiff, the Plaintiff remains free to raise a "failure to re-initiate" claim at that time assuming all other jurisdictional requirements are met. But, unless and until those circumstances arise, Plaintiff's attempts to obtain an advisory opinion on the Corps' alleged duty to re-initiate consultation concerning its actions under the Programmatic Biological Opinion are unripe for review.

### 2. Assuming Plaintiff's Reinitiation Claims Are Ripe, They Lack Merit.

As explained in detail above, the Corps decided to continue using NWP 48 in Washington with the Programmatic Biological Opinion as an option for operators to demonstrate ESA compliance after considering public comments on whether additional regional conditions were needed. COE127485. Plaintiff asserts that the Corps was legally required to reinitiate consultation with NMFS at the time it decided to approve NWP 48 in Washington State because the Corps had materially changed NWP 48 *after* NMFS issued the Programmatic Biological Opinion. *See* Pl. Mem. 42-49. Plaintiff has the burden to show that the Corps acted arbitrarily and capriciously in failing to reinitiate consultation with NMFS. *Friends of River v. Nat'l Marine Fisheries Serv.*, 293 F. Supp.3d 1151, 1175 (E.D. Cal. 2018), *appeal docketed*, No. 2:16-cv-00818-JAM-EFB (9th Cir. Apr. 11, 2018). Plaintiff has failed to satisfy this burden.

As a threshold matter, Plaintiff misconstrues the relevant agency action that was addressed in the Programmatic Biological Opinion. The Corps action subject to consultation was not the

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 27
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

1   issuance of NWP 48 or the approval of NWP 48 by the Corps' Seattle District for use in

2   Washington State.  Rather, the "proposed action" for the consultation with NMFS was a suite of

3   commonly permitted shellfish aquaculture activities resulting in a set acreage amount over a period

4   of 20 years.  COE134764-89.  Even assuming, *arguendo*, that the Programmatic Biological Opinion

5   assumed that NWP 48 would be implemented in a certain form, Plaintiff fails to demonstrate that

6   reinitiation of consultation is necessary because of any changes to NWP 48 since NMFS issued the

7   Programmatic Biological Opinion.

8          Both the Corps *and* NMFS have authority to request reinitiation pursuant to the ESA

9   consultation regulations, 50 C.F.R. § 402.16.  NMFS submitted comments in response to the Corps'

10  public notice, COE120052, seeking comment on regional issues concerning the Corps' June 1, 2016,

11  proposal to reissue the nationwide permits.  COE119426.  However, the record before the Court

12  reflects that NMFS did *not* request reinitiation of consultation on the Programmatic Biological

13  Opinion after issuance of NWP 48.  To the contrary, the Corps and NMFS have worked together to

14  ensure compliance with the conservation measures and terms and conditions in the Programmatic

15  Biological Opinion.  *See, e.g.,* COE134958.  Moreover, the biological opinion itself recognizes that

16  NMFS intended for the Programmatic Biological Opinion to cover Corps activities over a relatively

17  long period of time (20 years) despite the possible changing terms of NWP 48 every five years.

18  COE 134762, COE 134767.  The fact that NMFS did not request reinitiation of consultation on the

19  Programmatic Biological Opinion after the most recent issuance of NWP 48 at the national level

20  indicates that it was reasonable for the Corps to proceed with approving NWP 48 for use in

21  Washington without reinitiating consultation with NMFS.  *See* COE127562.[21]

22         For the reasons set forth in detail below, based on the applicable triggers for reinitiating ESA

23  consultation, *see* 50 C.F.R. § 402.16(b)-(c), none of the grounds cited by Plaintiff warrants

24  reinitiation of consultation concerning the Corps' implementation of conservation measures

25  _____

26  [21] Even if NMFS had requested reinitiation of consultation, the consultation regulations provide that the ultimate
    decision whether to proceed with a proposed action following ESA consultation is committed to the discretion of the
27  action agency. *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1193–94 (9th Cir. 1988).  Moreover, the ESA consultation
    regulations do not require an agency to stop and reinitiate consultation every time there is a modification of or
28  uncertainty in a complex and lengthy agency action. *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987).  "The
    magnitude of and importance of the modification must be taken into account in determining whether reinitiation of
    consultation is necessary." *Protect Our Water v. Flowers*, 377 F. Supp. 2d 844, 876 (E.D. Cal. 2004) (citing *Marsh*).

described in the Programmatic Biological Opinion.

### a. The Number of Acres Potentially Subject to Aquaculture Does Not Constitute "New Information Requiring Reinitiation of Consultation.

Plaintiff asserts that reinitiation of consultation is necessary because the estimated acreage of marine tidelands potentially authorized for commercial aquaculture under NWP 48 (based on the definition of "existing acreages") is 72,300 acres, *see* COE127591, compared to the 38,715 acres analyzed in the Programmatic Biological Opinion, COE134768 Table 2. Pl. Mem. 42. As explained in the Corps' Supplemental Decision Document, the Corps estimated the total acreage of tidelands that could theoretically be impacted by authorizations under NWP 48 over a five year period based on state-owned aquatic lands that have been sold by the State of Washington since 1895 pursuant to the Bush Act and the Callow Act, RCW Chapter 79.135. COE137590-91. Lands engaged in aquaculture historically "may nor may not be engaged in aquaculture today." COE127582. Therefore, the Corps stated that the resulting acreage estimate in the NWP 48 Supplemental Decision Document "may ultimately be an overestimation of the acreage that is actually verified and/or put in to active use under NWP 48 2017." COE127591.

As explained above, prior to verification by the Corps that an aquaculture project is authorized under NWP 48, a project proponent must provide an appropriate PCN or notification to the Seattle District and comply with all applicable conditions, including General Condition 18. COE 127550 ("[U]nder NWP general condition 18, a PCN is required in all cases in the Seattle District."). Therefore, even assuming the Corps' decision to issue NWP 48 was based on the Programmatic Biological Opinion (although it was not), reinitiation of consultation would not be triggered pursuant to 50 C.F.R. § 402-16(b)-(c) because NWP 48 does not itself authorize the cultivation of any acreage of marine tidelands absent submittal of a PCN by the project proponent and a further determination by the Corps that the project proponent has complied with all applicable conditions. All NWP 48-authorized activities in Washington State will be subject to appropriate conditions resulting from ESA consultation, whether the activity is subject to the Programmatic Biological Opinion or an individual consultation. COE127561.

Moreover, the Corps and NMFS monitor projects authorized under the Programmatic Biological Opinion pursuant to the Reasonable and Prudent Measures of the incidental take

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 29
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

statement. COE134936. The record before the Court shows that the acreage of shellfish activities authorized between October 1, 2016, and September 30, 2017, was within the acreage totals analyzed in the Programmatic Biological Opinion. *Compare* COE134768 and COE135228 (Corps annual report dated October 12, 2017). If at some point in the future the Corps authorizes aquaculture projects in excess of the acreage-related assumptions of the Programmatic Biological Opinion, the Corps or NMFS may reinitiate consultation at that time. *See* 50 C.F.R. § 402.16(b); COE134859. In the meantime, prior to the authorization of projects in excess of what was described in the Programmatic Biological Opinion, reinitation of consultation is unnecessary. *See Northern Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 959, 981 (9th Cir. 2006) ("There was no violation of the ESA at this stage. If future actions differ from the BiOp assumptions, BLM must reinitiate consultation with the FWS.").

      **b. The Corps' Decision Not To Incorporate the Conservation Measures of the Programmatic Biological Opinion Does Not Require Reinitiation of Consultation.**

Next, Plaintiff asserts that the Corps should have incorporated as terms of NWP 48 the conservation measures described in the Programmatic Biological Opinion, COE134771-75. *See* Pl. Mem. 43. As described in detail above, the Corps decided not to incorporate all of the conservation measures as regional conditions for NWP 48 to preserve the option for some operators to comply with the ESA through an individual consultation. COE127550. "If a project proponent would like coverage under an existing programmatic consultation, they must ensure their project meets the design criteria and conservation measures described in the programmatic consultation." COE127561.[22] Plaintiff fails to demonstrate that reinitiation of consultation is necessary pursuant to 50 C.F.R. § 402.16(b)-(c), because there is no significant new information revealing effects of the

---

[22] The "majority" of growers will elect to comply with the ESA in this fashion. COE127558. However, from the outset of the consultation process, the Corps and NMFS understood that if users could not comply with any required conservation measures identified through the programmatic consultation they would still have a "way forward" to comply with any ESA requirements through individual consultation." COE134117. *See also* COE133601 ("[W]e clarified the consultation is applicable to permit decisions for existing commercial shellfish aquaculture activities and not restricted to activities verified under any version of the NWP 48."). The Programmatic Biological Opinion itself recognizes that individual consultation remains an option. COE134771 ("Shellfish activities that do not employ these measures where applicable will not are not within the scope of this proposed action and are potentially liable under provisions of the Endangered Species Act unless they are covered under a separate ESA consultation and COE permit.").

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 30
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

1    action that were not considered and because the Corps action analyzed in the Programmatic
2    Biological Opinion has not changed.
3         For the same reasons, it was unnecessary for the Corps to incorporate terms and conditions
4    of the Programmatic Biological Opinion's incidental take statement, *see* COE134936-37, among the
5    regional conditions for NWP 48, as suggested by Plaintiff. *See* Pl. Mem. 44-45. Again, to be
6    authorized under NWP 48 a project proponent must not only provide the Corps with a PCN but
7    also demonstrate ESA compliance either by complying with the terms and conditions of the
8    Programmatic Biological Opinion or else by completing an individual consultation. COE127550.
9    In either case, General Condition 18 ensures that the Corps can comply with the Programmatic
10   Biological Opinion's requirement to "[m]onitor and report real-time implementations of the
11   proposed action." COE134857.[23] Plaintiff has failed to demonstrate that reinitiation of consultation
12   is required pursuant to 50 C.F.R. § 402.16(c) based on an alleged change to the Corps action subject
13   to consultation.

### c. NWP 48's Revised Definition of New Versus Existing Aquaculture Operations Does Not Require Reinitiation of Consultation.

16        Next, Plaintiff asserts that reinitiation of ESA consultation is necessary because NWP 48
17   modified the definition of "new" aquaculture operations in relation to how such operations were
18   previously defined in the Programmatic Biological Opinion. *See* Pl. Mem. 46. Again, the Corps'
19   decision to adopt NWP 48 was not premised on implementation of the conservation measures
20   incorporated in the Programmatic Biological Opinion. To the extent the Corps will use the
21   Programmatic Biological Opinion to verify individual projects under NWP 48, the redefinition of
22   "new" aquaculture operations in NWP 48 does not constitute a modification of the action that
23   causes an effect to the listed species or critical habitat that was not considered in the biological
24   opinion for purposes of triggering reinitation of consultation pursuant to 50 C.F.R. § 402.16(c).

---

[23] The cases cited by Plaintiff are inapposite. *See* Pl. Mem. 45. In *Pacificans for a Scenic Coast v. California Dep't of Transportation*, 204 F. Supp. 3d 1075, 1092 (N.D. Cal. 2016), the court found that planned project mitigation changed after ESA consultation was completed. In *Center for Biological Diversity v. U.S. Bureau of Land Management*, 698 F.3d 1101, 1115 (9th Cir. 2012), the court questioned the enforceability of certain mitigation measures proposed by private parties. Here, by contrast, project proponents seeking to rely on the Programmatic Biological Opinion will continue to be required to comply with the conservation measures and terms and conditions specified by NMFS. COE127558.

As stated in the Supplemental Decision Document for NWP 48, [i]f a project proponent would like coverage under an existing programmatic consultation, they must ensure their project meets the design criteria and conservation measures described in the programmatic consultation." COE 127561. As further explained in the Seattle District's guidance for implementing NWP 48, "[e]ach NWP 48 verification letter the district issues to an applicant that chooses to use the programmatic Biological Opinions to attain ESA coverage for his/her activities must state that only activities that conform with the definition of the "proposed action" in the Biological Opinions are authorized . . . ." COE134956. Therefore, the fact that NWP 48 otherwise redefined "new" aquaculture operations does not modify the definition for purposes of determining compliance with the Programmatic Biological Opinion. *See id.* Again, if an applicant seeks to use the Programmatic Biological Opinion, the applicant's project must incorporate conservation measures applicable to new or existing operations as they were defined in the Programmatic Biological Opinion. *See* COE127561. Plaintiff fails to demonstrate that reinitiation of consultation is necessitated pursuant to 50 C.F.R. § 402.16(c) based on NWP 48's revised definition of new operations.

### d. Reinitiation of Consultation Is Unnecessary Based on the Alleged Pesticide Impacts of Aquaculture Operations.

Plaintiff suggests that NMFS erred in deeming the use of the herbicide imazamox as an activity interrelated with the marine aquaculture activities analyzed in the Programmatic Biological Opinion. *See* Pl. Mem. 47 (citing COE134770). However, Plaintiff does not challenge the merits of the Programmatic Biological Opinion. Plaintiff has failed to allege, much less demonstrate, that NMFS's findings concerning imazamox were arbitrary and capricious.

In any event, deference is owed to NMFS's informed decisionmaking with respect to its inclusion of imazamox within the actions considered in the Programmatic Biological Opinion. *See Marsh*, 490 U.S. at 377 (holding that substantial deference is afforded to the agency where issues of agency expertise are implicated); *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993) (deference to a reasoned federal agency's decision "is especially appropriate where . . . the challenged decision implicates substantial agency expertise."). Under the circumstances, Plaintiff cannot show that the Corps unreasonably relies on the Programmatic Biological Opinion as an option to allow aquaculture operators to demonstrate ESA compliance for purposes of NWP 48. *See Pyramid Lake*

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 32
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

*Paiute Tribe*, 898 F.2d at 1415 (action agency's reliance on biological opinion will satisfy obligation under ESA if the challenging party can not point to "new information" that the consulting agency did not take into account). Reinitiation of consultation is unnecessary because Plaintiff fails to identify any specific new information revealing effects of imazamox or other chemicals on listed species or critical habitat that were not considered in the biological opinion.

> **e. General Condition 18 Ensures That Issuance of NWP 48 Will Result In "No Effect" on ESA-Listed Species and Designated Critical Habitat.**

Finally, Plaintiff suggests that the Corps erred in relying upon General Condition 18 to adopt a process for a case-by-case review at the regional level to ensure ESA compliance for NWP 48 projects that do not rely on the Programmatic Biological Opinion. Plaintiff contends instead the the Corps was required to reinitiate consultation on the Programmatic Biological Opinion to ensure that all projects authorized under NWP 48 meet the terms and conditions of a (revised) Programmatic Biological Opinion. *See* Pl. Mem. 49. Plaintiff ignores the fact that the Corps and NMFS specifically elected to expand the scope and duration of the Programmatic Biological Opinion so that it would not be limited to the limited scope of activities and short, 5-year duration of NWP 48. COE134762. Moreover, Plaintiff does not identify any specific facts to contradict the Corps' determination that the issuance of NWP 48 at the national level will have "no effect" on listed species or designated critical habitat. COE 127560. Instead, Plaintiff alleges that Corps procedures under NWP 48 and General Condition 18 will result in a piecemeal approach to Section 7 consultation. *See* Pl. Mem. 49.[24]

The facts here are analogous to *North Slope Borough v. Andrus*, 642 F.2d 589, 609 (D.C. Cir. 1980), in which the court reasoned that environmental review procedures under the Outer Continental Shelf Lands Act provided "checks and balances" to ensure that environmental effects

---

[24] The cases cited by Plaintiff, *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015) and *Alliance For the Wild Rockies v. Krueger*, 950 F. Supp. 2d 1196, 1200 (D. Mont. 2013), both construed an agency's duty to reinitiate consultation concerning forest management plans where existing biological opinions confirmed that actions authorized under the plans will have significant effects on ESA-listed species and designated critical habitat. Here, by contrast, General Condition 18 supports the Corps' reasonable determination that the adoption of NWP 48 will have "no effect" on ESA-listed species or designated critical habitat.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 33
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

could be fully assessed at later stages.[25]  Consistent with the reasoning in *North Slope*, the Corps' "no

effect" determination is based upon a conclusion that the terms and conditions of NWP 48,

General Condition 18, and the regional conditions establish checks and balances that will ensure

FWS and/or NMFS review of NWP 48 authorizations on an activity-specific basis.[26]  *See*

COE127560.  Again, "[n]o activity is authorized under any NWP which 'may affect' a listed species

or critical habitat, unless Section 7 consultation addressing the effects of the proposed activity has

been completed." 82 Fed. Reg. at 1,999; NWP000140.  Thus, any activity potentially affecting a

listed species or critical habitat that has not been subject to prior consultation (either programmatic

or on an individual basis) with FWS and/or NMFS is, by definition, not authorized under NWP 48.

*See id.*

       In sum, Plaintiff is simply incorrect in suggesting that the Corps' decision to implement

NWP 48 in Washington State is conditioned upon implementation of the Programmatic Biological

Opinion for every NWP 48-authorized project, for the reasons explained in detail above.  Even

assuming for the sake of argument that the Corps' decision to implement NWP 48 in Washington

State is deemed to be subject to the findings of the Programmatic Biological Opinion, Plaintiff has

failed to demonstrate that reinitiation of consultation is required under any of the applicable triggers

set forth in the ESA consultation regulations, 50 C.F.R. § 402.16(a)-(d).  The Court should grant

---

[25] *See also Ctr. for Biological Diversity v. U.S. Dep't of Interior,* 563 F.3d 466, 482–83 (D.C. Cir. 2009) (applying *North Slope* to hold that ESA-related claims concerning leasing program was unripe); *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 687 (D.C. Cir. 1982) ("Any future proposals . . . to conduct drilling activities in the Cabinet Mountains area will require further scrutiny under NEPA and the ESA."). *Cooling Water Intake Structure Coal. v. EPA,* No. 14-4645, 2018 WL 3520398 at *12, ___F.3d___ (2d Cir. July 23, 2018) ("Nothing in the ESA requires that the Services assess every future 'phase' of an agency action on a site-specific or species-specific basis."); *Defenders of Wildlife v. U.S. Dept. of Navy,* 733 F.3d 1106, 1121 (11th Cir. 2013) ("[T]he rule that biological opinions must be coextensive in scope with the 'entire action' or else violate the ESA is nowhere to be found in the language of the ESA. . . ."). The cases cited by Plaintiff, *Cottonwood Environmental Law Center. v. U.S. Forest Service,* 789 F.3d 1075, 1088 (9th Cir. 2015) and *All. For the Wild Rockies v. Krueger,* 950 F. Supp. 2d 1196, 1200 (D. Mont. 2013), both construed an agency's duty to reinitiate consultation concerning forest management plans where existing biological opinions confirmed that actions authorized under the plans will have significant effects on ESA-listed species and designated critical habitat.  Here, by contrast, General Condition 18 supports the Corps' reasonable determination that the adoption of NWP 48 will have "no effect" on ESA-listed species or designated critical habitat.

[26] This approach is entirely consistent with procedures established under the ESA consultation regulations, which provide that future federal actions (such as future NWP authorizations that may be granted by Corps districts) will be subjected to consultation when they occur.  *See* 51 Fed. Reg. 19,926, 19,933 (June 3, 1986), *cited in, Miccosukee Tribe of Indians of Fla. v. United States,* 566 F.3d 1257, 1269 (11th Cir. 2009).

DEFENDANTS' MOTION FOR SUMMARY         U.S. Department of Justice
JUDGMENT ("MSJ") AND OPP. TO         Dedra S. Curteman, Trial Attorney
PLAINTIFF'S MSJ – Page 34         (202) 305-0446
2:17-cv-01209-RSL

summary judgment in favor of the Corps with respect to all of Plaintiff's ESA-related claims.

**IV.    The Corps' "Minimal Effects" Determination Complies With CWA Section 404(e).** [27]

In two interrelated arguments, Plaintiff claims that the Corps "failed to adequately evaluate the cumulative impact of permitting commercial shellfish aquaculture," Pl. Mem. 13-15, and "failed to provide documentation to support" its finding that NWP 48, will have only minimal cumulative effects on the aquatic environment, *id.* at 16-18.  Both claims are predicated on Plaintiff's argument that the Corps' effects analysis improperly relied on the future use of "mitigation measures" to avoid adverse impacts. *Id.* at 13 -18.  That argument is simply wrong.[28]

**A.    The Corps Minimal Effects Finding Reasonably Took into Consideration the Pre-Construction Notification Process, General and Regional Conditions, and Conservation Measures Applicable to Shellfish Activities.**

Plaintiff alleges that the Corps' minimal effects finding improperly credits "mitigation measures," a phrase Plaintiff uses to characterize the review, analyses, and protections afforded by the third of the three-level regulatory process, which includes the District Engineers' consideration of site-specific conditions and requirements applicable to shellfish activities under the general and regional conditions to the NWP and conservation measures in the Programmatic Biological Opinion. [29]  Plaintiff's allegations are supported by neither the law nor the administrative record.

The CWA authorizes the Corps to rely on post-issuance procedures, such as post-issuance authorization of each activity by the District Engineer, when it makes its pre-issuance minimal-

---

[27] In a footnote, Plaintiff alleges for the first time that all activities authorized under NWP 48 are not "similar in nature." Pl. Mem. 15 n. 11.  That claim was not asserted in Plaintiff's 65-page Amended Complaint (ECF No. 9).  "The term 'similar in nature' is undefined in the statute.  In interpreting the statute, the Corps' construction 'is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress.'" *Alaska Center for the Env't,* 157 F.3d at 683 (citing *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 131 (1985)).  Plaintiff has cited no record evidence that establishes that the Corps abused its discretion.

[28] Plaintiff also asserts that the Corps was required to assess the impacts of pesticides which are regulated under FIFRA and CWA section 402, not CWA section 404.  That claim is also incorrect for reasons discussed above at Section C.1.

[29] To support its argument, Plaintiff cites cases in which the Corps had relied on compensatory mitigation to offset adverse effects from permitted activities.  Pl. Mem. 13-18.  The Corps did no such thing in issuing NWP 48. "Compensatory mitigation" is defined as "the restoration (re-establishment or rehabilitation), establishment, enhancement, and/or in certain circumstances preservation of aquatic resources for the purposes of offsetting unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization has been achieved."  33 C.F.R. § 332.2.  Here, the Corps found that that compensatory mitigation is unlikely to be necessary to offset authorized impacts and ensure only minimal adverse effects will occur.  NWP003098. S*ee also* NWP003052; NWP003054.  As a result, the Corps' minimal effects finding does not reflect any decrease in adverse effects that might result from compensatory mitigation.

---

effects determinations. *Bulen,* 429 F.3d at 501; *Alaska Center for the Env't v. West,* 157 F.3d 680, 683 (9th Cir. 1998) (holding that that the Corps can rely on a general permit's special conditions in making its pre-permit minimal effects determinations.); *Sierra Club v. Bostick,* 787 F.3d 1043, 1056 (10th Cir. 2015) ("The Corps permissibly interpreted § 404(e) to allow establishment of additional safeguards through the use of project-level personnel"); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs,* 833 F.3d 1274, 1285-89 (11th Cir. 2016) (upholding a minimal effects determination which relied, in part, on permit terms that allowed a District Engineer to authorize an activity under a NWP if he determines that: the activity "will result in minimal individual and cumulative adverse effects" and it complies with additional "applicable regional conditions and any activity-specific conditions added to the NWP authorization by the district engineer."). Post-issuance procedures are a practical necessity. "[G]iven the inevitable *ex ante* uncertainty the Corps confronts when issuing a nationwide permit, its reliance on post-issuance procedures is a reasonable, if not the only possible, way for it to cement its determination that the projects it has authorized will have only minimal environmental impacts." *Bulen,* 429 F.3d at 501 (footnote omitted).

Plaintiff alleges that the Corps' effects determination inadequately described, documented, and evaluated post-issuance procedures intended to minimize adverse effects under NWP 48. Pl. Mem. 15. Those procedures, however, meet or exceed the criteria courts use in reviewing minimal effects determinations. *E.g., id.* at 499-500 ("The Corps' impact analysis took account of a variety of factors, including. . . requirements . . . that the permit will not authorize activities that will jeopardize any endangered species . . . ; [and] the applicability of a variety of General Conditions to NWP 21. . . .."). In approving NWP 48, the Corps summarized the many required mitigation measures:

> All activities authorized under the 2017 NWP 48 must comply with the terms and conditions of NWP 48 and the applicable national general conditions, regional general conditions, and NWP 48 regional conditions. A PCN is required for all requests for verifications [under] NWP 48 [] because of NWP general condition 18 – *Endangered Species*; all aquaculture operations in the state are located in waters where there are either listed threatened or endangered species or listed critical habitat. When reviewing the PCN the district engineer will also ensure compliance with the applicable NWP general conditions to help insure the impacts are no more than minimal. These conditions include, but are not limited to NWP general condition 1 – *Navigation,* NWP general condition 2 – *Aquatic Life Movement,* NWP general condition 3 – *Spawning Areas,* NWP general condition 6 – *Suitable Material,* NWP general condition 14 - *Proper Maintenance*, NWP general condition 17 – *Tribal Rights,*

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 36
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

NWP general condition 18 – *Endangered Species*, NWP general condition 23 – *Mitigation,* and NWP general condition 32 – *Pre-Construction Notification.* RGC 1 – *Project Drawings* and NWP 48 general condition 1 will provide information about and restrictions to the proposed activities. New operations are limited to ½ acre of impacts to submerged aquatic vegetation.

COE127592; NWP000146-47 (82 Fed Reg. at 2004-05) Each of these measures includes criteria for its implementation. For example, "under NWP general condition 18, a PCN is required in all cases in the Seattle District. The project proponent has the option to meet the programmatic ESA and MSA biological opinions' terms and conditions or instead have an individual ESA/MSA consultation for his or her project area." COE127550. Those terms and conditions include 29 separate "conservation measures," which the permittee must follow for an activity to be authorized by the Corps under the programmatic biological opinion consultation. COE134764. "The conservation measures were developed in cooperation with NMFS and USFWS as actions to avoid or reduce specific impacts to ESA-listed species and critical habitat." COE127558. Plaintiff does not establish that any of these measures are inappropriate, nor does it identify additional measures that would further minimize adverse effects, if incorporated into NWP 48, the general and regional conditions, or the conservation measures specified by the biological opinion.

In addition to the requirements described above, the NWP contain two levels of important backstop Corps' authority to ensure that impacts are kept to a minimum. First, the District Engineer has authority to review the PCN and add conditions to the NWP to ensure that impacts to the aquatic environmental remain individually and cumulatively minimal. Second, if the effects are more than minimal even after the District Engineer adds conditions, then the DE "may exercise his discretionary authority and require the project to be modified to reduce or eliminate the adverse impacts or will notify the prospective permittee to seek authorization under an individual permit." COE127592 (citations omitted).

The general and regional conditions applicable under NWP 48 together with the conservation measures established by the programmatic biological opinion set forth "mitigation measures" that are tailored to the adverse effects of shellfish aquaculture. In instances where those specific requirements do not sufficiently minimize adverse effects, the District Engineer has discretion to impose additional mitigation measures or deny authorization of shellfish activities

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 37
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

under NWP 48. Such discretionary measures are made necessary by the inherent uncertainty in attempting to forecast the effects of an authorized activity at widely varying locations. *See Bulen,* 429 F.3d at 500-01. Reliance on the district engineer's discretion to tailor additional mitigation measures to meet specific site conditions is neither contrary to the CWA nor arbitrary or capricious.

### B. The Corps Reasonably Concluded That NWP 48 Would Have No More Than Minimal Cumulative Effects on the Aquatic Environment.

Plaintiff generally does not take issue with the Corps' discussion of the potential adverse effects of shellfish aquaculture in the absence of mitigation measures. Indeed, Plaintiff bases its opinion that the cumulative adverse effects are more than minimal in the Corps' effects analysis.[30] But Plaintiff cannot prevail on its APA claim simply by showing that other conclusions can be supported by the administrative record. *See Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1212 (9th Cir. 2008) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the agency."). Plaintiff must prove that the Corps' minimal effects finding was contrary to law, arbitrary, or capricious—and it did not do so here.

Plaintiff contends that the Corps made a "fatal error" in its cumulative effects determination by supplementing its analysis of currently available information with the district engineer's review of authorizations under NWP 48 on a "case-by-case basis to ensure those activities result in no more than minimal adverse environmental effects, individually or cumulatively." Pl. Mem.17. The CWA, however, allows the Corps to make minimal impacts determinations after a NWP permit is issued and as it considers preconstruction notices and imposes specific mitigation measures. "[N]either that section [404(e)] nor any other provision of the CWA specifies how the Corps must make the minimal-impact determinations, the degree of certainty that must undergird them, or the extent to which the Corps may rely on post-issuance procedures in making them." *Bulen,* 429 F.3d at 500. An interpretation of section 404(e) that would require certainty in minimal effects findings before a NWP is issued, and prohibit the Corps from adjusting its findings as it acquires site-specific information, is untenable. *Id.*

---

[30] Plaintiff also relies on an internal draft cumulative impacts analysis. Pl. Mem. 14 (citing COE127583 -700). This reliance is misplaced for reasons discussed at fn. 8, *supra.*

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 38
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

The authority granted the Corps by CWA section 404(e) "demonstrates that Congress anticipated that the Corps would make its initial minimal-impact determinations under conditions of uncertainty and that those determinations would therefore sometimes be inaccurate, resulting in general permits that authorize activities with *more-than-minimal* impacts. It also demonstrates that Congress expected that the Corps would engage in post-issuance policing of the activities authorized by general permits in order to ensure that their environmental impacts are minimal." *Bulen,* 429 F.3d at 500 (footnote omitted; emphasis added).

Moreover, practical considerations prevent the Corps from making a minimal effects determination before some site-specific conditions and effects of mitigation measures are known.

> [I]t is impossible for the Corps' *ex ante* determinations of minimal impact to be anything more than reasoned predictions . . . . This is so because the environmental impact of the activities authorized by a general permit depends on factors that, as a practical matter, are outside the Corps' ability to predict with certainty *ex ante.* This uncertainty is especially acute when the Corps issues a *nationwide* permit . . . because the Corps must attempt to forecast the environmental effects the authorized activities could have if undertaken anywhere in the country under any set of circumstances.

*Id.* at 501. It is neither illegal, arbitrary, nor capricious for the Corps to use the post-issuance procedures to supplement those aspects of the minimal effects evaluation that cannot practically be undertaken before a project is underway. *Id.; Bostick*, 787 F.3d at 1060.

Here, the Corps used the available information to evaluate, to the extent practical, the ways in which various "mitigation measures" minimize adverse effects. *E.g.*, COE127534 (impacts to forage fish are addressed through General Condition 18); COE127559 (NWP 48 and the NWP national general conditions address aquaculture gear and marine debris); COE127569 (impacts to vegetated shallows including eelgrass are addressed through General Condition 18, including ESA and Magnuson-Stevens Fishery Conservation and Management Act consultation). Any alleged shortcomings in the Corps' cumulative effects determination due to uncertainties inherent in the future application of the "mitigation measures" can be overcome by adequate policing or procedures to assure that any adverse effects are no more than minimal. *See Wy. Outdoor Council, Powder River Basin*

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 39
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

*Res. Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1250 (D. Wyo. 2005); *Ohio Valley Envtl. Coal. v. Hurst*, 604 F. Supp. 2d 860, 891 (S.D. W. Va. 2009). As discussed above, that assurance is provided by Nationwide 48, general and regional permit conditions, and ESA conservation measures, which, among other things, require prospective permittees to submit PCNs containing detailed information about each site and the proposed activity and require the district engineer to evaluate individual and cumulative adverse effects. Plaintiff does not establish that those requirements provide inadequate information or that the district engineer is incapable of using that information to analyze and ensure that the effects of proposed activities are no more than minimal.

Predicting cumulative impacts involves many elements of uncertainty. *Bulen,* 429 F.3d at 500. A court "must afford the Corps special deference in this area because it 'is making predictions, within its area of special expertise, at the frontiers of science . . . as opposed to simple findings of fact.'" *Black Warrior*, 833 F.3d at 1289 (citation omitted); *see Friends of the Earth v. Hintz*, 800 F.2d 822, 830–31 (9th Cir. 1986). Plaintiff has not shown that the Corps' minimal effects finding was arbitrary or capricious.

## V.     Should the Court Grant Summary Judgment in Plaintiff's Favor, Vacatur of Nationwide Permit 48 Would Not Be the Appropriate Remedy

Plaintiff requests vacatur of NWP 48. *See* Pl. Mem. 40. As detailed above, Federal Defendants are entitled to summary judgment as to all claims; thus, Plaintiff is not entitled to any relief. In any event, Plaintiff is incorrect that vacatur of NWP 48 in Washington—let alone for the nation as a whole—would be the appropriate remedy. *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (citing *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (holding that whether agency action should be vacated depends on the seriousness of the error and the disruptive consequences of an interim change). Any remedy here would depend on the scope of the Court's ruling; Federal Defendants respectfully submit that additional briefing as to remedy would be necessary.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion for Summary Judgment and grant the Corps' Cross Motion for Summary Judgment.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 40
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446

Dated: August 6, 2018                          Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division

KENT E. HANSON
Environmental Defense Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044
206-639-5544
kent.hanson@usdoj.gov

*/s/ Dedra S. Curteman*
PETER KRYN DYKEMA
DEDRA S. CURTEMAN
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044
(202) 305-0436 (Dykema)
(202) 305-0446 (Curteman)
peter.dykema@usdoj.gov
dedra.curteman@usdoj.gov

MARK ARTHUR BROWN
United States Department of Justice
Environment & Natural Resources Division
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, DC 20044
(202) 305-0204
mark.brown@usdoj.gov

OF COUNSEL:
Jason R. DeRosa, Assistant Division Counsel, Northwestern Division
Chiara V. McGowan, Assistant District Counsel, Seattle District
James V. DeBergh, Assistant Counsel, Headquarters
U.S. Army Corps of Engineers

Rose Stanley, Attorney-Advisor, Northwest Section
Caitlin Imaki, Attorney-Advisor, Northwest Section
NOAA Office of General Counsel, U.S. Department of Commerce

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2018, I filed the foregoing with the Clerk of the Court using the CM/ECF system which will cause a copy to be served upon counsel of record.

*/s/ Dedra S. Curteman*

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ("MSJ") AND OPP. TO
PLAINTIFF'S MSJ – Page 42
2:17-cv-01209-RSL

U.S. Department of Justice
Dedra S. Curteman, Trial Attorney
(202) 305-0446