1                                              The Honorable Robert S. Lasnik

2

3  George A. Kimbrell (WSB No. 36050)
   Amy van Saun (*pro hac vice*)
   Center for Food Safety
4  917 SW Oak Street, Suite 300
   Portland, OR 97205
5  T: (971) 271-7372 / F: (971) 271-7374
6  Email: gkimbrell@centerforfoodsafety.org
           avansaun@centerforfoodsafety.org

7

8  *Counsel for Plaintiffs*

9                 **THE UNITED STATES DISTRICT COURT**
                **FOR THE WESTERN DISTRICT OF WASHINGTON**
10

11 CENTER FOR FOOD SAFETY, a non-profit    )  Case No. 2:17-cv-01209-RSL
12 corporation,                            )
                                           )
13            *Plaintiffs,*                )  **PLAINTIFF'S COMBINED OPPOSITION**
                                           )  **TO FEDERAL DEFENDANTS' AND**
14            v.                           )  **INTERVENOR-DEFENDANT PCSGA'S**
                                           )  **CROSS-MOTION FOR SUMMARY**
15 U.S. ARMY CORPS OF ENGINEERS, *et.*     )  **JUDGMENT AND REPLY IN SUPPORT**
16 *al.,*                                  )  **OF PLAINTIFF'S MOTION FOR**
                                           )  **SUMMARY JUDGMENT**
17            *Defendants,*                )
                                           )
18            *and*                        )
                                           )
19 PACIFIC COAST SHELLFISH GROWERS         )  NOTE ON MOTION CALENDAR: Court will
20 ASSOCIATION,                            )  schedule once all briefs are filed.
                                           )
21            *Intervenor-Defendant.*      )
22 ───────────────────────────────         )
                                           )
23 THE COALITION TO PROTECT PUGET          )
   SOUND HABITAT, a non-profit Corporation,)
24                                         )
25            *Plaintiff,*                 )
                                           )
26            v.                           )  Case No. 2:16-cv-0950-RSL

1    U.S. ARMY CORPS OF ENGINEERS, *et.*          )
                                                  )
2    *al.*,                                       )
                                                  )
3                   *Defendants,*                 )
                                                  )
4                   *and*                         )
                                                  )
5    TAYLOR SHELLFISH COMPANY, INC.,              )
                                                  )
6                   *Intervenor-Defendant.*       )
                                                  )
7    _____

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1
2

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

BACKGROUND FACTS ........................................................................................................... 6

ARGUMENT ............................................................................................................................. 9

I.     THE CENTER HAS STANDING. ................................................................................... 9

II.    THE CENTER PROPERLY CHALLENGED NWP 48 AS
       APPLIED IN  WASHINGTON. ...................................................................................... 17

III.   THE CORPS VIOLATED THE CLEAN WATER ACT. ............................................. 22

       A.     The Corps Cannot Adopt a NWP with More than Minimal
              Cumulative Impacts. ........................................................................................ 22

       B.     The Corps Failed to Adequately Document Its Minimal
              Cumulative Impact Conclusion and Evaluate Impacts from
              NWP 48. ............................................................................................................ 27

IV.   THE CORPS VIOLATED NATIONAL ENVIRONMENTAL
       POLICY ACT ................................................................................................................. 33

       A.     Defendants Admit No NEPA Assessment Was Completed for
              NWP 48 with Regional Conditions in Washington. ...................................... 33

       B.     The Significance Determination Was Not Supported By
              Record. .............................................................................................................. 34

              1.     Scope of environmental assessment was unreasonably
                     narrow. ................................................................................................ 35

              2.     The significance factors of "context" and "intensity"
                     were not addressed. ............................................................................ 38

              3.     Direct, indirect, and cumulative impacts were ignored. ................ 40

V.    THE CORPS VIOLATED THE ENDANGERED SPECIES ACT. ......................... 43

       A.     The ESA Requires Comprehensive Consultation On Whole
               Action That May Affect Listed Species, Not Deferral to

**Piecemeal Individual Level.** ............................................................ 44

**B.**     **The Corps Violated the ESA By Not Consulting on 2017 NWP 48 with Regional Conditions in Washington.** ............................... 46

    **1.**     **The Corps already made "may affect" determination for commercial shellfish permitting.** ................................... 47

    **2.**     **Any "no effect" determination for 2017 NWP 48 is unlawful.** ............................................................................... 50

    **3.**     **Re-initiation was required before the Corps adopted 2017 NWP 48 for Washington.** ............................................ 53

**VI.**     **THE COURT SHOULD VACATE THE CHALLENGED PERMIT.** ................. 58

CONCLUSION ........................................................................................................ 60

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Alaska Ctr. for Env't v. West*,
    31 F. Supp. 2d 714 (D. Alaska 1998) ...................................................16

*All. for the Wild Rockies v. Krueger*,
    950 F. Supp. 2d 1196 (D. Mont. 2013), *aff'd sub nom. All. for the Wild
    Rockies v. Christensen*, 663 F. App'x 515 (9th Cir. 2016)......................44

*Alliance for the Wild Rockies v. U.S. Forest Service*,
    -- F.3d --, 2018 WL 5316129 (9th Cir. October 25, 2018).................58, 60

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
    632 F. Supp. 2d 968 (N.D. Cal. 2009) ...................................................51

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) ...............................................44, 50, 52

*Cottonwood Envtl. L. Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) ....................................................... *passim*

*Covington v. Jefferson Cnty.*,
    358 F.3d 626 (9th Cir. 2004) .....................................................................9

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
    807 F.3d 1031 (9th Cir. 2015) ...................................................................9

*Ctr. for Envtl. Health v. Vilsack*,
    No. 15-cv-01690-JSC, 2016 WL 3383954 (N.D. Cal. June 20, 2016)....................59

*Ctr. for Food Safety v. Vilsack*,
    734 F. Supp. 2d 948 (N.D. Cal. 2010) ...................................................60

*Defenders of Wildlife v. Ballard*,
    73 F. Supp. 2d 1094 (D. Ariz. 1999) .................................16, 18, 20, 34

*Defenders of Wildlife v. U.S. Envtl. Prot. Agency*,
    420 F.3d 946 (9th Cir. 2005) *rev'd on other grounds Nat'l Ass'n of Home
    Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ........................59

*Ecological Rights Found. v. Pac. Lumber Co.*,
    230 F.3d 1141 (9th Cir. 2000) .................................................................13

Page(s)

**Federal Cases Con't**

*Fed. Election Comm'n v. Akins,*
    524 U.S. 11 (1998) ........................................................................................58

*Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs,*
    401 F. Supp. 2d 1298 (S.D. Fla. 2005) ........................................................19

*Fox Bay Partners v. U.S. Corps of Eng'rs,*
    831 F. Supp. 605 (N.D. Ill. 1993) ................................................................30

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ........................................................................................9

*Friends of Yosemite Valley v. Kempthorne,*
    520 F.3d 1024 (9th Cir. 2008) ......................................................................40

*High Sierra Hikers Ass'n v. Dep't of Interior,*
    848 F. Supp. 2d 1036 (N.D. Cal. 2012) .......................................................34

*Humane Soc'y of U.S. v. Locke,*
    626 F.3d 1040 (9th Cir. 2010) ......................................................................59

*Karuk Tribe of California v. U.S. Forest Serv.,*
    681 F.3d 1006 (9th Cir. 2012) *(en banc)* ......................................................49

*Kentucky Riverkeeper, Inc. v. Rowlette,*
    714 F.3d 402 (6th Cir. 2013) ..................................................................27, 28

*Lane Cty. Audubon Soc. v. Jamison,*
    958 F.2d 290 (9th Cir. 1992) ........................................................................44

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..................................................................................9, 20

*Maryland Native Plant Soc'y v. U.S. Army Corps of Eng'rs,*
    332 F. Supp. 2d 845 (D. Md. 2004) ..............................................................19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ....................................................................23, 32, 38, 51

*Nat. Res. Def. Council v. Rodgers,*
    381 F. Supp. 2d 1212 (E.D. Cal. 2005) ...................................................45, 55

Page(s)

**Federal Cases Con't**

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
  453 F. Supp. 2d 116 (D. D.C. 2006) ...................................................................31, 32

*Nat'l Parks & Conservation Ass'n v.Babbitt,*
  241 F.3d 722 (9th Cir. 2001) ...........................................................................42

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.,*
  606 F.3d 1058 (9th Cir. 2010) .........................................................................36

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
  524 F.3d 917 (9th Cir. 2008) ........................................................................45, 46

*Nat'l Wildlife Fed'n v. Norton,*
  332 F. Supp. 2d 170 (D.D.C. 2004) ...................................................................46

*Nat'l Wildlife Fed'n. v. U.S. Army Corps of Eng'rs,*
  170 F. Supp. 3d 6 (D.D.C. 2016) ..............................................................15, 45, 51

*Native Village of Point Hope v. Jewell,*
  740 F.3d 489 (9th Cir. 2014) ...........................................................................38

*Natl. Wildlife Fedn. v. Brownlee,*
  402 F. Supp. 2d 1 (D.D.C. 2005) ................................................................. *passim*

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
  402 F.3d 846 (9th Cir. 2005) ......................................................................13, 35, 43

*Ohio Valley Envtl. Coal. v. Bulen,*
  429 F.3d 493 (4th Cir. 2005) .......................................................................24, 28

*Ohio Valley Envtl. Coal. v. Hurst,*
  604 F. Supp. 2d 860 (S.D.W. Va. 2009) ......................................................13, 14, 23, 24

*Oregon Nat. Desert Ass'n v. Singleton,*
  47 F. Supp. 2d 1182 (D. Or. 1998) .....................................................................42

*P. Coast Shellfish Growers Assn. v. U.S. Army Corps of Engineers,*
  C16-193RAJ, 2016 WL 3000259 (W.D. Wash. May 25, 2016) ......................................47, 48

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.,*
  482 F. Supp. 2d 1248 (W.D. Wash. 2006) ..............................................................45

Page(s)

**Federal Cases Con't**

*Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency,*
    806 F.3d 520 (9th Cir. 2015) ........................................................................59

*Preserve Our Island v. U.S. Army Corps of Engineers,*
    C08-1353RSM, 2009 WL 2511953 (W.D. Wash. Aug. 13, 2009).........................43

*Riverside Irrigation Dist. v. Andrews,*
    758 F.2d 508 (10th Cir. 1985) .......................................................................30

*Salmon River Concerned Citizens v. Robertson,*
    798 F. Supp. 1434 (E.D. Cal. 1992), *aff'd,* 32 F.3d 1346 (9th Cir. 1994).............20

*Salmon Spawning & Recovery All. v. Gutierrez,*
    545 F.3d 1220 (9th Cir. 2008) ...............................................................9, 48, 55

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
    747 F.3d 581 (9th Cir. 2014) .........................................................................19

*Save Our Sonoran, Inc. v. Flowers,*
    No. CV-02-0761-PHX-SRB, 2006 WL 1160191 (D. Ariz. May 2, 2006).......................31, 32

*Se. Alaska Conservation Council v. Fed. Highway Admin.,*
    649 F.3d 1050 (9th Cir. 2011) .......................................................................36

*Sierra Club v. U.S. Army Corps of Eng'rs,*
    803 F.3d 31 (D.C. Cir. 2015).........................................................................19

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009)...............................................................................14, 15

*Tenakee Springs v. Clough,*
    915 F.2d 1308 (9th Cir. 1990) .......................................................................34

*United States v. Alaska,*
    503 U.S. 569 (1992)...................................................................................32

*United States v. Mango,*
    199 F.3d 85 (2d Cir. 1999)............................................................................31

*W. Watersheds Project v. Kraayenbrink,*
    632 F.3d 472 (9th Cir. 2011) ................................................................. *passim*

Page(s)

**Federal Cases Con't**

*Wash. Toxics Coal. v. Dep't of Interior,*
    457 F. Supp. 2d 1158 (W.D. Wash. 2006)..................................................38

*WaterWatch of Oregon v. U.S. Army Corps of Eng'rs,*
    CIV. NO. 99-861-BR, 2000 WL 1100059 (D. Or. June 7, 2000)......................31, 32

*Wild Fish Conservancy v. Salazar,*
    628 F.3d 513 (9th Cir. 2010) ...........................................................46

*Wyoming Outdoor Council Powder River Basin Res. Council v. U.S. Army Corps of Eng'rs,*
    351 F. Supp. 2d 1232 (D. Wyo. 2005)...............................23, 25, 30, 42

**Federal Statutes**

5 U.S.C. § 706(2) ......................................................................38, 58

16 U.S.C. § 1536(a)(2)....................................................................44

33 U.S.C. § 1251 .........................................................................36

33 U.S.C. § 1344(e)(1).........................................................17, 24, 32

42 U.S.C. § 4332(C) ......................................................................19

**Regulations**

33 C.F.R. § 230.7 ........................................................................37

33 C.F.R. § 323.2(h) .....................................................................17

33 C.F.R. § 330.5 ....................................................................17, 19

40 C.F.R. § 230.7(a) .....................................................................17

40 C.F.R. § 230.7(b)(2)...................................................................35

40 C.F.R. § 230.11 .......................................................................30

40 C.F.R. § 1508.9(b) ....................................................................36

40 C.F.R. § 1508.18(a)....................................................................19

40 C.F.R. § 1508.27 ......................................................................38

40 C.F.R. § 1508.28 ..................................................................................................20

50 C.F.R. § 402.02 ....................................................................................................45

50 C.F.R. § 402.14 ....................................................................................................53

50 C.F.R. § 402.14(a) ...............................................................................................44

50 C.F.R. § 402.16(a) ...............................................................................................55

50 C.F.R. § 402.16(a)-(c) ..........................................................................................53

33 C.F.R. § 320.4(a)(2) .............................................................................................35

40 C.F.R. § 230.7(b)(3) .............................................................................................21

82 Fed. Reg. 1860 (Jan. 6, 2017) .............................................................................34

**Other Authorities**

U.S. Army Corps of Eng'rs, Shellfish Aquaculture Permitting Program Update
(Jan. 2018), http://www.nws.usace.army.mil/Portals/27/docs/regulatory/
NewsUpdates/20180122_ShellfishPermittingUpdate.pdf .......................................14

Wash. Dept. Ecology, *Zostera japonica management on commercial clam beds in
Willapa Bay General Permit*,
https://fortress.wa.gov/ecy/publications/documents/ecy070512.pdf; ....................31

*Willapa-Grays Harbor Oyster Growers Association v. Ecology*,
No. P18-073 (filed Oct. 26, 2018) ..........................................................................32

1

**INTRODUCTION AND SUMMARY OF ARGUMENT**

2   This action challenges the Defendant Army Corps of Engineers' (Corps) unlawful

3   adoption of Nationwide Permit (NWP) 48 for commercial shellfish aquaculture in Washington

4   State. The Corps' action failed to comply with the Clean Water Act (CWA), the National

5   Environmental Policy Act (NEPA), and the Endangered Species Act (ESA), and should be

6   vacated. *See* Plaintiff's Motion for Summary Judgment, ECF No. 31. The Corps and Defendant-

7   Intervenors, Pacific Coast Shellfish Growers Association (PCSGA or Intervenors), attempt to

8   muddy the waters with novel gotcha arguments and red herrings, as well as reliance on past

9   actions or promised future actions, but none of them alter the proper and straightforward

10   resolution of the case, about this approval. Defendants have failed to rebut Plaintiff Center for

11   Food Safety's (the Center) claims, in fact making several key admissions that show the Center is

12   entitled to summary judgment on all claims, based on the whole of the record and the controlling

13   precedent.

14   The Corps violated the CWA by adopting the national NWP 48, an expanded and less

15   protective permit, without sufficient regional conditions to avoid cumulative harm to

16   Washington's aquatic ecosystems. The Corps and PCSGA fail to rebut the cumulative impacts

17   evidenced in the record, showing that the Corps could not, under the CWA, adopt NWP 48 as

18   written in Washington. Further, the Corps also failed to adequately assess the harm to the

19   environment from NWP 48 through an Environmental Impact Statement (EIS), relying instead

20   on the insufficient Environmental Assessment and arbitrary Finding of No Significant Impact, in

21   violation of the NEPA. The Corps and PCSGA actually argue that the Seattle District (and

22   Northwestern Division) of the Corps conducted *no* NEPA assessment for their decision to adopt

23   NWP 48 in Washington (and had no obligation to do so), despite this being a major federal

24   action with significant impacts to the environment. Because the Corps not only completed

25   insufficient NEPA analysis of its issuance of NWP 48 with regional conditions, but apparently

26   no analysis at all, the Center is entitled to summary judgment on its NEPA claims. Finally, the

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

Corps violated its mandatory duty to ensure its actions will not jeopardize threatened and endangered species under the Endangered Species Act, because NWP 48 as adopted in Washington plainly "may affect" listed species, and the Corps failed to consult with the federal Services on the actual permit adopted. The Corps and PCSGA admit that the permit adopted does not match the prior programmatic consultation and that further ESA consultation is required. The Corps cannot, however, defer consultation on the whole action it took to later, piecemeal assessments, as this violates the ESA and settled case law.

First, Defendants attack the Center's standing, asserting that none of the Center's members have suffered injury in fact from a shellfish operation permitted under NWP 48. *See infra* pp. 8-16. This attack is based entirely on the assertion that the Center's members failed to identify any specific commercial shellfish operation that was or will be permitted under NWP 48. This argument fails because commercial shellfish aquaculture operations in Washington are permitted through the NWP 48, in the Corps' own words, the "vast majority" of the time (COE127590). Most shellfish aquaculture operations are reasonably certain to be permitted under 2017 NWP 48, and the Center's members described in precise detail their aesthetic, recreational, and economic injuries from commercial shellfish operations in Willapa Bay and Puget Sound (including to their interests in threatened and endangered species in these areas). These injuries are sufficiently concrete and particularized. It is undisputed that thousands of commercial shellfish operations will be or already are permitted under 2017 NWP 48, continuing and expanding the harm to the Center's members. Finally, in a procedural challenge to a general permit such as this one, the Center does not need to show specific authorizations to establish actual and imminent injury under Ninth Circuit precedent and in line with other challenges to NWPs across the country. The Center has made more than a sufficient standing showing.

Second, Defendants next claim that the Center is not entitled to summary judgment because it challenged the wrong document, focusing on the Corps Seattle District's Supplemental Decision Document rather than the National Decision Document for NWP 48

completed by the Corps' Headquarters. *Infra* pp. 16-22. This "gotcha" argument is factually and legally erroneous. The Center is challenging the Corps decision to adopt NWP 48 in Washington with regional conditions (or a lack thereof), a standalone decision that carries with it all the obligations of the CWA, NEPA, and the ESA. While the Center did expressly reference both documents in its complaint, and acknowledges that the Corps Seattle District referenced the National Decision Document in its decision, the operative decision here *is* the adoption of the NWP 48 with regional conditions in Washington, as the Corps' own record statements acknowledge and CWA and NEPA standards establish. "Tiering" back is permissible in some cases, but statute-compliant analyses are still required at the regional level. Further, beyond the facts and law, as a practical matter, Defendants' hyper-technical argument is also contrary to common sense: this case is about impacts in Washington State, specific to that state. Because the Corps' decision-making as to whether to adopt NWP 48 in Washington and how to condition it is the operative decision, the Center was correct to focus on that in its motion.

Third, before the Court reaches the NEPA and ESA violations, it should first determine whether the record supports the Corp's determination that NWP 48, as re-issued by the Corps Headquarters, including the 100-year look back and without regional conditions to protect Washington, complied with the CWA "minimal cumulative impacts" mandate for general permits. *Infra* pp. 22-27. This record has a damning and rare buried treasure piece of evidence: an actual cumulative impacts analysis from the Corps itself that shows this permit failed that mandate, which is probably why it was discarded and not made public previously by the Corps. The Seattle District's own cumulative impacts analysis, as well as other evidence in the record, shows that the Corps should never have adopted NWP 48 for Washington, at least not without conditions to protect wildlife habitat, because it will have (and has had in the past) more than minimal cumulative impacts. 2017 NWP 48 expands these impacts *further*, to even more acreage. Therefore, under arbitrary and capricious standard, the Corps' failed to make a rational connection between the information before it and its minimal impacts determination.

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 3
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    Here again is a major theme of the case: Defendants' passing of the buck backwards and

2    forwards, to other actions, in order to avoid responsibilities for the challenged action. While the

3    Corps may rely *in part* on post-issuance procedures to ensure minimal impacts, it may not rely

4    exclusively on them, as it has done here, and it must still document and support how they will

5    work to avoid cumulative impacts, which it has failed to do here. Reliance on the submission of

6    Pre-Construction Notifications (PCN) for each permit verification (under General Condition 18)

7    does not support any cumulative impacts determination, because by their very nature, cumulative

8    impacts cannot be evaluated in the context of a single project.

9    Separate from the Corps' arbitrary and capricious minimal impacts determination, it also

10   failed to fulfill its CWA documentation requirement to support that finding, both in the National

11   and Supplemental Decision Documents. In these decision documents, the Corps over and over

12   relies on the district engineer's authority to assess impacts on a case-by-case basis, but an

13   assertion of authority over individual authorizations is not a substitute for actual documentation

14   of how impacts will be kept cumulatively minimal. Not only do these Decision Documents rely

15   on post-issuance review to mitigate all impacts, they fail to even fully document those impacts,

16   ignoring entirely geoduck aquaculture (National), microplastics, and pesticides, and the full

17   extent of the impacts from shellfish aquaculture on eelgrass and forage fish habitat

18   (Supplemental and National). The Corps cannot paint a rosy picture of this industrialized activity

19   without documenting its harms and how it will ensure cumulatively minimal impacts from NWP

20   48.

21   Fourth, the Corps also failed to conduct an adequate NEPA analysis at either the national

22   or regional level. In its most damning admission, Defendants argue that the Corps was not

23   required to, and did not, assess impacts to the environment pursuant to NEPA for its decision to

24   adopt NWP 48 with regional conditions in Washington. However, while the Corps was required

25   to comply with NEPA for its re-issuance of the over fifty NWPs on a national level, it is not

26   exempt from NEPA's procedural requirements at the regional scale. If the Court agrees that

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 4
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    NEPA was required at the regional level, the Center is entitled to summary judgment on its

2    NEPA claims.

3         Further, the National Decision Document did not assess the full scope of impacts from

4    commercial shellfish aquaculture in Washington, and *could* not assess the impact of any regional

5    conditions, as they were not yet written, according to the tiered system that the Corps and the

6    CWA regulations have set up. Accordingly, the Corps relied on an inadequate Environmental

7    Assessment and Finding of No Significant Impact (not cured by the apparently non-NEPA

8    Supplemental Decision Document) and arbitrarily failed to prepare an EIS for NWP 48 in

9    Washington. As with the CWA, the Seattle District's internal cumulative impacts analysis drives

10   this NEPA claim home, and the Defendants' post-hoc attempts to explain away this evidence are

11   unavailing. The Corps knew there would be significant impacts to the environment from NWP

12   48 but failed to comply with NEPA anyway.

13        Fifth, with regards to the ESA, Defendants admit that the permit adopted in March 2017

14   differs significantly from the action that was consulted on in 2016, in several legally significant

15   ways. This triggers the ESA consultation re-initiation duty, because the action was modified in a

16   way that will cause never-considered impacts to listed species, and the Corps supplied new

17   information in its Supplemental Decision Document that was never evaluated by the expert

18   wildlife agencies in their prior programmatic Biological Opinions (BiOps).

19        In response is more buck-passing, to later promised actions: Defendants' position is

20   contrary to well-settled ESA settled case law requiring the Corps to consult on its whole action

21   *before* it is taken, here the actual 2017 NWP 48 adopted, and prohibiting deferral to the later

22   individual authorization stage. The Corps has already made a "may affect" determination for

23   NWP 48, as it has in the past, acknowledging its duty to seek consultation with NMFS and FWS

24   when adopting NWP 48 in Washington specifically. Any "no effect" determination here for the

25   general permit, based on later piecemeal consultations, would be contrary to settled law and

26   arbitrary and capricious given the Corps' past acknowledgement that NWP 48 "may affect"

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 5
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   listed species. But despite permitting significantly expanded shellfish aquaculture in Washington,

2   the Corps failed to seek such consultation, instead relying on its now-outdated programmatic

3   consultation and deferring to piecemeal consultations for some unknown amount of individual

4   authorizations. The Corps cannot avoid its duty to consult on the comprehensive action it has

5   taken, at the outset. Because the expanded NWP 48 may cover twice the acreage assessed in

6   2016, and allows more activities with far lower protections than those assessed in 2016, the

7   Corps must re-initiate consultation with the Services.

8       Clearing away Defendants' flotsam and jetsam, clear waters elucidate the proper result:

9   Because the Corps violated the CWA, NEPA, and the ESA, this Court should vacate the decision

10  to adopt NWP 48 in Washington, and require the Corps to comply with these protective statutes

11  prior to re-issuing any new permit for commercial shellfish aquaculture in Washington.

12                                **BACKGROUND FACTS**

13      PCSGA spends four pages extoling the virtues of shellfish aquaculture, and ignoring the

14  evidence of harm from this expanding and ever-more industrial activity. ECF No. 44 at 1-5.

15  However, as explained in the Center's opening brief, commercial shellfish aquaculture is far

16  from benign, especially as it continues to expand over significant percentages of all

17  Washington's tidal and nearshore habitat. ECF No. 31 at 2-6.

18      PCSGA focuses on the filtering of the water column by bivalves while they are alive,

19  ECF No. 44 at 2-3, and while this is true, it is not the only impact of all the activities and gear

20  that comes with shellfish aquaculture. Wild bivalves filter the water, but do not need artificial

21  plastic structures; plastic gear becomes dislodged and migrates, or entangles wildlife, or breaks

22  down into microplastics that in turn accumulate toxins and are ingested by fish, birds, oysters,

23  and ultimately humans. ECF No. 31 at 5. The "anti-predator" cover nets are particularly

24  problematic for these reasons, COE128654-660, leading a Washington Department of Fish and

25  Wildlife biologist to urge a Pierce County, Washington biologist: "And for goodness sake try to

26  get them [a proposed clam operation] to avoid clam predator netting. *That stuff alters habitat*

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 6
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    *more than you could imagine*, ends up washed all around the beach, just bad stuff, we do not use

2    on our public shell fish beaches any longer." COE 132535 (emphasis added).

3          Shellfish aquaculture operations, also unlike wild bivalves, clear the beaches of other life,

4    spray herbicides to kill eelgrass, and dislodge great amounts of sediment when harvested,

5    sending plumes of sediment into the water column. *Id.* at 2-4. These activities disturb and change

6    the composition of native substrate and the species living there. *See e.g.* COE128595-601;

7    COE128654-128660. Even if shellfish aquaculture provides some environmental benefit from

8    the filter feeding of bivalves, that alleged benefit must be considered alongside the rest of the

9    adverse impacts of aquaculture.

10         PCSGA even goes so far as to claim that commercial shellfish aquaculture *benefits*

11   eelgrass. ECF No. 44 at 3. As the record shows, and as the Corps itself admits, this is far from

12   the truth. ECF No. 31 at 3-4; COE125631-632. On balance, commercial shellfish aquaculture in

13   Washington has *harmed* rather than helped the restoration of eelgrass and other seagrasses, and

14   along with other impacts has contributed to cumulative adverse impacts to these crucial habitats.

15   COE125654-125686; COE134241 (finding overlap of oyster culture and eelgrass "would

16   substantially reduce or eliminate the eelgrass in these areas at least during significant portions of

17   the culture and harvest cycle.") Indeed, the Corps wrote in its 2015 Programmatic Biological

18   Assessment of commercial shellfish aquaculture's impacts to ESA-listed species:

19         When shellfish activities are co-located in areas with eelgrass, *a net loss in*
20         *eelgrass* is typically the result either as a result of bed preparation activities,
         competition for space with the culture species or equipment, or harvest (Tallis et
21         al. 2009, Wagner et al. 2012, Wisehart 2007; Dumbauld et al. 2009, Ruisink et al.
         2012, NMFS 2009, NMFS 2005, Rumrill and Poulton 2004). This is the case for
22         *all forms of ground-based culture*. Eelgrass is replaced by oysters, culture bags,
         and geoduck tubes. Eelgrass often coexists within the culture area albeit at a
23         reduced density. Bed preparation and harvest activities physically remove eelgrass
         (Ruesink and Rowell 2012; Tallis et al. 2009; Boese 2002, Simenstad and Fresh
24         1995). Use of vessels and floats can smother and cause physical disturbance to
         eelgrass due to grounding of the vessels (NMFS 2005). *Longline and suspended*
25         *bag culture may shade eelgrass and preclude it underneath the structure* (Skinner
         et al. 2014; WDNR 2014b). *Biofouling on cover nets can reduce light availability*
26

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1
2
3
4
5

*for eelgrass* (WDNR 2013a). The magnitude and duration of effect may vary depending on culture method and individual grower practices. For example, dense, mature bottom oyster culture may totally preclude eelgrass during certain parts of the aquaculture cycle while lesser densities of oyster may allow eelgrass to coexist within the culture area. Eelgrass recovery times after disturbance vary depending on the type of disturbance, environmental conditions, and the availability of local seed sources. Timeframes can range from *less than two to greater than five years* (Dumbauld et al. 2009; Tallis et al. 2009; Wisehart; 2007, Boese 2002).

6   COE134227 (emphases added). The Northwest Fisheries Science Center, experts within NOAA

7   Fisheries that conduct research on marine resources and habitat, stated in their comments to

8   NMFS regarding the 2016 programmatic biological opinion:

9
10
11
12
13
14
15
16
17

Based upon our considerable review and evaluation of available literature, it is clear to us that *shellfish aquaculture of all types, impacts eelgrass*. Impacts have been measured on growth, above ground biomass, seed production, and so on. While all types of shellfish aquaculture can cause these types of negative impacts, much of the available information concerns shellfish aquaculture. While there is *considerable science linking shellfish aquaculture and eelgrass impacts*, little is known about implications of changes to eelgrass such as on invertebrate communities, juvenile salmon and forage fish (of any species). We note that this is due in large part to the lack of studies on this subject. We also note that there is considerable uncertainty over possible "beneficial effects" of shellfish aquaculture. For example, shellfish could provide structure that might be analogous to eelgrass. There are some functions of eelgrass that we believe shellfish aquaculture would not be able to replace, such as detritus production (organic matter derived from eelgrass that is important in estuarine food webs).

18   COE134942 (emphases added). This is not a temporary impact, but is continuous: "For impacts

19   where recovery times are on the order of years, such as disturbance to eelgrass, an annual or

20   every few year repeat disturbance may never allow a full recovery of the eelgrass from the

21   impact or the impact would be repeated shortly after recovery is achieved." COE134234. Thus,

22   the record establishes the harm to eelgrass, a keystone species for aquatic ecosystems, from

23   commercial shellfish aquaculture, necessitating careful regulation of these activities by the

24   Corps.

25
26

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 8
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1                                    **ARGUMENT**

2   **I.      THE CENTER HAS STANDING.**

3           Defendants begin by challenging standing. The Center has standing because it has (1)

4   suffered injury (2) traceable to the Corps' challenged conduct that is (3) redressable. *Friends of*

5   *the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Lujan v.*

6   *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Defendants' challenge fails, because the

7   Center has representational standing. An organization has representational standing when (1)

8   "the interests at stake are germane to the organization's purpose," (2) the claim itself and relief

9   requested do not require "the participation of individual members in the lawsuit," and (3) one of

10  the organizations' members could otherwise establish standing on their own behalf. *Laidlaw*, 528

11  U.S. at 181; *Cottonwood Envtl. L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1079 (9th Cir. 2015).

12  The Corps cannot dispute that the interests at stake in this matter are central to the Center's

13  overall purpose of reforming industrial food production methods, including industrial

14  aquaculture, and addressing its environmental impacts. Kimbrell Decl., ECF No. 37 ¶¶ 3, 5-6, 8-

15  10. And, as the Corps also does not dispute, neither the cause of action nor the requested relief

16  requires participation by individual members. *Laidlaw*, 528 U.S. at 181. Thus, the Center has

17  sufficiently shown representational standing if one member of the organization has standing. *Id*.

18          Further, because this is a procedural injury case (*e.g.*, failure to adequately analyze

19  impacts under NEPA and CWA, failure to reinitiate ESA consultation), the Center has a lesser

20  standing burden. *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d

21  1031, 1044 (9th Cir. 2015) ("A showing of procedural injury lessens a plaintiff's burden on the

22  last two prongs of the Article III standing inquiry, causation and redressability.") (citing *Lujan*,

23  504 U.S. at 572 n.7). The "normal standards for redressability" are relaxed. *Lujan*, 504 U.S. at

24  572 n.7; *Covington v. Jefferson Cnty.*, 358 F.3d 626, 641 (9th Cir. 2004). That is, the Center need

25  only show that a Court order in their favor "may" remedy their injuries. *Salmon Spawning &*

26  *Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226-27 (9th Cir. 2008).

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    The Corps focuses its challenge on the injury-in-fact prong, not challenging causation

2    and redressability. Fed. Defs. Mot. for Summ. J. & Opp'n, ECF No. 43 at 12. Essentially, the

3    only disputed showing here is whether the Center has sufficiently shown concrete injury to its

4    members. It has: the Center's members suffer injury-in-fact from the Corps' unlawful shellfish

5    aquaculture permitting through NWP 48. *See, e.g.*, *Cottonwood*, 789 F.3d at 1079, ("An

6    organization can satisfy the concrete harm requirement by alleging 'an injury to the recreational

7    or even the mere esthetic interests' of its members.") (citing *Jayne v. Sherman*, 706 F.3d 994,

8    999 (9th Cir. 2013)).

9    The Corps' only standing argument is that the member declarations do not identify

10   *specific* shellfish aquaculture operations that were authorized under NWP 48. ECF No. 43 at 12-

11   14. This argument misses the mark: the member standing declarants identify commercial

12   shellfish aquaculture operations, in various specific parts of the state, as the source of their harm.

13   Barkhurst Decl., ECF No. 33; Buchele Decl., ECF No. 34; Cohen Decl., ECF No. 35; Corbett

14   Decl., ECF No. 36; Townsend Decl., ECF No. 38. And, as the Corps itself has acknowledged on

15   many occasions, the overwhelming majority of all commercial shellfish aquaculture in

16   Washington is permitted under NWP 48, as opposed to individual permits. For example, in its

17   Supplemental Decision Document, the Corps admitted: "*The vast majority* of acreage for

18   commercial aquaculture is for activities authorized under the 2012 NWP 48." COE127590 (also

19   stating 1,020 verifications under 2012 NWP 48, about 49,575 acres, with 1,300 verifications

20   estimated on 72,300 acres under 2017 NWP 48) (emphasis added); *see also* COE134149 (PBA

21   stating that Corps issued 850 verifications under 2012 NWP 48 between Mar. 2012 and Feb.

22   2013).[1]

23   Thus, the "vast majority" of the time, the specific commercial operations in question are

24

25   [1] *See also* Corps spreadsheet titled "Copy of NWP 48_CM_locked" provided on Disc 5 of the
     Administrative Record (without bates stamp), showing thousands of entries for NWP 48 in

26   Washington State.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1  going to be permitted under the challenged program, and hence directly attributable to it. The

2  Washington commercial shellfish aquaculture industry is basically synonymous with NWP 48.

3  Shellfish aquaculture permitted under 2017 NWP 48 is more than "reasonably certain to take

4  place" in the areas described by the Center's members, including Willapa Bay, Puget Sound, and

5  Hood Canal. ECF No. 43 at 12; *see* COE134134-340; COE127485-127611. This is more than

6  sufficient to satisfy standing.

7       The declarations are detailed and very specific: The Center's members identified

8  commercial shellfish aquaculture operations in various specific parts of the state, most of which

9  were expressly approved under the NWP 48 (the past version or the 2017 version), and they

10  identified the Corps' lack of appropriate oversight of these operations through NWP as the

11  source of their recreational, economic, environmental, aesthetic, and other harms. For example,

12  Center members Ross Barkhurst, Tom Buchele, and Fritzi Cohen all own homes and real estate

13  on or near Willapa Bay; they live or frequently recreate there; and they have suffered harm from

14  commercial shellfish operations, permitted under NWP 48, to their economic, recreational,

15  environmental, and aesthetic interests. *See* Barkhurst Decl., ECF No. 33 ¶¶ 3-7, 10-11 (Mr.

16  Barkhurst lives on Willapa Bay, including owning shellfish beds; he regularly gathers shellfish,

17  fishes, and hunts in Willapa Bay); Buchele Decl., ECF No. 34 ¶¶ 3-7; 9 (Mr. Buchele owns a

18  vacation home on Long Beach Peninsula very near the Bay; eats oysters from Bay; enjoys and

19  observes wildlife in and around the Bay); Cohen Decl., ECF No. 35 ¶¶ 3-9 (Ms. Cohen owns a

20  historic B&B hotel directly on Willapa Bay, with its own shellfish beds; has suffered economic,

21  environmental, and aesthetic impacts from industrial shellfish industry). Similarly, members

22  Susan Corbett and Patrick Townsend live in Puget Sound (Squamish Harbor and Boston Harbor,

23  respectively), and their recreational and aesthetic interests are harmed by commercial shellfish

24  aquaculture permitted under NWP 48. *See* Corbett Decl., ECF No. 36 ¶¶ 2-4, 6 (impacts of

25  geoduck aquaculture in Squamish Harbor); Townsend Decl., ECF No. 38 ¶¶ 2-9 (harm to

26  specific places they recreate and live from shellfish aquaculture).

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 11
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    These members also alleged interests in and harm to specific endangered species in the

2    areas in which the Center's members reside and enjoy use. *See, e.g.,* Barkhurst Decl. ¶ 5 (fishes

3    for sturgeon, would fish for green sturgeon if numbers were high enough); Buchele Decl. ¶¶ 8,

4    10 (observes snowy plovers); Cohen Decl. ¶ 11 (observing snowy plover is a major draw for her

5    hotel guests); Corbett Decl. ¶¶ 2-4 (walks the beaches of Squamish Harbor and takes photos,

6    wants to observe and is concerned about marbled murrelet, Hood Canal summer-run chum

7    salmon); Townsend Decl. ¶¶ 3-5 (recreates and observes Puget Sound Chinook Salmon and

8    Southern Resident Killer Whales, including at Boston Harbor, Tolmie State Park, Burfoot Park,

9    and Priest Point Park, the Nisqually Wildlife Refuge also in South Puget Sound, Long Beach,

10   Moclips, Dungeness, and Westhaven State park near Westport, and owns a home on the

11   waterfront where Chinook and chum salmon run right past his home).

12   All these declarants specifically identified commercial industrial-scale shellfish

13   aquaculture as causing harm to their recreational, economic, environmental, aesthetic, and other

14   personal interests, including from its pesticide and plastic gear use, clearing the beaches of other

15   wildlife, and the discharge of gravel or "frosting" onto shellfish beds, and the Corps' lack of

16   oversight of shellfish aquaculture. Barkhurst Decl. ¶¶ 7-11 (impacts of commercial shellfish

17   operations including pesticides and gravel "frosting" are not properly regulated by Corps and

18   harming his interests); Buchele Decl. ¶¶ 10-12 (concerned about pesticide use in shellfish

19   industry due to eating oysters and lack of public information from Corps); Cohen Decl. ¶¶ 8-9,

20   11-12 (due to pesticide use by commercial shellfish industry and lack of oversight by federal

21   government, has lost tens of thousands of dollars on oyster sales and hotel visitors, also

22   concerned about plastic use, including PVC pipes in geoduck aquaculture); Corbett Decl. ¶¶ 3-4,

23   6-7 (has witnessed harm from shellfish aquaculture to wildlife habitat in Squamish Harbor,

24   including from a particular geoduck operation permitted by the Corps); Townsend Decl. ¶¶ 7-9

25   (believes expansion of industrial geoduck farms is negatively impacting native eelgrass, has seen

26   shellfish structures in water disruptive to salmon migration, concerned about expansion, and

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 12
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

finds them aesthetically unpleasing; aware of wildlife like eagles and crabs becoming entangled and has personally been caught in shellfish equipment while kayaking; concerned about plastics leaching chemicals and breaking down into microplastics).

The injury showing provided by these concrete and particularized member declarations is more than sufficient: "[A]n individual can establish 'injury in fact' by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859-60 (9th Cir. 2005), (citing *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000)). In *Ocean Advocates*, the environmental group's members used and enjoyed the area where a proposed dock extension would risk increased tanker traffic and thus a greater potential for an environmentally-damaging oil spill. *Id.* at 860. Just a greater *potential* for an oil spill, which would decrease members' recreational and scientific use of the area, was sufficient to show injury in fact. *Id.* Here, there is nothing probabilistic about the environmentally-damaging shellfish activities taking place: because of NWP, they will continue and expand, in the specific areas in which the members reside and recreate.

Moreover, in a challenge to a general program approval such as this case, an injury can be actual and imminent even *without* specific authorizations under the challenged general permit. *Cottonwood*, 789 F.3d at 1081 (holding that plaintiffs need not challenge "any specific project" in order to challenge Forest Service's failure to consult a Forest Plan under the ESA because the "procedural injury was complete"); *Ohio Valley Envtl. Coal. v. Hurst,* 604 F. Supp. 2d 860, 876 (S.D.W. Va. 2009) (citing *La. Envtl. Action Network v. U.S. Envtl. Prot. Agency,* 172 F.3d 65, 67-68 (D.C. Cir.1999)). In *Ohio Valley*, the court found standing for the environmental group "because its members visit, live near, recreate near, drive by and/or fly over areas of the state that are visibly harmed by [the NWP] activities," despite there not being specific authorizations yet

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

on the re-issued NWP. *Id.* at 876 (internal quotation marks omitted). "The organization need not prove the merits of its case—*i.e.,* that localized harm has in fact resulted from a federal rulemaking—in order to establish its standing, but it must demonstrate that there is a substantial probability that local conditions will be adversely affected and thereby injure a member of the organization." *Id.* (citing *Sierra Club v. S. Envtl. Prot. Agency*, 292 F.3d 895, 898 (D.C. Cir. 2002)). Because the NWP in *Ohio Valley* had been issued, and was estimated to have hundreds of annual authorizations, including in the area used by the plaintiff, it "clearly show[ed] that there is a substantial probability that local conditions will be adversely affected and therefore [plaintiff] will suffer an actual injury." *Id.* Just like the NWP in *Ohio Valley*, here the Corps acknowledged that it will re-authorize the thousands of operations it previously authorized under 2012 NWP 48, plus hundreds more, under 2017 NWP 48, in the areas that the Center's members live and recreate. This is not disputed. Accordingly there can be no question that the Center's members will (and already are) suffering imminent and concrete harm from commercial shellfish aquaculture operations authorized under 2017 NWP 48.

Indeed, after this case was filed, the Corps has already authorized hundreds of operations under 2017 NWP 48.[2] And as in *Ohio Valley*, the Corps does not provide public notice and an opportunity to challenge these thousands of specific authorizations, as is the nature of a general permit, so it is unclear how the Center's members would ever identify for the Corps which specific commercial shellfish operations are authorized under NWP 48, when that information is within the Corps' control. *Ohio Valley*, 604 F. Supp. 2d at 876 ("In addition, my determination of harm is influenced by the fact that the Corps is not required to provide the public, including [plaintiff], with notice of a particular permit authorization or an opportunity to challenge

---

[2] In January 2018 the Corps held a public meeting to update stakeholders on its progress on NWP 48 authorizations, showing that since the Complaint in this case was filed, hundreds of operations have been authorized under 2017 NWP 48. *See* U.S. Army Corps of Eng'rs, Shellfish Aquaculture Permitting Program Update (Jan. 2018), http://www.nws.usace.army.mil/Portals/27/docs/regulatory/NewsUpdates/20180122_ShellfishPermittingUpdate.pdf.

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 14
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   it….[T]he harm caused by the issuance of NWP 21 is immediate, irreversible, and difficult to

2   monitor.").

3        The Corp's case law is not contrary or is distinguishable. First, *Summers* merely

4   confirmed the rule that environmental plaintiffs establish injury by showing they actually use the

5   area(s) affected by the challenged activity; the Center's members have done so here. *Summers v.*

6   *Earth Island Inst.*, 555 U.S. 488, 494 (2009). The plaintiffs in *Summers* lacked standing because

7   their single affidavit alleged only *past* injury with no imminent future harm, and did not identify

8   any particular place, merely alleging that he planned to visit "several unnamed national forests in

9   the future." *Id.* at 495. Because the national forests occupy more than 190 million acres, it was

10  unlikely that the member would actually be in the same place as the parcel impacted by the

11  regulations at issue. *Id.*

12       The facts of *Summers* stand in stark contrast to the Center's members here, who alleged

13  specific areas of Washington in which they live and recreate, and their plans to continue to do so

14  in the future. *See, e.g.*, Corbett Decl. ¶ 5; Townsend Decl. ¶ 6. Similarly, the court in *National*

15  *Wildlife Federation* found standing lacking because declarants, although showing they were

16  impacted by bulkheads authorized under the NWP, failed to show they would continue to be

17  harmed by *future pending* NWP projects. *Nat'l Wildlife Fed'n. v. U.S. Army Corps of Eng'rs*,

18  170 F. Supp. 3d 6, 13-14 (D.D.C. 2016). In contrast here, the record conclusively shows there

19  already are NWP 48-authorized shellfish operations, and they will continue and expand, in the

20  same places the Center's members live and recreate. *See supra*.

21       The Center has also established standing as to the ESA claim, because its members enjoy

22  observing threatened and endangered species and using areas inhabited by these species, which

23  are threatened by the Corps' action. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 484

24  (9th Cir. 2011) ("We have held that environmental groups had standing to bring an ESA claim

25  where the groups' members regularly used and enjoyed an area inhabited by the imperiled

26  species."). Members have shown they enjoy observing threatened and endangered species in

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 15
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   places where they live and regularly recreate and where shellfish aquaculture also takes place.

2   *See supra.* Indeed, the entire Willapa Bay—the region of the state with the most shellfish

3   aquaculture acres—is critical habitat for the Southern DPS green sturgeon, and includes critical

4   habitat for the snowy plover on Leadbetter Point. COE134790; COE134526. Similarly, Puget

5   Sound and Hood Canal have designated critical habitat for endangered salmon, including Hood

6   Canal summer-run chum salmon, and Puget Sound Chinook salmon. COE134804, COE134844-

7   47. The National Marine Fisheries Service found that commercial shellfish aquaculture

8   (overwhelmingly permitted under NWP 48, COE134147) is "likely to adversely affect" Hood

9   Canal summer-run chum salmon, Puget Sound Chinook salmon, green sturgeon, and their

10   respective critical habitat. COE134763. The Corps itself has acknowledged that its NWP 48 may

11   affect ESA-listed species: "In the Seattle District, all shellfish aquaculture occurs in marine

12   waters with ESA-listed species and/or critical habitat in the vicinity." COE127534, 127550.

13       In other cases where plaintiffs challenged a NWP for failure to comply with the ESA,

14   courts have found standing based on use and enjoyment of areas affected by the NWPs that are

15   habitat for the ESA-listed species. *See, e.g.*, *Defenders of Wildlife v. Ballard,* 73 F. Supp. 2d

16   1094, 1100 (D. Ariz. 1999) (plaintiffs resided in and used areas within the pygmy owl habitat

17   and sufficiently alleged injury from NWP activities that "may affect" the owl without proper

18   cumulative impacts analysis at the regional level); *Alaska Ctr. for Env't v. West*, 31 F. Supp. 2d

19   714, 720 (D. Alaska 1998) (finding plaintiffs had standing to sue under ESA because they lived

20   in and around the waters affected by the NWP and enjoy the presence of ESA-listed species, and

21   the Corp's decision document showed that NWP would impact those species).

22       In summary, the Center's members are harmed by the commercial shellfish aquaculture

23   industry that is permitted under NWP 48; their declarations and the Corps' admissions establish

24   their injuries are easily sufficient to support standing to bring the Center's claims under the

25   CWA, NEPA, and the ESA.

26

1   **II.    THE CENTER PROPERLY CHALLENGED NWP 48 AS APPLIED IN
          WASHINGTON.**

2          Next, the Corps and Intervenor PCSGA claim that summary judgment should be denied

3   because the Center challenged the wrong document, by focusing on the regional Supplemental

4   Decision Document for the Seattle District (*i.e.*, Washington State),[3] rather than the Corps

5   Headquarters' National Decision Document.[4] ECF No. 43 at 16, 19; Intervenor-Def. Mot. for

6   Summ. J. & Opp'n, ECF No. 44 at 10-14 (national decision document satisfies Corps' NEPA

7   duties); *id.* at 15-17 (CWA compliance at national level). Defendants' "gotcha" argument is

8   wrong on the facts and the law.

9          First, the Center's complaint expressly references the National Decision Document,

10  which contains the CWA cumulative impacts assessment and NEPA national environmental

11  assessment (EA) for all of NWP 48, but then reasonably focuses on the later regional

12  supplemental analysis, because that is what the Corps used to evaluate the specific impacts of

13  NWP 48 *in Washington State*, as contemplated by the Corps' National Decision Document and

14  its regulations.[5] The Center did not ignore the Corps' evaluation of NWP 48 generally in its

15  National Decision Document; it did focus its challenge on the adoption of NWP 48 and its

16  regional conditions in Washington State, as evaluated under CWA and NEPA, in the Corps'

17  Supplemental Decision Document. There is nothing improper about such commonsensical focus.

18         Second, the Corps' own statements and the CWA regulations make it clear that the

19  regions themselves have the last word on whether to adopt, modify, or revoke a NWP for that

20  region, and cannot in fact adopt any NWP under the CWA if it would have more than minimal

21

22  [3] COE127485-127611 (Seattle District Supplement to National Decision Document for NWP 48,
    March 19, 2017).

23  [4] NWP003034-3116 (National Decision Document for NWP 48, Dec. 21, 2016).

24  [5] *See* Amended Complaint, ECF No. 9 ¶¶ 96-100 (discussing Corps National Decision Document
    NEPA compliance, comments regarding same, and what it failed to address); *Id.* ¶¶ 165-171
    (Claim 1, challenging failure to prepare EIS, focus on adoption of NWP 48 in Washington but

25  specifically alleging that the Center urged both the Corps Headquarters and Seattle District to
    conduct EIS and both failed to do so); *Id.* ¶ 175 (discussing interplay between national EA and

26  regional NEPA analysis of alternatives in Claim 2).

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

cumulative impacts to the area. 33 C.F.R. § 330.5; *see also* 33 U.S.C. § 1344(e)(1); 33 C.F.R. § 323.2(h); 40 C.F.R. § 230.7(a). The Supplemental Decision Document on which the Center focused is what the Corps regions use to determine whether to adopt, condition, or revoke a NWP in their own region under the CWA, as specifically contemplated by the NWP 48 National Decision Document here:

> An important aspect for the NWPs is the emphasis on regional conditions to address differences in aquatic resource functions, services, and values across the nation. *All Corps divisions and districts are expected to add regional conditions to the NWPs* to enhance protection of the aquatic environment and address local concerns. *Division engineers can also revoke an NWP if the use of that NWP results in more than minimal individual and cumulative adverse environmental effects*, especially in high value or rare wetlands and other waters. When an NWP is issued or reissued by the Corps, division engineers *issue supplemental decision documents that evaluate potential impacts of the NWP at a regional level*, and include regional cumulative effects assessments.

NWP003057 (emphases added); NWP003072-73 (it is Division and district engineers that impose conditions on NWP to address locally important factors and ensure no more than minimal cumulative impacts). The Seattle District acknowledged this in its own Supplemental Decision Document:

> The Seattle District completed a supplemental decision document for each NWP during the re-issuance process that discussed cumulative effects at a regional level if they differ from the national cumulative effects analysis and required the division engineer to modify, suspend, or revoke NWPs on a regional basis (see 33 CFR 330.5(c)).

COE127494-5. Contrary to the Corps' framing, it would be nonsensical for the Center in such instances to focus only on the broader national assessment (although the Corps also adopted a NWP that will have more than minimal cumulative impacts under CWA and failed to conduct an EIS there), when the *regional* cumulative impacts are covered in the regional decision document. The same is true for the Center's focus here, on what matters for Washington State.

Third, under NEPA, where the Corps itself sets up a tiered system to evaluate regional cumulative impacts *after* the National Decision Document is complete, it must still comply with

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 18
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   NEPA at all appropriate levels. *See Defenders of Wildlife*, 73 F. Supp. 2d at 1113-1114 (holding

2   "[a]s a matter of law, authorizations under the challenged NWPs violate NEPA mandates *until*

3   *Defendants conduct a regionally based, programmatic impact analysis*.") (emphasis added).[6]

4   The Corps and Intervenor appear to be arguing that although the Center challenged the

5   *application* of NWP 48 *in Washington*, they are confined to challenging only the Corps' NEPA

6   compliance at the *national* level, and that no NEPA compliance was required at the regional

7   level when the Corps determined that NWP 48 would be appropriate for Washington, wrote its

8   regional conditions (the few that apply to shellfish), and made its finding that NWP 48 would not

9   cause more than minimal cumulative effects in Washington. ECF No. 44 at 11; ECF No. 43 at

10  15-16.

11       This is legally incorrect. NEPA applies to any "major Federal actions significantly

12  affecting the quality of the human environment." 42 U.S.C. § 4332(C). The adoption of a general

13  permit is certainly a "major federal action," including the adoption of NWP 48.[7] But the Corps

14  Headquarters' adoption of a NWP is not the end of the story—Corps Divisions and Districts

15

16  ---

[6] *See also Sierra Club v. U.S. Army Corps of Eng'rs,* 803 F.3d 31, 46 (D.C. Cir. 2015) (where
Corps did not analyze impacts to listed species when issuing national NWP, deferring
consideration to the verification stage, that regulatory approval incorporating conditions and
authorizing take of species amounts to a "significant federal action requiring environmental
review under NEPA").

[7] NEPA applies to a broad range of federal actions, including agency programs, policies, and
proposals. *See* 40 C.F.R. § 1508.18(a) (CEQ regulations defining "major federal action" to
include "new or revised agency rules, regulations, plans, policies, or procedures"); *id*. §
1508.18(b)(1) ("interpretations" subject to NEPA); *id*. § 1502.4(b) (programmatic EIS required
for "broad Federal actions such as the adoption of new agency programs or regulations"). *See
also Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1311 (S.D. Fla.
2005) ("…the Section 404 permit constitutes major federal action, particularly in view of the fact
that the proposed project could not be constructed in its absence."); *San Luis & Delta-Mendota
Water Auth. v. Jewell*, 747 F.3d 581, 646 (9th Cir. 2014) (agency's implementation of a
biological opinion was a "major Federal action [ ] significantly affecting the quality of the
human environment"); *Maryland Native Plant Soc'y v. U.S. Army Corps of Eng'rs*, 332 F. Supp.
2d 845, 849 (D. Md. 2004) ("NEPA applies to activities authorized by the Corps under the Clean
Water Act" including individual and general permits).

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 19
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1  must then determine whether impacts in their location will be cumulatively minimal, and what

2  regional conditions to attach to a NWP to ensure minimal impacts. *See, e.g.*, 33 C.F.R. § 330.5.

3       While "tiering" from a programmatic NEPA analysis to a regional or site-specific NEPA

4  analysis is sometimes appropriate, allowing tiering *does not entirely absolve* the Corps of NEPA

5  duties for its NWP 48 adoption with regional conditions, the regional and site-specific decision

6  tiered to the National NWP 48 analysis. *See* 40 C.F.R. § 1508.28 (defining tiering as "the

7  coverage of general matters in broader environmental impact statements (such as a national

8  program or policy statements) with subsequent narrower statements or environmental analyses

9  (such as regional or basinwide program statements or ultimately site-specific statements)

10  incorporating by reference the general discussions and concentrating solely on the issues specific

11  to the statement subsequently prepared" and explaining when appropriate). The Corps itself set

12  up its own tiered system of NWPs, ECF No. 44 at 11, which evaluates cumulative impacts at the

13  *regional* level. In doing so, it must comply with NEPA at all appropriate levels, including

14  regionally. *Defenders of Wildlife*, 73 F. Supp. 2d at 1113 ("The 1996 Final Decision recognized

15  the Corps' duty to assess the cumulative impact of its NWP program and determined that the

16  assessment would best be done at the regional level. Here, Defendants, themselves, have defined

17  the bounds of the analysis to be regionally based, watershed by watershed."). In *Defenders of

18  Wildlife*, the regional impacts were never evaluated, and court ordered the Corps to take a hard

19  look at the cumulative impact of the NWPs, and determine whether the use of those permits *in

20  the specific region* had no significant impact pursuant to NEPA. *Id.*[8]

21       Fourth, the operative decision being challenged in this matter, under the CWA, NEPA,

---

22  [8] The Corps argues that the Center's attacks on the scope of the environmental assessment in the
    Supplemental Decision Document is "misdirected" because it is not a "standalone document,"
23  citing *Salmon River Concerned Citizens v. Robertson*, 798 F. Supp. 1434, 1439 (E.D. Cal.
    1992), *aff'd*, 32 F.3d 1346 (9th Cir. 1994). *See* ECF No. 43 at 19. However, *Salmon River
24  Concerned Citizens* actually supports the Center's ability to challenge the NEPA cumulative
    impacts assessment (or lack thereof) at the more localized level. *Id.* at 1440 (rejected challenge
25  to programmatic EIS for herbicide use, because agency could consider impacts at the forest level
26  in an EA or supplemental EIS).

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    and the ESA, is the Seattle District and Northwestern Division's decision to adopt NWP 48 as

2    conditioned (with only a single regional condition specific to shellfish, a prohibition on hydraulic

3    clam escalator harvest) in Washington State. *See* COE126119-136; COE127485-611; Pls. Mot.

4    for Summ. J., ECF No. 31 at 10-11 (one of commenters' and the Center's chief concerns was the

5    lack of regional conditions to NWP 48, including two regional general conditions that exempted

6    NWP 48). That operative decision was not made at the Corps Headquarters, but rather by the

7    regional Corps offices after completing their Supplemental Decision Document, to evaluate the

8    cumulative impacts specific to Washington. It could not be made by the Corps Headquarters

9    because of the very tiered system Defendants seek to use against the Center now: it is only *after*

10   regional supplemental analyses that the Corps determines whether a given NWP will have more

11   than minimal cumulative impacts in that region. The National Decision Document acknowledges

12   that information is missing, and will be filled in by the Corps regions and that regional

13   conditions can be attached to mitigate adverse impacts, *see* NWP003072.[9]

14

15   [9] Over and over again, throughout the National Decision Document, the Corps relies on and
     defers to the regional analysis and ability to condition the NWP. *See, e.g.*, NWP003036-38; 3042
16   (Division engineers can impose regional conditions to ensure mechanical harvesting results in no
     more than minimal cumulative impacts, and to address the use of plastics); 3045-46 (because the
17   Corps Headquarters decided to forgo compliance with ESA Section 7 for this round of NWPs,
     ESA consultation will be on a "regional programmatic" basis); 3047 (divisions to impose
18   regional conditions to address concerns about cumulative impacts to eelgrass and other species,
     and spawning areas); 3049 ("In a geographic area where dredge harvesting, tilling, or harrowing
19   activities might result in more than minimal adverse effects to submerged aquatic vegetation, the
     division engineer can add regional conditions to this NWP to require PCNs for those
20   activities."); 3051-52 ("In areas where a Corps district determines that NWP 48 activities may
     have more than minimal adverse effects on submerged aquatic vegetation or other special aquatic
21   sites, the district can request that the division engineer add a regional condition to this NWP to
     require PCNs for activities that have impacts to submerged aquatic vegetation or other special
22   aquatic sites or impose limits on impacts to submerged aquatic vegetation or other special
     aquatic sites."); 3055; 3057 (Corps expressly included "Regional Modification Alternatives" in
23   its listing of alternatives under NEPA, although not stating what those might be); 3072 (stating
     that National Decision Doc "contains a general assessment of foreseeable effects" and "[t]he
24   supplemental documentation provided by division engineers will address how regional
25   conditions affect the individual and cumulative effects of the NWP."); 3073 (Regional
     conditioning of this NWP will be used to account for differences in aquatic resource functions,
26

1    Thus, the Corps decision-making and environmental assessment under the CWA, NEPA,

2  and the ESA, simply are not concluded at the national level. Indeed, as the record reflects, the

3  Seattle District actually completed a much more detailed—though damning—cumulative

4  impacts analysis internally, the very cumulative impact analysis that the public, other agencies,

5  and tribal governments have been seeking for years; however this cumulative impact assessment

6  never made it into the District's Supplemental Decision Document or to the public. COE125584-

7  125699; *see* COE 125701-04.[10] The cumulative impact of commercial shellfish aquaculture *in*

8  *Washington State* is the heart of this dispute, and therefore the failure to conduct proper analysis

9  for, or ensure minimal cumulative impacts of, NWP 48 as adopted *in Washington* is the proper

10  focus of this lawsuit.

11 **III.    THE CORPS VIOLATED THE CLEAN WATER ACT.**

12    **A.    The Corps Cannot Adopt a NWP with More than Minimal Cumulative**
13         **Impacts.**

14    Before the Court should even reach the NEPA and ESA arguments, it must adjudicate

15  whether NWP 48 was lawful to cover commercial shellfish aquaculture in Washington, the state

16  by far the most saturated with aquaculture operations for geoduck, oysters, clams, and mussels in

17  the United States. As set forth in the Center's opening brief, the CWA does not authorize the

18  Corps to adopt a general permit where the impacts of all the combined authorizations will have

19  more than minimal cumulative adverse impacts. ECF No. 31 at 12-13.

20    Here, the record does not support the Corps' conclusion that NWP 48, as amended in

21  2017 (including the 100-year look back), would only have minimal cumulative impacts, without

22  ─────────────────────────────────
   services, and values across the country, ensure that the NWP authorizes only those activities with
23  "no more than minimal individual and cumulative adverse environmental effects"); 3077; 3087-
   88; 3092-94 (compliance with Section 7 and conditions for ESA-species to be regional); 3102
24  (concluding in Cumulative Impacts, 40 C.F.R. § 230.7(b)(3) section that "Division and district
   engineers will restrict or prohibit this NWP on a regional or case-specific basis if they determine
25  that these activities will result in more than minimal individual and cumulative adverse effects on
   the aquatic environment."); 3106.
26  [10] *See infra* pp. 38-40.

1   further conditioning the national permit. ECF No. 31 at 13-16. The Corps' own internal

2   cumulative impacts analysis, as well as other evidence in the record, underscores that the Corps'

3   conclusion that the expansion of the existing operations to potentially 72,300 acres, of which

4   very few would be considered "new" and therefore have to comply with the half acre limit to

5   eelgrass impacts, would only have minimal cumulative impacts is arbitrary and capricious. *See*

6   *Wyoming Outdoor Council Powder River Basin Res. Council v. U.S. Army Corps of Eng'rs*, 351

7   F. Supp. 2d 1232, 1254 (D. Wyo. 2005); *Ohio Valley Envtl. Coal.*, 604 F. Supp. 2d at 884. The

8   evidence here is *not* susceptible to more than one interpretation, contrary to the Corps'

9   conclusory statement, ECF No. 43 at 38. Rather, the public, tribes, and other agencies all warned

10  the Seattle District that adopting the 2017 NWP 48 in Washington, without further protections,

11  would result in more than minimal cumulative impacts (and was likely to adversely affect several

12  ESA-listed species), and this is borne out by the Corps' own prediction of the number of acres

13  affected and its own internal cumulative impact analysis. ECF No. 31 at 6-11.

14          Under the arbitrary and capricious standard, the Corps "must examine the relevant data

15  and articulate a satisfactory explanation for its action including a rational connection between the

16  facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

17  *Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). Thus, if the Corps'

18  failed to consider an important aspect of the problem (such as the true extent of cumulative

19  impacts or the use of pesticides), or offered an explanation that runs counter to the evidence

20  before the agency, this court "should not attempt itself to make up for such deficiencies." *Id.*

21  Here, the Corps concluded over and over that the revised 2017 NWP 48, with essentially no

22  regional conditions for shellfish, would not cause cumulative impacts to Washington's

23  environment. However that conclusion runs counter to the evidence before the agency, especially

24  its own draft cumulative impacts analysis, as well as the evidence offered by commenters, tribes,

25  and other agencies. ECF No. 31 at 9-11.

26          The Corps complains that it cannot be required to provide "certainty" that its NWP will

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 23
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   cause only minimal effects, relying not on the language of the CWA (which restricts nationwide

2   permits to activities that "will have only minimal cumulative adverse effect on the environment,"

3   33 U.S.C. §1344(e)(1)), but instead relying on a single extra-circuit case that cuts against the

4   Corps on remand. ECF No. 43 at 35-40, citing *Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493

5   (4th Cir. 2005). The Corps relies heavily on *Bulen*, but fails to mention that this court did not

6   address the question of whether the Corps' minimal impact determination was arbitrary and

7   capricious, remanding to the district court to adjudicate that question. *Ohio Valley Envtl. Coal.*,

8   604 F. Supp. 2d at 872 ("Court of Appeals left open, however, the question of whether the

9   Corps' minimal impact determination was arbitrary and capricious."). When the district court *did*

10  address the question, it found that the Corps' cumulative impacts determination for NWP 21

11  (2007) *was* arbitrary and capricious, because it "relied exclusively on a mitigation process with

12  no demonstrable insurance of success." *Id.* at 897 (even taking the Fourth Circuit's instruction

13  that there is some uncertainty in nationwide permit issuance, and the determination may be a

14  "reasoned prediction," the court still held that "[t]he Corps cannot forecast the cumulative

15  impacts of the NWP 21 (2007) authorizations based solely on that unsupported mitigation

16  plan.").[11]

17      Thus, while the Corps may rely *in part* on post-issuance procedures to ensure minimal

18  cumulative impacts, it cannot rely *exclusively* on them, *id.* at 872, and must still document and

19  support *how* they will avoid cumulative impacts, *see infra.* Thus, an effects determination will

20  ―――――――――――――――――

21  [11] The Corps' attempt to distinguish this contrary case law because it deals with "compensatory
    mitigation," a term-of-art in the CWA Section 404 context, *i.e.*, measures to offset unavoidable

22  adverse impacts, which the Corps did not find necessary here, rings hollow. ECF No. 43 at 35
    n.29. The Corps' minimal effects determination was arbitrary and capricious because it failed to

23  rationally explain how it could come to this conclusion based on the evidence before the agency
    of negative impacts, in which as the Corps argues, it found *no* compensatory mitigation was

24  required. *Id.* Whether or not the term of art was used, the Corps in its approval of NWP 48
    without regional conditions for Washington, stated repeatedly that it would ensure minimal

25  cumulative impacts through post-issuance piecemeal review, just like it did with other NWPs in
    the cases cited by the Center. ECF No. 31 at 13-18. It is unclear how its lack of "compensatory

26  mitigation" *helps* the Corps here.

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 24
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    still be arbitrary and capricious if it ignores evidence of cumulative impacts from the record and

2    fails to explain how the post-issuance review of individual authorizations will actually limit

3    impacts to a minimal cumulative level. *Ohio Valley Envtl. Coal.*, 604 F. Supp. 2d at 897. Indeed,

4    the entire purpose of a cumulative impact analysis is to look at the combined impact of all the

5    authorizations under a NWP. "By their very nature, the 'cumulative impacts' of a general permit

6    cannot be evaluated in the context of a … single project." *Wyoming Outdoor Council,* 351 F.

7    Supp. 2d at 1243. Here, the Corps relied entirely on post-issuance, case-by-case review of

8    authorizations to ensure cumulative impacts would be minimized. *Supra* n.9.[12]

9           The Corps argues that the national level general conditions will ensure minimal impacts,

10   but relies mainly on General Condition 18, which only requires a Pre-Construction Notice to the

11   Corps (meaning that shellfish aquaculture operations cannot just go about their activities without

12   notifying the Corps), but the Corps does not go on to explain *how* this post-issuance measure will

13   _____

14   [12] Like the National Decision Document, the Supplemental Decision Document also defers to
     and relies upon conditions attached by the district engineer during individual authorization

15   review to mitigate impacts. COE127486; 127490-92 ("If the district engineer determines, after
     considering mitigation, that there will be more than minimal individual or cumulative adverse

16   environmental effects, he or she will exercise discretionary authority and require an individual
     permit for the proposed activity."); 127495; 127504; 127508; 127535 ("When the district

17   engineer receives a PCN, impacts to forage fish will be evaluated by the Seattle District…");
     127542 ("The determination of "more than minimal" environmental effects is made by the

18   district engineer after the receipt of a PCN."); 127551-2; 127553 ("district engineers to review
     activities and determine if there will be any adverse effects on navigation"); 127554; 127556 ("If

19   the District Engineer determines an activity to have more than minimal adverse environmental
     impacts compensatory mitigation requirements may be addressed through conditions to the NWP

20   authorization"); 127558-9 (district engineer may add conditions to deal with impacts to eelgrass
     beds and from plastic debris); 127588 (impacts to eelgrass may be permanent, but "[i]mpacts to

21   eelgrass from all operations will be reviewed by the district engineer upon receipt of the PCN.
     Special conditions may be applied on a project specific basis to ensure impacts are minimal. The

22   district engineer may exercise his discretionary authority as discussed below to ensure impacts
     are minimal both individually and cumulatively."); 127589-92 ("While the impacts from any

23   NWP 48 authorized activities are expected to continue throughout the 2017 NWP 48
     authorization period, the effects will be individually and cumulatively minimal based on the

24   compliance with the conditions above, and the district engineer's ability to require activity
     specific conditions or exercise discretionary authority. No additional regional conditions are

25   proposed…").

26

Center for Food Safety
                                                           917 SW Oak Street, Suite 300
                                                           Portland, OR 97205
                                                           (971) 271-7372

1   avoid cumulative impacts through this piecemeal individual review of hundreds of operations.

2   Further, the Seattle District's own internal documents acknowledge that "it is uncertain whether

3   any of the general conditions would minimize effects of the action. Historically, these conditions

4   have not been invoked to restrict activities under NWP 48." COE125589. The Corps further

5   argues that it will be applying the twenty-nine conservation measures from its programmatic

6   ESA consultation with NMFS and FWS, ECF No. 43 at 37, but ignores that it refused to

7   incorporate these conditions into the NWP 48 despite urging by commenters and other agencies.

8   ECF No. 31 at 9-11.

9        In fact the Corps acknowledges and even relies on the fact that NWP 48 will cover more

10   operations than its programmatic consultation, because the Corps did not intend that this

11   consultation would cover all NWP 48 users, because some would choose not to conform to the

12   conservation measures or terms and conditions and would require their own ESA consultation.

13   ECF No. 43 at 24-25. But the Corps fails to explain in any decision document how including

14   operations that fail to conform to the programmatic consultation measures to be permitted under

15   NWP 48 would still only result in minimal cumulative impacts. NMFS found likely adverse

16   impacts to several listed species, based on half the potential acreage under 2017 NWP 48 as

17   adopted, and even with the conservation measures identified by the Corps. The Corps has no

18   answer for this, but merely falls back on its piecemeal, post-issuance review. *Id.*[13] The Corps

19   also revoked two regional general conditions from application to NWP 48, which would have

20   protected forage fish spawning areas and eelgrass, ECF No. 31 at 10-11.[14] Even taking these

---

22   [13] Indeed the "talking points" document (which the Corps cites to prove it reasonably decided

23   against including these conservation measures) states that some are "unenforceable" (ECF No. 43 at 25 (citing COE135242)), so it is hard to understand how the Corps expects the public and Court to just blindly believe it when it says that the ESA consultation measures (which will only

24   be applied to some, but not all, NWP 48 authorization), will adequately mitigate the cumulative

25   impacts of tens of thousands of acres of shellfish aquaculture.

26   [14] The Corps is incorrect that the Center does not "identify additional measures that would further minimize adverse effects" (ECF No. 43 at 37), beyond the national and regional general

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 26
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   general conditions and ESA conservation measures into account, the Corps still failed to show

2   any rational connection between the evidence in the record and its minimal impacts

3   determination.[15]

4        PCSGA argues that the Center failed to take the National Decision Document into

5   account, but this is false and the cumulative impacts analysis and determination in the National

6   Document does nothing to help the arbitrary regional determination. ECF No. 44 at 19. The

7   Supplemental Decision Document's cumulative impacts section is at least slightly more accurate

8   based on the evidence in the record than the National's, which touts the benefits of shellfish and

9   barely acknowledges the documented harms industrial shellfish aquaculture causes (by ignoring,

10  for example, geoduck aquaculture). However it still fails to account for the evidence of more

11  significant harm in the record, including the District's internal cumulative impacts analysis.

12  COE125584-125699, *see infra* pp. 38-40.

13      **B.     The Corps Failed to Adequately Document Its Minimal Cumulative Impact
                 Conclusion and Evaluate Impacts from NWP 48.**

14

15      Separate from its arbitrary and capricious determination that 2017 NWP 48 would only

16  have minimal cumulative impacts in Washington, the Corps also failed to fulfill the CWA's

17  documentation requirement. ECF No. 31 at 16-18. As explained above, even if reliance in part

18  _____

19  conditions, and the BiOp "terms and conditions" that some, but not all, of the NWP 48
    operations will choose to meet. In addition to the Regional General Conditions 10 and 14

20  discussed above, the Center as well as other commenters urged the Corps to limit NWP 48 to
    operations that do not use plastics and pesticides through regional conditions, and to include

21  other conditions to protect aquatic habitat, like eelgrass, and water quality. ECF No. 31 at 9-11.

22  [15] To the extent the Corps argues it is at the "frontiers of science" and is entitled to deference,
    ECF No. 43 at 40, it completely ignored its own internal cumulative impact analysis

23  (COE125584-125700), as well as other expert agencies like EPA, ECF No. 31 at 9-10, when
    making its conclusory determination that up to 72,300 acres of shellfish aquaculture, with no

24  regional conditions, would not have cumulative impacts to aquatic resources. The Corps is not
    entitled to deference here, where the record belies its cumulative effects determination. *W.*

25  *Watersheds Project v. Kraayenbrink,* 632 F.3d 472, 493 (9th Cir. 2011), citing *Earth Island Inst.*
    *v. Hogarth,* 494 F.3d 757, 763-64 (9th Cir. 2007) (explaining a result that is not rationally

26  connected to the best available scientific evidence receives no such deference).

1  on post-issuance procedures to mitigate cumulative impacts from a NWP is allowable and was

2  not arbitrary and capricious in this case, the Corps must still document the information that

3  supports its minimal impact finding. *See Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402,

4  412-13 (6th Cir. 2013) (distinguishing *Bulen*, 429 F.3d 493). The Sixth Circuit in *Kentucky*

5  *Riverkeeper* "acknowledge[d] that the Corps may rely on post-issuance mitigation procedures to

6  minimize environmental impacts, but in making a minimal-cumulative-impact finding, *it must, at*

7  *a minimum, provide some documented information supporting that finding*." *Id.* at 413 (emphasis

8  added) (citing 40 C.F.R. §§ 230.7(a)-(b), 230.11(g)).

9          The Corps' documentation of impacts in support of its minimal effects determination

10  (including the Section 404(b) Guidelines Impact Analysis) is conclusory and unsupported, both

11  in the Supplemental Decision Document for the Seattle District and in the National Decision

12  Document to which it refers. COE127569-70; NWP003102-3106. The Seattle District largely

13  refers to the discussion in the National Decision Document, adding only that impacted vegetated

14  shallows (like the keystone eelgrass) will be "fully assessed through the PCN process and

15  ESA/MSA consultation," and the general condition requiring a PCN "will ensure impacts to

16  vegetated shallows are minimized." COE127569. This, like many similar statements throughout

17  both decision documents, merely asserts the authority to assess the impacts on a case-by-case

18  basis, but not *how* the district engineer will actually reduce impacts to aquatic vegetation.

19          For example, the explanation in the National Decision Document of how shellfish

20  aquaculture, known to destroy eelgrass habitat, will somehow only have minimal adverse

21  impacts does not cure this deficiency. NWP003105. Similarly, relying on the prohibition on

22  "new" operations affecting more than half acre of submerged aquatic vegetation to avoid impacts

23  is meaningless with the new "100 year look back" in NWP 48's definition of new, as the Seattle

24  District's own analysis of how many acres will actually be considered "new" in Washington

25  makes clear, COE127592 (predicting 332 acres of 72,300 will be considered "new" under 100

26  year look back definition, or less than half of one percent of acres). Nor has the Corps explained

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 28
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    anywhere how allowing thousands of operations to destroy hundreds of acres of eelgrass in half

2    acre-increments is cumulatively minimal (if they were all considered "new" which they will not

3    be).

4         As elsewhere throughout both documents, the Corps relies on post-issuance PCN review

5    by the district engineer, but fails to explain and document how that review (which has not proven

6    useful to protecting aquatic resources over the last two iterations of this permit), will actually

7    avoid cumulative impacts. *See* NWP003105; *supra* n.9, n.12. The National Decision Document

8    cites a study (Dumbauld and McCoy (2015)) for the idea that eelgrass and other seagrasses

9    recover after disturbance, but ignores the fact that shellfish aquaculture amounts to a continuous

10   disturbance, both in the cycle of seeding and harvesting and because the operations previously

11   permitted are assured to receive another permit under the next 5-year NWP and these

12   operations/acres have only increased since 2007 (the first NWP 48). COE127587-588 (Seattle

13   District does actually recognize this in its Supp. Dec. Doc.). Further, impacts from geoduck

14   culture (involving thousands of PVC tubes covered in plastic netting) are largely ignored, with

15   the National Decision Document not even mentioning the *word* geoduck. NWP003034-3116.[16]

16   And in a complete contradiction, the National Decision Document acknowledges that it must

17   evaluate the "trade-offs" between oyster aquaculture (again, not geoduck), and eelgrass

18   populations "at the landscape scale, rather than a site scale," NWP003105, but still relies entirely

19   on district engineer case-by-case review of individual authorization to avoid cumulative impacts.

20   *Supra* n.9. While many impacts are ignored, *see* COE125584-125699; *supra* n.16

21   (microplastics), the two decision documents acknowledge some of the harmful impacts of

22

---

23

24   [16] Nor does the National Decision Document address the issue of plastic gear and microplastics,
     or pesticides. NWP003042 (ignoring comments about plastic gear in shellfish aquaculture and
     deferring consideration to district and division engineers); COE127552 (ignoring microplastics
25   issue, but acknowledging harm from marine debris, but refusing to condition NWP 48 as not
     "practicable solution"). The Corps here is acknowledging an unmitigated adverse impact from
26   NWP 48.

1   commercial shellfish aquaculture but fail to support their minimal effects determination or how

2   individual PCN review can take the place of a "landscape scale" cumulative effects analysis.

3   Taking these two documents together, the Corps failed to adequately support and document its

4   minimal impact decision for NWP 48 and regional conditions in Washington.

5          One of the impacts of concern to the public (including the Center's members) is the use

6   of pesticides by the commercial shellfish industry to kill eelgrass, an invaluable habitat and

7   ecosystem engineer. COE127555; NWP003042. The Corps refused to assess the impacts of

8   pesticide use by the shellfish industry or to regionally condition NWP 48 to address this issue

9   (which is unique to Washington State), based on the fact that the Corps is not the agency that

10  issues pollution discharge permits for aquatic pesticide use under the CWA Section 402. *Id.*

11  However, Corps' regulations require it to make a "determination of *secondary effects* on the

12  aquatic ecosystem." 40 C.F.R. § 230.11 ("Secondary effects are effects on an aquatic ecosystem

13  that are associated with a discharge of dredged or fill materials, but do not result from the actual

14  placement of the dredged or fill material. Information about secondary effects on aquatic

15  ecosystems shall be considered prior to the time final section 404 action is taken by permitting

16  authorities."). The §404(b) guidelines require secondary effects to be considered prior to issuing

17  a general permit. *Wyoming Outdoor Council*, 351 F. Supp. 2d at 1255 (finding the Corps'

18  cumulative effects determination for a general permit was unlawful, in part, because it failed to

19  evaluate the secondary effects to non-wetland aquatic environments). *See also Fox Bay Partners

20  v. U.S. Corps of Eng'rs*, 831 F. Supp. 605, 609-10 (N.D. Ill. 1993) (upholding the Corps' denial

21  of a private marina project based on its evaluation of the cumulative and *secondary* impacts,

22  including increasing boat traffic in an already heavily trafficked area).

23         PCSGA also asserts, without citation to authority, that the Corps need not have discussed

24  any impacts beyond the discharge of dredge or fill material from a point source, including

25  pesticide use. ECF No. 44 at 22. As described above, documentation of secondary impacts is

26  required. *Riverside Irrigation Dist. v. Andrews*, 758 F.2d 508, 512 (10th Cir. 1985) (rejecting the

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 30
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   idea that the Corps may only consider direct, on-site effects of discharge before issuing a permit,

2   as indirect, downstream effects are reasonably related).

3           Moreover, documentation of impacts, including those secondary or indirect to the actual

4   discharge of dredged or fill materials, is not an academic exercise. The Corps has authority to

5   impose conditions that are "reasonably related" to the purpose of the permit (here, commercial

6   shellfish aquaculture). *United States v. Mango*, 199 F.3d 85, 93 (2d Cir. 1999) (citing the Corps'

7   own regulations that interpret the CWA authority to issue permits as including conditions

8   directly *or indirectly* related to the discharge). The court in *Mango* found that the Corps'

9   regulations giving it authority to include indirectly related conditions to a Section 404 permit

10  were reasonable based on the CWA's mandate to consider the effect of discharges "on human

11  health or welfare," "ecosystem diversity," and "esthetic, recreation, and economic values." *Id.*;

12  *see also Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,* 453 F. Supp. 2d 116, 134

13  (D. D.C. 2006) (holding that "the requirement to establish and maintain vegetated buffers when

14  practicable is reasonably related to the discharges of dredged or fill material."); *Save Our*

15  *Sonoran, Inc. v. Flowers,* No. CV-02-0761-PHX-SRB, 2006 WL 1160191, at *16-17 (D. Ariz.

16  May 2, 2006) (Corps modified permit imposing specific mitigation requirements for removal of

17  upland vegetation were "reasonably relate[d] to the permitted discharge and are within the

18  Corps' jurisdiction to impose); *WaterWatch of Oregon v. U.S. Army Corps of Eng'rs,* CIV. NO.

19  99-861-BR, 2000 WL 1100059, at *9 (D. Or. June 7, 2000) (conditions on the construction of

20  water pumping stations regarding the operation of these stations were reasonably related to the

21  purpose of the permits). The use of plastic gear and pesticides are both related to the primary

22  purpose of NWP 48: commercial shellfish aquaculture. Growers in Willapa Bay and Grays

23  Harbor spray herbicide to kill eelgrass because they claim it interferes with their ability to grow

24  as many shellfish per acre as they would like and seek a permit to spray neonicotinoid insecticide

25

26

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   to kill burrowing shrimp for the same reason.[17]

2          Accordingly, the Corps has authority to condition its commercial shellfish aquaculture

3   permit to avoid these impacts, like the vegetated buffers, mitigation of upland vegetation

4   removal, and pumping station operation conditions that other courts have deemed "reasonably

5   related" to other Section 404 permits. *Nat'l Ass'n of Home Builders,* 453 F. Supp. 2d at 134;

6   *Save Our Sonoran,* 2006 WL 1160191, at *16-17; *WaterWatch of Oregon,* 2000 WL 1100059, at

7   *9.[18] This is especially true for a nationwide permit, which by definition cannot permit activities

8   that will cumulatively have adverse impacts to the environment, 33 U.S.C. § 1344(e)(1), and the

9   use of pesticides on hundreds or thousands of acres of tide lands per year is likely a cumulative

10  adverse impact—one that the Corps arbitrarily refuses to assess. *State Farm Mut. Auto. Ins. Co.,*

11  463 U.S. at 43 (failure to consider an important aspect of the problem is arbitrary and

12  capricious).

13         The Corps failed to comply with the CWA in adopting NWP 48, failing to support its

14  minimal impacts determination and adopting NWP 48 with almost no regional conditions in

15  Washington contrary to evidence contradicting that determination. The Center is entitled to

16  summary judgment on their CWA claim.

17

18  [17] Wash. Dept. Ecology, *Zostera japonica management on commercial clam beds in Willapa Bay General Permit*, https://fortress.wa.gov/ecy/publications/documents/ecy070512.pdf; Wash. Dept.

19  Ecology, *Burrowing shrimp control (Imidacloprid)*, https://ecology.wa.gov/Regulations-Permits/Permits-certifications/Aquatic-pesticide-permits/Burrowing-shrimp-control-

20  Imidacloprid. While the burrowing shrimp permit has been denied by the Washington Department of Ecology, the growers' association has appealed that denial to the Pollution

21  Control Hearings Board. *See Willapa-Grays Harbor Oyster Growers Association v. Ecology*, No. P18-073 (filed Oct. 26, 2018).

22  [18] The Corps also has authority under the Rivers and Harbors Act (the other authority for its regulation of commercial shellfish aquaculture), to condition permits. *See United States v.*

23  *Alaska,* 503 U.S. 569, 570 (1992) (Pursuant to the River and Harbors Act, the Supreme Court

24  determined that the Corps has broad authority to impose conditions on permitted activity, concluding that "it would make little sense, and be inconsistent with Congress' intent, to hold

25  that the Corps legitimately may prohibit construction of a port facility, and yet to deny it the authority to seek the less drastic alternative of conditioning the permit's issuance on the State's

26  disclaimer of rights to accreted submerged lands.").

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 32
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1
2

**IV.     THE CORPS VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT.**

Even if the Corps could adopt NWP 48 as conditioned in Washington under the CWA (it

3
cannot), it failed to comply with NEPA, by relying on an inadequate Environmental Assessment

4
and Finding of No Significant Impact (FONSI) to avoid preparation of an Environmental Impact

5
Statement. As described above, *supra* pp. 17-22, while the Corps is free to tier its NEPA

6
assessments from the broader, programmatic national assessment of NWP 48 to the regional

7
NWP 48 with conditions in Washington assessment, the Corps failed to adequately disclose and

8
analyze environmental impacts at *both* stages, and is not exempt from complying with NEPA for

9
its decision to adopt NWP 48 with regional conditions for Washington State. The Center

10
informed the Corps at both the national and regional levels that an EIS was required, due to

11
significant cumulative impacts to the unique and already-threatened aquatic ecosystems in

12
Washington.[19] Yet the Corps nonetheless failed to conduct a proper NEPA analysis at either. The

13
Corps' admission in its cross-motion that no NEPA assessment was *ever* completed for NWP 48

14
in Washington entitles the Center to summary judgment, especially on the first claim for failure

15
to conduct an EIS for NWP 48. Moreover even taking the apparently non-NEPA Supplemental

16
Decision Document and the National Decision Document together, the Corps failed to

17
adequately disclose and assess the impacts from commercial shellfish aquaculture under the new

18
NWP 48 and must conduct an EIS before adopting it in Washington. *See* NWP003034-3116 and

19
*supra* n.16.

20
21

      **A.     Defendants Admit No NEPA Assessment Was Completed for NWP 48 with
          Regional Conditions in Washington.**

22
The Defendants disclaim any duty by the Corps to conduct a NEPA analysis at the

23
regional level, arguing this is only required at the National Headquarters level: the National

24
Decision Document is the only environmental assessment and fully satisfies its NEPA

25
obligations. ECF No. 43 at 15-16; ECF No. 44 at 10-14. This is an admission that the Corps

26

---

[19] NWP046263-46278; NWP048064-48404; COE128576-128593.

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 33
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   failed to comply with NEPA *at all* for NWP 48 with regional conditions in Washington, and on

2   this basis alone the Court should grant summary judgment for the Center on its NEPA claims.

3        First, if the Court agrees with the Center that the Corps was required to comply with

4   NEPA, even if it tiers to the National NEPA assessment, before adopting NWP 48 with any

5   regional conditions for Washington State, then the inquiry can end, because the Corps admits

6   that its own NEPA compliance took place solely at the national level in the National Decision

7   Document for NWP 48. *See Defenders of Wildlife*, 73 F. Supp. 2d at 1113; *supra* pp.18-20; *see*

8   *also Tenakee Springs v. Clough,* 915 F.2d 1308, 1312 (9th Cir. 1990) ("Where there are large

9   scale plans for regional development, NEPA requires both a programmatic and site-specific

10  EIS."); *High Sierra Hikers Ass'n v. Dep't of Interior*, 848 F. Supp. 2d 1036, 1051 (N.D. Cal.

11  2012) ("…the NPS has promulgated a programmatic plan for its parks with an accompanying

12  programmatic EIS. When critical decisions with regard to site-specific acts are made in the

13  future, the NPS must then prepare more detailed EIS.").

14       Second, the National EA cannot be the end of the Corp's NEPA duties, because it failed

15  to assess impacts specific to Washington State (such as the ever-expanding geoduck aquaculture

16  in Puget Sound and Hood Canal and pesticide use), and especially did not—and *could not* —

17  assess the impacts of NWP 48 with regional conditions that the division and district engineers

18  might attach in the future. *See* 82 Fed. Reg. 1860 (Jan. 6, 2017) (adopting NWPs on national

19  level); COE126119-126136 (Mar. 17, 2017 Seattle District notice of final regional conditions).

20       Because the Corps admits it did not conduct any NEPA assessment for the NWP 48

21  actually adopted in Washington, the Court should grant the Center's summary judgment on

22  Claim 1 (failure to prepare an EIS) as well as all other NEPA claims (2-6).

23       **B.    The Significance Determination Is Not Supported By Record.**

24       Defendants argue that the EA conducted by Corps Headquarters for NWP 48 (without

25  any regional conditions) is adequate and no EIS was needed. However, this National EA suffers

26  from several serious flaws**,** which are not cured by the Supplemental Decision Document. Both

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1  ignored a crucial internal cumulative impacts analysis conducted by the Seattle District staff to

2  determine the significance of the impacts from all commercial shellfish aquaculture in

3  Washington (not even including the massive expansion contemplated by the District to 72,300

4  acres as reflected in the final Supplemental Decision Document).

5      For an EIS to be required, a plaintiff need not prove significant effects will in fact occur;

6  rather once substantial questions are raised as to whether a project "may" cause significant

7  impacts, an EIS is required. ECF No. 31 at 18-19; *Ocean Advocates*, 402 F.3d at 864-65. The

8  internal cumulative impacts analysis, as well as other evidence in the record, establishes that

9  there are substantial questions as to whether NWP 48 (with its 100 year look back "new"

10 definition, almost no regional conditions, and expansion to potentially 72,300 acres) will cause

11 significant impacts to Washington's environment. ECF No. 31 at 2-6; 19-22. In its assessment of

12 impacts under NEPA, the Corps' failures started with an unreasonably narrow purpose and need

13 and refusal to consider reasonable alternatives, and continued with an inadequate evaluation of

14 direct, indirect, and cumulative impacts, using a flawed baseline, and a complete disregard of the

15 significance factors to be considered, finally concluding that there would be no significant

16 impact based entirely on the individual case-by-case review and any special mitigating

17 conditions the district engineer may add to each authorization. These flaws all add up to an

18 inadequate EA and arbitrary finding of no significant impacts. The Corps must complete an EIS

19 before adopting NWP 48 in Washington.

20      **1.    The scope of environmental assessment was unreasonably narrow.**

21      The Corps argues that the purpose and need outlined in the National EA (and not in the

22 Supplemental Decision Document, because it is not a NEPA assessment according to the Corps),

23 is reasonable. ECF No. 43 at 16-17. The Corps cites several bits and phrases from various

24 locations in the National Decision Document, mostly responsive to CWA regulations, not NEPA.

25 *Id.* at 17 (citing NWP003097 (a description of the activities pursuant to 40 C.F.R. § 230.7(b)(2),

26 a CWA regulation requiring the Corps to evaluate whether the activities in a general permit are

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 35
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1  sufficiently similar in nature); NWP003091 (public interest review factors under 33 C.F.R. §

2  320.4(a)(2)); NWP003056, 3059 ("no action" alternative and a nonsensical citation to a

3  discussion of land uses in the U.S.)). But nowhere in the National EA or Supplemental Decision

4  Document is there a clear "purpose and need" section, pursuant to the *NEPA* requirement. 40

5  C.F.R. § 1508.9(b). Further these various statements merely provide what the proposed permit

6  would do, *i.e.*, authorize discharges of dredged or fill material for commercial shellfish

7  aquaculture activities, not the *purpose and need* the action is fulfilling.

8          The only purpose the Corps seems to be suggesting is saving itself time in permitting

9  discharges by using a general permit, but given all the reliance it puts on individual case-by-case

10  evaluations by the district engineer to ensure minimal impacts, *supra* n.9, it is unclear how the

11  nationwide permit would fulfill that purpose and need, if the required individual review is

12  actually being conducted for NWP 48 authorizations. Moreover, saving time is not one of the

13  purposes of the CWA. *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d

14  1058, 1070 (9th Cir. 2010) ("an agency should always consider the views of Congress,

15  expressed, to the extent that the agency can determine them, in the agency's statutory

16  authorization to act, as well as in other congressional directives."); 33 U.S.C. § 1251 (objective

17  to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters").

18  To the extent these various phrases sprinkled throughout the National EA can be said to

19  constitute a purpose and need statement, they seem to confine the purpose and need to *adopting*

20  *NWP 48*, a classic definition of purpose and need that is improperly so narrow as to only be

21  satisfied by the proposed action alternative. *See Nat'l Parks*, 606 F.3d at 1070 ("An agency may

22  not define the objectives of its action in terms so unreasonably narrow that only one alternative

23  from among the environmentally benign ones in the agency's power would accomplish the goals

24  of the agency's action.").

25          By cabining the purpose solely to saving time through a nationwide permit authorizing

26  essentially unlimited commercial shellfish aquaculture, the Corps sidestepped its statutory duty

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 36
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   to meaningfully assess all alternatives, including the no action alternative of not authorizing

2   commercial shellfish aquaculture through a general permit, or restricting the activities included

3   under the NWP. *See Se. Alaska Conservation Council v. Fed. Highway Admin.*, 649 F.3d 1050,

4   1057 (9th Cir. 2011) ("Informed and meaningful consideration of alternatives—including the no

5   action alternative—is thus an integral part of the statutory scheme."). This is revealed by the

6   Corps' statement that the "no action" alternative in the National EA was determined not to

7   "achieve the goals of the NWP 48" (as opposed to the goals of the *CWA*). ECF No. 43 at 17. The

8   National EA's other "alternatives" include "National Modification Alternatives" which merely

9   states that NWP 48 could have had different terms and conditions, but does not state what they

10  are, or analyze the difference in impacts from the new terms of the Corps' proposed 2017

11  version. NWP003057. The Corps' "Regional Modification Alternatives" again just states that

12  divisions and districts can and should add regional conditions, or not use NWP 48 at all, to

13  ensure minimal cumulative impacts, and must analyze the cumulative impacts of NWPs in their

14  regions. *Id.* This is not a NEPA alternative, as it does not state *what* the alternative is at all. It

15  does, however, again illustrate why NEPA documentation is required at the regional level in

16  addition to the national level, and the Corps essentially admits as much. *See* ECF No. 43 at 18

17  (the NWP was determined to be the best approach but did not foreclose regional and case-

18  specific alternatives). Finally, the Corps is counting as an "alternative" the case-specific on-site

19  modifications that a district engineer may make during individual authorization review.

20  NWP003058. This reliance on post-issuance, case-by-case review is not an *alternative* to NWP

21  48; it is a feature of NWP 48. *Supra* n.9.

22      The Supplemental Decision Document, which should have included a NEPA assessment

23  for regional impacts of adopting NWP 48 with regional conditions, included no purpose and

24  need statement. ECF No. 31 at 22-23. However, the Supplemental document *did* include an

25  Alternatives section, albeit inadequate (*see id.* at 23-24), begging the question why, if it was not

26

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 37
CASE NO. 2:17-CV-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

a NEPA analysis, did it consider alternatives.[20] Because the purpose and need and alternatives, the scope of the NEPA review, were seriously flawed and/or non-existent in the Corps' NEPA documentation, the Corps' determination of impacts was arbitrary and capricious and does not comply with the procedures required by NEPA. 5 U.S.C. § 706(2)(a).

> **2.      The significance factors of "context" and "intensity" were not addressed.**

The Corps ignores, in its Decision Documents and its motion, the requirement under NEPA for the action agency to evaluate the "context" and "intensity," or significance factors, of its proposed action. 40 C.F.R. § 1508.27; ECF No. 31 at 21. The PCSGA cites 40 C.F.R. § 1508.27, but points to no consideration of these factors in the Corps' public NEPA documentation. ECF No. 44 at 10. Indeed, they were never considered in a public NEPA document, at the national or regional level. Tellingly, these significance factors *were* evaluated in the internal cumulative impacts analysis by the Seattle District (again, the proper place for a site-specific or regional NEPA assessment to be conducted), but never saw the light of day. COE125682-125685; ECF No. 31 at 20-21. This failure violated NEPA.

Both the Corps and PCSGA argue that the Center cannot rely on the internal cumulative impact analysis in general, but this is self-serving and not the law. ECF No. 43 at 16 n.13; ECF No. 44 at 20. The Court may rely on any evidence in the record, *i.e.* before the agency, to determine whether the agency made a rational connection between the facts found and the choice made. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43; *Wash. Toxics Coal. v. Dep't of Interior*, 457 F. Supp. 2d 1158, 1182-1200 (W.D. Wash. 2006) (relying on agency correspondence and internal critiques to conclude decision was arbitrary and capricious and finding NEPA violations); *Native Village of Point Hope v. Jewell*, 740 F.3d 489, 499-505 (9th Cir. 2014) (relying heavily on internal emails and "draft scenario[s]" to find agency's environmental impact

---

[20] The CWA regulations state that a consideration of alternatives is not directly applicable to general permits. 33 C.F.R. § 230.7.

1   statement violated NEPA). PCSGA bends over backwards trying to discredit the internal

2   cumulative impacts analysis, but the PCSGA's arguments as to the value of the draft analysis fail

3   for several reasons. First, unlike the effects determinations in either the National or Supplemental

4   Decision Documents, it actually evaluates the significance factors of context and intensity.

5   COE125682-125685. Second, it is far more detailed and accurate than any public cumulative

6   impacts analysis from the Corps regarding NWP 48. *Compare* COE125584-125699 (116-page

7   detailed analysis of specific impacts of commercial shellfish aquaculture in Washington), *with*

8   NWP003074-3085 (eleven pages that mentions shellfish only once) *and* COE127582-127593

9   (eleven pages of cumulative impacts of shellfish aquaculture in Washington that the Corps

10  argues is not to be considered for NEPA compliance). Third, it references *dozens* of studies

11  apparently ignored in the final Supplemental Decision Document and National Decision

12  Document. *Compare* COE125696-125699 *with* COE127600-605 *and* NWP003108-3116. Fourth,

13  it did not "fail to account for the conditions associated with NWP 48" but rather finally

14  acknowledged that the general conditions for NWPs are *not* generally applied to reduce impacts

15  from shellfish aquaculture. COE125589. The analysis also assumed no regional conditions

16  would be applied to NWP 48, which is also reasonable because the Corps removed regional

17  general conditions 10 and 14 from application to NWP 48 that would have reigned in some of

18  the impacts to eelgrass and forage fish, and attached only one NWP 48-specific condition ("The

19  commercial harvest of clams by means of hydraulic escalator harvester equipment is not

20  authorized by NWP"). COE126119-136 (and the analysis was conducted to determine what

21  conditions should be attached). Fifth, as the March 6, 2017 meeting notes make clear (held

22  eleven days before the Corps publically announced its final regional NWP conditions), this

23  internal cumulative impact analysis was "a NEPA-level analysis." COE125856. Indeed, this

24  cumulative impacts analysis, albeit never polished or released to the public, was exactly the type

25

26

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 39
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1  of "NEPA-level analysis" that is missing from all of the Corps' public NEPA documentation,

2  and also pursuant to § 404(b)(1) requirements, COE125586.[21] <u>Finally</u>, the offhand comment in a

3  March 7, 2017 email that the draft cumulative impact analysis was "nonsense in its current

4  version" reveals nothing about the scientific accuracy of the analysis, and may instead refer to

5  the number of edits and revisions from all the various reviewers. *See* COE125700 (review

6  schedule for 6-8 other Corps staff before February 17, 2017). As the meeting notes reflect, the

7  Corps did not use this detailed cumulative impacts analysis not because it is inaccurate, but

8  because it was "NEPA-level" and the Seattle District determined it need not comply with NEPA

9  for its NWP 48 decision. COE125856.

10                **3.       The direct, indirect, and cumulative impacts were ignored.**

11           Despite the evidence of harmful impacts from unchecked and expanding industrial

12  shellfish aquaculture in the record, including the detailed internal cumulative impacts analysis,

13  the Corps ignored direct, indirect, and cumulative effects in both its National EA and

14  Supplemental Decision Document. ECF No. 31 at 26-29.

15           The Corps starts its analysis from an improper baseline by assuming the full extent of

16  impacts from all permitting under 2012 NWP 48 as the existing and continuing impacts to the

17  environment. ECF No. 31 at 25-26. The Corps has moved the goalposts to include as "existing"

18  more and more industrial commercial shellfish aquaculture since the first NWP 48 in 2007, but it

19  cannot start its analysis of impacts by assuming "the existence of the very plan being proposed."

20  *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024 (9th Cir. 2008). The Corps points back

21  to the National Decision Document and its "no action" alternative, which it claims considered a

22  _____

23  [21] Withholding this information from the public, and indeed not allowing the public to comment
    on the Supplemental Decision Document or its vastly different information than the National

24  Decision Document (such as the difference in estimated impacted acreage between just over
    50,000 and 72,300), violated NEPA's public participation requirement. ECF No. 31 at 23-24. It

25  is again unclear why the Corps would even argue that the Seattle District complied with this
    requirement, when it also argues that NEPA was unnecessary at that level, and completed in the

26  National Decision Document. ECF No. 43 at 19-20.

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 40
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

proper baseline against which to measure impacts, but the cited pages, NWP003055-56, do not analyze the likely baseline environment without NWP 48 at all.

The Corps argues that it considered the pesticide impacts of commercial shellfish aquaculture operations by pointing to an exceedingly vague sentence in the National Decision Document. ECF No. 43 at 20. Notably, in its brief the Corps does not seem to dispute that it could condition NWP 48 regarding the use of pesticides, *id.* ("the district can request that the division engineer add a regional condition to this NWP"), but that here it concluded those pesticides would have only minimal cumulative impacts.[22] However, there is *no* analysis in the National or Supplemental Decision Documents of how the use of pesticides, an indirect impact of NWP 48-authorized activities, might contribute to the cumulative impact to the aquatic resources in Washington. *See* NWP003077 (stating merely that "[a] variety of pollutants, including pesticides, might be released into the environment during the operation and maintenance of [NWP 48] activities."); COE127555, 127559 (stating only that Corps does not have authority to permit use of pesticides, no evaluation of their impact).

The Corps' argument that it adequately assessed all direct, indirect, and cumulative NEPA impacts follows a "trust us, we don't need to show our work" mentality. *See* ECF No. 43 at 21-22. The Corps does not address its failure to explain its deviation from the analysis and conclusions in its internal cumulative impacts analysis, and that explanation is nowhere to be found in the decision documents. And again the Corps relies on its later, individual-level review for the hundreds or thousands of aquaculture operations in Washington to ensure minimal cumulative impacts. *Id.* at 21.

Importantly, the Corps' reliance on future assessment of each authorization, *id.* at 21-22, does show that its Finding of No Significant Impacts was predicated on these later mitigation measures. Despite the Corps' suggesting otherwise, the significance determination here is plainly

---

[22] PCSGA argues that the Corps lacks authority to condition NWP 48 regarding the use of pesticides. ECF NO. 44 at 22-23.

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 41
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    a "mitigated FONSI," because the Corps (1) acknowledges impacts, and (2) says they will be

2    mitigated later with additional conditions (although it is unclear what those conditions will be).

3    *Id.* at 19 n.15. Thus the Corps is incorrect and flatly contrary to the record when it states that it

4    did not rely on mitigation here; at every turn, throughout both decision documents, impacts to

5    wildlife, water quality, biodiversity, and all other aspects of the environment, are discounted or

6    dismissed through reference to the regional conditions (National level) and district engineer's

7    ability to do case-by-case review and attach any additional conditions. *See supra* n.9, n.12.

8         As a "mitigated FONSI," under NEPA the Corps is obliged to disclose the mitigation it

9    intends to use, developed to a reasonable degree, and analyze their efficacy *at the time the permit*

10   *is issued. Nat'l Parks & Conservation Ass'n v.Babbitt*, 241 F.3d 722, 733-34 (9th Cir. 2001);

11   *Wyoming Outdoor Council*, 351 F. Supp. 2d at 1250; *Oregon Nat. Desert Ass'n v. Singleton*, 47

12   F. Supp. 2d 1182, 1193 (D. Or. 1998). Accordingly the Corps' claim that it need not develop its

13   mitigation plan or disclose mitigation measures in the EA rings hollow: the permit has issued.

14   Moreover, this is the *third* iteration of the NWP 48, showing even more reason that, by this point

15   the Corps should have developed its mitigation measures and be able to evaluate their efficacy.

16   ECF No. 43 at n.15. Its failure to do so violated NEPA.

17        The internal cumulative impacts analysis found many direct, indirect, and cumulative

18   impacts, impacts that were ignored in the Decision Documents. *See* COE125635-37 (summary of

19   shellfish activity effects on habitats). First, it found that all ground-based shellfish activities

20   result in a "net loss" in eelgrass, and that impacts to eelgrass in fallow areas (never to be

21   considered "new" under NWP 48 and thus subject to the half acre restriction) should however be

22   considered new impacts relative to the baseline. COE125632, 125642. The internal analysis

23   further found that shellfish activities result in a change to the composition of the native substrate,

24   and those operations that use racks, bags, nets, and PVC tubes "result in an altered substrate that

25   is intermittently or more broadly surfaced with plastic." COE125631. Further, the "regular

26   graveling" or frosting, associated with some shellfish culture can "result in shifts in the

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 42
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

composition of the benthic community" and the changes in sediment chemistry due to "nutrient enhancement" (*i.e.*, shellfish waste), can "result in decreased benthic community abundance and diversity for some culture methods." COE125633. Microplastics are also discussed, COE125634, as are negative effects to forage fish spawning habitat are also discussed, COE125686-91. The analysis found that shellfish growers are "in direct competition with eelgrass and directly affect it" and given the losses in eelgrass populations to date, additional losses are as permitted under NWP 48 would be *significant*. COE125680-686 ("Given the magnitude of the impacts in acreage, the importance of eelgrass to the marine ecosystem, and the scale of the aquaculture impacts relative to other stressors, the impacts are considered significant.").

This analysis, in addition to other evidence in the record, ECF No. 31 at 1-6 and *supra* pp. 6-8, belie the Corps' argument that it adequately considered direct, indirect, and cumulative impacts in its Decision Documents, and show its decision to forgo an EIS was arbitrary and capricious. *Ocean Advocates,* 402 F.3d at 864 ("conclusory assertions that an activity will have only an insignificant impact on the environment" are insufficient); *Preserve Our Island v. U.S. Army Corps of Engineers*, C08-1353RSM, 2009 WL 2511953 (W.D. Wash. Aug. 13, 2009) (EIS required for construction of barge-loading facility on Maury Island in Puget Sound). Accordingly, the Court should grant the Center's motion for summary judgment on all NEPA claims and deny the cross-motions.

## V.      THE CORPS VIOLATED THE ENDANGERED SPECIES ACT.

Defendants go to some length to overcomplicate the issue. The issue is simple, but of high importance to the threatened and endangered species which must compete with and are adversely affected by commercial shellfish aquaculture in Washington. COE134134-134340; COE134755-134928. The Corps is not an expert on protecting ESA species, and it violated the ESA by refusing to consult the expert wildlife agencies on its decision to adopt 2017 NWP 48. The Corps does not dispute that the action it took (*i.e.*, deciding to adopt NWP 48 in

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

Washington) is different than the action on which it previously consulted with NMFS and FWS in 2016, but it argues that its failure to reinitiate consultation is nonetheless still lawful. The question for the Court boils down this: whether it is lawful for the Corps to take a new wide-ranging programmatic approval action without completing comprehensive Section 7 consultation on that particular action, and instead deferring to later, piecemeal consultations on individual authorizations. This is not lawful agency action, and the Court should therefore grant summary judgment for the Center and deny the Corps' and PCSGA's motions.

### A.      ESA Requires Comprehensive Consultation On Whole Action That May Affect Listed Species, Not Deferral to Piecemeal Individual Level.

The Corps and PCSGA are fundamentally wrong that the Corps can take an action without consulting on that entire action under ESA Section 7. 16 U.S.C. § 1536(a)(2). Deferral to later, piecemeal and case-by-case consultations does not satisfy the Corps' duty to ensure its actions will not jeopardize the existence of listed species at the outset, *before* taking the action at issue. *See* ECF No. 31 at 39. Defendants' position is contrary to the Ninth Circuit's warning in *Cottonwood Envtl. Law Ctr.* that "project-specific consultations do not include a unit-wide analysis comparable in scope and scale to consultation at the programmatic level." 789 F.3d at 1082 ; *see also All. for the Wild Rockies v. Krueger*, 950 F. Supp. 2d 1196, 1200 (D. Mont. 2013), *aff'd sub nom. All. for the Wild Rockies v. Christensen*, 663 F. App'x 515 (9th Cir. 2016) ("The agencies cannot shift this analysis to the project level."). The PCSGA baldly states that "the ESA does not require a coterminous Section 7 consultation to be performed on each version of every NWP," without citation to any supporting authority. ECF No. 44 at 31. This is because the authority is squarely against PCSGA and the Corps on this question. *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988) (explaining that "the ESA requires the [BiOp] to analyze the effect of the *entire* agency action.") (emphasis in original); *id.* at 1457-58 (instructing that "biological opinions must be *coextensive* with the agency action") (emphasis added).

Contrary to the Defendants' position here, the ESA requires that consultation be done "at

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 44
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

the earliest possible time," 50 C.F.R. § 402.14(a), and cannot be put off to later-stage approvals.

*Conner*, 848 F.2d at 1454 (holding that agency could not put off biological opinion until later

stage of oil and gas lease approvals, since it is "critical that ESA review occur early in the

process to avoid piecemeal chipping away of habitat."); *Lane Cty. Audubon Soc. v. Jamison*, 958

F.2d 290, 294 (9th Cir. 1992) (holding that BLM required to submit its "Jamison strategy" for

selecting land for logging for consultation with FWS, because it was an "action" that "may

affect" the spotted owl, and thus consultation required on strategy before it could be

implemented through individual timber sales); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l*

*Marine Fisheries Serv*., 482 F. Supp. 1248, 1267 (W.D. Wash. 2006) ("In adopting a

wholesale deferral of analysis to the project level, it cannot be said that the agencies satisfied

their burden to 'make certain' that the proposed action is not likely to jeopardize listed species or

destroy or adversely modify critical habitat.").

      Courts have repeatedly held that piecemeal ESA consultations are not sufficient,

including because they logically ignore cumulative impacts. *See infra.* These cases include ESA

duties for the adoption of NWPs like the one adopted here in Washington. *Natl. Wildlife Fedn. v.*

*Brownlee*, 402 F. Supp. 2d 1, 10 (D.D.C. 2005) ("Similarly in our case, overall consultation for

the NWPs is necessary to avoid piece-meal destruction of panther habitat through failure to make

a cumulative analysis of the program as a whole."); 50 C.F.R. § 402.02 (defining "action" as "all

activities or programs of any kind authorized, funded, or carried out, in whole or in part, by

Federal agencies…includ[ing]…the granting of …permits."). Agencies must consult on the

whole action taken, including all its cumulative and foreseeable impacts, which simply cannot be

achieved through piecemeal individual consultations. *Nat. Res. Def. Council v. Rodgers,* 381 F.

Supp. 2d 1212, 1239 (E.D. Cal. 2005) ("ESA mandates that biological opinions must be

coextensive with the action authorized . . . and does not permit incremental-step consultations.");

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 930 (9th Cir. 2008)

(instructing that "the proper baseline analysis is not the proportional share of responsibility the

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 45
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1  federal agency bears for the decline in the species, but what jeopardy might result from the

2  agency's proposed actions *in the present and future human and natural contexts*") (emphasis in

3  original).

4     The Ninth Circuit in *National Wildlife Federation* held that requiring the agency consider

5  the impacts of their action in their *actual* context is necessary to avoid an approach where "a

6  listed species could be gradually destroyed, so long as each step on the path to destruction is

7  sufficiently modest. This type of slow slide into oblivion is one the very ills the ESA seeks to

8  prevent." *Id.* at 930. *See also Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 179 (D.D.C.

9  2004) (alteration in original) (after reviewing biological opinion for Army Corps dredge-and-fill

10  permit, finding "FWS may not disregard reasonably foreseeable projects 'with a relatively small

11  area of impact but that carr[y] a high risk of degradation when multiplied by many projects and

12  continued over a long time period.'"); *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 522-525

13  (9th Cir. 2010) (holding that the scope of consultations is crucial because the ESA requires

14  analysis of the *entire* agency action, and finding agency and Service were required to consult on

15  the whole comprehensive action, the operation of a fish hatchery, and the decision to limit

16  consultation to a five-year term was arbitrary and capricious).

17     Thus, the adoption of NWP 48 in Washington is an action that triggers Section 7

18  consultation, and this consultation must match the actual action taken and examine all future and

19  cumulative impacts. The Corps decision to defer consultation down the road to piecemeal

20  individual authorizations violated the ESA.

21    **B.**  **Corps Violated the ESA By Not Consulting on 2017 NWP 48 with Regional**
22       **Conditions in Washington.**

23     The Corps is wrong that the path it took here is lawful. ECF No. 43 at 22-25. Rather, by

24  previously consulting on a certain amount and type of commercial shellfish permitting, then

25  adopting a different, expanded, and less-protective permit, but nonetheless forgoing

26  comprehensive consultation and deferring instead to piecemeal consultations at the authorization

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 46
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    stage, the Corps violated the ESA.

2        1.    **The Corps already made "may affect" determination for commercial
             shellfish permitting.**

3

4        The Corps already made a "may affect" determination for commercial shellfish

5    aquaculture permitting in Washington. While the Corps argues now that it found "no effect" for

6    its decision to approve NWP 48 for use in Washington, ECF No. 43 at 22-23,[23] this is belied by

7    its formal consultation with NMFS and FWS just months earlier. COE134134-134340;

8    COE134516-1347545; COE134755-134928. As an initial matter, this supposed "no effect"

9    determination for NWP 48 appears to be a post-hoc rationalization by the Corps, given the

10   Seattle District's history of consulting with NMFS and FWS on its commercial shellfish

     permitting since the first NWP 48 in 2007.[24]

11

12       The Seattle District has found that its commercial shellfish permitting under NWP 48

13   "may affect" listed species since the first NWP 48 was issued, and has already gone through

14   several rounds of formal and informal consultation with the Services. COE132801-998;

15   COE133063-173; COE134755-928; COE134516-754. Indeed, at the first NWP 48 issuance, the

16   Seattle District found it "may affect" ESA-listed species in Washington and submitted a

17   programmatic biological assessment (PBA) to the Services in 2007, and NMFS and FWS each

18   completed biological opinions in 2009. COE134144. When the 2012 NWP 48 expanded its

19   coverage to include new operations, beyond the footprint of active acreage in 2007, the ESA

20   coverage for 2007 NWP 48 expired and updated ESA consultation was "therefore required to

21   ─────────────────

     [23] This is yet another acknowledgment that the decision to adopt NWP 48 with regional
22   conditions in Washington was a standalone agency action.

23   [24] The page the Corps' cites from its Supplemental Decision Document that supposedly contains
     this "no effect" determination says merely that the Chief Counsel for the Corps (Headquarters)
24   sent a letter to the Services back in 2012 stating a legal position that its issuance of all NWPs
     would have "no effect" on listed species because the Corps would require piecemeal
25   consultations on each authorization, and concluding that "[t]he principles discussed in [that 2012
     letter] apply to the 2017 NWPs as well." COE127560. At best, this is less than a clear statement
26   of any determination by the Seattle District that its adoption of NWP 48 in Washington would
     have "no effect" on listed species.

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

comply with the ESA." COE134145; COE133619; *see also P. Coast Shellfish Growers Assn. v. U.S. Army Corps of Engineers*, C16-193RAJ, 2016 WL 3000259, at *2 (W.D. Wash. May 25, 2016) ("The Seattle District of the Corps decided to go through a programmatic process with the Services after receiving more than 1000 permit applications for shellfish activities since 2007."); *id.* at *2 n.1 (after the Corps issued a new set of NWPs in March 2012, which superseded the 2007 NWPs, it and the Services determined in 2013 that the prior programmatic consultation covered only activities under the 2007 version of NWP 48).

On the national level, after an initial biological opinion finding jeopardy for all NWPs, COE133303, NMFS issued a final biological opinion in 2014, which expressly acknowledged and relied upon a second step consultation at the regional level. COE134145. After adopting the expanded 2012 NWP 48, the Seattle District started a comprehensive, programmatic consultation in 2014, after realizing its prior coverage had expired. *Id.* Accordingly, the Seattle District prepared a new PBA in 2014, finalized in 2015, for its shellfish permitting, this time including all types and looking at impacts beyond the five-year general permit, out to 20 years. *Id.* The Seattle District has thus been operating *for over a decade* under the correct reality that commercial shellfish permitting under NWP 48 "may affect" ESA-listed species, and requires consultation with the Services under Section 7.

Indeed, in making its argument that the Seattle District (as opposed to the Corps Headquarters) suddenly did an about-face and found "no effect" from the adoption of NWP 48, the Corps *admits* in a footnote that "the Corps acknowledged in its correspondence initiating consultation with NMFS prior to obtaining the Programmatic Biological Opinion that its issuance of both individual permits and the issuance of verification letters under general permits 'may affect' ESA-listed species." ECF No. 43 at 23 n.16. The Corps tries to downplay this admission as "of no moment" but it is actually of *great* moment: it is the Corps' express admission and acknowledgement that its shellfish aquaculture permitting (which is overwhelmingly commercial and permitted under NWP 48 since 2007) *may affect* listed species.

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 48
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    Throughout its Supplemental Decision Document the Corps states that *all* commercial

2    shellfish aquaculture throughout Washington takes place in areas that are home to listed species

3    (or designated critical habitat) and therefore will require a PCN under General Condition 18.

4    COE127534. The undisputed geographic overlap of this commercial activity (which has

5    documented detrimental effects, ECF No. 31 at 2-6; *supra* pp. 6-8), with ESA-listed species

6    easily meets the very low "may affect" threshold. *Karuk Tribe of California v. U.S. Forest Serv.*,

7    681 F.3d 1006, 1027 (9th Cir. 2012) (*en banc*); *see also W. Watersheds Project*, 632 F.3d at 496.

8    "[A]ctions that have *any chance* of affecting listed species or critical habitat—even if it is later

9    determined that the actions are 'not likely' to do so—require *at least some* consultation under the

10   ESA." *Karuk Tribe*, 681 F.3d at 1027 (emphases added). Further: "*Any possible effect*, whether

11   beneficial, benign, adverse or of an undetermined character triggers the requirement." *Id.*

12   (*quoting Lockyer*, 575 F.3d at 1018-19) (quotation omitted) (emphasis in *Lockyer*). The Corps'

13   existing "may affect" determination for commercial shellfish aquaculture, leading to formal

14   programmatic consultation and several "likely to adversely affect" determinations by NMFS, is

15   not suddenly superseded by this supposed and buried "no effect" determination from the Corps'

16   Headquarters for the national re-issuance of the NWPs.

17   To the extent the Corps and PCSGA argue that the 2016 programmatic consultation is

18   irrelevant because it examined a broader set of Corps' shellfish permitting than just commercial

19   aquaculture, this is a red herring. ECF No. 43 at 24; ECF No. 44 at 30-31. While all parties are in

20   agreement that the 2016 consultation did not cover all the commercial shellfish aquaculture that

21   the Corps ultimately included in its 2017 NWP 48, it is still highly relevant here because it shows

22   that the Corps understands that its permitting is an action that is subject to the ESA and "may

23   affect" listed species. *See supra.* Further, the programmatic consultation also found that several

24   fish species and their critical habitat were likely adversely affected, by *less* acreage with *more*

25   protections than the challenged action. COE134516-1347545; COE134755-134928.

26   Moreover, as the Corps itself recognized in its 2015 PBA for the consultation, "[t]he

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 49
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   *majority of permitting actions* authorizing shellfish activity using the PBA are expected to be for

2   *commercial aquaculture purposes*." COE134186 (emphasis added). So Defendants' idea that the

3   prior consultation covered markedly different activities is misleading. While the 2016

4   consultation only evaluated about half the acreage estimated in 2017 NWP 48, and did not

5   evaluate that amount of acreage without the conservation measures, it was still overwhelmingly

6   focused on *commercial* shellfish aquaculture, almost all of which is authorized under NWP 48 in

7   Washington. Because the Corps has already (correctly) determined that commercial shellfish

8   aquaculture in Washington "may affect" listed species, the only question is whether it must

9   reinitiate consultation due to the differences in 2017 NWP 48 from the action evaluated in the

10  2016 programmatic consultation. It must.

11              **2.    Any "no effect" determination for 2017 NWP 48 is unlawful.**

12          Regardless of what the Corps calls it, it failed to consult on 2017 NWP 48. But a "no

13  effect" determination for the adoption of NWP 48, based on individual consultations later at the

14  authorization level, is contrary to settled ESA law and arbitrary and capricious given the Corps'

15  own statements, actions, and the evidence before the agency.

16          The adoption of a NWP is a federal action triggering the ESA Section 7 consultation

17  requirement. *See Natl. Wildlife Fedn.*, 402 F. Supp. 2d at 10. The ESA gives agencies a "clear

18  mandate that a comprehensive biological opinion…be completed before initiation of the agency

19  action." *Conner*, 848 F.2d at 1455. In *Conner*, the agency argued, just like the Corps here, that it

20  could satisfy its ESA duties by including a provision in each oil and gas lease on federal land

21  stipulating that ESA consultation would occur for each individual activity, and that some

22  restrictions or even prohibitions may be attached to avoid violating the ESA. *Id.* at 1455. The

23  agency there argued that deferring to individual consultations for each lease exempted it from the

24  mandate to conduct a comprehensive consultation. *Id.* The Corps' argument that it is exempt

25  from a comprehensive consultation on NWP 48 now, because General Condition 18 requires

26  individual ESA consultations for each authorization, is virtually identical. As in *Conner*, this

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 50
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   argument must fail based on the plain language of the ESA. *Id.* ("We reject this invitation to

2   amend the ESA. That it is the role of Congress, not the courts…" and "incremental-step

3   consultation does not vitiate the ESA requirement that the Secretary prepare a comprehensive

4   biological opinion.").

5          Indeed, another court determined that the Corps' exact legal position here, that issuance

6   of a NWP does not require immediate consultation, but that consultation can be deferred to the

7   individual authorization stage, is wrong under the ESA, its regulations, and the law of the Ninth

8   Circuit. *Natl. Wildlife Fed'n*, 402 F. Supp. 2d at 10. The court in *National Wildlife Federation*

9   found that the Corps' argument that it could individually consult for each specific dredge-and-fill

10  activity authorized under four NWPs to have "several serious problems" because the ESA

11  regulations are clear that while a consultation may include similar individual actions, "[t]his does

12  not relieve the Federal agency of the requirements for considering the effects of the action *as a*

13  *whole*." *Id.* (emphasis added) (citing *Lane Cty. Audubon Soc.*, 958 F.2d at 294; 50 C.F.R. §

14  402.14(c).

15         As stated above, the Corps admits it found shellfish aquaculture "may affect" listed

16  species. Any sudden change to a "no effect" determination for NWP 48 adoption in Washington

17  would be classically arbitrary and capricious—contrary to the record evidence before the agency,

18  with a failure to rationally connect the conclusion to the facts found.[25] *State Farm Mut. Auto. Ins.*

19  *Co.*, 463 U.S. at 43; *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 632 F. Supp. 2d 968,

20

21  [25] PCSGA argues that the Center is barred from obtaining summary judgment on the lack of
22  consultation prior to adopting NWP 48 in Washington because, according to Intervenors, the
    Center did not argue the supposed "no effect" determination was arbitrary. ECF No. 44 at 29.
23  They are wrong—the Center's ESA claim is squarely challenging the Corps' failure to consult
    prior to adopting NWP 48 in Washington. The Center's amended complaint acknowledged the
24  Corps' national "no effect" position, and alleged that it is arbitrary and capricious, ECF No. 9 ¶¶
    158-160, and specifically alleged it again in the ESA claim, which broadly challenges adoption
25  of NWP 48 without Section 7 consultation first (Claim 9), *id.* ¶ 229. Further, the Corps and
    PCSGA move for summary judgment on the reasonableness of this supposed "no effect"
26  determination, so the Center has the right to respond in opposition.

981–82 (N.D. Cal. 2009) (current rule "may affect" for same reasons as past iterations of rule "may affect" and agency's argument that the programmatic nature of the rule means "no effect" rejected); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011) (BLM's "no effect" finding and failure to consult arbitrary and capricious because agency's own staff advised that action "may affect" listed species).

In fact, even the Corps Headquarters realized that its new plan to forgo comprehensive consultation on NWPs at the national level and just call it "no effect" was likely contrary to law and might be struck down by a court. *See* NWP036481-82.[26] As laid out above, the Corps Seattle District has acknowledged throughout the years that commercial shellfish permitting under NWP 48 "may affect" listed species, and has consulted on that permit. *Supra* pp. 46-49. The whole purpose of the 2016 programmatic consultation was to avoid doing piecemeal, individual consultations. And this is for good reason: as noted above these piecemeal consultations fail to capture the full cumulative impacts of the commercial shellfish aquaculture industry in Washington. *Conner*, 848 F.2d at 1455; *Natl. Wildlife Fedn.*, 402 F. Supp. 2d at 10. Going back to this method of Section 7 compliance would be contrary to law, and thus re-initiation of programmatic consultation is required.

---

[26] Email from David Olson, Corps Headquarters, to Margaret Gaffney-Smith, Corps Headquarters, dated Jan. 17, 2014 (rather than reinitiate consultation every five years, recommending the Corps "make a 'no effect' determination for the proposed and final 2017 NWPs."). Also recommending that Headquarters direct districts to determine if local procedures needed to facilitate ESA Section 7 compliance, because "[r]equiring local coordination might make a national 'no effect' determination more legally defensible." *Id.* Finally, stating that the Corps "could continue to make the national 'no effect' determination for each NWP reissuance until it is challenged in federal court and a judge rules against the Corps. If we lose in federal court, then we would start doing the national programmatic consultations again." *Id.* The Corps here also recognized that it could not make a "no effect" determination until the 2012 NWPs expired, because of the "current jeopardy biological opinion from NMFS." *Id.* It is defies logic, law, and sound science how the Corps could go from a *jeopardy* opinion to finding "no effect" from the NWPs.

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 52
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

3.      **Re-initiation was required before the Corps adopted 2017 NWP 48 for Washington.**

Here, re-initiation is required because the actual 2017 NWP 48 as adopted exceeds the existing programmatic consultation from 2016. Not one but several ESA re-initiation triggers were met. ECF No. 31 at 29-40. The 2016 consultation covered a certain type and amount of commercial shellfish permitting (which is overwhelmingly permitted through NWP 48, COE134147), but in 2017 the Corps adopted a commercial shellfish general permit *that changed that type and amount*, full stop. ECF No. 44 at 33 ("the consultation and the permit are not linked"); *id.* at 35 ("the 2016 Programmatic Consultation is not a consultation on NWP 48"). The Corps cannot adopt a piecemeal approach and ignore the cumulative impacts of thousands of acres of commercial shellfish aquaculture, and therefore must consult *before* it happens. *See supra* pp.44-46; 50 C.F.R. § 402.14 (cumulative effects must be evaluated).

The action here was "modified" in several ways "that causes an effect to the listed species or critical habitat that was not considered" in the prior consultation; it included "new information" that "may affect listed species or critical habitat in a manner or to an extent not previously considered;" and it disregarded the Incidental Take Statement (ITS) measures from the 2016 consultation. 50 C.F.R. § 402.16(a)-(c); ECF No. 31 at 33-39. These changes, *see ECF No. 31 at 33-39*, necessitate re-initiation of the programmatic consultation.

The Corps argues it can satisfy its ESA duties by allowing some operations to seek coverage under the 2016 programmatic consultation, and doing individual consultations on others. ECF No. 43 at 24-25. However, when individual smaller actions (such as individual NWP authorizations) are *based* on the larger action (here, the NWP 48), the Corps still has a continuing duty to reinitiate consultation on the larger action if facts change, even if individual actions might themselves trigger Section 7 consultation. *Cottonwood Envtl. L. Ctr.*, 789 F.3d at 1082, 1084-85. In *Cottonwood*, the Forest Service promulgated a management plan for the Canada Lynx on 18 National Forests (called the Lynx Amendments) and completed a consultation, but failed to reinitiate consultation after changes to the lynx's critical habitat. 789

1   F.3d at 1078-79. The Ninth Circuit, in holding that plaintiffs did not need to challenge individual

2   projects, explained that while the agency may initiate Section 7 consultation on individual

3   projects, it bases its analysis of those projects on the broader action (Lynx Amendments) and its

4   corresponding biological opinion. *Id.* at 1082. "Thus, even though individual projects may

5   trigger Section 7 scrutiny, that scrutiny is dependent, in large part, on the [broader action]" and

6   its biological opinion, which was completed *before* the information changed, requires re-

7   initiation. *Id.* The exact same is true here.

8          The Corps next argues that it does not have to re-initiate because the conditions for re-

9   initiation have not been triggered, ECF No. 43 at 25-27, but ignores that its prior 2016

10  programmatic consultation evaluated a vastly lower magnitude of commercial shellfish

11  aquaculture than 2017 NWP 48 as adopted, and therefore it has a continuing duty to re-initiate.

12  Fundamentally, the Corps cannot hope to capture and meaningfully consider the cumulative

13  impacts of commercial shellfish aquaculture under NWP 48 by allowing some operations to seek

14  ESA coverage under the 2016 consultation (which did not examine the *whole* 2017 NWP 48) and

15  others to do individual consultations. *Natl. Wildlife Fedn.*, 402 F. Supp. 2d at 10. This action is

16  ripe without challenges to specific project verifications, contrary to the Corps' arguments, ECF

17  No. 43 at 26-27, because the Corps has completed its adoption of NWP 48 with regional

18  conditions in Washington, and refused to reinitiate Section 7 consultation despite changing terms

19  and magnitude of the action. *See Cottonwood Envtl. L. Ctr.,* 789 F.3d at 1083-84.

20          *Acreage Changes*

21          The Corps cannot and does not dispute that the acreage that may be permitted under 2017

22  NWP 48 is much larger than the acreage considered in the 2016 consultation (72,300 versus

23  38,715). ECF No. 31 at 33-34. The Corps argues, however, that the 72,300 figure that *it*

24  *estimated* in its Supplemental Decision Document adopting NWP 48 may be an overestimation

25  of the acreage that will actually be verified under the permit. ECF No. 43 at 29. This argument is

26  unavailing because the Corps still adopted a permit that could authorize that acreage, double

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 54
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

what the Corps consulted on in 2016. In *Nat. Res. Def. Council,* the agency similarly consulted on less than the full action authorized, and the reviewing court struck down this approach. 381 F. Supp. 2d at 1239. There, the Bureau of Reclamation renewed several long-term water contracts, but rather than consider the full amount of water use authorized, the consultation with FWS considered less than half of what was authorized. *Id.* at 1238. The court found that the ESA requires that *all* impacts of the agency action, both present and future, must be addressed in the consultation's jeopardy analysis. *Id.* at 1239. The court was not swayed by the agency's argument, like the Corps' arguments here, that delivery of all the water allowed by the contracts may not happen, and could be analyzed later on. *Id.* Here, this Court should similarly not be swayed by the Corps' post-hoc argument[27]—that these acres may or may not all be covered with commercial shellfish aquaculture—because this is the full extent of the permit the Corps issued, and like the Bureau's water contracts in *Nat. Res. Def. Council*, the consultation must be co-extensive with the agency action taken.

Furthermore, whether or not the full 72,300 acres estimated in the Supplemental Decision Document are authorized under 2017 NWP 48, that document also stated that a full *49,575 acres* were authorized under the last NWP 48 from 2012-2017. COE127592. Just based on that number alone, the 2016 programmatic consultation did not encompass the full extent of commercial shellfish permitting under NWP 48. Thus, the project was modified (50 C.F.R. § 402.16(a)) and this new acreage constitutes new information (*id.* § 402.16(b)) and re-initiation is warranted.

*NWP 48 Does Not Include Conservation Measures or Terms and Conditions from 2016 Consultation*

The Corps acknowledges that 2017 NWP 48 as adopted in Washington does not include the 29 conservation measures or terms and conditions from the 2016 programmatic consultation.

---

[27] The Corps offered no explanation at the time they adopted NWP 48 in Washington as to why they were not reinitiating consultation despite the significant increase in acreage estimated. COE127590-127592. Moreover, while the Corps stated its estimate of 72,300 acres may be an overestimation, it was based on various sources, including "discussion with individual shellfish operations." COE127591.

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 55
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   ECF No. 43 at 30-31; ECF No. 31 at 34-36. The Corps argues, however, that its failure to

2   include all conservation measures and terms and conditions in the permit as regional conditions

3   somehow still does *not* mean the permit was "modified." ECF No. 43 at 31. This is incorrect: a

4   permit with dozens of conservation measures is different, and more protective, than one without

5   those protection measures.

6       Even if, as the Corps claims, a "majority" of growers will elect to seek ESA coverage

7   under the 2016 biological opinions, *id.* at 30 n.22, the permit adopted is still different from the

8   action previously subject to consultation. Not only is it unclear how *many* permittees under NWP

9   48 will elect not to follow the 2016 programmatic conservation measures, that consultation

10  simply did not include consideration of shellfish aquaculture that would forgo compliance with

11  these measures. COE134764-134775. Thus, it cannot possibly have determined the full

12  cumulative impact of all NWP 48 activities in Washington, with *some* complying with the

13  conservation measures and some not. And this new information and modification "may affect"

14  listed species, because even with the application of the 29 conservation measures, NMFS *still*

15  found that commercial shellfish aquaculture was "likely to adversely affect" (the level above

16  "may affect") four fish species (canary rockfish, Hood Canal summer chum salmon, Puget

17  Sound Chinook salmon, and Southern DPS green sturgeon). COE134757. It is worth

18  underscoring that the FWS—the expert agency here, not the Corps—urged the Corps to adopt all

19  conservation measures and terms and conditions from the biological opinions as regional

20  conditions to NWP 48, *specifically to avoid re-initiation* of consultation or piecemeal individual

21  consultations. COE121689. The Corps' decision not to, without re-initiating, contrary to the

22  warning of the expert agency, violated the ESA.

23      *New v. Continuing Operations, 100-year look back*

24      The 100-year look back imposed by the Corps Headquarters results in almost no

25  operations in Washington being considered "*new*" because of the age of the industry.

26  COE125708-12; COE127592 (332 acres of 72,300 would be "new" under 2017 NWP 48); ECF

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 56
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1  No. 31 at 37. Thus, almost none of the operations authorized under 2017 NWP 48 will have to

2  comply with the protective term prohibiting impacts to more than half acre of eelgrass

3  (submerged aquatic vegetation). NWP003035.[28]

4      The Corps and PCSGA assure the Court that for any operations seeking authorization

5  under NWP 48 that choose to also get ESA coverage under the 2016 programmatic BIOPs will

6  be considered new or continuing based on the programmatic consultation definition, and not the

7  definition actually in the permit. ECF No. 43 at 32. So according to the Corps, an operation will

8  be considered "continuing" under NWP 48 but could still be considered "new" under the

9  programmatic consultation. Setting aside the feasibility of this plan,[29] it does not change the fact

10  that some operations can get coverage under NWP 48, with its 100-year look back, and *not*

11  comply with the programmatic consultation and its increased protections for lands without active

12  shellfish aquaculture as of 2007. The Corps' failure to re-initiate on this modification violated

13  the ESA.

14      *Pesticides*

15      Pesticide use by the shellfish industry, not prohibited under NWP 48, has never been

16

17  [28] Not that this would be protective enough, however, *see* COE125584-125699.

18  [29] The Corps argument begs the question of how the Corps will actually ensure that operations
    are following conservation measures and monitor/track terms and conditions. Just in terms of

19  ensuring individual operations conform to the requirements for coverage under the 2016
    programmatic biological opinion, the Corps appears to have already had problems. As of March,

20  2017, NMFS informed the Corps that of the 526 notifications from the Corps for re-
    authorizations under 2012 NWP 48 (that never went through ESA consultation), only 139 of

21  these notifications had a complete set of documents. *See* Letter from Barry Thom, NOAA
    Regional Administrator, to Colonel Buck, Seattle District Engineer (March 7, 2017), attached as

22  exhibit to van Saun Declaration, filed concurrently. *W. Watersheds Project v. Kraayenbrink*, 632

23  F.3d 472, 497 (9th Cir. 2011) (holding that courts "may consider evidence outside the
    administrative record for the limited purposes of reviewing" claims arising directly under the

24  Endangered Species Act). Further it is unclear how Corps will monitor the efficacy of any
    conditions it attaches. COE125712 (guidance from the Corps Headquarters informing the Seattle

25  District it "does not need to independently verify compliance with the conservation measures
    prior to verification since compliance with these measures, as applicable, is the applicant's

26  responsibility.").

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

evaluated as part of the cumulative impact of NWP 48 on ESA-listed species. ECF No. 31 at 38-39. The 2016 programmatic consultation did not include pesticide use by shellfish operations as the "action" evaluated. COE134769. While the PCSGA asserts that the Corps' does not have authority over the regulation of pesticides, as explained *supra*, that does not mean the Corps cannot condition NWP 48 regarding their use, and there use as part of the commercial shellfish industry in Washington is part of the action the Corps took in adopting NWP 48. *Supra* pp. 23-25.

In sum, the Corps must re-initiate consultation on the significantly modified permitting action it took in 2017, the NWP 48 as adopted in Washington, and its failure to do so violated the ESA.

## VI.     THE COURT SHOULD VACATE THE CHALLENGED PERMIT.

If the Court grants the Center's motion on one or more claims, it should vacate the permit. *See* ECF 31 at 40; ECF 9 at 15, 52-66 & 67. The Center's claims are reviewed under the standards of the Administrative Procedure Act (APA), which instructs that reviewing courts "*shall…hold unlawful and set aside agency action*, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2) (emphasis added); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case—even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason.") (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)). Agency decisions may not be inconsistent with the governing statute. 5 U.S.C. § 706(2)(A) (instructing courts to "set aside" agency action "not in accordance with law.").

Thus, vacatur and remand is the express, presumptive remedy for an agency action held contrary to law and as such, the *Defendant Corps*, not the Plaintiff Center, carry the burden to show why another result, such as remand without vacatur, is appropriate instead. *See, e.g.*,

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 58
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1    *Alliance for the Wild Rockies v. U.S. Forest Service*, -- F.3d --, 2018 WL 5316129, *12 (9th Cir.

2    October 25, 2018) (defendants had "not overcome the presumption of vacatur"); *Ctr. for Envtl.*

3    *Health v. Vilsack*, No. 15-cv-01690-JSC, 2016 WL 3383954, at *13 (N.D. Cal. June 20, 2016)

4    ("given that vacatur is the presumptive remedy for a procedural violation such as this, it is

5    Defendants' burden to show that vacatur is unwarranted"); *In re Polar Bear Endangered Species*

6    *Act Listing and § 4(d) Rule Litig.,* 818 F.Supp.2d 214, 238 (D.D.C. 2011) ("[T]he Supreme Court

7    and the D.C. Circuit have held that vacatur is the presumptive remedy for this type of

8    violation.").

9        For this reason, the Ninth Circuit has authorized remand without vacatur only in "rare" or

10    "limited" circumstances, *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir.

11    2010) ("rare circumstances"); *Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*, 806

12    F.3d 520, 532 (9th Cir. 2015) ("limited circumstances"), and only when the agency can show

13    that "equity demands" a departure from the presumptive remedy, *Pollinator Stewardship*

14    *Council*, 806 F.3d at 532 (quoting *Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392, 1405-06 (9th

15    Cir. 1995)). *See also Defenders of Wildlife v. U.S. Envtl. Prot. Agency*, 420 F.3d 946, 978 (9th

16    Cir. 2005) ("Typically, when an agency violates the Administrative Procedure Act and the

17    Endangered Species Act, we vacate the agency's action and remand to the agency to act in

18    compliance with its statutory obligations.") *rev'd on other grounds Nat'l Ass'n of Home Builders*

19    *v. Defenders of Wildlife*, 551 U.S. 644 (2007). The Ninth Circuit considers if such "rare

20    circumstances" for remand without vacatur are met by "weigh[ing] the seriousness of the

21    agency's errors against the disruptive consequences of an interim change that may itself be

22    changed." *Pollinator Stewardship Council*, 806 F.3d at 532 (internal quotation marks and

23    citation omitted).

24        Here, the Defendants have not come close to meeting their burden to show why this is the

25    "rare" case where the Court should not simply vacate the unlawful action. Federal Defendants

26

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1   make no effort at all.[30] PCSGA makes the conclusory assertion of alleged economic harm to

2   shellfish growers from vacatur. ECF No. 44 at 36. This cannot meet their burden. And

3   regardless, any allegations of economic harm are belied by the fact that growers could seek

4   individual permits, which would be more protective and transparent (with notice and comment).

5   But more importantly, regardless of speculative economic consequences, in environmental cases

6   like this one, "'vacatur is appropriate when leaving in place an agency action risks more

7   environmental harm than vacating it.'" *Alliance for the Wild Rockies*, -- F.3d --, 2018 WL

8   5316129, *12 (quoting *Pollinator Stewardship Council*, 806 F.3d at 532); *see also Ctr. for Food*

9   *Safety v. Vilsack,* 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only

10  found remand without vacatur warranted by equity concerns in limited circumstances, namely

11  serious irreparable environmental injury."). Here, where Washington's coastal ecology is at

12  issue, as well as numerous endangered species, the environmentally protective action is to vacate

13  the unlawful permit and remand for compliance with the Court's order.

14                                      **CONCLUSION**

15          For the reasons explained above, the Court should grant summary judgment on all of the

16  Center's claims and deny Defendants' cross-motions for summary judgment.

17

18  Respectfully submitted this 2nd day of November, 2018 in Portland, Oregon.

19

20                                      /s/ Amy van Saun

21                                      Amy van Saun (*pro hac vice*)
                                        George A. Kimbrell (WSB No. 36050)

22
                                        Center for Food Safety
23                                      917 SW Oak Street, Suite 300
                                        Portland, OR 97205

24

25  [30] Nor is additional briefing needed for it, as the above standards show, and the Defendants'
    requests for such briefing should be denied. This case was not bifurcated between merits and
26  remedy.

PLAINTIFFS' COMBINED OPPOSITION AND REPLY
PAGE 60
CASE NO. 2:17-cv-01209

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372

1               T: (971) 271-7372 / F: (971) 271-7374
Email: gkimbrell@centerforfoodsafety.org
2               avansaun@centerforfoodsafety.org

Center for Food Safety
917 SW Oak Street, Suite 300
Portland, OR 97205
(971) 271-7372