1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

THE COALITION TO PROTECT PUGET
SOUND HABITAT,

Case No. C16-0950RSL

9

Plaintiff,

10

v.

11

U.S. ARMY CORPS. OF ENGINEERS, *et al.*,

12

Defendants,

13

and

14

TAYLOR SHELLFISH COMPANY, INC.,

15

Intervenor - Defendant.

16

_____

17

CENTER FOR FOOD SAFETY,

Case No. 17-1209RSL

18

Plaintiff,

19

v.

ORDER VACATING NWP 48 IN
THE STATE OF WASHINGTON

20

U.S. ARMY CORPS OF ENGINEERS, *et al.*,

21

Defendants,

22

and

23

PACIFIC COAST SHELLFISH GROWERS
ASSOCIATION,

24

Intervenor - Defendant.

25

26

27

On October 10, 2019, the Court, after considering the cross-motions for summary

28

judgment filed by the parties and intervenors in the above-captioned matters as well as the

Swinomish Indian Tribal Community's submission in a related case, C18-0598RSL (Dkt. # 28), found (a) that there is insufficient evidence in the administrative record to support the U.S. Army Corps of Engineers' conclusion that the 2017 reissuance of Nationwide Permit ("NWP") 48 would have minimal individual and cumulative impacts on the aquatic environment for purposes of the Clean Water Act ("CWA") and (b) that the Corps' environmental assessment related to NWP 48 did not satisfy the requirements of the National Environmental Policy Act ("NEPA"). In issuing NWP 48, the Corps opted to interpret the "similar in nature" requirement of 33 U.S.C. § 1344(e)(1) broadly, with the result that it was virtually impossible to evaluate the impacts of "commercial shellfish aquaculture activities" in a way that captured all of the varying operations in the varying ecosystems throughout the nation. The Court found that the Corps' promise that its District Engineers would consider the impacts of the permitted activities did not satisfy the agency's obligation "to thoroughly examine the environmental impacts of permitted activities" before issuing a nationwide permit. *Ohio Valley Envtl. Coal. v. Hurst*, 604 F. Supp.2d 860, 901-02 (S.D. W.Va. 2009). The Corps' issuance of a nationwide permit, at least with respect to activities in the waters of the State of Washington, was found to be arbitrary and capricious and not in accordance with NEPA or the CWA.

Despite the statutory direction to "set aside agency action" that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the Court has discretion to leave the unlawful agency action in place while the agency corrects the identified errors or deficiencies. 5 U.S.C. § 706(2). The circumstances in which a remand without vacatur is appropriate are "rare," *Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010), or "limited," *Cal. Communities Against Toxics, v. U.S. Envtl. Prot. Agency*, 688 F.3d 989, 992 (9th

ORDER VACATING NWP 48
IN THE STATE OF WASHINGTON - 2

Cir. 2012). Because the APA creates a "presumption of vacatur" if an agency acts unlawfully, the presumption must be overcome by the party seeking remand without vacatur. *Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121-22 (9th Cir. 2018). *See also Nw. Envt'l Advocates v. U.S. Envt'l Protection Agency*, 2018 WL 6524161, at *3 (D. Ore. Dec. 12, 2018) ("Because vacatur . . . is the ordinary remedy, the Court concludes [that the party opposing vacatur] bears the burden of demonstrating vacatur is inappropriate.").[1]

When determining whether to vacate an agency action, the courts in the Ninth Circuit consider (1) the seriousness of an agency's errors and (2) the "disruptive consequences of an interim change that may itself be changed." *Cal. Communities*, 688 F.3d at 992 (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

> Put differently, courts may decline to vacate agency decisions when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error. . . . Courts have considered remand without vacatur to be appropriate where serious irreparable environmental injury would result from vacatur. . . . In addition to environmental harm, it is appropriate to consider other practical concerns when weighing the consequences of vacatur. *Cal Communities*, 688 F.3d at 993-94 (considering delay to "much needed power plant," possibly resulting in blackouts, to be a "severe" consequence of vacatur that may be considered in balance).

*AquAlliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 881 (E.D. Cal. 2018) (internal quotation marks and citations omitted). In the context of environmental regulation, the Ninth

---

[1] At oral argument, the Army Corps of Engineers argued that vacatur was inappropriate because plaintiffs had not established that each and every commercial shellfish operation authorized by NWP 48 caused them injury. Because the agency's action was unlawful, vacatur is the "ordinary result." *Empire Health Found. v. Azar*, __ F.3d __, 2020 WL 2123363, *10 (9th Cir. May 5, 2020). "Other courts routinely have vacated invalid agency actions of broad applicability without requiring plaintiffs to show harms stemming from each unlawful application." *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, No. 4:19-cv-0044-GF-BMM (D. Mont. May 11, 2020). The Corps' argument is rejected.

ORDER VACATING NWP 48
IN THE STATE OF WASHINGTON - 3

Circuit considers (a) whether vacating the invalid rule would risk environmental harm and (b) whether the agency could legitimately adopt the same rule on remand (or whether the flaws were so fundamental that it is unlikely the same rule would result after further analysis). *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015). Courts "leave an invalid rule in place only when equity demands that we do so." *Id.* (internal quotation marks and citation omitted). *See also All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018).

Having considered the submissions of the parties, amici, the Swinomish Indian Tribal Community, and Nisbet Oyster Co., Inc., regarding the appropriate remedy for the agency's unlawful actions and having heard the arguments of counsel, the Court finds as follows:

**1. Seriousness of the Agency's Errors**

The Corps argues that, although the Court found that it violated the CWA and NEPA by failing to take a hard look at the anticipated environmental impacts of NWP 48, the consequences of its unlawful actions are not serious enough to justify vacatur because no environmental harm will, in fact, occur if activities authorized under 2017 NWP 48 are allowed to continue.[2] The Corps maintains that, even if it cannot devolve its obligations under the CWA and NEPA to the District Engineer, the project-by-project verification process that is required in

---

[2] The Corps stopped processing NWP 48 applications in Washington State following entry of the Court's October 10, 2019, order. All pending and new shellfish aquaculture permit applications are being processed as individual permits. Case No. C16-0950RSL, Dkt. # 63-2 at ¶ 5. Until oral argument, the Corps agreed that "[r]emand with instructions to process new permit applications and modification requests through the individual permit process" was a viable option. Dkt. # 63-1 at 5.

ORDER VACATING NWP 48
IN THE STATE OF WASHINGTON - 4

the State of Washington[3] effectively ensures that the aquaculture operations authorized by NWP 48 have minimal environmental impacts.

As of October 10, 2019, the Corps had verified 898 projects in the State of Washington under 2017 NWP 48, encompassing 35,800 acres. Case No. C16-0950RSL, Dkt. # 63-2 at ¶ 7. Before verifying a project, a District project manager reviews the site-specific information provided with the application as well as the remainder of the permit file (including all prior authorizations), memorializing his or her findings in a "Memorandum for Record." Case No. C16-0950RSL, Dkt. # 63-2 at ¶¶ 12-13. All projects in Washington are subject to the terms and conditions of a Programmatic ESA Consultation which are intended to ensure "avoidance and minimization of impacts to endangered species and critical habitat, as established by analyses performed in the Biological Assessment by the Corps and Biological Opinions for the Programmatic ESA Consultation by the National Marine Fisheries Service and the U.S. Fish and Wildlife Service (the 'Services')." Case No. C16-0950RSL, Dkt. # 63-2 at ¶¶ 7, 16-17. In addition, the District inspects a percentage of all activities authorized under NWP 48 each year to make sure that they are being conducted in accordance with the representations made in the

---

[3] Although permittees may generally proceed with activities authorized by an NWP without notifying the District Engineer, (33 C.F.R. § 330.1(e)(1)), general condition 18(c) requires the submission of a pre-construction notification ("PCN") if the proposed activity may affect or is in the vicinity of a species listed or habitat designated as critical under the Endangered Species Act ("ESA"). Because all aquaculture operations in the State of Washington occur in waters where there are threatened/endangered species and/or critical habitat, applicants who seek to operate under the auspices of NWP 48 in this State must submit a PCN and obtain a "verification" that the activity falls within the terms of the permit and that the requirements of the ESA have been satisfied. "For a project to qualify for verification under a general permit, a Corps District Engineer must conclude that it complies with the general permit's conditions, will cause no more than minimal adverse effects on the environment, and will serve the public interest." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 39 (D.C. Cir. 2015) (citing 33 C.F.R. §§ 330.1(e)(2), 330.6(a)(3)(i)).

ORDER VACATING NWP 48
IN THE STATE OF WASHINGTON - 5

1    application and all terms and conditions imposed on the permittee.[4]

2        The District has provided two partial case files "that are representative of typical NWP 48

3    verifications." Case No. C16-0950RSL, Dkt. # 63-2 at ¶ 11. The first verification authorizes 211

4    acres of on-bottom Pacific oyster cultivation on a 213 acre project area in Willapa Bay. Two

5    acres of slough within the project site would not be cultivated. The area had previously been

6    cultivated by a different operator under 2007 NWP 48. Case No. C16-0950RSL, Dkt. # 63-6 at

7    11. The District recognized that "[e]elgrass is present throughout the project area" with "denser

8    concentrations" marked on a map and that restarting cultivation in the area "would degrade the

9    eelgrass beds to some degree through direct removal of the eelgrass from trampling and

10   mechanical harvest and from increased turbidity and burying during mechanical harvest." Case

11   No. C16-0950RSL, Dkt. # 63-6 at 10-11. No compensatory mitigation for unavoidable impacts

12   to aquatic resources was required "because the on-going activity was previously authorized."

13   Case No. C16-0950RSL, Dkt. # 63-6 at 12. The District determined that the project should be

14   verified under 2017 NWP 48 and that the Corps had satisfied its obligations under the ESA

15   through the imposition of the terms and conditions arising from the earlier programmatic

16   consultation with the Services. Case No. C16-0950RSL, Dkt. # 63-6 at 11-12.[5] Although the

17   Memorandum for Record makes the requisite finding that the proposed "activity will result in no

18   

19   

20   

21   

22   _____

23   [4] In 2019, the Seattle District inspected 5-6% of the permitted activities. Case No. C16-0950RSL, Dkt. # 63-2 at ¶ 18.

24   [5] The Programmatic Biological Opinions for Shellfish Activities in Washington State include a number of conservation measures aimed at minimizing or avoiding impacts to eelgrass, including conditions 3, 6, 25, 26, and 32. Case No. C16-0950RSL, Dkt. # 63-6 at 20-24. Three of these measures do not, it appears, apply to this Willapa Bay site where shellfishing activities had occurred before March 18, 2007.

27   ORDER VACATING NWP 48
28   IN THE STATE OF WASHINGTON - 6

more than minimal individual and cumulative adverse effects on the aquatic environment," Dkt.
# 63-6 at 16, there is no indication that the agency performed a NEPA- or CWA-level impact
analysis. Thus, the Corps' failure to take a hard look at the environmental impacts of shellfish
aquaculture (other than, arguably, the potential impacts to endangered or threatened species
under the ESA) was not corrected at the District level. In fact, the District declined to require
any mitigation for the expected loss of eelgrass because the Corps permitted, on a nationwide
basis, operations affecting submerged aquatic vegetation as long as the area had previously been
used for commercial shellfish aquaculture.

The second verification authorizes a 3.6 acre intertidal geoduck farm in previously-
uncultivated acreage. The District recognized that the project location was a documented
spawning area for surf smelt and sand lance, and was .3 miles away from a documented herring
spawning area. Case No. C16-0950RSL, Dkt. # 63-7 at 18 and 24. No compensatory mitigation
was required because the Corps found that there would be no adverse impacts to aquatic
resources. Case No. C16-0950RSL, Dkt. # 63-7 at 19. The District determined that the project
should be verified under 2017 NWP 48 and that the Corps had satisfied its obligations under the
ESA through the imposition of the terms and conditions arising from the earlier programmatic
consultation with the Services. Case No. C16-0950RSL, Dkt. # 63-7 at 18-20.[6] There is no
indication that the agency performed a NEPA- or CWA-level impact analysis before making this
finding. Once again, the Corps' failure to take a hard look at the environmental impacts of

---

[6] The Programmatic Biological Opinions for Shellfish Activities in Washington State include a
number of conservation measures specifically aimed at minimizing or avoiding impacts to surf smelt,
sand lance, and herring spawning areas, including conditions 7-10. Case No. C16-0950, Dkt. # 63-7 at
5-6.

ORDER VACATING NWP 48
IN THE STATE OF WASHINGTON - 7

shellfish aquaculture (other than, arguably, the potential impacts to endangered or threatened species under the ESA) was not corrected at the District level.

Intervenors argue that, in addition to the Corps' verification process, state, local, and Tribal permit requirements and reviews provide layers of safeguards that "protect against the potential for environmental harm associated with allowing existing authorizations to remain in effect" following remand. Case No. C17-1209RSL, Dkt. # 66 at 7. Intervenors point to Washington's Shoreline Management Act of 1971 and the State's Environmental Policy Act, but the only permit requirement identified applies to "new commercial geoduck aquaculture only." WAC 173-26-241(3)(b)(iv). Existing geoduck operations and all other shellfish aquaculture need not obtain a use permit under that regulation, and local governments have discretion to exclude from the requirement new geoduck operations on acreage that was already in aquaculture. Intervenors also point out that the use of pesticides in shellfish aquaculture has been limited to an herbicide to control non-native eelgrass in Willapa Bay and that the number of tideland acres in shellfish production has actually decreased in Washington since the first nationwide permit issued in 2007.

The Corps/Intervenors have not shown that the District level verification process or state, local, and/or Tribal oversight of commercial shellfish aquaculture activities in Washington overcome the seriousness of the agency's errors in this case. In 2017, the Corps authorized the installation of various structures, nets, and tubes and the discharge of dredged or fill materials into waters of the United States as necessary for shellfish seeding, rearing, cultivating, transplanting, and harvesting. The 2017 version of NWP 48 authorizes (a) the cultivation of nonindigenous shellfish species as long as the species has previously been cultivated in the body

ORDER VACATING NWP 48
IN THE STATE OF WASHINGTON - 8

of water at issue, (b) all shellfish operations affecting ½ acre or less of submerged aquatic

vegetation, and (c) all operations affecting more than ½ acre of submerged aquatic vegetation if

the area had been used for commercial shellfish aquaculture activities at any point in the past

100 years. The Corps failed to identify and evaluate the various impacts of commercial shellfish

aquaculture before issuing the nationwide permit, despite acknowledging that those activities

have environmental impacts. *See* NWP003040 (commercial shellfish aquaculture activities

"have some adverse effects on the biotic and abiotic components of coastal waters, including

intertidal and subtidal areas"); Id. (noting that "at a small spacial scale (e.g., the site directly

impacted by a specific aquaculture activity) there will be an adverse effect."); NWP003041

(acknowledging "some impacts on intertidal and subtidal habitats, fish, eelgrass, and birds");

NWP003042 (recognizing that "commercial shellfish aquaculture activities do have some

adverse effects on eelgrass and other species that inhabit coastal waters"); COE 127559 (stating

that "marine debris is a serious impact on the marine environment"); COE 127570

(acknowledging "potential adverse impacts" to riffle and pool complexes); COE 127584 (noting

that "[c]ommercial shellfish aquaculture activities can result in conversion of substrates (e.g.

mudflats to gravel bars), impacts to submerged aquatic vegetation, alteration in aquatic

communities from native to non-native shellfish species, and water quality impacts from harvest

activities"). This failure goes to the heart of the CWA and NEPA. As a consequence of this

failure, the environmental impacts of commercial shellfish aquaculture operations, individually

and cumulatively, are largely unknown. That the District subsequently assured itself that 898

shellfish operations fell within the terms of 2017 NWP 48 does not cure the fact that the permit

was issued without attempting to describe and quantify most of the foreseeable environmental

ORDER VACATING NWP 48
IN THE STATE OF WASHINGTON - 9

impacts of those activities. While the local review of new geoduck operations provides some level of confidence that the environmental impacts of such operations has been evaluated, neither the Corps nor the Intervenors has shown that the review process applies to anything but a small subset of the operations verified under 2017 NWP 48 in the State of Washington.

The first factor in determining the nature of the remand in this case - the seriousness of the agency's errors - supports vacatur.

### 2. Disruptive Consequences of an Interim Change That May Itself Be Changed

The second factor also favors vacatur. The Corps and the Intervenors rely heavily on the economic consequences that will befall shellfish producers if their permits are vacated immediately. These concerns are important and have been considered below, but the second factor as originally stated by the D.C. Circuit - and adopted by the Ninth Circuit in *California Communities* - focuses on the disruptions that would arise if a vacatur order were followed by appropriate agency action reinstating the original rule or permit. The equities tilt away from vacatur where "the disruptive consequences of an interim change that may itself be changed" are significant, *Allied-Signal*, 988 F.2d at 150-51, and the factor "is weighty only insofar as the agency may be able to rehabilitate its rationale for the regulation," *Comcast Corp. v. Fed. Commc'ns Comm'n*, 579 F.3d 1, 9 (D.C. Cir. 2009). *See also Nw. Envtl. Advocates v. United States Envtl. Prot. Agency*, No. 3:12-CV-01751-AC, 2018 WL 6524161, at *3 (D. Or. Dec. 12, 2018). In this case, the Court has significant doubts regarding the agency's ability to reissue a nationwide permit governing commercial shellfish aquaculture in any form, much less in the same form as was found invalid in October. The Corps implicitly acknowledged throughout its Decision Documents that the incredible diversity in environments and activities covered by

ORDER VACATING NWP 48
IN THE STATE OF WASHINGTON - 10

NWP 48 made it virtually impossible to conduct a nationwide impact analysis. The existing record also suggests that the environmental impacts of these activities are more than minimal, both individually and cumulatively, making it highly unlikely that the Corps will be able to make the necessary findings under the CWA to rehabilitate NWP 48 in its present form. Thus, the disruptive consequences of invalidating agency action only to have the action reinstated shortly thereafter are not likely to arise.

The Court will assume, for purposes of this case, that the Ninth Circuit's analysis of the equities has diverged from the D.C. Circuit's and takes into account other disruptive consequences that will arise from vacatur, including both economic and environmental impacts. If NWP 48 is retroactively vacated in the State of Washington, all verifications issued under the auspices of that permit and all operations conducted pursuant to those verifications would be considered unauthorized and in violation of federal law. Case No. C16-0950RSL, Dkt. # 63-2 at ¶ 26.[7] Immediate vacatur would force commercial shellfish growers to apply for individual permits, overwhelming the Corps' staff and resources. The Corps asserts that it would be unable to process all 898 individual permit applications before the current NWP 48 expires in 2022.[8] Therefore, while some growers might receive individual permits for their operations within a few months, others might have to wait years before they could conduct shellfish operations in

_____

[7] In the circumstances presented here, the Court rejects the Intervenors' argument that invalidation of NWP 48 leaves untouched the Seattle District's verifications of projects under that permit. Those verifications are not stand-alone permits and in no way corrected the serious deficiencies in the Corps' initial analysis.

[8] At oral argument, the Corps raised the possibility of re-issuing a NWP or issuing a regional permit as a means of addressing its prior unlawful action. Because that possibility was not discussed in its memorandum in support of remand without vacatur, it is unclear how long that process would take or its impact on the economic consequences facing the growers.

ORDER VACATING NWP 48
IN THE STATE OF WASHINGTON - 11

this State.[9]

The Swinomish Indian Tribal Community fears that its shellfish operation may not survive if NWP 48 is retroactively vacated, despite the fact that it has intentionally designed its shellfish operations to avoid eelgrass, to not use pesticides, and to minimize the use/loss of plastics. The Tribe also points out that it attempted to persuade the Corps to adopt more stringent avoidance and minimization measures when reauthorizing NWP 48 in 2017, but to no avail. The Tribe's shellfishing entity, the Swinomish Shellfish Company, not only generates income for the Tribe, but also "provides shellfish at no cost to tribal members for ceremonial and subsistence purposes." C18-0598RSL, Dkt. # 33 at ¶ 12. As a result of COVID-19 business closures and furloughs on the Reservation and in their community, the ability to provide traditional, nutritious shellfish to members is a matter of food security for the Tribe. Dkt. # 82-1. Its aquaculture operation is relatively small and depends on three plantings per year with a regular, year-round harvest cycle to meet the needs of its members and its customers. C18-0598RSL, Dkt. # 41 at ¶ 4. The Tribe fears that if its shellfish company is "required to suspend activity while seeking an individual Corps permit, it is likely the Company would go out of business without significant additional capital from the Tribe." C18-0598RSL, Dkt. # 41 at ¶ 9.

Members of Intervenor Pacific Coast Shellfish Growers Association likewise report that

_____

[9] The Corps and Intervenors also argue that vacating the verifications will lift environmentally-protective conditions imposed on the growers, impairing the Corps' efforts to protect sensitive species and habitats in the project area. Case No. C16-0950RSL, Dkt. # 63-2 at ¶ 27; Case No. C17-1209RSL, Dkt. # 66 at 18. If NWP 48 is vacated and remanded, previously-authorized activities become unauthorized, and the Corps and other agencies would have the power to impose penalties for unpermitted discharges and harm to endangered species or critical habitat. The Corps/Intervenors do not explain how the cessation of cultivation would be less protective of the environment than continued cultivation with Corps oversight.

ORDER VACATING NWP 48
IN THE STATE OF WASHINGTON - 12

vacatur of NWP 48 before commercial shellfish farmers have an opportunity to seek and obtain

alternative permit coverage - be it through an individual permit or under a replacement national

or regional permit - would have devastating impacts on the continuing viability of their farms,

their employees, their communities, the state and local economies of which they are a part, and

the ability of Washington shellfish farmers to compete on a national or international basis. *See*

Case No. C17-1209RSL, Dkt. # 66 at 13-18.[10] The growers also argue that vacatur would

ultimately harm the environment because shellfish are filter feeders which improve water

quality, shellfish farmers are strong advocates for the high water quality that is essential to their

crop, and shellfishing retards upland development activities. Case No. C17-1209RSL, Dkt. # 66

at 17-18.

The Court has no reason to doubt the assertions of Swinomish or the Intervenors

regarding the threat vacatur poses to the continued viability of their businesses and the

downstream sequelae of closure. Farmers are part of a complicated chain of suppliers and

customers. They have to manage their resources in a way that allows them to generate income on

a predictable (if not regular) basis in order to pay their bills, retain employees, and stay in

business. Ordering the immediate cessation of all shellfishing activities conducted pursuant to

NWP 48 would result in the abandonment of harvestable shellfish to predators or the sea, the

neglect of existing shellfish structures and beds, and the inability to seed the next succession of

---

[10] Much has changed since the original memoranda regarding remedy were filed and this Order was drafted. The restaurant closures and market upheavals associated with the spread of the novel coronavirus in Asia and the United States have already caused massive losses in the shellfish market. At oral argument, counsel represented that 80% of the market disappeared in the first few months of this year. Many of the devastating impacts the growers initially feared as a result of the vacatur of NWP 48 have already come about. The growers are now concerned that, if they are unable to maintain existing beds and seed new beds, they will have no product to sell when the markets finally reopen.

ORDER VACATING NWP 48
IN THE STATE OF WASHINGTON - 13

shellfish. Plaintiffs' suggested compromise - that the growers be permitted to continue harvest activities under the prior verifications as long as they timely submit an application for an individual permit - would at least allow the growers to recover some of their sunk costs. The Intervenors rejected the proposal, however, arguing that anything short of the continued ability to maintain, harvest, and re-seed under the current authorizations threatens the long-term viability of their enterprises.[11]

The burden is on the parties opposing invalidation of unlawful agency action to rebut the APA's "presumption of vacatur" by showing that the equities demand remand without vacatur. The problem is not that the Intervenors have failed to establish that the loss of their authorization to install shellfishing equipment and to discharge materials into the waters of the United States would have devastating impacts on their businesses, but rather that they have not shown that those impacts outweigh the environmental consequences of continuing their activities as currently permitted. Those consequences are largely unknown precisely because the Corps - seemingly at the behest of the industry - failed to comply with its statutory obligations to identify and quantify impacts on aquatic resources. Intervenors are essentially arguing that they should be allowed to conduct shellfish operations under a defective, unlawful permit regardless of the environmental impacts for an unspecified period of time. This situation would last until the Corps is able to correct its errors, which the Corps says it cannot do before 2022 (when 2017

---

[11] Swinomish, for its part, requests that seeding and planting be permitted in areas that do not have mature native eelgrass beds for an additional six month period, which would essentially allow its operations to continue throughout this growing season. Dkt. # 82-2 at 2. The Jamestown S'Klallam request a stay of vacatur for "any shellfish aquaculture activities which are conducted pursuant to, and to provide treaty harvest[] in furtherance of[,] treaty rights adjudicated under United States v. Washington." Dkt. # 87 at 3.

ORDER VACATING NWP 48
IN THE STATE OF WASHINGTON - 14

NWP 48 would have expired anyway). Thus, as put forward by the Corps and the Intervenors, all existing verifications would stay in place, shellfishing operations in Washington would continue without change, and the Corps could turn its attention to crafting the 2022 version of NWP 48.

The equities in this case pit acknowledged adverse environmental impacts, the full extent of which have not been fully evaluated or quantified by the agency tasked with doing so, against the devastating impacts that will result if all commercial shellfishing activities in the State of Washington are immediately prohibited while the Corps processes a replacement permit. As discussed at oral argument, it appears that there are ways forward that could more appropriately balance the concerns of all parties, but the Court's role at this point is limited to determining whether the equities demand remand without vacatur. As the issue has been presented by the Corps and the Intervenors, the equities are unclear and they have not overcome the presumption in favor of vacatur. In the absence of meaningful assistance from the Corps and the Intervenors in helping to shape a compromise remedy, the Court will adopt a remedy based on the suggestions of plaintiffs, amici, and Swinomish.

For all of the foregoing reasons, it is hereby ORDERED as follows:

1) NWP 48 and all authorizations or verifications under it are VACATED in the State of Washington. This vacatur is hereby STAYED for sixty days to allow the Corps and/or Intervenors to appeal and obtain a stay from the Ninth Circuit;

2) The vacatur is also STAYED as to the following activities:

a) maintenance and harvesting activities (conducted in accordance with the terms

ORDER VACATING NWP 48
IN THE STATE OF WASHINGTON - 15

1   of the current verification) for shellfish that were already planted/seeded as of the date of this

2   Order;

3
            b) seeding/planting activities (conducted in accordance with the terms of the
4
    current verification) occurring within six months of the date of this Order in areas that do not
5
    contain mature native eelgrass beds, as well as to maintenance and subsequent harvesting of the
6
    beds seeded/planted under this subsection;
7
            c) shellfish activities (conducted in accordance with the terms of the current
8
    verification) which occur pursuant to and to provide treaty harvest in furtherance of treaty rights
9
    adjudicated under United States v. Washington.[12]
10
            **The stay provided by this paragraph is contingent on compliance with paragraph 3;**
11
        3) Permittees who intend to conduct maintenance, harvest, and/or seeding/planting
12
    activities under the preceding paragraph shall submit an application for an individual or other
13
    existing Corp permit as soon as practicable and no later than six months from the date of this
14
    Order;
15
        4) Other activities that were authorized by an existing NWP 48 verification, including
16
    planting/seeding not covered by paragraph 2, are not authorized unless or until the operator
17
    obtains a new valid permit from the Corps; and
18
        5) The Corps shall process individual permit applications and modification requests
19
    related to commercial shellfish aquaculture in Washington as expeditiously as possible
20

21

22

23

24      [12] *United States v. Washington*, 873 F. Supp. 1422 (W.D. Wash. 1994) ("Shellfish I"); *United
        States v. Washington*, 898 F. Supp. 1453 (W.D. Wash. 1995) ("Shellfish II"); *United States v.*
25      *Washington*, 909 F. Supp. 787 (W.D. Wash. 1995) ("Shellfish III"); *United States v. Washington*, 157
        F.3d 630 (9th Cir. 1998); *United States v. Washington*, 19 F. Supp.3d 1317, 1344-45 (W.D. Wash. 2000)
26      ("Shellfish Implementation Plan").

27      ORDER VACATING NWP 48
        IN THE STATE OF WASHINGTON - 16
28

regardless whether it also chooses to pursue a new nationwide or a regional permit. The Corps shall process shellfish cultivation permits in Washington in a manner consistent with the CWA and NEPA requirements, as outlined in this Court's Oct. 10, 2019 Order.

Dated this 11th day of June, 2020.

Robert S. Lasnik
United States District Judge

ORDER VACATING NWP 48
IN THE STATE OF WASHINGTON - 17